**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RIGHT FIELD ROOFTOPS, LLC, ) | |
| d/b/a SKYBOX ON SHEFFIELD; ) | |
| RIGHT FIELD PROPERTIES, LLC; ) | |
| 3633 ROOFTOP MANAGEMENT, LLC, ) | |
| d/b/a LAKEVIEW BASEBALL CLUB; and ) | |
| ROOFTOP ACQUISITION, LLC, ) | Case No. |
| ) | |
| Plaintiffs, ) | Hon. |
| ) | |
| v. ) | Magistrate |
| ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; ) | JURY TRIAL DEMANDED |
| CHICAGO CUBS BASEBALL CLUB, LLC; ) | |
| WRIGLEY FIELD HOLDINGS, LLC; and ) | |
| THOMAS S. RICKETTS, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

NOW COME the plaintiffs, (i) Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, (ii) Right Field Properties, LLC, (iii) 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and (iv) Rooftop Acquisition, LLC (collectively, the ōPlaintiffsö), by and through their attorneys, Thomas M. Lombardo and Abraham Brustein of the law firm of Di Monte & Lizak, LLC, and for their Complaint against the defendants, Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, Wrigley Field Holdings, LLC and Thomas S. Ricketts (collectively, the ōDefendantsö), state as follows:

## THE PARTIES

1.      Plaintiff Right Field Rooftops, LLC, d/b/a Skybox on Sheffield (ōSkyboxö), is an Illinois limited liability company with a usual place of business at 3627 N. Sheffield Avenue, Chicago, Illinois 60613 (the ō3627 Sheffield Propertyö), and it is the lessee of the 3627 Sheffield

Property where it sells food, drink, and the ability to view professional baseball games and other events at Wrigley Field to the consumer public for a fee.

2.     Plaintiff Right Field Properties, LLC ("3627 Owner") is an Illinois limited liability company with a usual place of business at 3627 N. Sheffield Avenue, Chicago, Illinois 60613 and is the owner of the 3627 Sheffield Property.

3.     Plaintiff 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club ("Lakeview Club", together with Skybox, the "Plaintiff Rooftop Businesses"), is an Illinois limited liability company with a usual place of business at 3633 N. Sheffield Avenue, Chicago, Illinois 60613 (the "3633 Sheffield Property") and it is the lessee of the 3633 Sheffield Property where it sells food, drink, and the ability to view professional baseball games and other events at Wrigley Field to the consumer public for a fee.

4.     Plaintiff Rooftop Acquisition, LLC ("3633 Owner," together with 3627 Owner, the "Plaintiff Rooftop Properties") is an Illinois limited liability company with a usual place of business at 3633 N. Sheffield Avenue, Chicago, Illinois 60613 and is the owner of the 3633 Sheffield Property.

5.     Defendant Chicago Cubs Baseball Club, LLC is a Delaware limited liability company with a usual place of business at 1060 W. Addison Street, Chicago, Illinois 60613.

6.     Defendant Wrigley Field Holdings, LLC is a Delaware limited liability company with a usual place of business at 1060 W. Addison Street, Chicago, Illinois 60613.

7.     Defendant Chicago Baseball Holdings, LLC is a Delaware limited liability company with a usual place of business at 1060 W. Addison Street, Chicago, Illinois 60613.

8.     Defendant Thomas S. Ricketts ("Ricketts") is an individual who, upon information and belief, resides in Wilmette, Cook County, Illinois.

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over those claims herein which arise under the Sherman Act, found at 15 U.S.C. § 1 *et seq.*, and under the Lanham Act, found at 15 U.S.C. § 1051 *et seq.*

10.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over those claims herein which arise under state law, as those state law claims form part of the same case or controversy as the federal claims arising under the Sherman Act and Lanham Act.

11.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the properties that are the subject of the claims herein are located in this judicial district.

## THE HISTORY OF WRIGLEY FIELD AND THE ROOFTOPS

12.     In 1914, a stadium was constructed at the Northwest corner of Clark Street and Addison Street in Chicago, Illinois to serve as the home of the minor league Chicago Federals. Originally known as Weeghman Park, the stadium was eventually renamed and continues to be known as "Wrigley Field."

13.     In addition to Clark Street to the West and Addison Street to the South, Wrigley Field is bordered by Sheffield Avenue to the East, and Waveland Avenue to the North.

14.     After the Chicago Federals disbanded, Wrigley Field became home to professional baseball's Chicago Cubs (the "Cubs"), which began playing at Wrigley Field in 1916.

15.     Since Wrigley Field's construction, and at all times thereafter, a number of mostly 3-flat apartment buildings existed across from Wrigley Field on both Sheffield Avenue and

Waveland Avenue, from which rooftops spectators could easily view the events taking place inside Wrigley Field. Indeed, spectators were on these rooftops when then-Weeghman Park first opened its doors on April 23, 1914.

16. From its earliest days, baseball games and other events at Wrigley Field were watched and enjoyed by spectators from the apartments and rooftops of the buildings on Sheffield Avenue and Waveland Avenue.

17. During the 1929 World Series, the rooftops on Sheffield Avenue and Waveland Avenue were packed with spectators.

18. During the 1938 World Series, the rooftops were filled with paying spectators. Indeed, even the apartments themselves were crowded with spectators attempting to watch the games, sometimes from ladders if the fans could not get a spot at the window.

19. Although a fence and non-permanent grandstands were constructed and dismantled from time to time in different areas of the Wrigley Field outfield before 1937, they did not obstruct the views from the rooftops on Waveland Avenue and Sheffield Avenue.

20. In 1937, a new brick wall and concrete bleachers were constructed in Wrigley Field's outfield along Sheffield Avenue and Waveland Avenue.

21. The concrete bleachers and brick wall constructed in 1937 did not obstruct the views of Wrigley Field from the rooftops on Waveland Avenue and Sheffield Avenue, and spectators continued to watch baseball games and other events from those rooftops and apartments for nearly seventy more years.

22. A defining characteristic of the original concrete bleachers was their distinctive "sweep," with the bleachers tallest in center field, then gradually decreasing in height outwards towards the left and right field foul poles.

23.     Beginning in the mid-1980ös, the rooftop owners gradually transformed their original flat-topped roofs into bleacher-style grandstands, and began to form rooftop business entities to serve a growing market for viewing Cubs games and other Wrigley Field events from the rooftops (the öRooftop Businessesö).

24.     In 1998, the City of Chicago (the öCityö) enacted an ordinance formally authorizing the Rooftop Businesses to operate as special clubs under license from the City (a öClub Licenseö). The Cubs did not object to this ordinance, nor to the numerous subsequent applications by Rooftop Businesses to obtain Club Licenses. By 2002, there were at least eleven Rooftop Businesses operating under Club Licenses.

25.     Skybox and Lakeview Club each hold Club Licenses to operate the Plaintiff Rooftop Businesses.

26.     By the late 1990ös and early 2000ös, most of the Rooftop Businesses on Waveland Avenue and Sheffield Avenue were thriving businesses, creating hundreds of jobs and providing consumers with an opportunity to watch Cubs games and other Wrigley Field events.

27.     The rooftops on Sheffield Avenue and Waveland Avenue are an integral part of Wrigley Field and Chicago Cubs history. For example, the 1985 Chicago Cubs Official Yearbook includes photographs of crowds of fans watching baseball games from the rooftops. In 1993, Cincinnati Reds pitcher and World Series Champion Tom Browning famously snuck out of Wrigley Field during a baseball game and later appeared, still in full uniform, on a Sheffield Avenue rooftop where he waived to his teammates and television cameras.

28.     Indeed, throughout the 1980ös and 1990ös, the Cubs regularly used the rooftops in a wide variety of marketing materials and profitable souvenir and collectible products.

5

29.    Harry Caray, the most beloved and famous of Chicago Cubs announcers, who served from 1982 to 1997, would regularly comment on-air, "Look at the rooftops!"  He was also quoted as stating, "That's one of the mystiques of Wrigley Field.  You look out and you see them on the rooftops, drinking, eating some barbecue, having fun . . ."

30.    The significance of the rooftops to Wrigley Field, the Cubs, and the City, was formally recognized and memorialized during the City's landmarking process for Wrigley Field, which began in 2000.

31.    The City's Landmark Designation Report, originally dated November 1, 2000 and revised on March 6, 2003, repeatedly cited the rooftops as being a significant contributing factor to the eventual landmark designation.  For example, the Landmark Designation Report states:

> Due to the varying height of the bleachers, which slope downward form the center, a portion of the ballpark–as seen from inside–is visually enclosed by the row of buildings that face Waveland and Sheffield Avenues, opposite the ballpark.  Most of these are masonry structures, three stories in height and often topped with smaller grandstands or roof decks.

> The ballpark's ivy-covered walls, hand-changed scoreboard, and *intimate urban setting-with views of the surrounding townhouses,* the El, and Lake Michigan-are as integral to the image and history of Chicago as Buckingham Fountain, the Old Water Tower, the Picasso sculpture, the Untion Stockyards, or the early skyscrpaers.

> Wrigley Field is considered one of the most unique and attractive ballparks in the United States.  Its overall quality of a design is reflected in its slightly asymmertical playing field layout, the curving grace of its grandstands and bleachers, the charm of its ivy covered walls, its ornate main entrance sign, and the *memorable view of the surrounding buildings* and Lake Michigan. *Taken together, this comprises one of the most famous built settings in the United States.*

> It is one of the few remaining ballparks whose design and field layout was strongly influenced by the surrounding street grid. The resulting proximity of the playing field creates a sense of intimacy and cahrm that is unique in professional baseball. *This urban character is further heightened by the line of masonry residences that face the ballpark along Sheffield and Waveland Avenues.*

*The row of three-story masonry buildings lining Sheffield and Waveland avenues—behind the bleachers—are a familiar feature to the tens of thousands of spectators within Wrigley Field and to the hundreds of thousands who watch televised coverage of the Chicago Cubs. Most were built between 1895 and 1915 and are set back approximately 10 feet from the street. Since 1990, several new structures have been built on the sites of older buildings.*

32.     While the City's landmarking process was taking place, the Cubs, then owned by the Tribune Company, announced a proposal to expand the Wrigley Field bleachers in 2001, which proposal in its original form would have added 2,600 bleacher seats by increasing the height of the bleachers and expanding them outward towards Waveland Avenue and Sheffield Avenue.

33.     Throughout the City's landmarking process, the Cubs remained committed to eventually expanding the bleacher section of Wrigley Field, and revised its proposal from time to time over the next several years while the landmarking process was underway.

## THE 2002 ROOFTOP DISPUTE AND SETTLEMENT AGREEMENT

34.     Also during the landmarking process, and despite decades of peaceful and mutually-beneficial coexistence, the Cubs erected a large green "windscreen" above Wrigley Field's outfield bleachers just days before the beginning of the 2002 baseball season, affecting the views from the Rooftop Businesses that year.  The Cubs' Vice President of Operations, Mark McGuire, stated at the time, "There's people stealing our product, making a lot of money off of us, and at the same time are preventing us from doing what we think is necessary and vital to Wrigley Field."  He also stated, "We had to become more aggressive."

35.     After installing the windscreens, which became popularly referred to as "the spite fence," the Cubs filed suit against most of the Rooftop Businesses after the end of the 2002

7

baseball season, on December 16, 2002 (the "2002 Lawsuit").[1]  However, facing extremely unfavorable public outcry and numerous early setbacks in the 2002 Lawsuit, the Cubs did not reinstall the spite fence for the 2003 baseball season.

36.     Following fourteen months of contentious litigation, and in the face of an approaching trial, the Cubs again threatened to install the spite fence for the 2004 season.  In response, the Rooftop Businesses promptly sought a temporary restraining order to prevent the reinstallation of the spite fence and the destruction of the Rooftop Businesses.

37.     While that motion was pending, the City of Chicago adopted the Wrigley Field Landmark Ordinance on February 11, 2004, effectively codifying the Landmark Designation Report and limiting future alterations to Wrigley Field to be consistent therewith.

38.     Also while that motion was pending, the Cubs and the Rooftop Businesses engaged in lengthy, difficult and complex settlement negotiations supervised by Magistrate Judge Schenkier, resulting in a settlement agreement (the "Rooftop License Agreement") dated January 27, 2004, which was approved by the district court on March 3, 2004.

39.     One of the original parties to the Rooftop License Agreement was Quoin, Ltd., which assigned all of its rights under the Rooftop License Agreement to Skybox in 2005.

40.     Under the Rooftop License Agreement, the Cubs agreed not to erect windscreens or other barriers to block the Rooftop Businesses' views, in return for 17% of each rooftop's gross revenues (the "Royalty Payment").  The Rooftop License Agreement was for a period of twenty years, not terminating until December 31, 2023, and by its own terms applied both to the Rooftop Businesses as well as their affiliate rooftop property owners.

---

[1] *Chicago National League Ball Club, Inc. v. Skybox on Waveland, et al.*, No. 02 C 9105 in the United States District Court for the Northern District of Illinois.

41.     A critical issue for the Cubs and the Rooftop Businesses during the settlement negotiations in the 2002 Lawsuit was the Cubs' ongoing goal of expanding the bleachers, which expansion might adversely affect the views of Wrigley Field from the Rooftop Businesses.

42.     As a result of these concerns, the Cubs and the Rooftop Businesses agreed to certain compensation mechanisms and formulas that would take effect depending on if, when, and to what extent the contemplated bleacher expansion affected views from the Rooftop Businesses.  Although the Rooftop License Agreement expressly permitted the Cubs to expand the Wrigley Field bleachers, under no circumstances were the Cubs permitted to erect windscreens or other barriers to obstruct the views from the Rooftop Businesses during the 20-year term of the Rooftop License Agreement.

43.     Following the 2005 baseball season, the Cubs expanded the bleacher section of Wrigley Field, adding approximately 1,790 seats (the "2005 Bleacher Expansion"), as permitted by the Rooftop License Agreement.  Windscreens, outfield signage and other barriers which would have affected the views from the Rooftop Businesses, all prohibited by the Rooftop License Agreement, were not part of the 2005 Bleacher Expansion.

<u>RICKETTS' ACQUISITION OF WRIGLEY FIELD AND THE CUBS</u>

44.     In the fall of 2009, entities controlled by the Ricketts family, including Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC and Wrigley Field Holdings, LLC (collectively hereinafter with Ricketts, the "Cubs Organization"), purchased 95% of the Cubs and acquired Wrigley Field from the Tribune Company, subject to the Rooftop License Agreement.

45.     When the Cubs Organization acquired the Cubs and Wrigley Field, it was aware of the Rooftop License Agreement, including the provisions therein which forbid the

construction of windscreens or other barriers that would block the views from the Rooftop Businesses.

46.     Shortly after acquiring the Cubs and Wrigley Field, the Cubs Organization undertook efforts to acquire ownership of all the Rooftop Businesses and underlying real estate, including Lakeview Club.  The Cubs Organization's goal was to destroy all competition in selling tickets to watch live Cubs games and other Wrigley Field events, and thereby control and increase ticket prices both inside Wrigley Field and at the acquired Rooftop Businesses.

47.     Upon information and belief, the Cubs Organization or its affiliates first acquired an ownership interest in "Down the Line," a Rooftop Business located at 3621 North Sheffield, around the time it purchased the Cubs in 2009.  The Cubs Organization's earliest efforts to acquire other Rooftop Businesses were unsuccessful.

48.     In 2010, the Cubs Organization announced plans to install a "Toyota" sign in left field.  Ricketts acknowledged the restrictions in the Rooftop License Agreement that the Cubs Organization had to deal with when installing any signage, stating at the City Club of Chicago on March 24, 2010, "I think it's fairly innocuous. It won't affect any rooftops and everyone will be able to see. It's really not a big deal."

49.     In early 2011, the Cubs Organization attempted to orchestrate a global purchase of all the Rooftop Businesses, which was likewise unsuccessful. Consequently, the Cubs Organization altered its strategy and engaged various Rooftop Business owners in separate and more adversarial purchase negotiations, which were similarly unsuccessful.

50.     In January of 2012, the 3633 Property was offered for sale by the Chapter 11 Bankruptcy Trustee in the case of *In re LVBC Realty Holdings, LLC*, Case No. 11-BK-34513, in the United States Bankruptcy Court for the Northern District of Illinois.  The Cubs Organization

made an unsuccessful offer to buy the 3633 Property, which was ultimately sold to 3633 Owner, then controlled by Mark Schlenker who already owned another Rooftop Business. Shortly after the transaction's closing, Cubs Executive Vice President/Chief Legal Officer Michael Lufrano called Schlenker, during which discussion they agreed that the Rooftop License Agreement would govern the relationship between the Cubs Organization and the 3633 Property.

THE CUBS ORGANIZATION'S CAMPAIGN
TO DESTROY THE ROOFTOPS AND INCREASE TICKET PRICES

51. After the early efforts of the Cubs Organization to acquire all the rooftops in 2009, 2010 and 2011 proved unsuccessful, it revealed its true motive. In April of 2012, media reports began circulating that City of Chicago Mayor Rahm Emmanuel had been in talks with the Cubs Organization discussing, amongst other things, approving numerous outfield signs, including a "jumbotron."

52. Several weeks later, on May 8, 2012, a meeting took place between the Cubs Organization and the Rooftop Business owners. Present at the meeting for the Cubs Organization were Ricketts, Lufrano, and Cubs President of Business Operations Crane Kenney. Also present at the meeting were Rooftop Business owners Jim Lourgos, George Loukas, Beth Murphy, Dan Finkel, Marc Hamid, Mark Schlenker, Aidan Duncan, George Vranis, Marc Anguiano, and several others.

53. During the May 8, 2012 meeting, Ricketts and the other Cubs Organization executives complained that the Rooftop License Agreement was a "bad deal" for the Cubs, and that the Cubs and the Rooftop Businesses were involved in a "price war" that was leading to a "race to the bottom" on Cubs ticket prices. They also complained that the Rooftop Businesses were selling individual tickets, discounting tickets, selling discounted tickets on Groupon and selling game-day tickets, all of which reduced demand for Wrigley Field tickets. Ricketts and

the other Cubs Organization executives demanded at this meeting that the Rooftop Businesses agree with the Cubs on setting coordinated, minimum ticket prices.

54. Also during this meeting, Ricketts admitted that the Rooftop License Agreement prevented the Cubs from blocking the Rooftop Businesses' views, and stated, "2023 can't come soon enough." Despite that contractual prohibition, Ricketts openly threatened to block the Rooftop Businesses' views into Wrigley Field unless they agreed to the price fixing scheme, stating, "whatever you give us is in return for not being blocked," referring to the recently-publicized signage plans.

55. The Rooftop Business owners refused to participate in the price fixing scheme that the Cubs Organization pressured them with. However, under the threat of having their views blocked, the Rooftop Business owners agreed to form a revenue committee to explore lawful means of addressing the Cubs Organization's demand that the Rooftop Businesses contribute additional revenue to the Cubs Organization. Similarly, a compliance committee was formed to address the Rooftop Businesses' sale of tickets on Groupon, sale of game-day tickets and individual tickets, minimum group sizes and related topics that the Cubs Organization complained about.

56. On a date between May 17, 2012 and June 7, 2012, the revenue committee met with Lufrano. During this meeting, the Cubs Organization, through Lufrano, again demanded that the Rooftop Businesses participate in a price-fixing scheme. In response, the Rooftop Business owners expressed concern that the Cubs Organization's proposed price-fixing scheme might not be lawful. Lufrano suggested that the Cubs Organization and the Rooftop Businesses create a "management firm" which would be empowered to set all ticket prices, including those inside Wrigley Field and those at the Rooftop Businesses, supposedly to avoid legal issues

concerning price-fixing. The Rooftop Businesses again refused to participate in the Cubs Organization's rebranded price-fixing scheme.

57. Also at this time, Lufrano and Cubs Organization Vice President of Strategy and Development, Alexander Sugarman, told Plaintiff Rooftop Business owner Marc Anguiano that the contract was "bullshit," and that the Rooftop Businesses needed to raise revenue for the Cubs Organization to avoid being blocked.

58. On January 19, 2013, the Cubs Organization formally announced its proposal to renovate Wrigley Field. In public comments, Ricketts explained that one of the Cubs Organization's ultimate goals was to close Sheffield Avenue in order to use it for "activities" on game days, similar to the Boston Red Sox's usage of adjacent Yawkey Way, which is filled with restaurants, taverns, vendors, and stores peddling licensed team apparel and souvenirs.

59. Despite rumors of a video board being installed in right field, the Cubs Organization's initial 2013 renovation proposal did not officially include outfield signage that would block the rooftop views on Sheffield Avenue, and Ricketts publically acknowledged again at the time that the Cubs Organization was "not allowed" to put up signage in the outfield.

60. In fact, on many other occasions, Ricketts and other Cubs Organization executives admitted, publicly and privately, that the Rooftop License Agreement prohibited outfield signage that would block the Rooftop Businesses.

61. Behind the scenes, however, the Cubs Organization was still looking for ways to take control of the Rooftop Businesses and increase ticket prices by eliminating marketplace competition.

62. On February 4, 2013, a number of Rooftop Business owners met with Ricketts and other members of the Cubs Organization. During this meeting, Ricketts complained that the

Rooftop Businesses were "direct competitors" and were selling tickets to watch Cubs games and live music concerts too inexpensively, complained that the Rooftop Businesses were selling individual tickets instead of only selling to groups, and complained that these actions were hurting the Cubs' own ticket sales for seats inside Wrigley Field.

63.     Specifically, Ricketts expressly communicated his anger that the Rooftop Businesses sold concert tickets for well-known band Pearl Jam before the Cubs Organization began selling those tickets.  This, complained Ricketts, denied the Cubs Organization the opportunity to set the initial market price for those concert tickets and lowered the overall ticket price for the concert.

64.     In order to avoid this supposed problem in the future, Ricketts demanded yet again that the Rooftop Businesses agree with the Cubs Organization to set a minimum ticket price for Cubs games and live music concerts at Wrigley Field.  The Rooftop Business owners again refused to Ricketts' demand to fix any ticket prices.

65.     The Cubs Organization announced a new renovation plan for Wrigley Field on or about April 15, 2013, which included a 6,000-square-foot jumbotron in left field and a 1,000-square-foot advertising sign in right field.  Contemporaneous with this announcement, Ricketts continued to create negative public sentiment about the Rooftop Businesses and promote his outfield sign package, stating "If this plan is approved, we will win the World Series for our fans and our city. We need this project in order to bring our fans a winner."  Ricketts' intent was to decrease public interest in buying Rooftop Business tickets so that the Rooftop Businesses would suffer, be unable to pay their bills, and eventually fail or sell to the Cubs Organization for distressed, below-market value.

66.    On May 1, 2013 Ricketts spoke at the City Club of Chicago. During his speech, Ricketts stated that the Rooftop Businesses were "direct competitors" of the Cubs Organization, and complained about decreased revenues, citing and criticizing the Rooftop Businesses for aggressively discounting tickets, selling tickets on Groupon, and selling to individuals instead of only to groups.

67.    Also during his May 1, 2013 speech, Ricketts complained that the Cubs Organization was losing $20 million or more in lost seasonal advertising revenues because of its agreement with the Rooftop Businesses, thus publicly acknowledging once again that the Rooftop License Agreement precluded the Cubs Organization from blocking the Rooftop Businesses' views.

68.    Nevertheless, Ricketts again touted the Cubs Organization's intent to erect a large video board in left field, also known as a "jumbotron," along with a large advertising sign in right field. Acknowledging that such actions might breach the Rooftop License Agreement, Ricketts stated that the Cubs Organization would move the outfield walls of Wrigley Field to "minimize" the impact on the Rooftop Businesses.

69.    Ricketts was unable, however, to provide any coherent response to questioning as to why the Cubs Organization refused to simply install the outfield signage on top of the Rooftop Businesses, instead of blocking their views. Instead, he merely referenced a vague need to "control" and "address" the issues that the Cubs Organization was having with the Rooftop Businesses and its "lost revenue."

70.    Notably, the Rooftop Businesses spent tens of thousands of dollars obtaining a professional report that demonstrated that signage on top of the Rooftop Businesses would generate significant revenue for the Cubs Organization, and the Rooftop Businesses even offered

to pass all such revenue on to the Cubs Organization to avoid having their views blocked. The Cubs Organization refused this proposal which would not have eliminated the Rooftop Businesses as competitors.

71. The purpose of the Cubs Organization's original signage proposal was to create pressure on the Rooftop Businesses to sell to the Cubs Organization or be blocked by those signs, which would destroy their businesses.

72. The motives of the Cubs Organization, to control the Rooftop Businesses and thereby increase prices for Cubs games, is also reflected by a conversation in 2013 between Kenney and Schlenker, wherein Kenney stated, "If we can control the rooftops, then we can control pricing."

73. On May 28, 2013 the Cubs Organization arranged for a "mock up" of its proposed 6,000 square foot left field jumbotron and 1,000 square foot right field advertisement sign. The Rooftop Business owners were present to witness the impact that these signs would have on their views, and on their rights under the Rooftop License Agreement. The purpose of this event was to further pressure the Rooftop Businesses into selling their properties to the Cubs Organization.

74. Without regard to its contractual obligations to the Rooftop Businesses, the Cubs Organization pressed the City Landmarks Commission to approve its signage plans.

75. On July 11, 2013 the City's Landmarks Commission approved a 5,700-square-foot jumbotron in left field, and a 650-square-foot advertisement sign in right field.

76. Armed with its Landmarks Commission approval and the pressure placed upon the Rooftop Business owners after the mock-up event, the Cubs Organization was emboldened to continue on its mission to coerce the Rooftop Business owners to sell their properties to the Cubs Organization at significantly depressed prices, or be blocked by signage and "destroyed."

77.     In the months that followed the July 11, 2013 Landmarks Commission approval, the Cubs Organization engaged various Rooftop Business owners in one-sided negotiations to purchase their Rooftop Businesses and underlying rooftop properties for a small fraction of fair market value, under the threat of being put out of business by now-approved outfield signage.

78.     A meeting took place on August 15, 2013 at the Cubs Organization's offices, involving Lufrano, Sugarman, Finkel and Anguiano.  During this meeting, Sugarman told Anguiano and Finkel that the ticket business was too competitive between the Cubs Organization and the Rooftop Businesses, that the Rooftop Businesses' ticket prices were too low, and that the Cubs Organization could not compete with the Rooftop Businesses' margins.  Sugarman explained that the only way for the Rooftop Businesses to meet the Cubs Organization's desired revenue levels was to raise the Rooftop Businesses' prices.

79.     The Cubs Organization also continued its media campaign to convince consumers to stop patronizing the Rooftop Businesses through false, misleading and confusing statements.

80.     For example, on January 17 – 19, 2014, the Cubs Organization held the annual Cubs Convention, which is heavily covered by media outlets and is attended by a large number of loyal and dedicated Cubs fans.  During a portion of the 2014 Cubs Convention called "Meet the Ricketts," Ricketts fielded an audience question about whether the Rooftop Businesses were "holding up the renovation" that the Cubs Organization claimed was necessary to field a competitive professional baseball team.  In response, Ricketts stated:

> It's funny — I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching 'Homeland.' You pay for that channel, and then you notice your neighbor looking through your window watching your television.

> And then you turn around, and they're charging the other neighbors to sit in the yard and watch your television. So you get up to close the shades, and the city makes you open them. That's basically what happened.

81. The audience, including the media and ticket-buying fans, widely accepted this statement as an accusation that the Rooftop Businesses were stealing the Cubs Organization's property, that the Rooftop Businesses were the reason that the Cubs were uncompetitive, and that the Rooftop Businesses had no lawful right to sell tickets to view Cubs games from their properties.

82. These statements are defamatory, misleading, false, confusing and deceptive. Ricketts falsely accused the Rooftop Businesses of criminal conduct with full knowledge that: (i) the Rooftop License Agreement gives the Rooftop Businesses a license to sell tickets to Cubs games, (ii) the Rooftop Businesses pay the Cubs millions of dollars a year for the right to sell admission to the Rooftop Businesses, and (iii) the Cubs contractually agreed not to block the Rooftop Businesses through 2023 in return for that stream of millions of dollars.

83. Despite telling the consumer public and media outlets that the Rooftop Businesses were thieves that were preventing the Cubs from winning the World Series, he told a reporter at one point during the 2014 Cubs Convention, "we just have to know in 2023 when we no longer have a contract [with the Rooftop Businesses] that we can do anything we want to the park and do what's right for the team and not have to worry about the people across the street."

84. Also during the 2014 Cubs Convention, on January 18, 2014, Kenney called "the rooftops a $20 million yearly drag on their business." He also stated at that time that "the Cubs are losing $20 million in bleacher sales due to the rooftops," and suggested that the Cubs Organization was unable to afford great baseball players like Miguel Cabrera, Justin Verlander, Joe Mauer and Cole Hamels because of the Rooftop Businesses, fueling the Cubs Organization's

media campaign to blame its team's abysmal record on the Rooftop Businesses and sour consumer sentiment for Rooftop Business tickets

85.     Each member of the Cubs Organization understood that their statements would be widely and prominently broadcast by the media covering the 2014 Cubs Convention to the consumer public at large, including existing and potential Rooftop Business customers.  All of the negative statements by the Cubs Organization about the Rooftop Businesses were made with the goal of convincing Cubs fans to refuse to patronize the Rooftop Businesses, thereby making it harder for the Rooftop Businesses to pay their bills, stay in business and compete with the Cubs Organization's ticket prices.

86.     On February 1, 2014, Cubs Organization spokesperson Julian Green made a statement on WSCR-AM radio that the Cubs might move out of Wrigley Field if it was not able to get the outfield signs it wanted because of the Rooftop Businesses.

87.     Following these negative statements about the Rooftop Businesses, and the threat by the Cubs Organization to move the Cubs out of Wrigley Field, numerous fans called for and expressed support for an outright boycott of the Rooftop Businesses.

88.     On May 21, 2014, Ricketts published a video of himself claiming that the Rooftop Businesses have prevented the Cubs Organization from realizing tens of millions of dollars in advertising revenue.  He also complained that the Rooftop Businesses were not willing to accept the two-sign proposal from January, 2013.  Thus, Ricketts announced that because the Rooftop Businesses threatened to take legal action to stop the two signs from being installed, the Cubs Organization would proceed with a different plan in the outfield that included even more signage.  The implication in this video, and other media releases, was that the Rooftop

Businesses caused the Cubs Organization to lose money that it desperately needed in order to field a competitive team.

89.     In the following days, it became clear that the Cubs Organization was seeking a total of not two, but seven signs in the outfield, which would destroy Rooftop Businesses and reduce competition.  The purpose for increasing the signage from two to seven was to increase pressure on the Rooftop Businesses to sell their properties to the Cubs Organization.

90.     On July 7, 2014, during a neighborhood meeting at the Addison and Broadway police station, and on several prior occasions, Lufrano stated to Finkel, who owned three Rooftop Businesses, "first we want to get the right to block you [from the City Landmark Commission], then we will negotiate."

91.     On July 10, 2014 the Cubs Organization obtained the City Landmarks Commission's approval to install seven signs: three 650-square-foot advertising signs and a 3,990-square-foot video board above the left field bleachers, plus a 2,400-square-foot video board and two more advertising signs above the right field bleachers.

92.     Renderings published by the Cubs Organization at the time, including on the Cubs Organization's own website, reflected that the signage approved for right field on July 10, 2014 would substantially block the views from many of the Rooftop Businesses, in direct violation of the Rooftop License Agreement.

93.     The Cubs Organization was aware, and specifically intended, that its seven-sign plan would adversely affect the competitor Rooftop Businesses, but not the one Rooftop Business that Ricketts and the Cubs Organization had an interest in by that date.

94.     Shortly after the seven-sign announcement was made, but before it was approved, one of the owners of the Plaintiffs, Ed McCarthy, met with Kenney to discuss the impact of the

signs on the Rooftop Businesses and a possible sale of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization. At the meeting, McCarthy offered to sell the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization at fair market value. McCarthy would not have made this proposal without the existing threat of being blocked by the signs being proposed by the Cubs Organization.

95.    In response to that fair market proposal from McCarthy, Kenney stated on the phone to McCarthy four days later, "That's a good deal if you have a Rooftop Business, but once we put up the signs you don't have a Rooftop Business." Kenney also said, "We control the City," referring to the Cubs Organization's ability to get the seven-sign proposal approved by the City Council.

96.    At the conclusion of this phone call, Kenney told McCarthy, "I'm going to call and make you an offer after the sign deal is approved [by the City]." Kenney then did call after the City approved the seven-sign proposal, and asked McCarthy to meet him at the Cubs Organization's offices. During this meeting in late July, 2014, Kenney showed McCarthy a model of Wrigley Field, the Rooftop Businesses, and the signs that would be erected under the approved seven-sign deal. Kenney stated, "We don't like you competing against our bleachers and grandstands." He also said, "We don't like you competing with our gate," and referred to the Rooftop Businesses' discounted ticket sales on Groupon. Kenney then offered McCarthy, under the threat of being blocked, a grossly unfair price for the Rooftop Businesses. During this call, Kenney stated, "How hard is it going to be to sell tickets when you have no glimpse of Wrigley Field."

97. Kenney also told McCarthy that the Cubs Organization intended to operate Rooftop Businesses wherever it was able to purchase one, but also that "Whatever [Rooftop Businesses] we don't buy, we're going to block."

98. Another meeting took place around this time between the Cubs Organization's Ricketts, Kenney and Lufrano, and the owner of three other Rooftop Businesses. During this meeting, Kenney threatened that the Cubs Organization would "destroy the rooftops" if that owner did not sell to the Cubs Organization.

99. Similarly, a conference call was held between Kenney and Finkel on September 9, 2014. During this call, Kenney stated that "We will own all these rooftops eventually, so we can buy [Finkel's] now, or I can deal with Fifth Third [Finkel's mortgage lender] and get these for five cents on the dollar out of bankruptcy." Kenney also stated during this call that Finkel had to "finish [the deal] this week, or I order the steel," referring to the signs that would block Finkel's three Rooftop Businesses.

100. On September 29, 2014 the Cubs Organization made good on its threats to "destroy the rooftops" by starting construction work at Wrigley Field. According to media statements, public announcements, and several websites controlled by the Cubs Organization, the construction that commenced on September 29, 2014 included installation of the seven signs announced by the Cubs Organization on May 21, 2014.

101. In October of 2014, Kenney left a voicemail message for the owner of another Rooftop Businesses, explaining that the Cubs Organization just reached an agreement to purchase several other Rooftop Businesses. In this voicemail message, Kenney threatened to move the signs that were already announced to unblock the Rooftop Businesses the Cubs Organization was buying, and shift them closer to this person's Rooftop Business.

102.   Similar statements were made by Kenney to Finkel at a meeting on September 3, 2014, at which time Kenney said that Finkel "could sell to me now and I'll slide the signs down in front of Hamid's buildings [referring to the Plaintiffs]," but "If you don't sell I'm ordering the steel and the signs will go up in front of your buildings. I'm done with this."

103.   On or shortly before October 21, 2014, the Cubs Organization learned that the three Finkel Properties defaulted on their mortgage loans with Fifth Third Bank, and might be facing an imminent foreclosure suit.  The Cubs Organization promptly made an unsolicited call to Fifth Third Bank, and made an unsolicited offer to purchase Finkel's mortgages from Fifth Third Bank.  The Cubs Organization's goal in seeking to become Finkel's mortgage lender was to foreclose on Finkel's three Rooftop Businesses and reduce competition by three more Rooftop Businesses.

104.   On November 14, 2014, Fifth Third Bank filed foreclosure actions against Finkel's three Rooftop Businesses.  Shortly thereafter, the Cubs Organization reached a tentative deal to acquire all three properties.

105.   Under the belief that it was buying Finkel's three Rooftop Businesses, and having just entered into contracts to purchase three other Rooftop Businesses from the owners it had threatened, the Cubs Organization announced yet another change to its signage plan.

106.   On December 4, 2014, the Cubs Organization announced that it was moving the 2,400-square-foot video board further towards the right field foul pole.  This change in its plans would effectively unblock the Rooftop Businesses that the Cubs Organization was planning to buy, and further block those Rooftop Businesses which were able to hold out, including the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties.

107.     The now-2,200-square-foot video board is being placed directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, while leaving four Cubs-owned Rooftop Businesses unobstructed.  Just before announcing the relocation of the video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, Kenney told Schlenker, "Just wait, we are firing the death blow."

108.     The 2,200-square-foot video board will substantially block the Plaintiff Rooftop Businesses and thereby destroy the Plaintiff Rooftop Businesses altogether and grossly devalue the Plaintiff Rooftop Properties.  Likewise, other signage being installed at Wrigley Field will affect other Rooftop Businesses and their ability to survive.

## COUNT I - ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF SHERMAN ACT
(All Plaintiffs v. All Defendants)

109.     The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 109.

110.     The Cubs Organization is engaged in willful anticompetitive conduct in an attempt to acquire greater, and maintain its existing, monopoly power in a relevant market.

111.     The Cubs Organization produces professional baseball games ("Cubs Games") to be commercially exploited in various product formats across various markets.  For instance, the Cubs Organization sells the rights to televised versions of Cubs Games (the "Cubs Television Product") to various television networks who then sell the Cubs Television Product at retail to Cubs Television Product consumers.  The Cubs Organization likewise sells the rights to radio broadcast versions of Cubs Games (the "Cubs Radio Product") to various radio networks who then sell the Cubs Radio Product at retail to Cubs Radio Product consumers.

112.    The Cubs Organization also sells the rights to live views of Cubs Games (the "Live Cubs Game Product").  But unlike the Cubs Radio Product and the Cubs Television Product, which are only sold at the distribution level to other companies who in turn sell those products at retail, the Cubs Organization sells the Live Cubs Games Product directly to consumers and also to other retailers who compete with the Cubs Organization at the retail level.

113.    Specifically, the Cubs Organization now controls the ability to sell up to 41,160 inside-Wrigley Field tickets, and another 800 Cubs-owned Rooftop Businesses ("Cubs Rooftops") tickets, directly to Live Cubs Game Product consumers for each event.  The Cubs Organization also sells, as a distributor, the rights for up to 2,200 Live Cubs Games Product tickets to competitor Rooftop Businesses ("Competitor Rooftops"), who then sell those tickets at retail per event.

114.    Consequently, the Cubs Organization is a vertically integrated enterprise which manufactures the Live Cubs Games Product, distributes the Live Cubs Game Product to Competitor Rooftop retailers, and also sells the Live Cubs Game Product at the retail level with tickets to Wrigley Field and Cubs Rooftops in direct competition with Competitor Rooftops.

115.    Tickets to watch Live Cubs Games from within Wrigley Field are reasonably interchangeable with tickets to watch Live Cubs Games from a Rooftop Business.

116.    The relevant market in this Count I is the market for watching Live Cubs Games, which consists of consumers who pay money to watch live-action Cubs Games, in person, as the games take place on the field at Wrigley Field.

117.    For each Live Cubs Game event, there are a total of 44,160 tickets available.  The Cubs Organization can sell up to 41,960 Live Cubs Games tickets at retail per event, and the Competitor Rooftops can sell up to 2,200 Live Cubs Games tickets at retail per event.

118.    The Cubs therefore have over 93% of the market for retail sales of the Live Cubs Games Product, which constitutes a monopoly share of the market for the Live Cubs Games Product.

119.    There are no reasonable substitutes for the Live Cubs Games Product.  The Cubs Television Product involves a limited number of cameras which typically focus on limited aspects of a Cubs Game, such as the pitcher, the batter, and the play of the baseball.  Consumers of the Cubs Television Product have no ability to see other action on the field at any given moment, such as infield and outfield player positioning, coaching signals, or bullpen activity. The Cubs Radio Product offers an even less reasonable substitute for the Live Cubs Games Product, as literally nothing can be viewed on a radio and consumers of the Cubs Radio Product have no input on what the announcer describes.

120.    Attendance at other live sporting events is also not a reasonable substitute for the Live Cubs Games Product, and thus tickets to other events are not reasonably interchangeable with tickets for the Live Cubs Games Product.  In professional sports, members of the consumer public are generally fans of a specific team, often based on their geographic location or upbringing, and thus when they want to see a live Cubs game, they are unlikely to patronize another team's live games, especially those of bitter rivals such as the Chicago White Sox, even if those other teams' tickets are much less expensive.

121.    Geographically, the market for the Live Cubs Games Product consists of just Wrigley Field and the sixteen total Rooftop Businesses located on the 3600 block of North Sheffield Avenue and on the 1000 block of West Waveland Avenue, all in Chicago, Illinois.

122.    There are significant barriers to any newcomers attempting to join in the retail market for the Live Cubs Games Product.  To begin with, nobody else can sell tickets inside

Wrigley Field, which has a limited capacity. Furthermore, there are only three parcels on Sheffield Avenue and Waveland Avenue which presently do not have Rooftop Businesses, none of which are well-suited to possess a Rooftop Business.

123. Other significant barriers to any retail newcomers to the Live Cubs Games Product market are: (i) the difficult and complex permitting process with the City, (ii) the extremely high cost of construction versus return-on-investment, (iii) the refusal of the Cubs Organization to enter into new rooftop license agreements with any new competitors, and (iv) the ongoing construction by the Cubs Organization which threatens to install signage which will effectively block any newcomer's views into Wrigley Field.

124. Despite the Cubs Organization's 93% monopoly share of the Live Cubs Games Product, the Rooftop Businesses have partially challenged the ability of the Cubs Organization to charge monopoly prices for the Live Cubs Games Product tickets, as there is sometimes capacity in excess of demand for the Live Cubs Games Product.

125. The Cubs Organization has acknowledged that the Competitor Rooftops are its direct competitors in the Live Cubs Games Product market, and that the Competitor Rooftops do challenge the Cubs Organization's ability to increase prices for the Live Cubs Games Product.

126. The Cubs Organization has repeatedly complained that the Competitor Rooftops have been successful in challenging ticket prices for the Live Cubs Game Product.

127. The Cubs Organization has demanded that the Competitor Rooftops conspire with each other and with the Cubs Organization to fix higher ticket prices, raise ticket prices, and discontinue selling discounted tickets on Groupon, in an attempt to raise overall market prices for the Live Cubs Game Product and increase the Cubs Organization's revenue.

128. The Cubs Organization has announced plans, and has begun the installation of, seven signs in the outfield at Wrigley Field which will block the views from the Competitor Rooftops, including the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties. The new outfield signs will not block the views from the four Rooftop Businesses that are owned by the Cubs Organization or its affiliates.

129. The Cubs Organization's intent in announcing its outfield signage plans has been to place pressure on the Competitor Rooftops to sell their properties to the Cubs Organization in the face of being destroyed, and if that fails, to actually destroy the Competitor Rooftops and gain a larger market share for the Live Cubs Games Product.

130. Blocking the views from the Competitor Rooftops will adversely affect the Competitor Rooftops' ability to sell tickets to Live Cubs Games.

131. Elimination of the Competitor Rooftops will further diminish the competition in the Live Cubs Games Product market by reducing the total number of Live Cubs Game Product tickets that are available per event, increasing the Cubs Organization's total market share, and permitting the Cubs Organization to increase the prices it charges consumers in the Live Cubs Game Product market.

132. If the new outfield signage is installed, there is a dangerous likelihood that the Cubs Organization will succeed on its attempt to maintain its existing, and acquire a larger, monopoly share of the Live Cubs Games Product market.

133. If unchecked, the Cubs Organization's anticompetitive conduct will adversely affect consumers by reducing competition in the Live Cubs Games Product market, reduce choice among consumers from whom they purchase the Live Cubs Games Product, and lead to increased prices for the Live Cubs Games Product.

134. The Cubs Organization's anticompetitive conduct has already resulted in its acquisition of three Competitor Rooftops and an increase in the Cubs Organization's market share of the Live Cubs Games Market.

135. At all relevant times there has been in effect a certain law known as the Sherman Act, found at 15 U.S.C. § 1 *et seq.*

136. Pursuant to 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

137. 15 U.S.C. § 15(a) provides, in pertinent part, that "... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

138. Pursuant to 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... "

139. 15 U.S.C. §§ 15 and 26 thus create a private right of action for violations of 15 U.S.C. § 2.

140.    Given the Cubs Organization's 93% market share for selling the Live Cubs Games Product, the inability for the Plaintiff Rooftop Businesses or any other Competitor Rooftop to increase their market share, and the many barriers to market entry, there is a dangerous probability that the Cubs Organization will succeed in maintaining and expanding its monopoly in the Live Cubs Games Product market through its anticompetitive conduct.

141.    The Cubs Organization possesses the specific intent to expand and maintain its monopoly in the market for the Live Cubs Games Product, reflected amongst other things by: (i) its statements that the Rooftop Businesses are direct competitors, (ii) its complaints that the Rooftop Businesses sell tickets too inexpensively; and (iii) its efforts to coerce the Rooftop Businesses to conspire to fix prices.

142.    The Cubs Organization's specific intent to expand and maintain its monopoly in the market for Live Cubs Games is also reflected by its anticompetitive conduct in furtherance of its attempt to monopolize, such as: (i) its efforts to purchase all of the Rooftop Businesses and underlying properties *en masse*, (ii) its efforts to purchase fewer than all of the Rooftop Businesses and underlying properties one-by-one; (iii) its contacting the lender of three other Rooftop Businesses and underlying properties and trying to purchase their mortgage loans and foreclose-to-own those Rooftop Businesses and underlying properties; (iv) its threats to install signage and destroy the Rooftop Businesses that would not sell out; (v) the actual commencement of the construction at Wrigley Field which includes adding up to seven new signs which will block the views from many if not all of the competitor Rooftops Businesses, including one 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties; and (vi) the Cubs Organization's recent acquisition of three Rooftop Businesses under duress.

143. The Cubs Organization's anticompetitive conduct also includes announcing plans on December 4, 2014 to shift the location of the new outfield signage to place it in front of Competitor Rooftops including the Plaintiff Rooftop Properties, while moving it away from the recently-acquired Cubs Rooftops and the other Rooftop Businesses that the Cubs Organization thought, at the time of the announcement, it was purchasing.

144. As a result of the Cubs Organization's campaign to destroy all competition in the market for Live Cubs Games and thereby maintain and expand its monopoly in such market, the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties have suffered and will continue to suffer significant damages.

145. Specifically, the Cubs Organization's announcement that it would commence the installation of up to seven signs after the 2014 baseball season, and the commencement of said construction, coupled with the December, 2014 announcement to "shift" the 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, has caused a number of the Plaintiff Rooftop Businesses' customers to refuse to pre-book Live Cubs Games events at the Plaintiff Rooftop Businesses for the 2015 baseball season.

146. Additionally, the Cubs Organization's announcement that it would commence the installation of up to seven signs after the 2014 baseball season, and the commencement of said construction, coupled with the December, 2014 announcement to "shift" the 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, has caused a number of the Plaintiff Rooftop Businesses' customers to demand partial or total refunds of their deposits for tickets to 2015 Live Cubs Games at the Plaintiff Rooftop Businesses in the event that the new outfield signage interferes with the views from the Plaintiff Rooftop Businesses.

147.     Moreover, the Cubs Organization's negative public relations campaign, such as blaming the Rooftop Businesses for its inability to field a champion-level team, or defaming the Rooftop Businesses by calling them thieves who sell tickets to watch someone else's premium television channel through a window, has caused a number of the Plaintiff Rooftop Businesses' customers to stop patronizing the Plaintiff Rooftop Businesses, and has led to several calls for a boycott of all the Rooftop Businesses by the consumer market.

148.     The Plaintiff Rooftop Properties have undergone expensive structural work and improvements to add fixtures, such as bleacher-style seating, which is rendered completely worthless without the viability of a Rooftop Business.  The Cubs Organization's aforementioned wrongful conduct was intended to, and has, caused injury to the Plaintiff Rooftop Properties by causing the property values of the Plaintiff Rooftop Properties to plummet by millions of dollars given the threat to the ongoing viability of the Plaintiff Rooftop Businesses which generate nearly all revenue in the form of rent to the Plaintiff Rooftop Properties.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a)     a permanent injunction prohibiting the Cubs Organization from installing any signs or other objects at Wrigley Field which will obstruct the views from the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties or any other Rooftop Business not owned by the Cubs Organization or its affiliates;

(b)     a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Businesses in an amount commensurate with their actual lost business revenue,

future lost business revenue, and reduction in company value, which amounts will be proven at

trial;

(c)     a money judgment jointly and severally against all defendants and in favor of the

Plaintiff Rooftop Properties in an amount commensurate with the decline in their property

values, which amounts will be proven at trial;

(d)     trebling of actual damages pursuant to statute;

(e)     Plaintiffs' attorneys' fees and costs; and

(f)     such other relief as appropriate in law or equity.

## COUNT II - ATTEMPTED MONOPOLIZATION
## IN VIOLATION OF SHERMAN ACT
(Pled in the Alternative to Count I)
(All Plaintiffs v. All Defendants)

149.     The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this

Paragraph 149.  This Count II is pled in the alternative to Count I.

150.     The Cubs Organization is engaged in willful anticompetitive conduct in an

attempt to acquire a monopoly in a relevant market.

151.     The Cubs Organization produces professional baseball games ("Cubs Games") to

be commercially exploited in various product formats across various markets.  For instance, the

Cubs Organization sells the rights to televised versions of Cubs Games (the "Cubs Television

Product") to various television networks who then sell the Cubs Television Product at retail to

Cubs Television Product consumers.  The Cubs Organization likewise sells the rights to radio

broadcast versions of Cubs Games (the "Cubs Radio Product") to various radio networks who

then sell the Cubs Radio Product at retail to Cubs Radio Product consumers.  Additionally, the

Cubs Organization sells the rights to watch live Cubs Games from within Wrigley Field (the

"Wrigley Tickets Product") directly to consumers.

152.    There is another market, the watching of live Cubs Games as they take place from the Rooftop Businesses (the õLive Rooftop Games Productö).  But unlike the Cubs Radio Product and the Cubs Television Product, which are only sold by the Cubs Organization at the distributor level to retailers who then sell those products to consumers, the Cubs Organization sells the Live Rooftop Games Product both at the distributor level and also at the retail level.

153.    Specifically, the Cubs Organization sells up to 800 Live Rooftop Games Product tickets, per event, at retail directly to consumers at the Rooftop Businesses it owns (the õCubs Rooftopsö).  The Cubs Organization also sells up to 2,200 Live Rooftops Games Product tickets, per event, at the distributor level to twelve competitor Rooftop Businesses who then compete with the Cubs Organization (the õCompetitor Rooftopsö) at the retail level for consumers of the Live Rooftops Games Product.

154.    Consequently, the Cubs Organization is a vertically integrated enterprise which manufactures the Live Rooftop Games Product, distributes the Live Rooftops Games Product to Competitor Rooftop retailers, and also sells the Live Rooftop Games Product at the retail level with tickets to Cubs Rooftops in direct competition with Competitor Rooftops.

155.    The Cubs Organization, through its Cubs Rooftops, and the 12 unaffiliated Competitor Rooftops, are direct competitors in the sale of the Live Rooftop Games Product, at the retail level, to Live Rooftop Games Product consumers.

156.    The Wrigley Tickets Product is not reasonably interchangeable with the Live Rooftop Games Product.

157.    The relevant market in this Count II is the market for the Live Rooftop Games Product, which consists of individuals and groups of consumers who pay money to watch live-

action Cubs Games from Rooftop Businesses, in person, as the games take place on the field at Wrigley Field.

158.    There are no reasonable substitutes for the Live Rooftop Games Product.  The Cubs Television Product involves a limited number of cameras which typically focus on limited aspects of a Cubs Game, such as the pitcher, the batter, and the play of the baseball.  Consumers of the Cubs Television Product have no ability to see other action on the field at any given moment, such as infield and outfield player positioning, coaching signals, or bullpen activity. The Cubs Radio Product offers an even less reasonable substitute for the Live Rooftop Games Product, as literally nothing can be viewed on a radio and consumers have no input on what the announcer describes.

159.    Tickets to Live Rooftop Games are also not reasonably interchangeable with tickets to watch live action baseball from inside Wrigley Field.  In addition to offering a different vantage point from which to view a live Cubs game, the Live Rooftop Games Product typically includes an all-you-can-eat and all-you-can-drink menu, for a flat fee, which has not historically been available from inside Wrigley Field.

160.    The Live Rooftop Games Product is also not reasonably interchangeable with tickets to watch live action baseball from within Wrigley Field because many of the Rooftop Businesses offer an interior lounge-like atmosphere for private groups of hundreds of people, along with numerous flat-screen televisions showing the baseball action, which is not available inside Wrigley Field.

161.    There are very few retailers of the Live Rooftop Games Product – only the four Cubs Rooftops and the twelve Competitor Rooftops.  Geographically, the market for Live

Rooftop Games consists of just the 3600 block of North Sheffield Avenue, and the 1000 block of West Waveland Avenue, in Chicago, Illinois.

162.    There are only 3,000 tickets for the Live Rooftop Games Product available for each Cubs game.  Of this total, and as of January 6, 2015, the Cubs Organization, through the Cubs Rooftops, controls 800 tickets, and the Competitor Rooftops control 2,200 tickets.  The Cubs Organization thus controls 26.6% of the Live Rooftop Games Product market.

163.    Prior to January 6, 2015, the Cubs Organization only owned one Rooftop Business, and therefore only controlled 6.6% of the market for the Live Rooftops Games Product.

164.    There are significant barriers to any newcomers attempting to join in the market for the Live Rooftop Games Product.  There are only three parcels on Sheffield Avenue and Waveland Avenue which presently do not have Rooftop Businesses, none of which are well-suited to possess a Rooftop Businesses.

165.    Other significant barriers to any retail newcomers to the Live Rooftop Games market are: (i) the difficult and complex permitting process with the City, (ii) the extremely high cost of construction versus return-on-investment, (iii) the indication that the Cubs Organization will not enter into new rooftop license agreements with any new competitors, and (iv) the ongoing construction by the Cubs Organization which threatens to install signage which would effectively block any newcomer's views into Wrigley Field.

166.    The Cubs Organization has demanded that the Competitor Rooftops conspire with each other and with the Cubs Organization to fix higher ticket prices, raise ticket prices, and discontinue selling discounted tickets on Groupon.

167.    The Cubs Organization has announced plans, and has begun the installation of, seven signs in the outfield at Wrigley Field which will block the views from the Competitor Rooftops, in particular the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties.  The new outfield signs will not block the views from the Cubs Rooftops.

168.    Blocking the views from the Competitor Rooftops will adversely affect the Competitor Rooftops' ability to sell the Live Rooftop Games Product.

169.    Elimination of the Competitor Rooftops will diminish the competition in the Live Rooftops Games Product market by reducing the total number of Live Rooftops Games Product tickets that are available per event, increasing the Cubs Organization's total market share in the Live Rooftops Games market, and permitting the Cubs Organization to increase the prices it charges consumers in the Live Rooftops Game Product market.

170.    If the new outfield signage is installed, there is a dangerous likelihood that the Cubs Organization will succeed on its attempt to monopolize the Live Rooftops Games Product market.  Eliminating the Plaintiff Rooftop Businesses alone will result in 400 fewer retail tickets for the Live Cubs Games Product, per event, and increase the Cubs Rooftops' market share in the Live Rooftops Games Product market to 30.7%.

171.    Furthermore, the Cubs Organization's anticompetitive conduct was aimed squarely at, and had a dangerous probability of successfully, eliminating all Competitor Rooftops and thereby result in the Cubs Organization obtaining 100% of the market for the Live Rooftops Games Product market.

172.    If unchecked, the Cubs Organization's anticompetitive conduct will adversely affect consumers by reducing competition in the Live Rooftops Games Product market, reduce

choice among consumers from whom they purchase the Live Rooftops Games Product, and lead to increased prices for the Live Rooftops Games Product.

173.    At all relevant times there has been in effect a certain law known as the Sherman Act, found at 15 U.S.C. § 1 *et seq*.

174.    Pursuant to 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

175.    15 U.S.C. § 15(a) provides, in pertinent part, that "… any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

176.    Pursuant to 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…" 15 U.S.C. § 26.

177.    Given the Cubs Organization's ongoing installation of signs at Wrigley Field which will block Competitor Rooftops, and its successful acquisition of now four Rooftop Businesses, there is a dangerous probability that the Cubs Organization will succeed in

monopolizing the retail market for Live Rooftop Games, either by coercively acquiring, or simply eliminating, Competitor Rooftops.

178.    The Cubs Organization possesses the specific intent to monopolize the Live Rooftops Games Product market, reflected amongst other things by: (i) its statements that the Competitor Rooftops are direct competitors, (ii) its complaints that the Competitor Rooftops sell tickets too inexpensively; and (iii) its efforts to coerce the Competitor Rooftops to conspire to fix prices.

179.    The Cubs Organization's specific intent to monopolize the Live Rooftops Games Product market is also reflected by its anticompetitive conduct in furtherance of its attempt to monopolize, such as: (i) its efforts to purchase all of the Competitor Rooftops and underlying properties *en masse*, (ii) its efforts to purchase fewer than all of the Competitor Rooftops and underlying properties one-by-one; (iii) its contacting the lender of three Competitor Rooftops and underlying properties and trying to purchase their mortgage loans and foreclose-to-own those Competitor Rooftops and underlying properties; (iv) its threats to install signage and destroy the Rooftop Businesses that would not sell out; (v) the actual commencement of the construction at Wrigley Field which includes adding up to seven new signs which will block the views from many if not all of the Competitor Rooftops, including one 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties; and (vi) the Cubs Organization's recent acquisition of three Rooftop Businesses under duress.

180.    The Cubs Organization's anticompetitive conduct also includes announcing plans to shift the location of the new outfield signage to place it in front of Competitor Rooftops including the Plaintiff Rooftop Properties, while moving such signage away from the recently-acquired Cubs Rooftop Businesses.

181. As a result of the Cubs Organization's campaign to reduce and destroy competition in the Live Rooftops Games Product market, and thereby acquire a monopoly in such market, the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties have suffered and will continue to suffer significant damages.

182. Specifically, the Cubs Organization's announcement that it would commence the installation of up to seven signs after the 2014 baseball season, and the commencement of said construction, coupled with the December, 2014 announcement to "shift" the 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, has caused a number of the Plaintiff Rooftop Businesses' customers to refuse to pre-book Live Cubs Games events at the Plaintiff Rooftop Businesses for the 2015 baseball season.

183. Additionally, the Cubs Organization's announcement that it would commence the installation of up to seven signs after the 2014 baseball season, and the commencement of said construction, coupled with the December, 2014 announcement to "shift" the 2,200-square-foot video board directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, has caused a number of the Plaintiff Rooftop Businesses' customers to demand partial or total refunds of their deposits for tickets to 2015 Live Cubs Games at the Plaintiff Rooftop Businesses in the event that the new outfield signage interferes with the views from the Plaintiff Rooftop Businesses.

184. Moreover, the Cubs Organization's negative public relations campaign, such as blaming the Competitor Rooftops for its inability to field a champion-level team, or defaming the Competitor Rooftops by calling them thieves who sell tickets to watch someone else's premium television channel through a window, has caused a number of the Plaintiff Rooftop Businesses'

customers to stop patronizing the Plaintiff Rooftop Businesses, and has led to several calls for a boycott of all the Competitor Rooftops by the consumer market.

185.    The Plaintiff Rooftop Properties have undergone expensive structural work and improvements to add fixtures, such as bleacher-style seating, which is rendered completely worthless without the viability of a Rooftop Business.  The Cubs Organization's aforementioned wrongful conduct was intended to, and has, caused injury to the Plaintiff Rooftop Properties by causing the property values of the Plaintiff Rooftop Properties to plummet by millions of dollars given the threat to the ongoing viability of the Plaintiff Rooftop Businesses which generate nearly all revenue in the form of rent to the Plaintiff Rooftop Properties.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a)    a permanent injunction prohibiting the Cubs Organization from installing any signs or other objects at Wrigley Field which will obstruct the views from the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties or any other Rooftop Business not owned by the Cubs Organization or its affiliates;

(b)    a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Businesses in an amount commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value, which amounts will be proven at trial;

(c)    a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Properties in an amount commensurate with the decline in their property values, which amounts will be proven at trial;

(d)     trebling of actual damages pursuant to statute;

(e)     Plaintiffs' attorneys' fees and costs; and

(f)     such other relief as appropriate in law or equity.

## COUNT III – FALSE AND MISLEADING COMMERCIAL REPRESENTATIONS IN VIOLATION OF LANHAM ACT
(All Plaintiffs v. All Defendants)

186.    The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 186.

187.    Pursuant to the Rooftop License Agreement, the Plaintiff Rooftop Businesses have each been granted a nonexclusive license to sell tickets to view Cubs games from the Rooftop Businesses through December 31, 2023.

188.    The Rooftop License Agreement is a valid and enforceable agreement between each of the Plaintiffs and the Cubs Organization.

189.    At all relevant times there has been in effect a certain law known as the Lanham Act, found at 15 U.S.C. § 1051 *et seq*.

190.    15 U.S.C. § 1125 provides, in pertinent part, that "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person… shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 11 U.S.C. § 1125.

191.    Pursuant to 11 U.S.C. § 1117, a successful plaintiff on a section 1125(A) claim shall be entitled to recover its actual damages, defendant's profits, the costs of the action and in exceptional cases its reasonable attorneys' fees. 11 U.S.C. § 1117(a).

192.    In addition to the civil liability imposed under 11 U.S.C. § 1117(a), 11 U.S.C. § 1126 provides for injunctive relief to prevent future violations.

193.    The annual Cubs Convention, including the 2014 Cubs Convention, is an advertising and promotional event for the Cubs Organization to increase Cubs brand awareness, create consumer excitement about the Cubs and create excitement about the next Cubs season.

194.    The annual Cubs Convention, including the 2014 Cubs Convention, is attended by consumers as well as numerous media outlets who subsequently publicize the events at the 2014 Cubs Convention to the consumer public.

195.    Ricketts' statement, that the Rooftop Businesses are analogous to a person charging people money to wrongfully watch a neighbor's pay-television through their window, is a false and misleading statement of fact because of the valid and binding Rooftop License Agreement pursuant to which the Plaintiff Rooftop Businesses have a contractual right to charge consumers money in return for permitting them to watch Cubs games from the Plaintiff Rooftop Businesses.

196.    Ricketts' aforementioned statement actually deceived, and has the tendency to deceive and confuse, a substantial segment of the consumer public, and the wide media coverage at the 2014 Cubs Convention led to widespread dissemination of those comments.

197.    Ricketts' caused the aforementioned statement to enter interstate commerce by making said statement, while being videotaped, at an event with widespread media coverage including print, online and television media.

198. Ricketts' statements resulted in, amongst other things, the consumer public calling for a boycott of the Rooftop Businesses.

199. The Plaintiff Rooftop Businesses have been injured by Ricketts' false, misleading and confusing statements by the loss of sales to consumers who do not want to patronize what they perceive to be illegitimate, illegal or wrongful businesses.

200. The Plaintiff Rooftop Businesses have been injured by Ricketts' false, misleading and confusing statements by resulting damage to the goodwill associated with the Plaintiff Rooftop Businesses.

201. The Plaintiff Rooftop Properties have been injured by Ricketts' false, misleading and confusing statements because (i) the general public does not distinguish between a rooftop business and a rooftop property owner, (ii) the value of the Plaintiff Rooftop Properties is based primarily on the viability of a Plaintiff Rooftop Business operating thereupon, and (iii) the false, misleading and confusing statements of Ricketts have caused the Plaintiff Rooftop Properties' real estate values to drastically decline.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a) a permanent injunction prohibiting the Cubs Organization from making any further false, misleading or confusing statements concerning the Plaintiff Rooftop Businesses or Plaintiff Rooftop Properties;

(b) a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Businesses in an amount commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value, which amounts will be proven at

trial and which are a result of the false, misleading and confusing statements made by the Cubs Organization;

(c) a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Properties in an amount commensurate with the decline in their property values, which amounts will be proven at trial and which are a result of the false, misleading and confusing statements made by the Cubs Organization;

(d) a money judgment against the Cubs Organization for its profits derived by virtue of the false, misleading and confusing statements;

(e) Plaintiffs' attorneys' fees and costs; and

(f) such other relief as appropriate in law or equity.

**COUNT IV – VIOLATIONS OF**
**UNIFORM DECEPTIVE TRADE PRACTICE ACT**
(All Plaintiffs v. All Defendants)

202. The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 202.

203. At all relevant times there has been in effect a certain law known as the Uniform Deceptive Trade Practices Act (the "Deceptive Practices Act"), found at 815 ILCS 510/1 *et seq.*

204. Pursuant to section 2 of the Deceptive Practice Act, "(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: … (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; … (8) disparages the goods, services, or business of another by false or misleading

representation of fact; í (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.ö 810 ILCS 510/2.

205.    Pursuant to section 3 of the Deceptive Practices Act, a person likely to be damaged by deceptive trade practices may be granted equitable relief without proof of monetary damages.  Moreover, a plaintiff shall be entitled to recover its attorneysø fees and costs where a defendant has willfully engaged in a deceptive trade practice. 815 ILCS 510/3.

206.    Pursuant to the Rooftop License Agreement, the Plaintiff Rooftop Businesses have each been granted a nonexclusive license to sell tickets to view Cubs games from the Rooftop Businesses through December 31, 2023.   By its own terms, the Rooftop License Agreement enures to the benefit of the Plaintiff Rooftop Properties.

207.    The Rooftop License Agreement is a valid and enforceable agreement between each of the Plaintiffs and the Cubs Organization.

208.    The annual Cubs Convention, including the 2014 Cubs Convention, is an advertising and promotional event for the Cubs Organization to increase Cubs brand awareness, create consumer excitement about the Cubs and create excitement about the next Cubs season.

209.    The annual Cubs Convention, including the 2014 Cubs Convention, is attended by consumers as well as numerous media outlets who subsequently publicize the events at the 2014 Cubs Convention to the consumer public.

210.    Ricketts spoke at the Cubs Convention in his official capacity as an owner, executive and chairman of the Cubs Organization.

211.    Rickettsø statement, that the Rooftop Businesses are analogous to a person charging people money to wrongfully watch a neighborøs pay-television through their window, is a false and misleading statement of fact in light of the valid and binding Rooftop License

Agreement, pursuant to which the Plaintiff Rooftop Businesses have a contractual right to charge consumers money in return for permitting them to watch Cubs games from the Plaintiff Rooftop Businesses.

212.    Ricketts' aforementioned statement actually deceived and has the tendency to deceive and confuse a substantial segment of the consumer public concerning the legality of the Plaintiff Rooftop Businesses and their status as legitimate license holders and sellers of tickets to watch Cubs games, and the wide media coverage at the 2014 Cubs Convention led to widespread dissemination of those comments.

213.    Ricketts' statements resulted in actual consumer confusion and the consumer public calling for a boycott of the Plaintiff Rooftop Businesses.

214.    Ricketts' statements also impacted the Plaintiff Rooftop Properties because the general public does not distinguish between the rooftop businesses and rooftop property owners.

215.    Ricketts and the Cubs Organization willfully engaged in the aforementioned deceptive trade practices with actual knowledge that the Plaintiff Rooftop Businesses did in fact have a lawful right to sell tickets to view Cubs games from the Plaintiff Rooftop Businesses pursuant to license.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a)    a permanent injunction prohibiting any of the defendants from making any further false, misleading or confusing statements concerning the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties;

(b)    Plaintiffs' attorneys' fees and costs; and

(c)     such other relief as appropriate in law or equity.

## COUNT V – VIOLATIONS OF
## CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (All Plaintiffs v. All Defendants)

216.    The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 216.

217.    At all relevant times there has been in effect a certain law known as the Consumer Fraud and Deceptive Business Practices Act (the ŏConsumer Fraud Actö), found at 815 ILCS 505/1 *et seq*.

218.    Pursuant to section 2 of the Consumer Fraud Act, ŏUnfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any í misrepresentation í or the use or employment of any practice described in Section 2 of the ŧUniform Deceptive Trade Practices Actø í in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged therebyí ö 815 ILCS 505/2.

219.    Section 10a of the Consumer Fraud Act provides for any person who suffers damage as a result of a violation of the act to recover actual damages, punitive damages, injunctive relief, attorneysø fees and costs from a defendant who violates section 2. 815 ILCS 505/10a.

220.    The annual Cubs Convention, including the 2014 Cubs Convention, is an advertising and promotional event for the Cubs Organization to increase Cubs brand awareness, create consumer excitement about the Cubs and create excitement about the next Cubs season.

221.    The annual Cubs Convention, including the 2014 Cubs Convention, is attended by consumers as well as numerous media outlets who subsequently publicize the events at the 2014 Cubs Convention to the consumer public.

222.    Ricketts' statement, that the Rooftop Businesses are analogous to a person charging people money to wrongfully watch a neighbor's pay-television through their window, is a misrepresentation of fact in light of the valid and binding Rooftop License Agreement, pursuant to which the Plaintiff Rooftop Businesses have a contractual right to charge consumers money in return for permitting them to watch Cubs games from the Plaintiff Rooftop Businesses.

223.    The Rooftop License Agreement, by its own terms, enures to the benefit of the Plaintiff Rooftop Properties.

224.    The consumer public does not distinguish between a rooftop business owner and a rooftop property owner, and therefore the aforementioned conduct similarly harmed the Plaintiff Rooftop Properties.

225.    Ricketts' aforementioned statement was made in the course of trade or commerce.

226.    Ricketts' aforementioned statement is also violation of the Deceptive Practices Act as set forth in Count IV.

227.    Ricketts' aforementioned statement is a misrepresentation of fact.

228.    Ricketts' statements resulted in the consumer public calling for a boycott of the Rooftop Businesses.

229.    The Plaintiff Rooftop Businesses have been injured by Ricketts' misrepresentation of fact by the loss of sales to consumers who do not want to patronize what they perceive to be illegitimate, illegal or wrongful businesses.

230. The Plaintiff Rooftop Businesses have been injured by Ricketts' misrepresentation of fact by resulting damage to the goodwill associated with the Plaintiff Rooftop Businesses.

231. The Plaintiff Rooftop Properties have been injured by Ricketts' misrepresentation of fact because the value of the Plaintiff Rooftop Properties is based primarily on the viability of a Plaintiff Rooftop Business operating thereupon, and the misrepresentation of fact by Ricketts has caused the Plaintiff Rooftop Properties' real estate values to decline significantly.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a) a permanent injunction prohibiting any of the defendants from making any further misrepresentations of fact concerning the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties;

(b) a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Businesses in an amount commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value, which amounts will be proven at trial and which are a result of the misrepresentations of fact made by the Cubs Organization;

(c) a money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Properties in an amount commensurate with the decline in their property values, which amounts will be proven at trial and which are a result of the misrepresentations of fact made by the Cubs Organization;

(d) a money judgment against the Cubs Organization for its profits derived by virtue of the misrepresentations of fact;

(e)     Plaintiffs' attorneys' fees and costs; and

(f)     such other relief as appropriate in law or equity.

## COUNT VI – DEFAMATION
### (All Plaintiffs v. All Defendants)

232.    The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 232.

233.    Ricketts' statement about the Rooftop Businesses made during the 2014 Cubs Convention constitutes defamation *per se* because it imputes that the Plaintiff Rooftop Businesses are committing theft or other criminal offenses by charging the public to watch Cubs games without the Cubs Organization's consent, impute a want of integrity, and prejudice Plaintiff Rooftop Businesses in connection with their professional business endeavors.

234.    Ricketts' statement about the Rooftop Businesses made during the 2014 Cubs Convention is patently false given the license granted to the Plaintiff Rooftop Businesses in the Rooftop License Agreement.

235.    Ricketts' statement about the Rooftop Businesses made during the 2014 Cubs Convention was unprivileged and was made to media as well as directly to the consumer public.

236.    Ricketts' statement was made in his official capacity as an owner, executive and chairman of the Cubs Organization.

237.    The Rooftop License Agreement, by its own terms, enures to the benefit of the Plaintiff Rooftop Properties.

238.    The consumer public does not differentiate between rooftop business owners and rooftop property owners, and therefore the aforementioned wrongful conduct also harmed the Plaintiff Rooftop Owners.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a) a money judgment jointly and severally against all defendants, in favor of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, in an amount to be determined at trial; and

(b) such other relief as may be appropriate.

## COUNT VII – FALSE LIGHT
(All Plaintiffs v. All Defendants)

239. The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 239.

240. Rickettsø statement about the Rooftop Businesses made during the 2014 Cubs Convention imputes that the Plaintiff Rooftop Businesses are acting improperly, immorally, illegally, and without a legitimate right to sell tickets to watch Cubs games from the Plaintiff Rooftop Businesses.

241. Rickettsø statement about the Rooftop Businesses made during the 2014 Cubs Convention is patently false given the license granted to the Plaintiff Rooftop Businesses in the Rooftop License Agreement, and consequently placed the Plaintiff Rooftop Businesses in a false light.

242. Rickettsø statement about the Rooftop Businesses made during the 2014 Cubs Convention would be highly offensive to a reasonable person.

243. Rickettsø statement about the Rooftop Businesses made during the 2014 Cubs Convention was made with actual malice and with knowledge that the statement was false.

244.     Ricketts' statement was made in his official capacity as an owner, executive and chairman of the Cubs Organization.

245.     The Rooftop License Agreement, by its own terms, enures to the benefit of the Plaintiff Rooftop Properties.

246.     The consumer public does not differentiate between rooftop business owners and rooftop property owners, and therefore the aforementioned wrongful conduct also harmed the Plaintiff Rooftop Owners.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a)     a money judgment jointly and severally against all defendants, in favor of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, in an amount to be determined at trial; and

(b)     such other relief as may be appropriate.

### COUNT VIII – CLAIM FOR INJUNCTIVE RELIEF
### BASED UPON ANTICIPATORY BREACH OF CONTRACT
(All Plaintiffs v. Defendants Chicago Baseball Holdings, LLC,
Chicago Cubs Baseball Club, LLC and Wrigley Field Holdings, LLC)

247.     The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 247.

248.     The Rooftop License Agreement provides, in pertinent part, that "The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftop" …

249.     The Rooftop License Agreement does not expire until December 31, 2023.

250.     The Rooftop License Agreement is a valid and enforceable contract between each of the Plaintiffs and defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC.

251.     The Plaintiffs have performed all of their obligations under the Rooftop License Agreement.

252.     The installation of signage at Wrigley Field, directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, which will block the views from the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, would constitute a breach of the Rooftop License Agreement by defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC.

253.     Defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC have manifested their intent to breach the Rooftop License Agreement by announcing plans to install numerous, large signs above the right field bleachers at Wrigley Field, which signs will obstruct the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties' rooftop views.

254.     Defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC have taken affirmative steps in furtherance of their anticipatory breach of the Rooftop License Agreement, as reflected by the commencement of construction at Wrigley Field.

255.     The foregoing constitutes an anticipatory breach of the Rooftop License Agreement by defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC.

256.     The 3627 Sheffield Property and 3633 Sheffield Property are highly unique due to the views each enjoys into Wrigley Field.  This unique character is irreplaceable at any cost.  In the event that defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC complete their ongoing construction efforts in violation of the Rooftop License Agreement, the Plaintiff Rooftop Properties will suffer irreparable harm in the form of the complete and total destruction of the views of Wrigley Field from the 3627 Sheffield Property and 3633 Sheffield Property.

257.     Each of the Plaintiff Rooftop Businesses is a highly unique business enterprise due to the views each enjoys from its upper level windows and rooftop into Wrigley Field.  This unique business attribute is irreplaceable at any cost.  The very nature of these businesses depend entirely on the ongoing existence of said views.  In the event that defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC complete their ongoing construction efforts in violation of the Rooftop License Agreement, the Plaintiff Rooftop Businesses will suffer irreparable harm in the form of the complete and total destruction of their businesses.

258.     The rights provided to the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties in the Rooftop License Agreement, in particular the unobstructed view into Wrigley Field, are clear and ascertainable rights in need of protection.

259.     The Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties have no adequate remedy at law against defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC, in the event they complete their construction project and obstruct the views from the Plaintiff Rooftop Businesses and Plaintiff

Rooftop Properties, because money damages cannot replace the destruction of the Plaintiff Rooftop Businesses and loss of the unique nature of the Plaintiff Rooftop Properties.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully prays for the following relief:

(a)     a permanent injunction prohibiting defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC from installing outfield signage or anything else that will obstruct the views of Wrigley Field from the 3627 Sheffield Property and 3633 Sheffield Property; and

(b)     such other relief as appropriate in law or equity.

## COUNT IX – BREACH OF CONTRACT
### (All Plaintiffs v. Defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC)

260.     The Plaintiffs restate paragraphs 1 through 108 as though fully set forth in this Paragraph 260.

261.     The Rooftop License Agreement provides, in pertinent part, that "The Cubs will not publically disparage, abuse or insult the business of any Rooftop or the moral character of any Rooftop or any Rooftop employee."

262.     The Rooftop License Agreement is a valid and enforceable contract between each of the Plaintiffs and defendants Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, and Wrigley Field Holdings, LLC.

263.     The Plaintiffs have performed all of their obligations under the Rooftop License Agreement.

264. Ricketts' statement about the Rooftop Businesses made during the 2014 Cubs Convention is a breach of the aforementioned non-disparagement clause.

265. Ricketts' aforementioned statement applies equally to the Plaintiff Rooftop Properties.

266. Ricketts' statement was made in his official capacity as an owner, executive and chairman of the Cubs Organization.

267. As a result of the aforementioned breach by the Cubs Organization of the Rooftop License Agreement's non-disparagement clause, the Plaintiffs have suffered damages in the form of lost revenues, negative publicity, the public calling for a boycott of its business, and a significant decrease in property values, among other things.

WHEREFORE the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully pray for the following relief:

(a) a money judgment jointly and severally against Ricketts and the Cubs Organization, in an amount to be determined at trial;

(b) a refund or cancellation with respect to any and all payments paid or due to be paid by the Plaintiff Rooftop Businesses to the Cubs Organization for the 2014 baseball season; and

(c) such other relief as appropriate in law or equity.

[Signature Page to Follow]

Date: January 20, 2015

Respectfully Submitted,

Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC

*/s/ Thomas M. Lombardo*_____
By: One of their Attorneys

Thomas M. Lombardo (6279247)
Abraham E. Brustein (327662)
Di Monte & Lizak, LLC
216 Higgins Road
Park Ridge, IL 60068
847-698-9600 tel
847-698-9623 fax
tlombardo@dimontelaw.com
abrustein@dimontelaw.com

58