**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, | ) | |
| d/b/a SKYBOX ON SHEFFIELD; | ) | |
| RIGHT FIELD PROPERTIES, LLC; | ) | |
| 3633 ROOFTOP MANAGEMENT, LLC, | ) | |
| d/b/a LAKEVIEW BASEBALL CLUB; and | ) | |
| ROOFTOP ACQUISITION, LLC, | ) | Case No. 15cv551 |
| | ) | |
| Plaintiffs, | ) | Hon. Virginia M. Kendall |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; and | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

The plaintiffs, (i) Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, (ii) Right Field Properties, LLC, (iii) 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and (iv) Rooftop Acquisition, LLC (collectively, "Plaintiffs"), for their Memorandum of Points and Authorities in Support of their Motion for Temporary Restraining Order and Preliminary Injunction, submit the following:

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………… ii

TABLE OF AUTHORITIES…………………………………………………………..iv

INTRODUCTION…………………………………………………………………… ...1

FACTUAL BACKGROUND………………………………………………………….2

ARGUMENT………………………………………………………………………….20

    I.      Legal Standard for Injunctive Relief………………………….....20

          A.  Likelihood of Success on Merits……………………………..20

          B.  Irreparable Harm and No Adequate Remedy at Law…………..21

          C.  Balance of Hardships………………………………………...21

          D.  The Public Interest…………………………………………...22

    II.     Strong Likelihood of Success on Breach of Contract Claim……….22

    III.    Strong Likelihood of Success on Sherman Act Claims…………….29

          A.  Legal Standard for § 2 Claims……………………………….29

              1.  Anticompetitive Conduct…………………………...29

              2.  Specific Intent to Monopolize…………………… 35

              3.  Dangerous Probability of Success……………….36

          B.  Cubs' Attempt to Expand and Maintain Existing Monopoly……38

              1.  Anticompetitive Conduct and Specific Intent……...39

              2.  Dangerous Probability of Success…………………43

          C.  Cubs Attempt to Monopolize Rooftop Market………….……..44

              1.  Anticompetitive Conduct and Specific Intent……...44

              2.  Dangerous Probability of Success……………….45

IV.     Plaintiffs Will Suffer Irreparable Harm Without Injunction…………......46

V.      Balance of Hardships Favors Injunctive Relief for Plaintiffs…………… 47

VI.     Public Interest Favors Injunctive Relief…………………………… 48

CONCLUSION…………………………………………………………… .49

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Meade Johnson & Co.*,
    971 F.2d 6 (7th Cir. 1992)í í í í í í í í í í í í í í .í í í í í í 20

*Abcor Corp. v. AM Intern., Inc.*,
    916 F.2d 924 (4th Cir. 1990)í í í í ..í í í í í í .í í í í í í í í ..35

*Air Safety, Inc. v. Teachers Realty Corp.*,
    706 N.E.2d 882 (Ill. 1999)í í í í .í í í í í í í í í í í í í í í í 24

*American Hospital Supply Corp. v. Hospital Products Ltd.*,
    780 F.2d 589 (7th Cir.1986)í í í í í í í í í í í í í í í í í ..í 22

*Aspen Skiing v. Aspen Highlands Skiing*,
    472 U.S. 585 (1985)í í í í í ...í í í í í í í í í í í í í í í í 32

*Blackwelder Furn. Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*,
    550 F.2d 189 (4th Cir. 1977)í í í ...í í í í í í í í í í í í í í ..22

*Brunswick Corp. v. Jones*,
    784 F.2d 271 (7th Cir. 1986)í í í í .í í í í í í í í í í í í í í 21

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
    148 F.3d 1080 (D.C. Cir. 1998)í í í í .í í í í í í í í í í í í í 30

*Chillicothe Sand Gravel Co. v. Martin Marietta Corp.*,
    615 F.2d 427 (7th Cir. 1980)í í í í í í í í í í í í í í í í í .30

*Coles-Moultrie Elec. Co-op. v. City of Sullivan*,
    709 N.E.2d 249, 253 (Ill. App. 4th Dist. 1999)í í í í í í í í í í í 23

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*,
    885 F.2d 683 (7th Cir. 1989)í í í í í í í í í í í í í í í í í .37

*Curtis v. Thompson*,
    840 F.2d 1291 (7th Cir. 1988)í í í í í í í í í í í í í í í í í ...20

*Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*,
    501 F.2d 917 (3rd Cir. 1974). í í í í í í í í í í í í í í í í í ...22

*Diginet, Inc. v. Western Union ATA, Inc.*,
    958 F.2d 1388 (7th Cir. 1992)í í í í í í í í í í í í í í í í í ...22

*Experience Works, Inc. v. Chao*,
    267 F. Supp. 2d 93 (D.D.C. 2003)……………………………………….20

*F.T.C. v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008)……………….....................................22

*First Bank and Trust Co. of Ill. v. Village of Orland Hills*,
    787 N.E.2d 300 (Ill. App. 1st Dist. 2003)………………………………….28

*Hiland Dairy, Inc. v. Kroger Co.*,
    402 F.2d 968 (8th Cir. 1968)……………………………………………….37

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
    846 F.2d 1079 (7th Cir. 1988)……………………………………………...20

*Jackson v. N.F.L.*,
    802 F. Supp. 226 (D. Minn. 1992)………………………………………….22

*Joyce v. DLA Piper Rudnick Gray Cary LLP*,
    888 N.E.2d 657 (Ill. App. 1st Dist. 2008)……………………………….....23

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
    452 F.2d 579 (7th Cir. 1972)……………………………………………….36

*Kehoe v. Com. Ed. Co.*,
    694 N.E.2d 1119 (Ill. App. 1st Dist. 1998)……………………………… 23

*Kowalski v. Chicago Tribune Co.*,
    854 F.2d 168 (7th Cir.1988)……………………………………………….22

*Law Offices of Colleen M. McLaughlin v. First Star Fin. Corp.*,
    963 N.E.2d 968 (Ill. App. 1st Dist. 2012)……………………………….....23

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1982)……………………………………………….36

*LePage's Inc. v. Kroll Assoc's, Inc.*,
    324 F.3d 141 (3rd Cir. 2003)…………………………..................30

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)……………………………………………………...30

*M & M Med. Supp. and Svc., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1993)……………………………………………….37

*MCI Communications Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983)…  ....................................................................................34

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011)…………………………………….……21

*Omega Satellite Products Co. v. City of Indianapolis*,
    694 F.2d 119 (7th Cir.1982)…………………………………….…………21

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)……………………………………………….…………31

*Ping v. National Education Ass'n*,
    870 F.2d 1369 (7th Cir.1989)……………………………………………22

*Planned Parenthood of Wis. v. Van Hollen*,
    38 F.3d 786 (7th Cir. 2013)…………………………………….…………21

*Power Mobility Coal. v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005)………………………….…………21

*Roland Mach. Co. v. Dresser Indus., Inc*,
    749 F.2d 380 (7th Cir. 1984)…………………………………….………21

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2nd Cir. 1970)……………………………….……….46

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)…………………………………………….…………29

*Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*,
    902 N.E.2d 1178 (Ill. App. 1st Dist. 2009)…………………………26

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953) ………………………………………………..35

*Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*,
    864 N.E.2d 927 (Ill. App. 1st Dist. 2007)…………………….23

*United States v. Citizens & Southern National Bank*,
    422 U.S. 86 (1975)…………………………………………………….33

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)………………………………………………...29

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).....................................................36

*United States v. Terminal R.R. Ass'n*,
    224 U.S. 383 (1912)..................................................30

*Western Ill. Oil Co. v. Thompson*,
    186 N.E.2d 285 (Ill. 1962)........................................23

*Winter v. N.R.D.C., Inc.*,
    555 U.S. 7 (2008)....................................................20

*Wooley v. Maynard*, 4
    30 U.S. 705 (1977)..................................................20

**Statutes and Rules**

15 U.S.C. § 2.............................................................29

15 U.S.C. § 15..........................................................29

15 U.S.C. § 26..........................................................29

Fed. R. Civ. P. 65....................................................20

**Other Authorities and Sources**

*New Webster's Dictionary of the English Language*
    (1985)...............................................................25

Chicago, Ill. Mun. Code §4-388-010.....................................3

Stuart Shea, The Long Life and Contentious Times of the Friendly Confines
    (2014).................................................................2

## INTRODUCTION

Across from Wrigley Field there are sixteen buildings which enjoy views into Wrigley Field from grandstands erected on their rooftops. These "Rooftop Businesses" sell tickets to Cubs games and concerts which can be watched from the grandstands on the Rooftop Businesses. To resolve and settle certain litigation then pending in the district court, in 2004 the owners of the Chicago Cubs entered into a contract with many of these Rooftop Businesses, pursuant to which the Rooftop Businesses agreed to pay the Cubs a royalty based on their gross rooftop sales, in return for twenty years of guaranteed unobstructed views into Wrigley Field. To date, the Rooftop Businesses have paid millions of dollars in royalty payments to the Cubs. However, when the Chicago Cubs and Wrigley Field were sold in 2009, the new owners complained that the Rooftop Businesses were competing with them for ticket sales, driving down ticket prices, and reducing demand for tickets sold by the Cubs to Wrigley Field.

The new Cubs Organization demanded that the Rooftop Businesses enter into a price-fixing scheme to raise ticket prices, which would reduce competition and increase the new Cubs Organization's profits. When these demands were rejected, the new Cubs Organization threatened to block the Rooftop Businesses with jumbotrons, video boards and other advertising signs, in complete disregard for the 20-year contract's terms, unless the Rooftop Businesses agreed to fix and raise ticket prices. After these threats did not deliver the desired results, the new Cubs Organization commenced the planning and construction of seven large outfield signs, while using the threats of these signs blocking rooftop views as leverage to coerce the Rooftop Business owners to sell their properties to the Cubs Organization at grossly undervalued prices.

This conduct has left the Plaintiffs, which own and operate two Rooftop Businesses, in a life-or-death situation. The Cubs Organization is in the process of installing a 2,200-square-foot

video board that will directly block the Plaintiffsø views into Wrigley Field. Without these views, the Plaintiffsø businesses cannot survive. Indeed, the mere threat of blocking the Plaintiffsø views has already caused a significant decline in the Plaintiffsø 2015 ticket pre-sales, and those customers who are booking events with the Plaintiffs are demanding refunds if the views are blocked. Without immediate injunctive relief which restrains the Cubs Organization from installing the video board and any other signage which blocks the Plaintiffsø views, the Plaintiffsø businesses will be destroyed before this case goes to trial. Simply put, without views into Wrigley Field there is no Rooftop Business ó a fact that the Cubs Organization has frequently pointed out while trying to strong-arm the Plaintiffs and others into selling out.

## FACTUAL BACKGROUND

Wrigley Field has been the home of the Chicago Cubs baseball since 1916. Declaration of Thomas M. Lombardo, Exhibit A at Exhibit A-1, p. 1, City of Chicago Landmark Designation Report. Its unique character to the neighborhood and its significance to Chicagoøs landscape and social environment were recognized when the City of Chicago (the õCityö) adopted the Wrigley Field Landmark Ordinance and accompanying Landmark Designation Report on February 11, 2004. Id.; Stuart Shea, *The Long Life and Contentious Times of the Friendly Confines* 390 (2014) The Landmark Designation Report states, in relevant part:

> Due to the varying height of the bleachers, which slope downward form the center, a portion of the ballparkô as seen from insideô is visually enclosed by the row of buildings that face Waveland and Sheffield Avenues, opposite the ballpark. Most of these are masonry structures, three stories in height and often topped with smaller grandstands or roof decks. Exhibit A-1, p. 2.

> The ballparkøs ivy-covered walls, hand-changed scoreboard, and intimate urban setting-with views of the surrounding townhouses, the El, and Lake Michigan-are as integral to the image and history of Chicago as Buckingham Fountain, the Old Water Tower, the Picasso sculpture, the Untion Stockyards, or the early skyscrapers. Exhibit A-1, p. 5.

2

It is one of the few remaining ballparks whose design and field layout was strongly influenced by the surrounding street grid. The resulting proximity of the playing field creates a sense of intimacy and charm that is unique in professional baseball. This urban character is further heightened by the line of masonry residences that face the ballpark along Sheffield and Waveland Avenues. <u>Exhibit A-1</u>, p. 7.

The row of three-story masonry buildings lining Sheffield and Waveland avenues-behind the bleachers-are a familiar feature to the tens of thousands of spectators within Wrigley Field and to the hundreds of thousands who watch televised coverage of the Chicago Cubs. Most were built between 1895 and 1915 and are set back approximately 10 feet from the street. Since 1990, several new structures have been built on the sites of older buildings. <u>Exhibit A-1</u>, p. 9.

From its earliest days, baseball games and other events at Wrigley Field were watched and enjoyed by spectators from the apartments and rooftops of the buildings on Sheffield Avenue and Waveland Avenue. Stuart Shea, *The Long Life and Contentious Times of the Friendly Confines* 72 (2014). Beginning in the mid-1980s, the rooftop owners gradually transformed their original flat-topped roofs into bleacher-style grandstands, and began to form rooftop business entities to serve a growing market for viewing Cubs games and other Wrigley Field events from the rooftops (the "Rooftop Businesses"). *Id.* at 375. In 1998, the City enacted an ordinance formally authorizing the Rooftop Businesses to operate as special clubs under license from the City (a "Club License"). Chicago, Ill. Mun. Code § 4-388-010, *et seq.*

Today, there are sixteen Rooftop Businesses on Sheffield Avenue and Waveland Avenue from which fans enjoy Cubs games and other live events at Wrigley Field. Declaration of Marc Anguiano, <u>Exhibit B</u>, ¶ 5. The names and general locations of the Rooftop Businesses are depicted on <u>Exhibit B-1</u>. *Id.* The Plaintiffs are four affiliated entities that own and operate the real estate and Rooftop Businesses at 3627 and 3633 North Sheffield Avenue. Declaration of Marc Hamid, <u>Exhibit C</u>, ¶¶ 3, 8; Declaration of Edward A. McCarthy, <u>Exhibit D</u>, ¶¶ 4-5. Right Field Properties, LLC ("3627 Owner") owns the 3627 North Sheffield Property, where Right

Field Rooftops, LLC, d/b/a Skybox on Sheffield ("Skybox") operates a Rooftop Business.
Exhibit C, ¶ 3; Exhibit D, ¶ 4. Rooftop Acquisition, LLC ("3633 Owner") owns the 3633 North
Sheffield Property, where 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club
("Lakeview Club") operates a Rooftop Business. Exhibit C, ¶ 8; Exhibit D, ¶ 5.

In the fall of 2009, entities controlled by the Ricketts family, including defendants
Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC and Wrigley Field
Holdings, LLC (collectively hereinafter with Ricketts, the "Cubs Organization"), purchased 95%
of the Cubs and acquired Wrigley Field from the Tribune Company. Exhibit A-11. For the next
five years, the new owners embarked on a ruthless crusade to raise ticket prices, squeeze
additional revenue out of the Rooftop Businesses, and ultimately acquire or destroy the Rooftop
Businesses that would not acquiesce by threatening to block their views with "jumbotrons" and
other large signs. The Cubs Organization did this, notwithstanding a binding 20-year contract
that the Tribune Company struck with the Rooftop Businesses in 2004 (the "Rooftop License
Agreement"), under which the Rooftop Businesses were guaranteed unobstructed views into
Wrigley Field through 2023, in return for 17% of their gross revenue. A true and correct copy of
the Rooftop License Agreement is attached hereto as Exhibit C-2-A.

The Rooftop License Agreement was the resolution of a lawsuit the Cubs filed against
most of the Rooftop Businesses after the 2002 baseball season (the "2002 Lawsuit"), claiming
amongst other things that the Rooftop Businesses were misappropriating the Cubs' property by
charging admission fees to watch Cubs games from the Rooftop Businesses.[1] Quoin, Ltd., an
original signatory on the Rooftop License Agreement, assigned its rights thereunder to Skybox
on November 15, 2005, in connection with a sale of the 3627 North Sheffield Property. Exhibit

---

[1] Case No. 02 C 9105 in the United States District Court for the Northern District of Illinois.

C, ¶ 5; <u>Exhibit C-2</u>.  3633 Owner outbid the Cubs Organization to purchase the 3633 North Sheffield Property in a bankruptcy sale on or about December 28, 2011.[2]  Shortly thereafter, 3633 Owner and the Cubs Organization expressly agreed to have the Rooftop License Agreement govern their relationship.  Declaration of Mark Schlenker, <u>Exhibit E</u>, ¶ 9.

The Cubs Organization, through affiliates, was able to acquire an ownership interest in "Down the Line," the Rooftop Business located at 3621 North Sheffield, shortly after it acquired the Cubs in 2009. Stuart Shea, *The Long Life and Contentions Times of the Friendly Confines* 407 (2014); <u>Exhibit A-8-1</u>.  In 2010, the Cubs Organization announced plans to install a "Toyota" sign in left field.  <u>Exhibit A-6-2</u>.  However, Ricketts tacitly acknowledged at the time that the Rooftop License Agreement prevented the Cubs Organization from blocking the Rooftop Businesses with signage, stating on March 24, 2010 at the City Club of Chicago, "I think it's fairly innocuous. It won't affect any rooftops and everyone will be able to see. It's really not a big deal." <u>Exhibit A-6-2</u>.

In early 2011, upon information and belief, the Cubs Organization again attempted to orchestrate a global acquisition of all the Rooftop Businesses, which like previous efforts proved unsuccessful.  Next, the Cubs Organization began to engage individual Rooftop Business owners in separate, but more adversarial negotiations. <u>Exhibit A-8-6</u>.  But after failing, once again, to acquire the Rooftop Businesses, the Cubs turned to the City in late 2011 or early 2012 and began lobbying for approval of an outfield sign package which would block the Rooftop Businesses, and provide leverage in their discussions with the Rooftop Businesses. <u>Exhibit A-3-1</u>.  In April of 2012, media reports began circulating that the Cubs Organization and City Mayor Emmanuel had been in talks regarding the approval of outfield signage, including a "jumbotron." *Id.*

---

[2] Case No. 11bk34516 in the United States Bankruptcy Court for the Northern District of Illinois.

Several weeks later, on May 8, 2012, a meeting took place between the Cubs Organization and the Rooftop Business owners or representatives. Exhibit B, ¶¶ 6-8; Exhibit C, ¶¶ 11-13; Exhibit E, ¶¶ 10-11; Declaration of Paul Bauch, Exhibit F, ¶¶ 5-7. At the meeting, the Cubs Organization was represented by Ricketts, Cubs Executive Vice President/Chief Legal Officer Michael Lufrano, and Cubs President of Business Operations Crane Kenney. *Id.* Various Rooftop Business owners or representatives in attendance were Jim Lourgos, George Loukas, Beth Murphy, Dan Finkel, Aidan Duncan, George Vranas, and several of Plaintiffs' owners or agents, Marc Anguiano, Marc Hamid and Mark Schlenker. *Id.*

During the May 8, 2012 meeting, Ricketts and the other Cubs Organization executives complained that the Rooftop License Agreement was a "bad deal" for the Cubs, and that the Cubs and the Rooftop Businesses were involved in a "price war" that was leading to a "race to the bottom" on Cubs ticket prices. *Id.* They also complained that the Rooftop Businesses were selling individual tickets, discounting tickets, selling discounted tickets on Groupon, and selling game-day tickets, all of which reduced demand for Wrigley Field tickets. *Id.* Ricketts and the Cubs Organization executives demanded that the Rooftop Businesses agree with the Cubs on setting coordinated, minimum ticket prices for Cubs tickets. *Id.*

Also during this meeting, Ricketts admitted that the Rooftop License Agreement prevented the Cubs from blocking the rooftops' views, stating, "2023 can't come soon enough." *Id.* But despite that contractual prohibition, Ricketts openly threatened to block the Rooftop Businesses' views into Wrigley Field unless they agreed to the price fixing scheme, stating, "whatever you give us is in return for not being blocked," referring to the recently-publicized signage plans. Exhibit C, ¶ 13. The Rooftop Business owners did not agree to participate in the pricing scheme that the Cubs Organization pressured them with. Exhibit B, ¶ 8; Exhibit C, ¶ 13.

However, under the threat of having their views blocked, the Rooftop Business owners agreed to form a revenue committee and a compliance committee to explore lawful means of acquiescing to the Cubs Organization's demands that the Rooftop Businesses contribute additional revenue to the Cubs Organization and stop discounting tickets. *Id.* The committees were also supposed to look at minimum group sizes and related topics that the Cubs Organization complained about. *Id*.

In late June of 2012, the compliance committee met with Lufrano and Cubs Organization Vice President of Strategy and Development, Alexander Sugarman. Exhibit B, ¶ 9. During this meeting, Lufrano again suggested that the Rooftop Businesses participate in a price-fixing arrangement. Exhibit B, ¶ 10. Lufrano, an attorney, also suggested that the Cubs Organization and the Rooftop Businesses create a "management firm" which would be empowered to set all ticket prices, including those inside Wrigley Field and those at the Rooftop Businesses, as a way to avoid legal issues associated with price-fixing. Exhibit B, ¶ 11. The Rooftop Businesses rejected the Cubs Organization's price-fixing demand, wanting the ability to control their own businesses and pricing. Exhibit B, ¶ 13.

Also at this meeting, Lufrano and Sugarman told Plaintiff Rooftop Business owner Marc Anguiano that the Rooftop License Agreement was "bullshit," and that the Rooftop Businesses needed to raise revenue for the Cubs Organization or they would be blocked. Exhibit B, ¶ 12.

Throughout the summer of 2012, Schlenker had numerous conversations with Kenney and Lufrano, in person and on the telephone, regarding the Cubs Organization's dealings with the Rooftop Businesses. Exhibit E, ¶ 12. During these conversations, Kenney stressed that Ricketts had given him the authority to do whatever was necessary to get control of the outfield. *Id.* Lufrano also complained to Schlenker numerous times that the Rooftop Businesses were charging too low for admission, which was hurting the Cubs' business. *Id.*

7

On February 4, 2013, a number of Rooftop Business owners or representatives met with Ricketts and other members of the Cubs Organization. Exhibit F, ¶ 8. During this meeting, Ricketts again proposed that the Rooftop Businesses and Cubs agree on ticket prices. *Id* at ¶¶ 9-10.

Upon information and belief, around this time, Ricketts also expressly communicated his anger that certain Rooftop Businesses sold concert tickets for well-known band Pearl Jam before the Cubs Organization began selling those tickets. This, complained Ricketts, denied the Cubs Organization the opportunity to set the initial market price for those concert tickets and lowered the overall ticket price for the concert. In order to avoid this supposed problem in the future, Ricketts demanded yet again that the Rooftop Businesses agree with the Cubs Organization to set a minimum ticket price for Cubs games and live music concerts at Wrigley Field.

On or about April 15, 2013, the Cubs Organization announced a new renovation plan for Wrigley Field, which included a 6,000-square-foot jumbotron in left field, and a 1,000-square-foot advertising sign in right field. Exhibit A-8-2. Contemporaneous with this announcement, Ricketts continued to create negative public sentiment about the Rooftop Businesses and promote his outfield sign package, stating "If this plan is approved, we will win the World Series for our fans and our city. We need this project in order to bring our fans a winner." *Id*.; Exhibit A-6-3. Ricketts' intent was to decrease public interest in buying Rooftop Business tickets so that the Rooftop Businesses would suffer, be unable to pay their bills, and eventually fail or sell to the Cubs Organization at a distressed, below-market price.

On May 1, 2013 Ricketts spoke at the City Club of Chicago. During his speech, Ricketts stated that the Rooftop Businesses were "direct competitors" of the Cubs Organization, and complained about decreased revenues, citing and criticizing the Rooftop Businesses for

aggressively discounting tickets, selling tickets on Groupon, and selling to individuals instead of only to groups. Exhibits A-8-3, A-8-4, A-8-5. Also during his May 1, 2013 speech, Ricketts complained that the Cubs Organization was losing $20 million or more in lost seasonal advertising revenues because of its agreement with the Rooftop Businesses, thus publicly acknowledging once again that the Rooftop License Agreement precluded the Cubs Organization from blocking the Rooftop Businesses' views. *Id.* Nevertheless, Ricketts again touted the Cubs Organization's intent to erect a large video board in left field, also known as a "jumbotron," along with a large advertising sign in right field. *Id.*

Acknowledging that such actions might breach the Rooftop License Agreement, Ricketts stated that the Cubs Organization would move the outfield walls of Wrigley Field to "minimize" the impact on the Rooftop Businesses. *Id.* In responding to a question from the audience about the Cubs Organization's contractual obligations to the Rooftop Businesses, Ricketts refused to answer. Instead, the Cubs Organization continued its anti-Rooftop Business public relations campaign by threatening the entire City, and all Cubs fans, to move the Cubs out of Wrigley Field if the Cubs Organization could not have the signs it wanted.[3] Ricketts was unable to provide any coherent response to questioning as to why the Cubs Organization refused to simply install the outfield signage on top of the Rooftop Businesses, instead of blocking their views.[4]

---

[3] YouTube.com, https://www.youtube.com/watch?v=JHTb9FFBgTU at 17:18 to 17:45. In response to the question, "[w]hat if opponents stop the signs [going up] in the outfield?" Ricketts answers, "I'm not sure how anyone is going to stop any signs in the outfield, but if it comes to the point that we don't have the ability to do what we need to do in our outfield then we are going to have to consider moving, simple as that."

[4] YouTube.com, https://www.youtube.com/watch?v=JHTb9FFBgTU at 28:53 to 29:46. In response to the question, "if you could make as much advertising money by putting the signs across the street on the rooftops why would you put them where they block rooftop views?" Ricketts answers, "We have obviously looked at that, the fact is that we need to control our relationship with our sponsors, we want the signs to be on our side of the street and will work to make sure that the signs we put on our side of the street will limit the impact on the rooftops and … on a personal level I like all the people that own the rooftops they're good folks, but we just

Notably, the Rooftop Businesses spent tens of thousands of dollars obtaining a professional report from Platt Retail Institute which demonstrated that signage on top of the Rooftop Businesses would generate significant revenue for the Cubs Organization. Exhibit C, ¶¶ 14-15. The Rooftop Businesses offered to let the Cubs Organization place signage on the Rooftop Properties, at no cost, offered to let the Cubs Organization control the content of the signage, and even offered to pass all related revenue on to the Cubs Organization, just to avoid having their views blocked. *Id*. The Cubs refused. *Id*.

The motives of the Cubs Organization, to control and thereby increase prices for Cubs games, is also reflected by a conversation in 2013 between Kenney and Schlenker, wherein Kenney indicated that the Cubs Organization wanted control of the Rooftop Businesses so it could control pricing. Exhibit E, ¶ 12.

On May 28, 2013, the Cubs organized a "mock up" event to show the Rooftop Business owners where the proposed signs would go. Exhibit C, ¶ 16; Exhibit A-3-3. It was clear from the mock-up event that the Plaintiffs' views would be substantially blocked. Exhibit C, ¶ 16.

Disregarding its contractual obligations to the Rooftop Businesses, the Cubs Organization pressed the City Landmarks Commission to approve their signage plans. On July 11, 2013 the City's Landmarks Commission approved a 4,560-square-foot video board in left field, and a 650-square-foot advertisement sign in right field. Exhibit A-4-1. Yet, despite receiving this approval, the Cubs Organization never bothered to install these signs. Instead, it used the approval as a weapon with which to threaten the Rooftop Businesses with complete annihilation.

---

have to start to address the issue it creates for us in terms of the dollars that we lose, and this [renovation] plan takes a step in that direction, and that's the way we've decided to go forward."

Armed with their Landmarks Commission Approval and the pressure placed upon the Rooftop Business owners after the mock-up event, the Cubs Organization was emboldened to continue on their mission to coerce the Rooftop Business owners to sell their properties to the Cubs Organization at significantly depressed prices, or be blocked by signage and destroyed if they refused to do so. Exhibit B, ¶ 15.  Upon information and belief, in the months that followed the July 11, 2013 Landmarks Commission approval, the Cubs Organization engaged various Rooftop Business owners in one-sided negotiations to purchase their Rooftop Businesses and underlying rooftop properties for a small fraction of fair market value, under the threat of being put out of business by now-approved outfield signage.  The Cubs Organization also continued its media campaign to convince consumers to stop patronizing the Rooftop Businesses through false, misleading and confusing statements.  Exhibits A-3-1 through A-3-4, A-8-3 through A-8-5.

A meeting took place on August 15, 2013 at the Cubs Organization's offices, attended by Lufrano, Sugarman, Finkel and Anguiano. Exhibit B, ¶ 15.  During this meeting, Sugarman told Anguiano and Finkel that the ticket business was too competitive between the Cubs Organization and the Rooftop Businesses, that the Rooftop Businesses' ticket prices were too low, and that the Cubs Organization could not compete with the Rooftop Businesses' margins. *Id.*  Sugarman explained that the only way for the Rooftop Businesses to meet the Cubs Organization's desired revenue levels was to raise the Rooftop Businesses' prices. *Id.*

On January 17 – 19, 2014, the Cubs Organization held the annual Cubs Convention, which is heavily covered by media outlets and is attended by a large number of loyal and dedicated Cubs fans.  During a portion of the 2014 Cubs Convention called "Meet the Ricketts," Ricketts fielded an audience question about whether the Rooftop Businesses were "holding up

the renovation that the Cubs Organization claimed was necessary to field a competitive professional baseball team. In response, Ricketts stated:

> It's funny — I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching 'Homeland.' You pay for that channel, and then you notice your neighbor looking through your window watching your television.
>
> And then you turn around, and they're charging the other neighbors to sit in the yard and watch your television. So you get up to close the shades, and the city makes you open them. That's basically what happened.

Exhibits A-8-6, A-8-7.

The audience, including the media and ticket-buying fans, widely understood this statement to be an accusation that the Rooftop Businesses were stealing the Cubs Organization's property, that the Rooftop Businesses were the reason that the Cubs were uncompetitive, and that the Rooftop Businesses had no lawful right to sell tickets to view Cubs games from their properties. For example, calls were made to boycott the Rooftop Businesses just days after this speech. Exhibit A-10-1; www.facebook.com/pages/Boycott-Wrigleyville-Rooftops/431500950272989.

Despite telling the consumer public and media outlets that the Rooftop Businesses are thieves who were preventing the Cubs from being a competitive team, Ricketts effectively acknowledged that his outfield sign plans violated the Cubs Organization's contractual obligations to the Rooftop Businesses. Exhibit A-8-8, A-8-9. At one point during the 2014 Cubs Convention, Ricketts stated that, "But this is a private investment of hundreds and hundreds of millions of dollars, we just have to know in 2023 when we no longer have a contract [with the Rooftop Businesses] that we can do anything we want to the park and do what's right for the team and not have to worry about the people across the street." Exhibit A-8-6, A-8-7.

Also during the 2014 Cubs Convention, on January 18, 2014, Kenney called "the rooftops a $20 million yearly drag on their business." Id. He also stated at that time that "the Cubs are losing $20 million in bleacher sales due to the rooftops," and suggested that the Cubs Organization was unable to afford great baseball players like Miguel Cabrera, Justin Verlander, Joe Mauer and Cole Hamels because of the Rooftop Businesses, fueling the Cubs Organization's media campaign to blame their team's poor record on the Rooftop Businesses and sour consumer sentiment for the Rooftop Businesses. *Id.*

On February 1, 2014, Cubs Organization spokesperson Julian Green made a statement on WSCR-AM radio that the Cubs might move out of Wrigley Field if they are not able to get the outfield signs they want because of the Rooftop Businesses. Exhibit A-6-1. Each representative of the Cubs Organization understood that these statements would be widely and prominently broadcast by the media covering the 2014 Cubs Convention to the public at large, including existing and potential Rooftop Business customers. All of the negative statements by the Cubs Organization about the Rooftop Businesses were made with the goal of convincing Cubs fans to refuse to patronize the Rooftop Businesses, thereby making it harder for the Rooftop Businesses to pay their bills and stay in business.

On May 21, 2014, Ricketts published a video of himself claiming that the Rooftop Businesses have prevented the Cubs Organization from realizing tens of millions of dollars in advertising revenue. Exhibits A-8-8, A-8-9. He also complained that the Rooftop Businesses were not willing to accept the two-sign proposal from January, 2013. Exhibits A-4-2 through A-4-4. Thus, Ricketts announced that because the Rooftop Businesses threatened to take legal action to stop the two signs from being installed, the Cubs Organization would proceed with a different plan in the outfield that included more, and larger signage. *Id.* The implication in this

video, and other media releases, was that the Rooftop Businesses caused the Cubs Organization to lose money that they desperately needed in order to field a competitive team. <u>Exhibits A-4-2</u> through <u>A-4-4</u>, <u>A-8-8</u>, <u>A-8-9.</u>

It soon became clear that the Cubs Organization was seeking a total of not two, but seven signs in the outfield, which would effectively destroy the Rooftop Businesses altogether, even if all the negative, misleading, confusing and false media propaganda blaming the Rooftop Businesses for the Cubs' dismal record was not successful in accomplishing same. *Id.*

In May of 2014 one of the owners of the Plaintiffs, Ed McCarthy, met with Kenney to discuss the impact of the signs on the Rooftop Businesses and a possible sale of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization. <u>Exhibit D</u>, ¶¶ 6-8. In response to a proposal McCarthy made to sell the Plaintiffs' businesses and properties to the Cubs Organization for what he felt was fair market value, Kenney stated, "That's a good deal if you have a Rooftop Business, but once we put up the signs you don't have a Rooftop Business." *Id.* at ¶¶ 7-8. Kenney also said, "We own the City, we control City Hall, we control [Ald. Partrick] O'Connor," and then added, "I guarantee the sign deal will be approved. The signs are going up and there is nothing you can do about it." *Id* at 8. At the end of the call, Kenney told McCarthy, "I'm going to call and make you an offer after the sign deal is approved, whatever I offer you better take." *Id.* At the conclusion of this early July, 2014 meeting, Kenney told McCarthy, "I'm going to call and make you an offer after the sign deal is approved, whatever I offer you better take." *Id.*

Upon information and belief, on July 7, 2014, during a neighborhood meeting at the Addison and Broadway police station, Lufrano stated to Dan Finkel, a manager and member of three Rooftop Businesses, "first we want to get the right to block you [from the City Landmark

14

Commission], then we will negotiate." On July 10, 2014 the City Landmarks Commission approved the Cubs Organization's request to install seven signs: three 650-square-foot advertising signs and a 3,990-square-foot video board above the left field bleachers, plus a 2,400-square-foot video board and two more advertising signs above the right field bleachers. Exhibit A-8-10. Renderings published by the Cubs Organization in various media outlets, including the Cubs Organization's own website, reflect that the signage approved for right field on July 10, 2014 would substantially block the views from the Plaintiff Rooftop Businesses in direct violation of the Rooftop License Agreement. Exhibit A-10-1; Exhibit C, ¶ 18.

Kenney called McCarthy after receiving the Landmarks Commission approval, and asked McCarthy to meet him at the Cubs Organization's offices. Exhibit D, ¶¶ 9-10. During this meeting in late July, 2014, Kenney showed McCarthy a model of Wrigley Field, the Rooftop Businesses, and the signs that would be erected under the approved seven-sign deal. Id. Kenney stated, "We don't like you competing against our bleachers and grandstands." Id. He also said, "We don't like you competing with our gate," and referred to the Rooftop Businesses' discounted ticket sales on Groupon. Id. Kenney then offered McCarthy, under the threat of being blocked, a grossly unfair price for the Rooftop Businesses. Id. at ¶ 10.

Kenney also told McCarthy that the Cubs Organization intended to operate Rooftop Businesses wherever they were able to purchase same, and went on to threaten, "Whatever [Rooftop Businesses] we don't buy, we're going to block." Id. at ¶¶ 11, 13. The Cubs Organization was aware, and specifically intended, that their seven-sign plan would adversely affect all of the Rooftop Businesses except the one that it already had an interest in. After McCarthy rejected Kenney's unreasonable offer, Kenney told Schlenker that he was going to raise the video board even higher to further diminish McCarthy's views. Exhibit E, ¶ 15.

15

Upon information and belief, a discussion took place between the Cubs Organization's Ricketts, Kenney and Lufrano, and George Loukas, an owner of the Rooftop Businesses and underlying properties at 1032 Waveland Avenue, 3609 Sheffield Avenue and 3643 Sheffield Avenue (the "Loukas Rooftops"). During this meeting, Kenney reportedly threatened that the Cubs Organization would "destroy the rooftops" if they Loukas not sell to the Cubs Organization.

These threats continued. In July of 2014, Kenney told Schlenker on a telephone call that the Cubs Organization had the support of the City to do whatever it wanted. Exhibit E, ¶ 13. To exemplify this point, Kenney told Schlenker that he had separately called two Rooftop Business owners, Jamie Purcell and George Loukas, to discuss selling their buildings. *Id.* In an attempt to force either Purcell or Loukas to sell their buildings, Kenney told them he was going to put a sign in front of the Rooftop Business that did not sell to the Cubs first. *Id.*

Upon information and belief, in a telephone call between Kenney and Finkel on September 9, 2014, Kenney stated that "We will own all these rooftops eventually, so we can buy yours now, or I can deal with Fifth Third [Finkel's mortgage lender] and get these for five cents on the dollar out of bankruptcy." Kenney also stated during this call that Finkel had to "finish the deal [to sell to the Cubs Organization] this week, or I order the steel," referring to the signs that would block Finkel's three Rooftop Businesses.

On September 29, 2014 the Cubs Organization made good on its threats to "destroy the rooftops" by starting construction on Wrigley Field. Exhibits A-8-11, A-8-12. According to media statements, public announcements and several websites controlled by the Cubs Organization, the construction that commenced on September 29, 2014 included installation of the seven signs announced by the Cubs Organization on May 21, 2014, which signs will

substantially block the views from many if not all of the Rooftop Businesses, except Down the Line, which the Cubs Organization has an ownership interest in. Exhibits A-8-11, A-8-12.

Additionally, in October of 2014, Kenney reportedly left a message for Jamie Purcell, the owner of the Rooftop Businesses and underlying properties at 1010, 1038 and 1048 Sheffield (the "Purcell Rooftops"), explaining that the Cubs Organization just reached an agreement to purchase the Loukas Rooftops, and threatened to alter the sign locations to block the Purcell Rooftops instead of the Loukas Rooftops if Purcell did not sell too.

Similar statements were reportedly made by Kenney to Finkel at a meeting on September 3, 2014, at which time Kenney said that Finkel "could sell to me now and I'll slide the signs down in front of Hamid's buildings [referring to the Plaintiffs]," but "If you don't sell I'm ordering the steel and the signs will go up in front of your buildings. I'm done with this."

On or shortly prior to October 21, 2014, the Cubs Organization learned that the three Finkel Properties defaulted on their mortgage loans with Fifth Third Bank and might be facing an imminent foreclosure suit. Upon information and belief, the Cubs Organization promptly made an unsolicited call to Fifth Third Bank, and made an unsolicited offer to purchase Finkel's mortgages from Fifth Third Bank at severely discounted prices. The Cubs Organization's goal in seeking to become Finkel's mortgage lender was to foreclose on Finkel's three Rooftop Businesses and reduce competition by three more Rooftop Businesses.

On November 14, 2014, Fifth Third Bank filed a foreclosure action against the three Finkel Properties.[5] Shortly thereafter, the Cubs Organization reportedly thought they had reached a deal to acquire all three Finkel Properties. Also by that time, the Cubs Organization reportedly had the Loukas Properties under contract. Exhibit 4-5. Believing that it would

---

[5] 14 cv 9169 and 14 cv 9171 in the United States District Court for the Northern District of Illinois.

eventually own all of the Finkel Properties, Loukas Properties and 3639 North Sheffield, which owner James Lourgos agreed to sell, the Cubs Organization announced yet another change to its right field signage plan on December 4, 2014. Exhibit A-8-13.

On December 4, 2014, the Cubs Organization announced that it was moving the 2,400-square-foot video board further towards the right field foul pole. *Id.* This change in its plans will effectively remove the obstruction of the views from the Rooftop Businesses that the Cubs Organization was planning to buy, and further block the views from those Rooftop Businesses which were able to hold out, including the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties. Exhibit A-8-13; Exhibits A-10-1, A-10-2; Exhibit C, ¶ 18.

The now-2,200-square-foot video board is being placed directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties, while leaving four Cubs-owned Rooftop Businesses unobstructed. *Id.* The 2,200-square-foot video board will substantially block the Plaintiff Rooftop Businesses and thereby destroy the Plaintiff Rooftop Businesses altogether and grossly devalue the Plaintiff Rooftop Properties.

In December, 2014, McCarthy and Kenney had another telephone conversation about the video board being placed directly in front of the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties. During this call, McCarthy said, "I cannot believe you're moving the sign in front of us. We are going to be out of business." To which Kenney responded, "[s]ometimes we make bad investments." Exhibit D, ¶ 14.

Plaintiffs Skybox and Lakeview have experienced significant difficulty selling rooftop tickets to 2015 events. A large number of customers have either refused to book events because of the threat of the views being blocked, or they are demanding refunds if the views are blocked on the date of their event. Exhibit C, ¶ 19; Group Exhibit C-3.

18

The Plaintiffs have engaged D3 LED, LLC ("D3"), a global technology company that designs, engineers and manufactures turnkey LED display and lighting solutions that enhance destination-based digital media experiences, and which has completed projects in the Advertising, Architecture, Entertainment, Gaming, Retail, Sports and Transportation markets in the USA, United Kingdom, Europe, Australia, the Middle East and Asia. Declaration of Eric Bland, Exhibit G, ¶ 1. The purpose of this engagement was for D3 to prepare a viewing angle study (a "VAS") to determine how the views from the grandstands on Plaintiffs' Rooftop Businesses would be affected by the proposed signs, and how altering the placement and dimensions of the signs would affect those views. Id. at ¶ 3.

The VAS D3 prepared for both Skybox and Lakeview Club, based on the latest location of the proposed video board, shows that spectators sitting in the bleachers at either Skybox or Lakeview will not be able to view the playing surface at Wrigley Field above the video board. Id. at ¶¶ 9-11; Exhibit G-1, G-2. The VAS for Skybox also shows that the only view of Wrigley Field's playing surface from Skybox will require spectators on this Rooftop Businesses to look between the bottom of the proposed video board and the top of the bleacher section's wall. This will result in complete blocking of the infield, and nearly complete blocking of the outfield. Exhibit G, ¶ 10; Exhibit G-1. The VAS for Lakeview Club reflects that the only view of Wrigley Field's playing surface from Lakeview Club will require spectators on this Rooftop Businesses to look between the bottom of the proposed video board and the top of the bleacher section's wall. This will result in near-complete blocking of the infield, and substantial blocking of the outfield. Exhibit G, ¶ 11; Exhibit G-2.

**ARGUMENT**

**I.    Legal Standard for Injunctive Relief**

Temporary restraining orders and preliminary injunctions are authorized by Rule 65 of the Federal Rules of Civil Procedure. The only material difference between a temporary restraining order ("TRO") and a preliminary injunction is that a TRO may be obtained on an *ex parte* basis but only lasts for up to fourteen days (plus one possible fourteen day extension), while a preliminary injunction requires notice but may remain effective until the conclusion of the case. Fed. R. Civ. P. 65; *Wooley v. Maynard*, 430 U.S. 705, 718 (1977). In either case, "The same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

To obtain injunctive relief, a plaintiff:

> … must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties.

*Abbott Laboratories v. Meade Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). Also see *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 20 (2008).

A.    Likelihood of Success on the Merits

To establish the first element, "… a plaintiff need only demonstrate that he or she has a "better than negligible" chance of succeeding on the merits to justify injunctive relief." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988) (citing *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988)). With respect to this standard,

"Although the plaintiff must demonstrate some probability of success on the merits, the threshold is low." It is enough that 'the plaintiff's chances are better than negligible....'" *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (quoting *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)).

B.      Irreparable Harm and No Adequate Remedy at Law

These elements are established where a plaintiff shows that it will suffer, without injunctive relief, "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Finding that irreparable harm exists where "Plaintiffs may be forced to close their businesses while awaiting final judgment.").  Although economic loss is typically not considered irreparable harm, "an economic loss that threatens the survival of the movant's business can amount to irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005). See also *Planned Parenthood of Wis. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013) (Finding irreparable harm where movant's business would be shut down without issuance of injunction).

C.      Balance of Hardships

On this element, the Seventh Circuit has explained that,

> The right to a preliminary injunction depends on a comparison of the likely harms to the parties (and to others as well, if others' rights or interests are affected) if such interim relief is granted or denied and on a tentative evaluation of the merits. The relevant harms are the irreparable ones, because a harm that will be cured by the entry of the final judgment supplies no reason for interim relief. Harms and merits are related inversely from the standpoint of whether to grant a preliminary injunction. The greater the harm to the plaintiff if the injunction is denied, the less of a showing that his case has merit need he make to get the injunction; the less the harm, the stronger the required showing of merit. And conversely for the defendant: the greater the harm to him if the injunction is granted,

> the less of a case on the merits need he make to defeat the plaintiff's motion.

*Diginet, Inc. v. Western Union ATA, Inc.*, 958 F.2d 1388, 1392-93 (7th Cir. 1992) (citing *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593-94 (7th Cir.1986)); *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 170 (7th Cir.1988); *Ping v. National Education Ass'n*, 870 F.2d 1369, 1371-72 (7th Cir.1989). This process is referred to as the "sliding scale" approach. *Abbott Labs*, 971 F.2d at 12.

      D.     The Public Interest

      In *Abbott Labs*, the Seventh Circuit defined the "public interest" as "the consequences of granting or denying the injunction to non-parties." *Id.* Courts have found a strong public interest in the enforcement of public laws and regulations. *See e.g. F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008); *Jackson v. N.F.L.*, 802 F. Supp. 226 (D. Minn. 1992). Furthermore, courts have found that the public interest is served in maintaining the status quo until the merits of a serious federal antitrust controversy are resolved on the merits. *Blackwelder Furn. Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir. 1977). However, it has also been recognized that the effect on third parties, and the public interest, may not be implicated in all cases, and that a court only need take those issues into account when they are relevant. *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 920 (3rd Cir. 1974).

## II. Strong Likelihood of Success on Plaintiffs' Anticipatory Breach of Contract Claim

      Section 6.6 of the Rooftop License Agreement prohibits the Cubs Organization from blocking the Rooftop Businesses' views through 2023. Exhibit C-2-A. Yet, despite this prohibition the Cubs Organization has announced its intent to block the Plaintiffs' views and has already broken ground at Wrigley Field to erect its contractually-prohibited video board and

other signage.  Although Plaintiffs need only show a "better than negligible" chance of success on the merits to satisfy this element for injunctive relief, the Plaintiffs have a very strong likelihood of success on the merits of their anticipatory breach of contract claim against the Cubs Organization.

Under Illinois law, "An anticipatory breach, also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 940 (Ill. App. 1st Dist. 2007).  Additionally, "[a] settlement agreement is a contract, and construction and enforcement of settlement agreements are governed by principles of contract law." *Law Offices of Colleen M. McLaughlin v. First Star Fin. Corp.*, 963 N.E.2d 968, 975 (Ill. App. 1st Dist. 2012).

The Illinois Supreme Court has held that, "An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used." *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962).  When presented to a court, "The primary goal of contract interpretation is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms." *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888 N.E.2d 657, 662 (Ill. App. 1st Dist. 2008).  Moreover," A contract is to be construed as a whole, giving meaning and effect to every portion thereof, if possible, and not resorting to detached portions thereof standing alone." *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. 4th Dist. 1999).  Furthermore, "As a general rule, the parties' intentions are determined from their final agreement." *Kehoe v. Com.*

*Ed. Co.*, 694 N.E.2d 1119, 1123 (Ill. App. 1st Dist. 1998). Moreover, "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). This approach is known as the "four corners rule." *Id.*

The Rooftop License Agreement provides, in pertinent part, as follows:

3.1    **Royalty**.

    a)    Each Rooftop shall pay the Cubs, on an annual basis, an amount equal to 17% of its Gross Revenues and 11% of its Billboard Revenues, if any (together, the "Royalty").

4.1    This Agreement will commence on the Effective Date and expire December 31, 2023 (the "**Term**"), unless earlier terminated as provided herein.

4.2    Expiration of this agreement at the end of its 20 year term shall be without prejudice to any Rooftop's ability to assert no license or permission from the Cubs is required for the right to sell admission to view Games from a Rooftop and without prejudice to the Cubs'

    ability to assert a license or other permission from the Cubs is required for the right to sell admission to view Games from the Rooftops.

5.2    **Successors**. This Agreement shall bind the Cubs, each Rooftop, and their respective parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.

6.6    The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

Exhibit C-2-A.

Under the "four corners rule," it is clear under the Rooftop License Agreement that the Cubs granted the Rooftop Businesses a license to sell admission to watch Cubs games from the Rooftop Businesses until December 31, 2023 in return for 17% of the Rooftop Businesses'

24

annual gross revenue. It is also clear under the Rooftop License Agreement that the Cub Organization is prohibited from erecting windscreens or other barriers to obstruct the views from the Rooftop Businesses until December 31, 2023.

First, it cannot be said that a 2,200-square-foot video board is a temporary banner, flag, or decoration for special occasion. Furthermore, the phrase "Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement" does not give the Cubs Organization the right to block the Rooftop Businesses with video boards or other signage. The words in this phrase must be given their plain and ordinary meaning. The word "Expansion" is defined as:

> The act of expanding or the state of being expanded; spreading out; increasing in size or in volume; dilation; distension; enlargement; the amount or degree of expanding; anything spread out; an expanse; an expanded, dilated or enlarged portion or form of a thing; … *mach.* increase of volume of the working medium in the operation of an engine, as of steam in the cylinder.

*New Webster's Dictionary of the English Language* 345 (1985). In the Rooftop License Agreement, the "expansion" that is permitted is "expansion of Wrigley Field." Therefore, given its plain and ordinary meaning, the Rooftop License Agreement permits the Cubs Organization to expand, spread out or enlarge Wrigley Field, essentially increase the volume of Wrigley Field. There is no ambiguity in these plain, everyday words and phrases that would require parol evidence to interpret.

The Cubs Organization is presently engaged in two distinct construction projects at Wrigley Field. It is expanding Wrigley Field, by adding more bleacher seats. At the same time, the Cubs Organization is installing a 5,000-square-foot jumbotron and a 2,200-square-foot video board, plus other signs. These are gigantic signs that will sit atop Wrigley Field. These signs do not expand the capacity or volume of Wrigley Field. They do not expand the area for the fans to

sit, stand or eat. The signs likewise do not expand the playing area of the field itself. Signs do not "expand" Wrigley Field at all, but they are barriers that obstruct the view of Wrigley Field from the Plaintiffs' Rooftop Businesses. The four-corners rule warrants a finding that the Cubs Organization's ongoing sign installation project violates the Rooftop License Agreement.

Second, courts must construe contracts reasonably to avoid absurd results. *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 902 N.E.2d 1178, 1190 (Ill. App. 1st Dist. 2009). Any construction of the Rooftop License Agreement that would categorize jumbotrons, video boards or other signs as "expansion of Wrigley Field" would be obviously and patently absurd. Could the Illinois Department of Transportation say that they "expanded" a tollway by installing billboards next to it? Could a car owner say that placing a bumper sticker on their car somehow expands the vehicle? Of course not. The installation of new signs at Wrigley Field may be contemporaneous with an expansion of the stadium, and the expected sign revenue might even pay for some of the expansion, but that does not make the new signage itself an expansion of Wrigley Field.

As noted above, the four-corners rule also calls for an examination of the entire agreement, not just isolated provisions. *Coles-Moultrie Elec. Co-op*, 709 N.E.2d at 253. Section 3.1(a) of the Rooftop License Agreement requires the Plaintiffs to pay 17% of their gross revenue to the Cubs Organization, and section 4.1 of the Rooftop License Agreement provides for a 20-year term. Exhibit C-2-A. Also, section 4.2 of the Rooftop License Agreement provides that at the end of the 20-year term, the parties were to revert to their pre-contractual status, in which the Rooftop Businesses held the right to assert that no license or permission from the Cubs Organization is necessary "to sell admission to view Games from a Rooftop." *Id.* None of these terms and provisions make sense if the Cubs Organization could effectively terminate the

Rooftop License Agreement moments after signing it, by putting up signs that would block the Rooftop Businesses' views.

If the court were to find that there is ambiguity in the Rooftop License Agreement, it may look to extrinsic evidence to resolve the ambiguity. *Air Safety*, 706 N.E.2d at 884. The term "expansion" as used in the Rooftop License Agreement can only be considered ambiguous if it susceptible to more than one meaning. *Id.* In the event the court finds this term ambiguous, the relevant extrinsic evidence practically jumps off the pages of the Rooftop License Agreement, and is almost non-extrinsic at all. When the settlement occurred in 2004, the upcoming bleacher expansion of 2005-06 was within the contemplation of the parties, and was specifically referenced in Article 6 of the Rooftop License Agreement. The upcoming "expansion," explains Section 6 of the Rooftop License Agreement, was an expansion of *bleacher seating*. Exhibit C-2-A. If *bleacher seating* expansion were to be approved, and if *bleacher seating* were to obstruct the Rooftop Businesses' views, the Rooftop License Agreement would permit same if the Cubs Organization compensated the affected Rooftop Businesses accordingly. But when the Rooftop License Agreement was entered into back in 2004, extrinsic evidence will unequivocally prove that the only "expansion" that any of the parties contemplated as permissible was *bleacher* expansion, and never signs or other obstructions. The Cubs Organization may contend that the last sentence Section 6.6 provides it with an unfettered right to erect signs that obstruct the views from the Plaintiffs Rooftop Business, as long as it does some kind of expansion at the same time with governmental approval, but any such contention must be rejected as contrary to this relevant extrinsic evidence.

The Rooftop License Agreement must also be construed as a whole. "A court will not interpret an agreement in a way that would nullify its provisions or render them meaningless."

27

*First Bank and Trust Co. of Ill. v. Village of Orland Hills*, 787 N.E.2d 300, 305 (Ill. App. 1st Dist. 2003). The very purpose of the Rooftop License Agreement was to settle a lawsuit questioning the Rooftop Businesses' right to sell admissions to Cubs games, while ensuring the Cubs were compensated for same. Exhibit C-2-A. The Rooftop License Agreement exists to ensure that the Rooftop Businesses can continue to operate for twenty years without being blocked, in return for 17% of their gross revenue. *Id.* A Rooftop Business cannot operate without a view into Wrigley Field, a fact that the Cubs Organization has counted on throughout its strong-arm bullying tactics aimed at pressuring Rooftop Businesses to sell or be blocked.

Likewise, the Cubs Organization cannot collect its 17% royalty if the Rooftop Businesses do not have a view into Wrigley Field. The Landmark Commission's 2014 approval of the erection of the seven sign package cannot be construed to be the type of expansion that is permitted by the last sentence of Section 6.6. That would lead to an absurd result. The "expansion" that is referenced in Section 6.6 is the 2005-06 *bleacher* expansion then contemplated by the parties. In settling the 2002 Litigation, the parties intended there to be a 20-year royalty arrangement, and inserted a covenant that the Cubs would not erect any barriers to obstruct views throughout that timeframe. It defies common sense to conclude that, in the last sentence of Section 6.6, the Cubs Organization was given carte blanche to obstruct the Rooftop Businesses' views into Wrigley Field merely by obtaining either a building permit or a finding from the Landmark Commission that a proposed sign package did not violate Wrigley Field's Landmark status. Construing the Rooftop License Agreement in such a fashion that would permit the Cubs Organization to effectively destroy the Rooftop Businesses by blocking their views would completely defeat the purpose of the Rooftop License Agreement and would be wholly inconsistent with the well-settled rules of contract interpretation.

28

Thus regardless of whether or not the court finds the Rooftop License Agreement is ambiguous, it protects the Rooftop Businesses' views, and yet the Cubs Organization is in the process of breaching that agreement by installing video boards, jumbotrons and other signage at Wrigley Field. For all these reasons, there is a very strong likelihood that the Plaintiffs will succeed on the merits of their anticipatory breach of contract claim, certainly a much greater than mere "negligible" chance that Plaintiffs must show to obtain injunctive relief.

### III. Strong Likelihood of Success on Plaintiffs' Sherman Act Claims

#### A. Legal Standard for Attempted Monopolization Claims

The Sherman Act prohibits attempts to monopolize interstate commerce, and authorizes injunctive relief to prevent same. 15 U.S.C. §§ 2, 15, 26. According to the Supreme Court, "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). To prevent monopolization, "§ 2 [of the Sherman Act] addresses the actions of single firms that monopolize, or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993). The Court in *Spectrum* continued,

> Consistent with our cases, it is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

*Id.* at 456. Each of these factors is discussed in detail below.

#### 1. Anticompetitive Conduct

The Sherman Act does not define "predatory" or "anticompetitive" conduct. As noted by the Third Circuit, "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the

varieties." *LePage's Inc. v. Kroll Assoc's, Inc.*, 324 F.3d 141, 152 (3rd Cir. 2003) (citing *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998)). One variety of anticompetitive conduct is predatory pricing, where a monopolist temporarily reduces prices to drive a smaller competitor out of business, then raises prices significantly thereafter. *See, e.g. Chillicothe Sand Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980).

Another form of anticompetitive or exclusionary conduct is the monopolist's "refusal to deal" or "refusal to cooperate." One of the earliest refusal to deal cases was *United States v. Terminal R.R. Ass'n*, 224 U.S. 383 (1912), which involved twenty four different railroads converging at St. Louis, Missouri. *Id.* at 399. Six of the railroads acted together to acquire a terminal which, as a practical matter, no railroad could pass through St. Louis or cross the Mississippi River without using. *Id.* These six railroads contracted amongst themselves to prohibit any non-members of their owner's association from using the terminal. *Id.*

Finding a Sherman Act violation, the Court in *Terminal* explained,

> But when, as here, the inherent conditions are such as to prohibit any other reasonable means of entering the city, the combination of every such facility under the exclusive ownership and control of less than all of the companies under compulsion to use them violated both the first and second sections of the act, in that it constitutes' an attempt to monopolize commerce among the states which must pass through the gateway at St. Louis.

*Id.* at 409. The Court thus remanded the case to the district court with directions to enter a decree providing for the admission of any other railroad company upon equal terms with the existing members of the terminal association. *Id.* at 411.

In 1951, the Supreme Court again considered a refusal-to-deal form of anticompetitive conduct in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). In *Lorain Journal*, the sole

30

newspaper in Lorain County, Ohio had an effective monopoly on mass media advertising until a radio station began operating nearby. When the radio station entered the market and began to sell advertising time on the air, the newspaper refused to accept newspaper advertising from companies that also advertised on the newcomer radio station. *Id.* at 148. The lower court "expressly found that the purpose and intent of this procedure was to destroy the broadcasting company." *Id.* at 148-49. The lower court also found that, "if the very existence of [the radio station] is imperiled by this attack upon one of its principal sources of business." *Id.* at 149.

The Court held that this conduct was an attempt to monopolize interstate commerce by reducing the number of advertising customers available to the radio station. The refusal to deal strengthened the newspaper's existing monopoly in the advertising market, and "more significantly, [it] tended to destroy and eliminate [the radio station] altogether." *Id.* at 149-50; 153. The *Lorain Journal* Court also affirmed the lower court's issuance of injunctive relief, explaining that, "The injunctive relief under [the Sherman Act] sought to forestall that success. While [the newspaper's] attempt to monopolize did succeed insofar as it deprived [the radio station] of income, [the radio station] has not yet been eliminated. The injunction may save it." *Id.* at 153. The Court concluded, "It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the ‑attempt to monopolize‖ clause of § 2 when it uses its monopoly to destroy threatened competition." *Id.* at 154.

The Supreme Court subsequently considered another "refusal to deal" in the context of anticompetitive conduct in *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). In *Otter Tail*, a power company: (i) generated electricity, (ii) transmitted its own and other generators' electricity over intermediary networks, and (iii) sold electricity at retail in 465 towns over its

municipal-level grids. *Id.* at 368-70. When several municipalities decided to operate their own municipal-level grids, the power company refused to sell the municipalities power at wholesale rates, and also refused to transmit or õwheelö power from other generators to the municipalities over its intermediary networks. *Id.* Having been unable to renew its contracts to operate the municipal-level grids in those towns, õOtter Tail simply refused to deal, although according to the findings it had the ability to do so.ö *Id.* at 371.

The Court found,

> The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws. The District Court determined that Otter Tail has "a strategic dominance in the transmission of power in most of its service area," and that it used this dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply. Use of monopoly power "to destroy threatened competition" is a violation of the "attempt to monopolize" clause of § 2 of the Sherman Act.

*Id.* at 377.

The Courtøs decision in *Aspen Skiing v. Aspen Highlands Skiing*, 472 U.S. 585 (1985), is also significant and instructive. In *Aspen*, four adjacent ski resorts had coexisted for years with different owners, and had jointly marketed an õall mountainö ski pass that allowed consumers to ski any of the four competitor mountains with a single lift ticket. *Id.* at 589-90. During the life of the all-mountain pass, the competing companies would distribute income amongst each other based upon surveys or counting methods to determine how frequently the passes were used at each mountain. *Id.*

Eventually, õSki Co.ö acquired control over three of the four resorts, and its president thereafter õí expressed the view that the 4-area ticket was siphoning off revenues that could be recaptured by Ski Co. if the ticket was discontinued.ö Id. at 592. Therefore, Ski Co. offered an

unreasonably low, fixed percentage of total all-mountain revenue to "Highlands," the smaller competitor.   One member of Ski Co. candidly admitted that Ski Co. made Highlands "an offer that [it] could not accept." *Id*.  This effectively left "Highlands," the smaller competitor, with the ability to sell its customers and patrons with tickets to just one mountain. *Id*. at 592-93.  With Ski Co.'s effective discontinuation of the all-mountain pass, Highlands attempted to compete for retail customers by creating an "Adventure Pack" to replace the all-mountain pass.  Highlands purchased Ski Co.'s tickets at retail, and then bundled those tickets with its own tickets. *Id*. at 593-94.  To counter this, Ski Co. simply refused to sell Highlands any Ski Co. passes, even at retail rates. This doomed the "Adventure Pack," and made it effectively impossible for Highlands to compete in the Aspen ski market. *Id*. at 594.

The *Aspen* Court focused on whether one competitor ever has a duty to cooperate with its rivals.  The Court started its analysis by explaining that, "The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion -- that is, by competing successfully rather than by arranging treaties with its competitors." *Id*. at 600, citing *United States v. Citizens & Southern National Bank*, 422 U.S. 86 (1975).  The Court continued,

> Ski Co., therefore, is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor. Ski Co. is quite wrong, however, in suggesting that the judgment in this case rests on any such proposition of law. For the trial court unambiguously instructed the jury that a firm possessing monopoly power has no duty to cooperate with its business rivals.
>
> The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and

> his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.

*Id.* at 600-601.

Citing *Lorain Journal*, the Court explained that a private business' right to refuse to deal with others is prohibited by the Sherman Act where that right is exercised purposefully to monopolize interstate commerce. *Id.* at 602. By changing a long-standing, and profitable business practice with its competitor, the Court found sufficient evidence in the record to support the jury's verdict that a Sherman Act violation had occurred. *Id.* at 604. ("The jury must, therefore, have drawn a distinction –between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other."). The Court went on to note, "If a firm has been –attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Id.* at 605.

A number of other refusal-to-deal cases similarly involve one party seeking to compel its monopolist competitor to "share" something that the monopolist owns, which the first party needs in order to compete. In *MCI Communications Corp. v. AT&T Co.*, AT&T controlled the telephone lines and infrastructure that connected long distance lines to people's homes. 708 F.2d 1081, 1093-96 (7th Cir. 1983). MCI, a newcomer to the long-distance telephone market, wanted AT&T to connect MCI's long distance network to people's homes over AT&T's lines and infrastructure, so that MCI could compete with AT&T in selling long-distance telephone service. *Id.* AT&T was generally unwilling to share its network resources with its new competitor. *Id.* When AT&T did provide access, it did so on unequal footing with the access it provided to itself. *Id.*

Citing *Otter Tail* and *Lorain Journal*, the Seventh Circuit explained,

34

A monopolist's refusal to deal under these circumstances is governed by the so-called essential facilities doctrine. Such a refusal may be unlawful because a monopolist's control of an essential facility (sometimes called a "bottleneck") can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms.

The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*Id.* at 1132-33. Affirming the trial court's decision that a Sherman Act violation had occurred, the Seventh Circuit reasoned, "the evidence supports the jury's determination that AT&T denied the essential facilities, the interconnections for FX and CCSA service, when they could have been feasibly provided. No legitimate business or technical reason was shown for AT&T's denial of the requested interconnections." *Id.* at 1133. Furthermore, "MCI produced sufficient evidence at trial for the jury to conclude that it was technically and economically feasible for AT&T to have provided the requested interconnections, and that AT&T's refusal to do so constituted an act of monopolization." *Id.*

2.      Specific Intent to Monopolize

In addition to showing anticompetitive conduct, a § 2 plaintiff must also show "a specific intent to destroy competition or build monopoly." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953). An inference of monopolistic intent is not derived from non-predatory, vigorous competitive conduct, but intent can be shown either through direct evidence, or through inference based on anticompetitive conduct. *Abcor Corp. v. AM Intern., Inc.*, 916 F.2d 924, 927 (4th Cir. 1990). The use of one's dominant power as a substitute for competition through

superior service, lower costs and improved efficiency, is anticompetitive under § 2. *Otter Tail*, 410 U.S. at 380.

      3.    <u>Dangerous Probability of Success in Achieving or Maintaining Monopoly Power</u>

      In all cases, the relevant market must be established in order to evaluate whether a dangerous probability existed in monopolizing that market had the attempted conduct been successful. A relevant market is determined by asking whether reasonable substitutes for the product in question are available. *E.I. du Pont,* 351 U.S. at 394. However, "courts will not consider substitutes other than those which are substantially fungible" *Id.* "For example," the Supreme Court stated in *United States v. Grinnell Corp.*, "burglar alarms are not interchangeable with fire alarm services." 384 U.S. 563, 572 (1966).

      Once the relevant market is ascertained, the Sherman Act prohibits both *attempts* to monopolize that market, as well as attempts by existing monopolies to *maintain* their market dominance, in either instance through anticompetitive conduct. *Lorain Journal*, 342 U.S. at 154; *Grinnell*, 384 U.S. at 570-71. But in either type of case, "the Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270-71 (7th Cir. 1982). "It is the attempt which is the offense. A subsequent failure to achieve monopoly status cannot itself vitiate a claim of attempted monopoly where other evidence substantially supports the attempt without eviscerating the entire attempt offense." *Id.*, citing *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1972).

      a.    <u>Dangerous Probability in Efforts to Achieve a New Monopoly</u>

      Jurisprudence on the dangerous probability element necessarily falls into two groups – those in which a party without monopoly power sought to obtain a monopoly, and those in which

an existing monopoly engaged in anticompetitive conduct to maintain its monopoly. In the first instance, where a party aspires to monopolistic levels, the "dangerous probability" element asks whether the defendant would have obtained monopoly power if its attempt had been successful. *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 (8th Cir. 1968). Stated another way, "[t]he plaintiff must show that there was a dangerous probability that the defendant's conduct would propel it from a non-monopolistic share of the market to a share that would be large enough to constitute a monopoly for purposes of the monopolization offense." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 694 (7th Cir. 1989). The court continued, "In evaluating the probability of successful monopolization ─we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct." *Id.*, citing *Kearney*, 452 F.2d at 579.

To determine whether a would-be monopolist had a "dangerously probable" chance to achieve monopoly status, courts must consider how much of the relevant market would need to be possessed by the defendant in order to control prices or exclude competition. *Hiland*, 402 F.2d at 974. In *M & M Med. Supp. and Svc., Inc. v. Pleasant Valley Hosp., Inc.*, the Fourth Circuit discussed what share of a market might be needed to exercise monopoly power, stating,

> While the market share necessary to show an attempt to monopolize is difficult to quantify, a leading text has offered a general scale that a court may cautiously apply taking into consideration the proof offered for the other two elements: (1) claims of less than 30% market shares should presumptively be rejected; (2) claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant per se liable; (3) claims involving greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied.

981 F.2d 160, 168 (4th Cir. 1993). However, the court also explained that market share is not the end-all, be-all of the analysis, stating,

37

> Market share is relevant, but its relevance is tempered by evidence of the other two elements of the claim. Compelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown. Conversely, weak evidence of the other two elements requires a showing of significant market share. A rising share may show more probability of success than a falling share. Other factors must be considered, such as ease of entry, which heralds slight chance of success, or exclusionary conduct without the justification of efficiency, which enhances the likelihood of success.

*Id.* at 168.

     b.   <u>Dangerous Probability in Monopoly Expansion or Maintenance Cases</u>

In the other type of case, where a monopolist seeks to maintain or expand its existing monopoly through anticompetitive conduct, the analysis differs. In such cases, a single entity, "if already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal*, 342 U.S. at 154. Likewise, in *Otter Tail*, the Court explained, "The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws." 410 U.S. at 377. Here, courts have not focused on the dangerous probability element, logically because a monopoly already exists. Again, the focus is not whether there was a dangerous probability that a scheme would work – it is whether a successful scheme would create a dangerous probability of achieving monopolistic levels. *Hiland*, 402 F.2d at 974.

     B.   <u>Cubs Organization Attempts to Expand and Maintain Existing Monopoly in Live Cubs Games Product Market</u>

In Count I, Plaintiffs allege that the Cubs Organization engaged in anticompetitive, exclusionary conduct with the specific intent to maintain and further expand its existing monopoly in the retail market for tickets to watch live views of Cubs games and other events as they occur at Wrigley Field (the "Live Cubs Games Product"), which conduct had and continues

to have a dangerous probability of success. In this market, the Complaint alleges that tickets inside Wrigley Field and tickets to the Rooftop Businesses are reasonably interchangeable with one another.

1.    The Cubs Organization's Specific Intent and Conduct in Furtherance

As discussed above, "Monopoly power is the power to control prices or exclude competition." *E.I. du Pont,* 351 U.S. at 391. The Cubs Organization's specific intent to control prices and exclude competition is clearly demonstrated by its' executives very own statements and admissions made contemporaneously with extreme anticompetitive conduct focused on the destruction of the only competition, the Rooftop Businesses. The most noteworthy of which statements and conduct, which establish both the intent and conduct elements for attempted monopoly, are as follows:

i.      In 2009, Cubs Organization acquires interest in Rooftop Business "Down the Line."

ii.     In 2011, Cubs Organization attempts to acquire Rooftop Business Lakeview Club.

iii.    In 2011, Cubs Organization engages individual Rooftop Business owners in separate purchase negotiations.

iv.     Late 2011 – Early 2012, Cubs Organization seeks approval from City to install signs.

v.      May 8, 2012 – Ricketts and other Cubs Organization executives met with Rooftop Business owners, calling the Rooftop License Agreement a "bad deal" for the Cubs Organization because the parties were involved in a "price war" and a "race to the bottom" on ticket prices. Cubs Organization complains about Rooftop Businesses selling discount tickets, thereby reducing demand for tickets inside Wrigley Field.

vi.     May 8, 2012 – Ricketts and other Cubs Organization executives demand that Rooftop Businesses agree on coordinated, minimum ticket prices, or be blocked by signs, stating "whatever you give us is in return for not being blocked."

vii.    June of 2012, Lufrano suggests the Rooftop Businesses and Cubs Organization create a "management firm" with power to set ticket prices. Sugarman tells

Anguiano that the Rooftop Businesses need to raise revenue for the Cubs Organization or be blocked.

viii.  Summer of 2012, Kenney stresses to Schlenker that Rooftop Businesses were charging too little for admission and needed to raise prices.

ix.  September, 2012 – Cubs Organization rejects proposal from Rooftop Businesses to permit large signs on top of Rooftop Businesses, to let Cubs Organization control such signage and give 100% of sign revenue to Cubs Organization.

x.  February 4, 2013 – Ricketts tells  Rooftop Businesses that they are "direct competitors" with the Cubs Organization, complains that Rooftop Businesses sell tickets too inexpensively, and complains this is hurting Cubs Organization's Wrigley Field ticket sales..

xi.  April 15, 2013 – Following Rooftop Businesses' ongoing refusal to fix ticket prices, Cubs Organization makes good on threats to block Rooftop Businesses, and announces 6,000-square-foot jumbotron and 1,000-square-foot advertising sign.

xii.  May 1, 2013 – Ricketts complains in speech at City Club of Chicago that Rooftop Businesses are "direct competitors" and criticizes them for selling discounted tickets, blames Rooftop Businesses for causing $20 million in annual lost revenue, announces intent to install jumbotron and other sign in outfield.

xiii.  July, 2013 – Cubs Organization makes offers to numerous Rooftop Business owners, below market value, using signage plan as a threat and as leverage.

xiv.  Summer, 2013 – Kenney tells Schlenker that the Cubs Organization wanted control of the Rooftop Businesses, so it could control pricing.

xv.  August 15, 2013 – Sugarman and Lufrano tell Anguiano and Finkel that Rooftop Business ticket prices are too low and that the Cubs Organization cannot compete with Rooftop Business margins, and said solution was to raise ticket prices.

xvi.  January, 2014 – At annual Cubs Convention, Ricketts likens Rooftop Businesses to thieves stealing someone else's property, and Lufrano says the Rooftop Businesses are a $20 million drag on business which is preventing Cubs Organization from  affording great baseball players.

xvii.  February 1, 2014 – Cubs Organization threatens to move team out of Wrigley Field if it does not get the signs it wants.

xviii.  May 21, 2014 – Ricketts publishes video complaining that Rooftop Businesses cost Cubs Organization millions in annual revenue and that he will proceed with

more signage because the Rooftop Businesses did not acquiesce to the 2-sign proposal.

xix.     May, 2014 – Kenney, in response to offer from McCarthy to sell Plaintiffs' two Rooftop Businesses at fair market value, "That's a good deal if you have a rooftop business, but once we put up the signs you don't have a rooftop business." Kenney also tells McCarthy, "We own the City, we control City Hall, we control [Alderman] O'Connor." Kenney further tells McCarthy, "I guarantee the sign deal will be approved. The signs are going up and there's nothing you can do about it." Kenney concludes to McCarthy, "I'm going to call and make you an offer after the sign deal is approved, whatever I offer you better take."

xx.      July 7, 2014 – Lufrano tells Finkel, "First we want to get the right to block you, then we will negotiate."

xxi.     July 10, 2014 – Cubs Organization secures City Landmarks approval for seven signs.

xxii.    Later July, 2014 – Kenney tells McCarthy, "We don't like you competing with our bleachers and grandstands. We don't like you competing with our gate." Kenney tells McCarthy the Cubs Organization will operate any Rooftop Business it acquires, and "Whatever we don't buy, we're going to block." Kenney offers grossly low price for Plaintiffs' Rooftop Businesses.

xxiii.   July, 2014 – Cubs Organization executives tell Loukas that the Cubs Organization would "destroy the rooftops" if he did not sell.

xxiv.    July, 2014 – Kenney tells Schlenker that the Cubs Organization would put a sign in front of whichever Rooftop Business, Loukas or Lourgos, did not sell first.

xxv.     September 9, 2014 – Kenney tells Finkel that they had to "finish the deal this week, or I order the steel [for the signs]."

xxvi.    September 29, 2014 – Cubs Organization begins construction efforts at Wrigley Field which includes outfield signage to block the Rooftop Businesses.

xxvii.   October, 2014 – Kenney leaves voicemail message for Purcell indicating that the Cubs Organization just reached a deal to buy several other Rooftop Businesses, and that the Cubs Organization would rearrange where the signs were going if he did not sell.

xxviii.  September 3, 2014 – Kenney tells Finkel that the Cubs Organization will block his Rooftop Businesses if he does not sell, and will block other Rooftop Businesses if Finkel does sell.

xxix. October 21, 2014 – Cubs Organization attempts to purchase Finkel's three Rooftop Business loans in order to foreclose on Finkel.

xxx. December 4, 2014 – After getting contracts to buy Loukas' and Lourgos' Rooftop Businesses, and expecting to acquire Finkel's three, the Cubs Organization alters its signage plans to greater block the Plaintiffs who still refused to sell.

There is hardly a need here, unlike in many other cases, to sift through the record and identify conduct that infers an intent to monopolize. Quite the opposite, the intent is revealed through the myriad admissions and statements made by the Cubs Organization's executives reflecting their specific intent to control prices, raise prices, and destroy competition. Instead of competing with the Rooftop Businesses through superior service, lower costs and improved efficiency, the Cubs Organization intended to, and in fact did, use its dominant power to maintain and expand its monopoly power in the Live Cubs Games Product market by destroying, eliminating or acquiring competition through unlawful means. Indeed, the Cubs Organization even admitted it could not compete with the Rooftop Businesses' margins, a major reason it resorted to anticompetitive conduct.

The anticompetitive conduct is plainly apparent. Efforts were made to purchase the competition. After those efforts were largely unsuccessful, efforts were made to convince the competition to fix and raise prices under the threat of retaliation in the form of signage placement blocking the lifeblood views of the Rooftop Businesses. And after those strong-arm tactics were resisted, efforts were made to actually destroy the competition by starting construction on the signs that would drive the Rooftop Businesses out of business altogether. Meanwhile, the Cubs Organization used the leverage of City approvals and eventually started construction to continue threatening the competition to sell out, sometimes successfully. Anticompetitive intent, and conduct, is readily apparent from both direct and circumstantial evidence.

2.     The Dangerous Probability of Success

As indicated above, in Count I the Live Cubs Games Product is the viewing of live Cubs Games, and other live Wrigley Field events, as they take place by viewing same, from the stands at Wrigley Field or on the Rooftop Businesses.  The Cubs Organization controls all 41,160 seats within Wrigley Field, and another 800 seats at the four Rooftop Businesses it acquired.  There are only 2,200 other seats in total, which are still controlled by the competitor Rooftop Businesses that have been fortunate enough to hold out this long in the face of ever-increasing pressure to sell or be blocked.  Based on these figures, the Cubs Organization possesses 93% of the market for the Live Cubs Games Product.  Without question, controlling 93% of a product's market, coupled with the power to control the exclusive facility from which that product emanates, reflects possession of a monopoly in that market and is a much greater figure than is necessary to presume a monopoly exists. *M & M*, 981 F.2d at 168.

The Cubs Organization already possesses a monopoly in the market for the Live Cubs Games Product.  It likewise controls the exclusive facility from which that product is derived.  The question is thus not whether the Cubs Organization has a dangerous probability of obtaining a monopoly, but whether, if successful, its anticompetitive conduct has a dangerous probability of expanding or maintaining that monopoly.  The undeniable answer, once again, is "yes."

The Cubs Organization's anticompetitive conduct has already eliminated the three competitor Rooftop Businesses it acquired in 2014, and those 600 seats are now controlled by the Cubs Organization.  Considering nothing else, the Cubs Organization's intent and conduct has already expanded and maintained its monopoly in this market.  But more importantly, the Cubs Organization's efforts were aimed at controlling all the rooftops, as reflected by its repeated attempts to purchase the Rooftop Businesses all at once, in a global deal.  If successful, those

efforts would have resulted in the Cubs Organization expanding its 93% market share to 100%; a clear maintenance and expansion of an existing monopoly. Any further success through anticompetitive conduct, whether forcing the competition out of business or by acquiring more competitors, will only expand and maintain the monopoly further. The Cubs Organization's market share has not declined, it has risen, and it has done so as a result of anticompetitive conduct and intent, thereby reflecting that the Plaintiffs have a strong likelihood of success on the merits of their theory that the Cubs Organization attempted to maintain and expand its monopoly in the market for the Live Cubs Games Product.

      C.     <u>Cubs Organization's Attempt to Monopolize Rooftop Baseball Market</u>

The Cubs Organization may argue that tickets to watch live events as they occur from the seats within Wrigley Field are not interchangeable with tickets to watch those events from the Rooftop Businesses, and that there are two distinct markets at issue. Plaintiffs alternatively assert in Count II that the Cubs Organization has engaged in anticompetitive, exclusionary conduct with the specific intent to acquire a monopoly in the retail market for watching live events as they take place from the Rooftop Businesses (the "Rooftop Product"). These efforts, if successful, have a dangerous probability of successfully resulting in the Cubs Organization securing a monopoly in the Rooftop Product market.

      1.     <u>The Cubs Organization's Specific Intent and Anticompetitive Conduct</u>

Starting again with the premise that monopoly power means the power to control prices or exclude competition, the Cubs Organization's specific intent to acquire such a monopoly in the Rooftop Product market is demonstrated by its' executives statements and admissions, made contemporaneously with extremely anticompetitive conduct, all focused on the destruction and acquisition of the entire Rooftop Businesses market. The most noteworthy of which statements

and conduct, which establish both the intent and conduct elements for attempted monopolization, are set forth in subsection III.B.1, above.

       2.    <u>The Dangerous Probability of Success</u>

There are 3,000 total seats in the Rooftop Product market. The Cubs Organization has acquired 800 of those seats, thus going from a 0% share to a 26.7% share in a short period of time. Undoubtedly, the Cubs Organization will argue that 26.7% of a particular market is not usually a monopoly, but that argument does not answer the question at hand. The issue is whether the Cubs Organization's anticompetitive conduct, if successful, would have had a dangerous probability of securing a monopoly share in the Rooftop Product market, not whether its conduct was itself likely or not to be successful.

That answer too can only be "yes." The Cubs Organization's stated purpose was to acquire all of the Rooftop Businesses in order to control pricing, and their anticompetitive conduct was aimed squarely to achieve that goal. If the Cubs Organization had been successful in its repeated efforts to acquire all of the Rooftop Businesses, it would have achieved its stated goal of a 100% share of the Rooftop Product market. But even assuming, *arguendo*, that the Cubs Organization never really wanted all of the Rooftop Businesses, it cannot avoid the fact that it has acquired a 26.7% market share already, and that it actively sought to acquire Finkel's 600 seats which would have elevated the Cubs Organization's market share to 46.7%. Moreover, the Cubs Organization also cannot deny that its ongoing construction places a 2,200-square-foot video board in front of the Plaintiffs' 400 seats, a fact that the Cubs Organization admitted will leave the Plaintiffs "no glimpse of Wrigley Field." In total, these acts reflect a concerted effort to achieve at least a dominant 60% market share in the Rooftop Product market,

which is certainly sufficient to show a dangerous probability of controlling prices. *M & M*, 981 F.2d at 168.

It is the attempt to monopolize that is the offense under section 2 of the Sherman Act, not the result. *Lektro-Vend*, 660 F.2d at 270-71. The Cubs Organization has openly attempted to gain a 100% monopoly share of the Rooftop Product market, a monopoly *per se*. Even if the Cubs Organization somehow proved it only attempted to acquire or destroy some of the Rooftop Businesses, the resulting market share from that anticompetitive conduct would have been at least 60%. This share of the market is certainly enough to create a dangerous probability of possessing the monopoly power to control prices and exclude competition in that market. *M & M,* 981 F.2d at 168.

**IV.    The Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief for Which There is No Adequate Remedy at Law**

It has long been recognized that the destruction of a plaintiff's business, in and of itself, constitutes irreparable harm for purposes of prejudgment injunctive relief. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir. 1970) ("Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award."). See also *Planned Parenthood*, 738 F.3d at 796; *Lorain Journal*, 342 U.S. at 150, 153 ("The findings go further. They expressly and unequivocally state that the publisher's conduct was aimed at the larger target – the complete destruction and elimination of WEOL…  .WEOL has not yet been eliminated. The injunction may save it.").

The Plaintiffs are in the Rooftop Business. They charge the public an admission fee, and in return they provide a place for their customers to watch live Cubs games and other live events at Wrigley Field from their rooftop grandstands. A Rooftop Businesses is centered around bleacher-style grandstands. It is the unique attribute that distinguishes Rooftop Businesses from the numerous bars and restaurants surrounding Wrigley Field. Without being able to see into Wrigley Field, the very purpose of a Rooftop Business is defeated – its very product or service ceasing to exist. Without views into Wrigley Field, the Rooftop Businesses are about as useful as a bus without wheels.

The Cubs Organization has acknowledged and relied on the principle that the Rooftop Businesses are not viable without views into Wrigley Field in its effort to monopolize the Rooftop Product market. Time and again the Cubs Organization has threatened to block and destroy the Rooftop Business owners with signage, knowing that the Rooftop Businesses cannot survive without those views. Even the Cubs Organization's Crane Kenney stated, "How hard is it going to be to sell tickets when you have no glimpse of Wrigley Field?" Without revenue from ticket sales, which necessarily will not exist without a product to sell, the Plaintiffs will become insolvent and be forced to close. This constitutes irreparable harm for which there is no adequate remedy at law.

## V.     The Balance of Hardships Tips Heavily in Plaintiffs' Favor

Without injunctive relief at this stage, the Plaintiffs will be put out of business. Such irreparable harm is of the most serious kind – nothing short of total destruction. On the other hand, the Cubs Organization will suffer no harm without the jumbotron and video board. 2015 will be the Cubs' 99th year playing at Wrigley Field. The Cubs have survived for a century without a jumbotron or video board. In 2013, Forbes Magazine ranked the Cubs as the fourth

most profitable team in major league baseball.[6]  There were no jumbotrons or video boards in 2013, and yet the Cubs made tens of millions of dollars in profit. *Id.*  When the Ricketts family purchased the Cubs in 2009 for around $845 million, there were no jumbotrons or video boards in Wrigley Field, and they still made tens of millions in profit.  In fact, the Cubs Organization is now attempting to sell 20% of its business for $400 million, meaning that the Cubs Organization is now worth $2 billion, an increase in value of $1.155 *billion* in just five years, all this without a jumbotron or video boards, and yet with competitor Rooftop Businesses.[7]

Clearly, the Cubs are not having any problems making money, and the lack of video boards and jumbotrons will not cause them any significant harm.  Not only do the Plaintiffs have a very strong chance of prevailing on the merits of their breach of contract and Sherman Act claims, which would make the need to show irreparable harm less important under the "sliding scale" approach, the balance of harms tips heavily in their favor, making their need to show a likelihood of success even less important.  In other words, the scale does not even slide here – all of the factors heavily weigh in the Plaintiffs favor and warrant immediate injunctive relief.

## VI.    The Public Interest Favors Injunctive Relief

The ultimate goal of the Cubs Organization is to drive up ticket prices to Cubs games and eliminate competition through anticompetitive conduct.  Their means to that end is the willful violation of a 20-year contract.  Therefore, there is a strong public interest in this would-be private contract action between private businesses.  The public will be adversely affected by the elimination of the competitor Rooftop Businesses, in the form of less choice between which business to patronize, and ultimately higher prices.

---

[6]  http://www.forbes.com/teams/chicago-cubs/
[7]  http://www.bleedcubbieblue.com/2014/10/28/7083463/cubs-valuation-2-billion-some-of-team-will-be-sold

## CONCLUSION

The Cubs' new owners told the Rooftop Businesses that their 20-year, 17% royalty agreement was a "bad deal" for the Cubs, that they were in a "price war," and that the rooftops' margins were too low for the Cubs to compete. The Cubs Organization wanted less competition and more money, so it demanded a price-fixing scheme. When the Rooftop Businesses refused, the Cubs threatened to install jumbotrons and video boards to block their views and "destroy the rooftops" with threats like, "How hard is it going to be to sell tickets when you have no glimpse of Wrigley Field?" Some owners of Rooftop Businesses capitulated under such threats as, "finish the deal this week, or I order the steel," but other owners are desperately hanging on. When a few owners did sell, the Cubs promptly and brazenly altered their sign plans to block the remaining holdouts while freeing up views from the Cubs' newly acquired rooftop locations. This is patently anticompetitive conduct with a specific intent to monopolize in violation of the Sherman Act. It is also a textbook breach of contract. A temporary restraining order and preliminary injunction are both necessary to save the rooftops and prevent the Plaintiffs' destruction.

WHEREFORE, the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC, respectfully request that this Honorable Court enter a Temporary Restraining Order and Preliminary Injunction requiring that the defendants, Chicago Baseball Holdings, LLC, Chicago Cubs Baseball Club, LLC, Wrigley Field Holdings, LLC and Thomas S. Ricketts (collectively, "Defendants"), immediately discontinue the installation of "jumbotrons," "video boards," billboards, advertisements, and any other type of signage in front

of Plaintiffsø properties located across from Wrigley Field, which signage will obstruct Plaintiffsø views into Wrigley Field, and grant any additional relief deemed just and appropriate.

Respectfully Submitted,

Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and Rooftop Acquisition, LLC

/s/ *Thomas M. Lombardo*
By: Thomas M. Lombardo
One of their Attorneys

Thomas M. Lombardo (6279247)
Abraham Brustein (327662)
Di Monte & Lizak, LLC
216 Higgins Road
Park Ridge, IL 60068
847-698-9600 tel
847-698-9623 fax
tlombardo@dimontelaw.com
abrustein@dimontelaw.com

50