**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, d/b/a | ) | |
| SKYBOX ON SHEFFIELD; RIGHT FIELD | ) | No. 1:15-cv-00551 |
| PROPERTIES, LLC; 3633 ROOFTOP | ) | |
| MANAGEMENT, LLC, d/b/a LAKEVIEW | ) | Judge Virginia M. Kendall |
| BASEBALL CLUB; and ROOFTOP | ) | |
| ACQUISITION, LLC, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; AND | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel for Defendants*

After watching four and a half months of construction, plaintiffs suddenly ask the Court to enter an "extraordinary and drastic" temporary restraining order to stop the Wrigley Field expansion and restoration in its tracks. Plaintiffs admit they knew all about a claimed "obstruction" for two years before construction began. They sat and they waited, yet now claim emergency. The fact construction is ongoing has not changed from last week or the week before or the week before that. Nor will plaintiffs suffer any irreparable harm between now and any prompt injunction hearing. In addition to all the reasons defendants detail in their injunction opposition, plaintiffs' "emergency" request for a TRO fails for three additional, fundamental reasons.

*First*, plaintiffs cannot establish any irreparable harm before this Court can conduct a preliminary injunction hearing—the key period for a TRO. *See Fleetwood Packaging v. Hein*, 2014 WL 7146439, at *2 (N.D. Ill. Dec. 15, 2014). Plaintiffs have come forward with *no evidence at all* that they will suffer any harm over the next few days or weeks. In fact, plaintiffs are not even *in* business during the next 28 days and by law cannot open for business until Opening Night at Wrigley Field on April 5. At most, plaintiffs allege they *may* suffer *some future* revenue loss, but offer nothing immediate and irreparable as required for a TRO. Perhaps this is why plaintiffs say nothing at all in their motion about the key TRO period. And although plaintiffs claim they may need to return customer deposits or refund tickets, that certainly will never happen *weeks or months* before game day. Nor does it support any sort of imminent destruction claim in any event.

*Second*, plaintiffs' own conduct hardly paints the picture of urgency needed to justify a TRO. By their own allegations, plaintiffs understood time and again since *May 2013* that the right field sign would obstruct their views. (Dkt. 21, Pl. Br. at 8-18; *id.*, Ex. B, Anguiano Decl.

¶ 17; *id.*, Ex. C, Hamid Decl. ¶ 16; Dkt. 1, Cplt. ¶¶ 73, 92, 94, 97, 106)  Plaintiffs viewed a "mock up" of the sign plan in May 2013, "renderings" of the signs from defendants' website by July 2014, and a "model of Wrigley Field" in July 2014—all of which showed "the impact that these signs would have on their views."  (Cplt. ¶ 73; *see id.* ¶¶ 92, 94, 96; Pl. Br. at 10, 15)  They also engaged a consultant between May and July 2013 to determine "how the views" from the rooftops "would be affected by the proposed signs."  (Pl. Br., Ex. G, Bland Decl. ¶ 3)  And in July 2013 and again in May 2014, they "threatened to take legal action."  (Cplt. ¶ 88; Pl. Br., Ex. A-4-1)  Yet they waited another *seven months* to file a Complaint, and then another three weeks to request a TRO.  Plaintiffs' own delay refutes any "emergency."

*Third*, there is no need to issue a TRO because defendants welcome an expedited resolution of plaintiffs' injunction request.  Defendants simultaneously have filed their full opposition to plaintiffs' preliminary injunction motion along with a motion to dismiss the Complaint in its entirety.  Thus, the Court has the parties' papers, declarations, and evidence, and defendants are ready to immediately proceed to a preliminary injunction hearing.

Ultimately, plaintiffs cannot satisfy any of the preliminary injunction requirements, much less all five factors needed to justify that relief.  But what matters for this opposition is that there is no "emergency" or urgency to justify a TRO.

## ARGUMENT

## I.    PLAINTIFFS WILL NOT BE IRREPARABLY HARMED BEFORE A PRELIMINARY INJUNCTION HEARING.

A temporary restraining order "is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing."  *Fleetwood*

*Packaging*, 2014 WL 7146439, at *2.[1]  The only period that matters for a TRO is from the date the plaintiff files its motion until the court can hold a preliminary injunction hearing.  *See id.* at *10 ("The 'common formula' is that TROs are intended to preserve the status quo only for so long as is needed to hold a hearing."); *Capgemini*, 2014 WL 340206, at *4 (same); *Dirig v. Wilson*, 2013 WL 2898276, at *1 (N.D. Ind. June 12, 2013) ("Under federal law a temporary restraining order should be restricted to preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.").  As plaintiffs recognize, this period can last no longer than 28 days.  (Pl. Br. at 20; *see H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844 (7th Cir. 2012))  Thus, to obtain the "extraordinary and drastic" interim remedy of a TRO, the plaintiff must come forward with "clear evidence" of irreparable harm **within the next 28 days** for which there is no adequate legal remedy.  Plaintiffs cannot come anywhere close to meeting that burden here (and they have not even tried), and their TRO request should be denied.

> **A.    Plaintiffs Will Not Be Irreparably Harmed Between Now And The Time The Court Decides Their Motion For A Preliminary Injunction.**

Plaintiffs' brief and seven attached declarations are notably silent about the next 28 days.  Plaintiffs do not mention this period at all.  They instead focus solely on the harm they allegedly will suffer "before this case goes to trial."  (Pl. Br. at 2)  But that period is irrelevant for a TRO, which requires *immediate*, substantial harm.  *See Fleetwood Packaging*, 2014 WL 7146439, at *10 (no TRO in absence of evidence that claimed harm "cannot be remedied within the next 28 days"); *Capgemini*, 2014 WL 340206, at *4 (same).

---

[1] To obtain a TRO, the plaintiff must demonstrate (1) "irreparable injury will occur without obtaining the relief sought"; (2) "no adequate remedy at law"; and (3) "some likelihood of success on the merits."  *Capgemini Fin. Servs., USA v. Infosys Ltd.*, 2014 WL 340206, at *1 (N.D. Ill. Jan. 30, 2014).  If the plaintiff can establish all three factors, it then must also show the balance of harms weighs in its favor and the public will not be harmed by an injunction.  *Id.*

There is zero evidence plaintiffs will suffer any irreparable harm over the next 28 days. Plaintiffs identify no customers who will refuse forever to patronize their businesses if construction continues over the next 28 days; no evidence this short period will somehow permanently affect customer behavior in the future in any way; no evidence the businesses will somehow shut down *now* due to the potential for some *future* customer loss; and no evidence the businesses will not be able to stay afloat over the next 28 days. Nor do they explain what is unique about the next 28 days (or more likely far less) to justify such drastic relief—particularly where they apparently believed they did not need a TRO during each of the last 23 days since filing their Complaint.

Plaintiffs offer nothing, for a good reason: they will experience no immediate harm at all. Plaintiffs' businesses are ***closed*** from now until long after a TRO would end. Calendars available on the rooftops' web sites confirm neither business plans to operate at all during the rest of February or the entire month of March. (Ex. 1, Online Ticket Calendars from Lakeview Baseball Club and Skybox on Sheffield Websites) There are no home games or Wrigley Field events during this time. Indeed, no baseball will be played at Wrigley Field until Opening Night, when the Cubs will play the St. Louis Cardinals on national television. In addition, City of Chicago rooftop licenses are not valid until March 1 (City Council Ord. § 4-388-070), no plaintiff has obtained a valid license yet for the 2015 baseball season, and the rooftops are not even permitted to open for business until Opening Night on April 5, over a month and a half from now (City Council Ord. § 4-388-120). It is illogical plaintiffs could somehow be forced out of business ***forever*** over the next 28 days—when they are not even ***in*** business during that time. That is, there is no conceivable way plaintiffs could lose all their customers (and never get those

customers back) when their businesses will not be hosting a single customer between now and the injunction hearing.

Plaintiffs point only to (1) a "difficult[]" (not impossible) time "selling rooftop tickets to 2015 events," including "a significant" (not complete) decline in "2015 ticket pre-sales," (2) "[m]any customers" (not all) are refusing to book dates, and (3) some customers (not all) are "demanding refunds if the views are blocked." (Pl. Br. at 2, 18; *id.,* Ex. C, Hamid Decl. ¶ 19) Plaintiffs further claim they had to sign contracts agreeing to return *half* of the advanced deposit to some customers (while keeping the rest)—a 50 percent damages loss. (*Id.,* Ex. C, Hamid Decl. ¶ 17) This evidence falls woefully short of satisfying their burden. None of this claimed loss can ever occur immediately.[2] Plaintiffs certainly will not return any deposits or make any refunds *weeks* or *months* before game day. And plaintiffs acknowledge they sell "game-day tickets" (Pl. Br. at 6)—meaning their loss (if any) cannot be assessed until each game occurs.

The customer emails plaintiffs offer confirm harm is not imminent. Only ***one*** email is from February 2015. In other words, in the two weeks prior to filing their TRO request, only one potential customer raised this issue. Hardly the stuff of going out of business. At most, the handful of customer emails establish plaintiffs may suffer some *future* revenue loss, which can be remedied with money damages if it is proven at trial. This is not irreparable harm needed to support a TRO. *See Lee v. John Labatt Ltd.*, 1992 WL 6697, at *2 (N.D. Ill. Jan. 15, 1992) (denying TRO: "While it may be difficult to ascertain damages in this case . . . plaintiffs' losses would appear to amount to lost profits, which plaintiff can be compensated for in money damages."); *Universal Bus. Computing Co. v. Comprehensive Accounting Corp.*, 1988 WL 79660, at *1 (N.D. Ill. July 22, 1988) ("[T]he possible loss of sales of computers to certain

---

[2] Nor is any of this alleged harm irreparable or incapable of being adequately compensated by money damages as defendants' preliminary injunction opposition more fully explains at pages 9 to 24.

customers[] is not of the irreparable type; damages, if proven, would adequately compensate CAC.").

At bottom, while plaintiffs claim a "life-or-death situation," they offer no evidence to back up their rhetoric. This simply is not a case that requires an immediate restraining order. *See Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 876-77 (N.D. Ill. 2011) (denying TRO where plaintiff did not "demonstrate how it will be harmed"); *Elec. Contractors' Ass'n of City of Chicago, Inc. v. Local Union No. 134, Int'l Bhd. of Elec. Workers*, 1994 WL 27878, at *2 (N.D. Ill. Jan. 31, 1994) ("ECA's fear that contractors will lose the good will of customers . . . is likewise largely conjectural . . . [and] does not constitute a showing of irreparable harm.").

## B.      Plaintiffs' Delay In Seeking A TRO Confirms There Is No Emergency.

Plaintiffs' own conduct belies any claim of an "emergency" or irreparable harm here. By their own allegations, for ***nearly two years*** plaintiffs have known defendants would construct outfield signs they believed would obstruct their views. (*See* Pl. Br. at 8, Cplt. ¶ 65 (April 2013 announcement); Pl. Br. at 9, Cplt. ¶¶ 67-68 (May 2013 announcement); Pl. Br. at 10, Cplt. ¶ 73 (May 2013 "mock up"); Pl. Br. at 10, Cplt. ¶ 75 (July 2013 approval); Pl. Br. at 13, Cplt. ¶¶ 88-89 (May 2014 announcement); Pl. Br. at 15, Cplt. ¶ 91 (July 2014 approval); Pl. Br. at 14-16, Cplt. ¶¶ 92-100 (July 2014 conversations); Pl. Br. at 18, Cplt. ¶ 106 (December 2014 announcement)) Plaintiffs' TRO request and Complaint also allege at least ***nine instances*** since May 2013 showing plaintiffs had actual knowledge of the harm they now claim:

- May - July 2013: Plaintiffs hired a consulting firm to "determine how the views from the grandstands on the roof of the two buildings ***would be affected by the proposed signs***[.]" (Pl. Br., Ex. G, Bland Decl. at 1-2 (emphasis added))

- May 28, 2013: Defendants "arranged for a 'mock up' of its proposed 6,000 square foot left field jumbotron and 1,000 square foot right field advertisement sign. The Rooftop Business owners were present to witness ***the impact that these signs would***

6

*have on their views*.” (Cplt. ¶ 73 (emphasis added); Pl. Br., Ex. A-3-3 (“[A]ll of the rooftop owners . . . were at Wrigley on Tuesday to view the mock-ups.”)) Plaintiffs claim, “It was *clear* from the mock-up event that the Plaintiffs’ views would be *substantially blocked*.” (Pl. Br. at 10 (emphases added); *id.,* Ex. C, Hamid Decl. ¶ 16)

- July 2013: One plaintiff stated at the Commission on Chicago Landmarks hearing, “If you . . . grant permission to the Ricketts family to place a sign in right field, you will *block the views* of my customers.” (Pl. Br., Ex. A-4-1 (emphasis added))

- October 2013: Defendants offered the rooftops another “mock up” which provided “another opportunity to see how their views would be *impacted by the sign*.” (Pl. Br., Ex. A-9 (emphasis added); *id.,* Ex. B, Anguiano Decl. ¶ 16)

- May 2014: It was “clear that the Cubs Organization was seeking a total of . . . seven signs in the outfield, which would effectively destroy the Rooftop Businesses altogether[.]” (Pl. Br. at 14; *id.,* Ex. D, McCarthy Decl. ¶ 6)

- July 2014: “Renderings published by the Cubs Organization. . . , including on the Cubs Organization’s own website, reflected that the signage approved for right field on July 10, 2014 would *substantially block the views from many of the Rooftop Businesses*.” (Cplt. ¶ 92 (emphasis added); Pl. Br. at 15)

- July 2014: Before the July 2013 Commission on Chicago Landmarks hearing, plaintiff and the Chicago National League Ball Club LLC’s President of Business Operations, Crane Kenney, discussed “*the impact of the signs on the Rooftop Businesses*[.]” (Pl. Br. at 14, Cplt.¶ 94 (emphasis added))

- July 2014: After the July 2013 Commission on Chicago Landmarks hearing, Mr. Kenney showed one plaintiff “a model of Wrigley Field, the Rooftop Businesses, and the signs that would be erected under the approved seven-sign deal.” (Pl. Br. at 15, Cplt. ¶ 96; Pl. Br., Ex. D, McCarthy Decl. ¶ 9)

- December 4, 2014: Defendants “announced that it was moving the 2,400-square-foot video board further towards the right field foul pole. This change in its plans [would] . . .*further block* [ ] *those Rooftop Businesses* which were able to hold out, including the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties.” (Pl. Br. at 18, Cplt. ¶ 106 (emphasis added)) At this time, plaintiff claimed: “We are going to be out of business.” (Pl. Br. at 18; *id.,* Ex. D, McCarthy Decl. ¶ 14)

In fact, plaintiffs “threatened to take legal action” against defendants both in July 2013 and again last May. (Cplt. ¶ 88; Pl. Br., Ex. A-4-1 (“Marc Hamid, owner of Skybox on Sheffield, left little doubt that rooftop owners would follow through on their threat to file a lawsuit”)) Moreover, many of the customer emails they cite supposedly in support of their loss are from October 2014,

and plaintiffs' counsel gathered much of the alleged support for plaintiffs' motion in early November of last year. (Pl. Br., Ex. C, Hamid Decl., Ex. C-3; Pl. Br., Ex. A, ¶¶ 4-8)

Plaintiffs did not sue defendants or seek interim relief after any of these events, even after government approvals along the way. Instead, they allowed defendants to break ground, purchase steel, purchase the videoboard, commence construction, tear down the existing bleachers, and install the foundation and steel required for the new bleachers and signs in the outfield. They watched while the construction efforts since September 2014 included "installation of the [ ] signs announced by the Cubs Organization on May 21, 2014." (Pl. Br. at 16-17; Cplt. ¶¶ 100, 128) Plaintiffs then waited another four months, until January 20, 2015, to file their Complaint, and another three weeks to seek injunctive relief. And rather than seeking an emergency TRO right away, plaintiffs noticed their motion on the regular motion schedule for a hearing six days later. Plaintiffs' slow-boat approach belies any claim of "emergency" and imminent harm. *See A.P. v. Tomah Area Sch. Dist.*, 2008 WL 2608095, at *2 (W.D. Wis. Apr. 16, 2008) ("[P]laintiff waited eighteen days after filing his complaint to file his motion for a temporary restraining order. This 2 1/2 week delay suggests that plaintiff is not suffering such an immediate and irreparable injury as to require this court to provide him with an *ex parte* temporary restraining order.").

This Court's decision in *Marketing Werks, Inc. v. Brian Fox & Foxsano Marketing, Inc.*, is directly on point. There, the plaintiff marketing firm sought a TRO to enjoin the defendant (its former employee who opened a competing firm) from working with one of the plaintiff's clients. 2013 WL 5609339 (N.D. Ill. Oct. 11, 2013). Although the plaintiff learned the defendant was a final contender for the client's account and demanded the defendant withdraw its bid in September 2013, it waited until several weeks into October 2013 to seek a TRO. *Id.* at *3. This

8

Court denied the request, based in part on the plaintiff's "delay[] in seeking emergency relief." *Id*. This Court noted, "the events leading up to this motion and the effects they have had or will have do not warrant a TRO." *Id*. The same result is warranted here. *See also, e.g., Fleetwood Packaging*, 2014 WL 7146439, at *10 (plaintiff's delay "belies its argument the harm that may result" before a preliminary injunction hearing); *Capgemini*, 2014 WL 340206, at *4 (plaintiff's "cautious approach" over several months "undermines the assertion that it will suffer irreparable injury if no relief is granted before a preliminary injunction hearing can be held"); *Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*, 2001 WL 1136145, at *2 (N.D. Ill. Sept. 24, 2001) ("The fact that Motor Werks did not seek a temporary restraining order immediately upon learning [the relevant facts] raises serious question as to the need for the requested order.").

### C.     Plaintiffs' Injunction Request Can Be Resolved Quickly Without A TRO.

Moreover, it is unnecessary to issue a TRO because defendants are prepared to expedite resolution of the injunction request.  In contrast to plaintiffs' continued delay, defendants have simultaneously filed this opposition, their opposition to plaintiffs' preliminary injunction motion, and a motion to dismiss the Complaint in its entirety.  Defendants are prepared to proceed to the preliminary injunction hearing right away.  Plaintiffs already have submitted all their evidence on irreparable harm.  And no additional evidence is needed to assess plaintiffs' likelihood of success on the merits:  as plaintiffs recognize, this simple contract dispute will ultimately turn on the four-corners of the parties' fully-integrated contract (Pl. Br. at 23-25), and plaintiffs already submitted the claimed proof they say they need on their antitrust claim (*id.* at 42), a claim their Complaint confirms cannot be the basis for an injunction anyway (Cplt. Counts I & II Prayer for Relief (seeking money damages without claiming irreparable harm or seeking a preliminary injunction)).  Certainly plaintiffs, who delayed bringing this TRO request for more than a year,

cannot now object to an expedited resolution. *See, e.g., Goodvine v. Thorpe*, 2010 WL 4806984, at *2 (E.D. Wis. Nov. 18, 2010).

## II.     PLAINTIFFS CANNOT ESTABLISH THE REMAINING ELEMENTS NEEDED FOR A TRO OR PRELIMINARY INJUNCTION.

Plaintiffs' inability to show they will suffer irreparable harm before this Court holds a preliminary injunction hearing dooms their TRO request. *See Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 995 (N.D. Ill. 2013) ("If the court determines that the moving party has failed to demonstrate any one of the[] three threshold requirements, it must deny the injunction."). But this is not the only TRO or preliminary injunction factor they cannot meet. As defendants explain more fully in their preliminary injunction opposition brief (which is incorporated herein by reference), plaintiffs likewise cannot meet their burden of establishing *any* of the other factors by "clear evidence"—rendering both a TRO and preliminary injunction inappropriate and unnecessary here.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' request for a temporary restraining order.

Date:   February 17, 2015                    Respectfully submitted,

/s/ *Andrew A. Kassof, P.C.*
Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, Diana M. Watral, hereby certify that on this 17th day of February 2015, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the parties listed on the electronic service list:

Thomas M. Lombardo
Abraham E. Brustein
Di Monte & Lizak
216 Higgins Road
Park Ridge, IL 60068
Telephone:     (847) 698-9600
Facsimile:      (847) 698-9623
tlombardo@dimontelaw.com
abrustein@dimontelaw.com

*Attorneys for Plaintiffs*

/s/ *Diana M. Watral*
Diana M. Watral