**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, d/b/a | ) | |
| SKYBOX ON SHEFFIELD; RIGHT FIELD | ) | No. 1:15-cv-00551 |
| PROPERTIES, LLC; 3633 ROOFTOP | ) | |
| MANAGEMENT, LLC, d/b/a LAKEVIEW | ) | Judge Virginia M. Kendall |
| BASEBALL CLUB; and ROOFTOP | ) | |
| ACQUISITION, LLC, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; AND | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel for Defendants*

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ...................................................................................................... 4

I.  CONSTRUCTION TO EXPAND AND RESTORE WRIGLEY FIELD IS WELL
    UNDERWAY. .................................................................................................... 4

II. DEFENDANTS ARE RESTORING AND EXPANDING WRIGLEY FIELD TO
    REMAIN COMPETITIVE WITH OTHER BASEBALL TEAMS. ................................. 5

III. CHICAGO CITY COUNCIL, CHICAGO PLAN COMMISSION, AND THE
     COMMISSION ON CHICAGO LANDMARKS REPEATEDLY APPROVED
     THE PROPOSED EXPANSION AND OVERRULED PLAINTIFFS'
     OBJECTIONS ................................................................................................... 7

ARGUMENT ......................................................................................................... 8

I.  PLAINTIFFS CANNOT SATISFY THE THRESHOLD REQUIREMENTS FOR
    A PRELIMINARY INJUNCTION ........................................................................ 9

    A.  Plaintiffs Will Not Suffer Irreparable Harm Before Trial In The Absence
        Of An Injunction. .................................................................................... 9

        1.  Plaintiffs Offer Nothing More Than Speculation That They Will
            Go Out Of Business Forever Before This Case Proceeds To Trial. ......... 10

        2.  None Of Plaintiffs' Cases Support Irreparable Harm. ............................. 14

    B.  Traditional Legal Remedies Will Adequately And Fully Compensate
        Plaintiffs For Any Harm Through Trial. ................................................... 15

        1.  Plaintiffs' Fixed-Term Contract Allows A Money Damages
            Calculation. ..................................................................................... 16

        2.  Any Lost Business Damages Can Be Calculated From Other
            Rooftops' Profits For The 2015 Season. ................................................ 18

        3.  Plaintiffs Have Offered Several Ways To Compute Alleged
            Damages, Even Under Their Speculative Out-Of-Business Claim. ......... 19

            a.  By Claiming An Antitrust Damages Remedy, Plaintiffs
                Concede Money Damages Would Be Adequate. ........................... 19

            b.  Plaintiffs Concede There Is A Fair Market Value For Their
                Property And Businesses. ........................................................... 20

i

## **TABLE OF CONTENTS (CONT'D)**

**Page**

    c.    Recent Rooftop Transactions Confirm The Ability To Value The Two Rooftop Plaintiff Businesses And Properties. ................................................................................ 21

    d.    The Parties Contemplated That Money Damages Were Available, And Adequate, As A Make-Whole Remedy. .............. 22

C.    Plaintiffs Cannot Establish A Likelihood Of Success Because The Contract Permits This Government-Approved Expansion. .................................. 24

    1.    The Contract Confirms Defendants Have The Right To Construct Government-Approved Outfield Signs At Wrigley Field......................... 25

    2.    The Agreement Confirms The Approved Expansion Does Not Violate "This Section"—The "Windscreen Or Other Barriers" Provision On Which Plaintiffs Rely ......................................................... 29

    3.    Plaintiffs' Other Contractual Interpretation Arguments Also Ignore The Contract's Plain Language................................................. 31

    4.    The Extrinsic Evidence, Which The Court Need Not Consider, Demonstrates Plaintiffs' Claims Are Meritless. ...................................... 32

II.    PLAINTIFFS CANNOT SATISFY THE BALANCING PHASE REQUIRED FOR A PRELIMINARY INJUNCTION......................................................... 35

A.    The Balance Of Equities Favors Defendants. ....................................... 35

B.    The Public Will Suffer If Plaintiffs' Motion Is Granted....................................... 37

CONCLUSION.................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
  471 F.3d 745 (7th Cir. 2006) ................................................ 25

*Aznaran v. Church of Scientology of California, Inc.*,
  937 F.2d 611 (9th Cir. 1991) ................................................ 23

*Barnett v. Caldwell Furniture Co.*,
  115 N.E.2d 389 (Ill. 1917) ................................................ 18

*BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*,
  148 P.3d 832 (Okla. 2005) ................................................ 33

*Bremer Bank, Nat'l Ass'n v. John Hancock Life Ins. Co.*,
  2006 WL 1205604 (D. Minn. May 2, 2006) ................................ 22

*Charles River Labs, Inc. v. Beg*,
  2014 WL 4100714 (N.D. Ill. Aug. 19, 2014) .................... 15, 16, 35

*Daveri Dev. Grp., LLC v. Village of Wheeling*,
  934 F. Supp. 2d 987 (N.D. Ill. 2013) ................................ 8, 9

*Davis v. G.N. Mortg. Corp.*,
  396 F.3d 869 (7th Cir. 2005) ................................................ 32

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*,
  501 F.2d 917 (3d Cir. 1974) ................................................ 39

*Ditton v. Rusch*,
  2014 WL 4435928 (N.D. Ill. Sept. 9, 2014) ........................ 11, 15

*Dows v. Nike, Inc.*,
  846 So. 2d 595 (Fla. Dist. Ct. App. 2003) ............................ 33

*EnVerve, Inc. v. Unger Meat Co.*,
  779 F. Supp. 2d 840 (N.D. Ill. 2011) ................................ 37

*Excelsior Motor Mfg. & Supply Co. v. Sound Equip., Inc.*,
  73 F.2d 725 (7th Cir. 1934) ................................................ 17

*Five Mile Capital Westin N. Shore SPE, LLC v. Berkadia Commercial Mtg., LLC*,
  2012 Ill. App. (1st) 122812 ................................................ 21

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Fowler v. Gartner*,
    89 So. 3d 1047 (Fla. App. 2012)........................................................................ 34

*Gallagher v. Lenart*,
    854 N.E.2d 800 (Ill. App. Ct. 2006) .............................................................. 31

*GNB Battery Techs., Inc. v. Gould, Inc.*,
    65 F.3d 615 (7th Cir. 1995) .......................................................................... 30

*Goodman v. Ill. Dep't of Fin. & Prof'l Reg.*,
    430 F.3d 432 (7th Cir. 2005) ............................................................................ 8

*Great American Ins. Co. v. Norwin School Dist.*,
    544 F.3d 229 (3rd Cir. 2008) ........................................................................ 34

*Harvey Barnett, Inc. v. Shidler*,
    143 F. Supp. 2d 1247 (D. Colo. 2001).......................................................... 23

*Hubbard v. Logsdon*,
    372 N.E.2d 101 (Ill. Ct. App. 1978) ............................................................ 18

*Ill. Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Bd. v. Ill. Inst. of Tech.*,
    946 N.E.2d 1118 (2011)................................................................................ 16

*In re Marriage of Perlmutter*,
    587 N.E.2d 609 (Ill. App. Ct. 1992) ............................................................ 21

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)......................................................................... 15

*Int'l Fidelity Ins. Co. v. Cnty of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000)............................................................ 34

*J.C. Penney Corp. v. Milwaukee Golf Dev. Co.*,
    2006 WL 1215376 (N.D. Ill. May 3, 2006) ............................................ 36, 38

*Kokomo Opalescent Glass Co. v. Arthur W. Schmid Intern., Inc.*,
    371 F.2d 208 (7th Cir. 1966) ........................................................................ 18

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*,
    2014 WL 1227311 (N.D. Ill. Mar. 25, 2014)........................................... 21, 22

*Lake in the Hills Aviation Grp. Inc. v. Village of Lake in the Hills*,
    698 N.E.2d 163 (Ill. Ct. App. 1998) ....................................................... 16, 18

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Lancaster Found., Inc. v. Skolnick*,
    1992 WL 211063 (N.D. Ill. Aug. 21, 1992) ................................................................. 20

*Lopez v. Dairyland Ins. Co.*,
    890 P.2d 192 (Colo. App. 1994) ................................................................. 33

*MacDonald v. Chicago Park Dist.*,
    132 F.3d 355 (7th Cir. 1997) ................................................................. 37

*Marketing Werks, Inc. v. Brian Fox & Foxsano Mktg, Inc.*,
    2013 WL 5609339 (N.D. Ill. Oct. 11, 2013)................................................ 15, 18, 36

*Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*,
    378 F.3d 29 (1st Cir. 2004)................................................................. 21

*McCoy v. Gamesa Tech. Corp., Inc.*,
    2012 WL 983747 (N.D. Ill. Mar. 22, 2012)................................................ 25

*Milex Prods., Inc. v. Alra Labs., Inc.*,
    603 N.E.2d 1226 (Ill. Ct. App. 1992) ................................................................. 17

*Mil-Mar Shoe Co. v. Shonac Corp.*,
    75 F.3d 1153 (7th Cir. 1996) ................................................................. 35

*Nat'l Min. Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ................................................................. 14

*NTE LLC v. Kenny Constr. Co.*,
    2015 WL 500623 (N.D. Ill. Feb. 4, 2015) ................................................ 15, 16

*Owens v. McDermott, Will & Emery*,
    736 N.E.2d 145 (Ill. App. 2000) ................................................................. 31, 33

*Penncro Assoc., Inc. v. Sprint Spectrum, LP*,
    499 F.3d 1151 (10th Cir. 2007) ................................................................. 34

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ................................................................. 14

*Power Mobility Coal. v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005) ................................................................. 14

*Real-Time Reporters, P.C. v. Sonntag Reporting Servs., Ltd.*,
    2013 WL 5818460 (N.D. Ill. Oct. 29, 2013)................................................ 9, 36

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ...................................................................... 14

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970) ....................................................................... 14

*State Farm Auto. Ins. Co. v. Kiehne*,
  641 P.2d 501 (N.M. 1982) ............................................................................ 33

*Swplaza III, LLC v. TSA Stores, Inc.*,
  2008 WL 703871 (C.D. Ill. 2008) ................................................................ 33

*Taracorp, Inc. v. NL Indus., Inc.*,
  73 F.3d 738 (7th Cir. 1996) .......................................................................... 33

*Thompson v. Gordon*,
  948 N.E.2d 39 (Ill. 2011) .............................................................................. 34

*Tower Oil & Tech. Co. v. Buckley*,
  425 N.E.2d 1060 (Ill. Ct. App. 1981) ........................................................... 17

*Triumph Packing Grp. v. Ward*,
  834 F. Supp. 2d 796 (N.D. Ill. 2011) ....................................................... 8, 24

*Unite Here Health v. La Plaza Secaucus, LLC*,
  2014 WL 287447 (N.D. Ill. Jan. 27, 2014) .................................................. 11

*United Airlines, Inc. v. Pappas*,
  809 N.E.2d 735 (Ill. App. Ct. 2004) ............................................................. 21

*Univ. of Notre Dame v. Sebelius*,
  743 F.3d 547 (7th Cir. 2014) ........................................................................ 24

*Utah Gospel Mission v. Salt Lake City Corp.*,
  316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) ................ 38

*Wells Fargo Funding v. Draper & Kramer Mortgage Corp.*,
  608 F. Supp. 2d 981 (N.D. Ill. 2009) ............................................................ 30

*Willow Hill Grain, Inc. v. Prop. Tax Appeal Bd. of the State*,
  549 N.E.2d 591 (Ill. App. Ct. 1989) ............................................................. 21

*Woods v. Elgin, Joliet & Eastern Ry. Co.*,
  2000 WL 45434 (N.D. Ill. Jan. 11, 2000) ..................................................... 33

## TABLE OF AUTHORITIES (CONT'D)

**Page**

**Other Authorities**

11 Corbin on Contracts,
§ 56.20.................................................................................................................... 17

Following extensive public debate and government approvals by the Chicago Plan Commission, Chicago City Council, and the Commission on Chicago Landmarks, defendants announced they would proceed with a privately financed expansion of Wrigley Field. Plaintiffs knew of these plans. They claim they saw "renderings" in May 2013 and again in July 2014 showing "the signage approved for right field on July 10, 2014 would substantially block the views from many of the Rooftop Businesses." (Dkt. 21, Pl. Br. at 10, 15; Dkt. 1, Cplt. ¶¶ 73, 92) As plaintiffs admit, defendants tried to negotiate with all of the rooftops *before* placing any steel orders and starting construction. Six rooftops changed hands—three to entities in which the Ricketts family invests, and three to other, unrelated investors. The two rooftop plaintiffs here, in contrast, claim they "offered to sell the . . . [b]usinesses" at "fair market value" (Cplt. ¶ 94; Pl. Br. at 14)—a number they had no trouble determining before this motion—but the parties could not agree on the price.

Rather than recognize the difficult negotiations over two years in which the Cubs tried repeatedly to address the rooftops' concerns, plaintiffs resort to spurious allegations of supposed statements by Cubs executives, already disclaimed by one referenced alderman. In reality, defendants never wavered from their commitment to restore Wrigley Field and pressed ahead with the expansion they announced years before: they purchased massive amounts of steel; demolished the existing bleachers; began construction; purchased the videoboard; and entered into contracts with sponsors for the sign plaintiffs say will block their views. Plaintiffs sat, watched, and did nothing while bulldozers razed the outfield across the street. Now, several months of construction later, plaintiffs seek a preliminary injunction to stop the expansion in its tracks.

Against that backdrop, plaintiffs' request for the "extraordinary and drastic remedy" of a preliminary injunction should be denied for at least five independent reasons.

*First*, and most fundamentally, plaintiffs will not suffer irreparable harm before this case proceeds to trial. Plaintiffs have set forth absolutely no evidence they will *forever* go out of business during the 2015 baseball season, that customers not only will stop buying tickets to their facilities this season but also *never return*, or any indicia of an imminently failing business. Indeed, plaintiffs' websites list many dates when tickets are already no longer available in the 2015 season. Plaintiffs' own say-so does not suffice.

*Second*, an adequate remedy at law exists if plaintiffs ever prevail at trial, as the parties' contract and basic math confirm. Plaintiffs' brief is noticeably silent on this factor. That is because money damages can fully compensate plaintiffs for any claimed injury that occurs between the injunction hearing and a trial on the merits if plaintiffs later prove their claims.

- Plaintiffs' prior earnings over the first 11 years of the parties' fixed-length contract can be used to determine damages (if any) for the remaining nine. Other rooftops' earnings in past years and the 2015 season provide additional data.

- Plaintiffs' proposed remedy in this case belies their suggestion that damages cannot be quantified: plaintiffs seek "***a money judgment*** . . . in an amount commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value" and "in an amount commensurate with the decline in their property values"—which they claim "***will be proven at trial***." (Cplt. ¶ 148 (emphases added))

- Damages, if any claims had any merit, could easily be calculated based on plaintiffs' fair market value—which plaintiffs were able to easily compute just months before filing suit and one plaintiff calculated just three years ago when he purchased the rooftop building and business. (*Id*. ¶¶ 50, 94; Pl. Br. at 14)

- Recent transactions involving other rooftops provide comparative sales data and another fair market value source.

- The parties' contract included a damages remedy if views were fully obstructed (from a bleacher expansion) and a rooftop was put out of business at any point during the first 8 years of the 20-year term. There is no reason a similar formula could not be used in contract year 11.

2

*Third*, plaintiffs' claims have no chance of success, much less a "reasonable likelihood." The contract expressly allows defendants to undertake any expansion of Wrigley Field so long as they obtain government approval—and there is no question defendants did that here. The outfield signs not only are part of the bleacher expansion as the government bodies recognized, but also expand, enlarge, and increase the size of Wrigley Field in several other ways. This government-approval provision expressly trumps the preceding "windscreens" sentence plaintiffs cite and makes clear the outfield signs are permitted under the contract. Plaintiffs' antitrust claim fares no better, as it is barred by baseball's antitrust exemption and fails to even meet the legal standard for an attempted monopolization claim.

*Fourth*, the balance of equities tips decidedly in defendants' favor. Plaintiffs admittedly knew the outfield signs would impact their views for nearly two years. Yet they delayed bringing their injunction request until months after construction began and after the Cubs completed the extensive governmental approval process. In the meantime, defendants pressed ahead with their massive, expensive, and time-sensitive construction project. In addition, defendants already entered a contract with Anheuser-Busch for the right field videoboard and would be harmed if advertisements cannot proceed.

*Finally*, the public will suffer from an injunction. The preservation of Wrigley Field is an undeniable public asset. Without the right field videoboard, the project would not go forward in its current, government-approved form. Plaintiffs should not be permitted to override the government-approval process they already lost.

In short, plaintiffs cannot come close to a "clear showing" (1) they will be irreparably harmed by potential lost customers during the 2015 season, (2) money damages could not compensate for any injury before trial, if they ever prevail, (3) they have a substantial likelihood

of success on the merits, (4) the balance of harms weighs in their favor, or (5) they should be allowed to end run the public approval they openly fought to prevent. The Court should reject plaintiffs' request for the "extraordinary and drastic remedy" they waited so long to seek.

## BACKGROUND

### I. CONSTRUCTION TO EXPAND AND RESTORE WRIGLEY FIELD IS WELL UNDERWAY.

Defendants broke ground and began construction five months ago on their multi-year plan to expand and restore Wrigley Field. (Pl. Br. at 16; Cplt. ¶¶ 100, 128; Ex. 1, Declaration of Carl Rice ("Rice Decl.") ¶ 12) Defendants tore down the right and left field outer walls, purchased approximately 15 feet of sidewalk and street on Waveland and Sheffield avenues, purchased specially-engineered steel and videoboards, installed steel, and poured a concrete foundation for the new, expanded bleachers. (*Id.*) As plaintiffs acknowledge, "the construction that commenced on September 29, 2014 included installation of the seven signs announced by the Cubs Organization on May 21, 2014." (Pl. Br. at 16; *see also* Cplt. ¶¶ 100, 128) This includes the installation of millions of dollars of specially ordered steel supporting both the bleachers and signs defendants ordered months before. (Ex. 1, Rice Decl. ¶¶ 21-23)

Defendants also contracted with Anheuser-Busch for sponsorship rights above the right field videoboard, and Anheuser-Busch already paid defendants under the contract. (*Id.* ¶ 27) Plaintiffs knew about but allowed defendants to undertake all of these efforts *before* filing suit or waiting even longer to request a preliminary injunction in this case.[1]

---

[1] As detailed in defendants' TRO opposition, plaintiffs spent two years viewing displays, replicas, and illustrations showing "the impact that the[] signs would have," which they believed "would substantially block the views from many of the Rooftop Businesses." They then watched construction for another five months before filing suit. (TRO Opp. at 6-9; *see also* Pl. Br. at 8-10, 15, 18; Cplt. ¶¶ 65, 67-68, 73, 92, 106; Pl. Br., Ex. B, Anguiano Decl. ¶ 16; Pl. Br., Ex. C, Hamid Decl. ¶ 16)

## II.    DEFENDANTS ARE RESTORING AND EXPANDING WRIGLEY FIELD TO REMAIN COMPETITIVE WITH OTHER BASEBALL TEAMS.

Defendants' current construction efforts are part of the preservation and expansion of historic Wrigley Field.  Several years ago, defendants began investigating ways to improve the ballpark.  Each of defendants' division competitors has benefited from stadiums built with publicly financed dollars since 2000, and every other team in baseball has a new ballpark or benefitted from improvements to their facilities within the last 25 years.  (Ex. 1, Rice Decl. ¶ 8) These investments include large videoboards and signs, which have generated substantial revenue for other Major League ballclubs to recruit the best players to compete with the Cubs and to provide the best experience for fans.  (*Id.* ¶ 9)  This has put defendants in a competitive disadvantage.  Unlike almost every other team in Major League Baseball, defendants did not receive significant public funding to restore their 100-year-old ballpark.  (*Id.* ¶ 10)[2]

Undeterred, defendants put together an extensive plan to expand and restore Wrigley Field using their own money.  But this required defendants to find additional sources of revenue. To this end, the Wrigley Field expansion includes several interrelated features:

- Bleacher Expansion:  New seats in the right and left field bleachers, as well as a new fan bleacher deck and improved and covered concessions.  (*Id.* ¶ 13)

- Sign Expansion:  Six additional signs structurally connected to the bleachers in the Wrigley Field outfield, including a videoboard in right field.  (*Id.* ¶ 14)

---

[2] To be sure, defendants did receive help from the City of Chicago, including the sale to defendants of portions of Waveland and Sheffield avenues used for bleacher expansion.  Defendants are also eligible for historic preservation tax incentives available to any entity renovating an historic facility. But while helpful, these incentives fall short of the hundreds of millions in public funding offered to other sports teams. Ex. 2, Justin Ove, "*Update: Cobb Offers $400M in "Public Support" for Braves Stadium,*" Patch.com, Nov. 11, 2013, http://patch.com/georgia/smyrna/atlanta-braves-relocating-to-smyrna-area-in-2017.

**NEW OUTFIELD SIGNS AT WRIGLEY FIELD.**

 

- <u>Property Expansion</u>:  Expanded property line by about 15 feet on Sheffield Avenue and 15 feet on Waveland Avenue.  (*Id.* ¶ 11)

- <u>Wall Expansion</u>:  Relocated and reconstructed exterior walls on Sheffield and Waveland avenues.  (*Id.*)

Critically, these expansion features all tie together.  There are not "two distinct construction projects at Wrigley Field" as plaintiffs wrongly claim.  (Pl. Br. at 25; Ex. 1, Rice Decl. ¶ 19)  A large team of architects, engineers, and building experts engaged in an extensive, costly, time-consuming process to design the bleachers, fan decks, videoboards and signs, and other expansion features as a single plan that could be constructed during the 2014-15 offseason. (*Id.*) As part of that interrelated plan, for example, the right field bleachers contain numerous steel structural columns that support *both* the bleachers and the outfield signs.  (*Id.* ¶ 20)  The steel columns extend 16 feet above ground—and 4 feet above the new bleacher deck—and were designed to stabilize the bleachers and videoboard on windy days.  (*Id.*)  Six of the steel columns are located in the bleachers directly below the right field videoboard, and others are spread throughout the right field bleachers.  (*Id.*)  It cost defendants many millions of dollars to design the bleachers and order sufficiently thick steel to withstand the weight of the signs; without the signs, engineers could have used different steel and a different design.  (*Id.* ¶¶ 19-21, 24)  As another example, the right field videoboard will be installed atop the new, expanded bleacher

patio, and the videoboard structure will provide a much needed permanent fixed overhead cover for a new, expanded concessions area. (*Id.* ¶ 17)

III. **CHICAGO CITY COUNCIL, CHICAGO PLAN COMMISSION, AND THE COMMISSION ON CHICAGO LANDMARKS REPEATEDLY APPROVED THE PROPOSED EXPANSION AND OVERRULED PLAINTIFFS' OBJECTIONS.**

During the last two years, defendants obtained government approval for the expansion plan. Because Wrigley Field is a designated City of Chicago landmark, approval from the Commission on Chicago Landmarks is required before making any changes that impact the significant historic elements of the ballpark. Local rules also require defendants to obtain approval from the Chicago Plan Commission and City Council. (Chicago Zoning Ordinance 17-13-0604-A, 17-13-0606) These approval requirements existed before the parties here entered into their agreement. (Ex. 3, 1/27/2004 Agreement between Chicago National League Ball Club, Inc. and Rooftop Owners (2004 Agreement), § 6.5)

After many meetings and public hearings, during which several rooftops appeared, testified, and objected to the proposed signs, the Chicago Plan Commission, City Council, and Commission on Chicago Landmarks approved the Wrigley Field expansion plan, which included the outfield expansion of the bleachers and signs. (Pl. Br. at 9, 15; Cplt. ¶¶ 75, 91; Ex. 4, 7/18/2013 Chicago Plan Comm'n Hr'g at 150-52; Ex. 5, 11/21/2013 Chicago Plan Comm'n Hr'g at 102-03; Ex. 6, 1/22/2014 Chicago City Council Ordinance re Planned Development (2013 Am. PD) at ¶ 6; Ex. 7, 6/27/2013 Comm'n on Chicago Landmarks Hr'g at 202-04; Ex. 8, 7/11/2013 Landmarks Hr'g at 243-45; Ex. 9, 11/7/2013 Landmarks Hr'g at 10-11, 30-31; Ex. 10, 7/10/2014 Landmarks Comm'n Rec. at 3-4; Ex. 27, 7/10/2014 Comm'n on Chicago Landmarks Hr'g at 21, 24, 31, 51, 178-79; Ex. 28, 12/4/2014 Landmarks Hr'g at 14-23, 78-79) As the Landmarks Commission staff itself recognized, the project included the ***"[e]xpansion of outfield signs and lights"*** at the ballpark. (Ex. 10, 7/10/2014 Landmarks Comm'n Rec. at 3-4) And the

additional signs, City Council and Plan Commission recognized, were "***part of the bleacher expansion***" of Wrigley Field.  (Ex. 6, 2013 Am. PD at ¶ 6 (emphasis added))

During this two-year approval process, the government entities acknowledged the outfield signs as a critical and "integral part" of the expansion project.  For example, City Council approved the outfield signs "as an integral part of this Planned Development, the proposed expansion and renovation of Wrigley Field."  (Ex. 6, 2013 Am. PD at ¶ 6)  This is consistent with testimony provided at each hearing, which reiterated the signs were an essential funding source and an integral structural component of the overall restoration.  (*E.g.*, Ex. 4, 7/18/2013 Chicago Plan Comm'n Hr'g at 32; Ex. 7, 6/27/2013 Comm'n on Chicago Landmarks Hr'g at 65; Ex. 8, 7/11/2013 Landmarks Hr'g at 90-91; Ex. 27, 7/10/2014 Comm'n on Chicago Landmarks Hr'g at 62-63)

## ARGUMENT

The Seventh Circuit recognizes a preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Goodman v. Ill. Dep't of Fin. & Prof'l Reg.*, 430 F.3d 432, 437 (7th Cir. 2005). "A preliminary injunction is 'a very serious remedy,' and it is 'never to be indulged in except in a case clearly demanding it.'"  *Triumph Packing Grp. v. Ward*, 834 F. Supp. 2d 796, 805 (N.D. Ill. 2011) (denying preliminary injunction).

Courts in this Circuit "engage[] in an analysis that proceeds in two distinct phases:  a threshold phase and a balancing phase."  *Daveri Dev. Grp., LLC v. Village of Wheeling*, 934 F. Supp. 2d 987, 995 (N.D. Ill. 2013).  The threshold phase requires the plaintiff to satisfy three requirements:  (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits."  *Id.*  "If the

8

court determines that the moving party has failed to demonstrate ***any one*** of these three threshold requirements, it must deny the injunction." *Id.* (emphasis added). The court does not even conduct the balancing phase—where it considers the harm to the defendant, public, and third parties—unless the plaintiff first satisfies all three threshold factors. Plaintiffs cannot prevail under either part of this two-tiered approach.

## I.   PLAINTIFFS CANNOT SATISFY THE THRESHOLD REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

Plaintiffs' preliminary injunction request and attached declarations make clear plaintiffs cannot satisfy *any* of the threshold elements required for an injunction—much less all three. Any injunction here would be unprecedented and inappropriate.[3]

### A.   Plaintiffs Will Not Suffer Irreparable Harm Before Trial In The Absence Of An Injunction.

"A party seeking a preliminary injunction must initially establish . . . absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims." *Real-Time Reporters, P.C. v. Sonntag Reporting Servs., Ltd.*, 2013 WL 5818460, at *1 (N.D. Ill. Oct. 29, 2013); *see* Pl. Br. at 2 (harm "before this case goes to trial"). Plaintiffs cannot meet that burden. The only relevant period here is between now and when this case goes to trial—*i.e.*, the 2015 baseball season. One of two things will happen if the videoboard goes up now and the litigation proceeds during that time: either defendants defeat plaintiffs' claims and the videoboard stays in place, or plaintiffs win on their claims, the videoboard comes down, and plaintiffs return to the operations they enjoyed in earlier seasons. In the former case, plaintiffs

---

[3] Plaintiffs request a broad injunction to prevent defendants from installing "'jumbotrons,' 'video boards,' billboards, advertisements and any other type of signage in front of Plaintiffs' properties located across from Wrigley Field, which signage will obstruct Plaintiffs' views into Wrigley Field[.]" (Pl. Br. at 50) Yet the only sign plaintiffs claim will "substantially block" their views is the right field videoboard. (Cplt. ¶¶ 107-08) Therefore, only one sign is at issue in this case; the remaining signs are not subject to plaintiffs' claims.

are entitled to no remedy; in the latter, plaintiffs can claim damages for lost profits during the 2015 season. There certainly is no irreparable harm under either.

Indeed, plaintiffs put forward *zero evidence* they will suffer irreparable harm in the interim period before trial. They offer no evidence all customers will stop patronizing their businesses during the 2015 baseball season, much less *never return* in future seasons; no evidence their businesses will need to close not just during the 2015 season, but *forever*; and no evidence they cannot otherwise keep their businesses afloat over one baseball season. In fact, the evidence demonstrates customers already are purchasing rooftop tickets for the 2015 season and plaintiffs may not even suffer a loss. And that says nothing about the season after—one "similar" rooftop closed completely for renovations for over a season, yet opened its doors again the next year and remains in business today. Ultimately, no matter what this Court decides, plaintiffs will still own their buildings and, if they prevail at trial, their customers will return for the 2016 season (if they ever left). There is no irreparable harm.

### 1. Plaintiffs Offer Nothing More Than Speculation That They Will Go Out Of Business Forever Before This Case Proceeds To Trial.

Plaintiffs speculate, without any actual evidence, the government-approved videoboard will cause "the complete and total destruction of their businesses." (Cplt. ¶ 257; Pl. Br. at 18, 47) That is empty rhetoric. Plaintiffs' 50-page brief and seven declarations offer no evidence whatsoever they will lose their entire businesses in one season while this litigation proceeds. They point to no evidence of customers who will forever refuse to purchase tickets if views are obstructed in 2015; no evidence their businesses could never recover from any customer loss during the 2015 season; and no evidence the businesses will shut down *permanently* before a trial on the merits. Plaintiffs' speculation about their imminent destruction cannot carry their burden to show irreparable harm. *E.g., Ditton v. Rusch*, 2014 WL 4435928, at *3, (N.D. Ill.

Sept. 9, 2014) ("The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural."); *Unite Here Health v. La Plaza Secaucus, LLC*, 2014 WL 287447, at *2 (N.D. Ill. Jan. 27, 2014) ("Defendants correctly contend that the immediate nature of the stated harms are too undetermined to establish imminent harm. Generally, a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries.").

The only other harm plaintiffs identify is "difficulty selling rooftop tickets to 2015 events," including "a significant decline" in "2015 ticket pre-sales," "[m]any customers" refusing to book dates, and some customers "demanding refunds if the views are blocked." (Pl. Br. at 2, 18; *id.*, Ex. C, Hamid Decl. ¶ 19) But "difficulty" selling tickets does not mean an inability; a "significant decline" is not zero; "many customers" does not mean all; and a return of some deposits means plaintiffs are keeping others. Plaintiffs' claimed evidence does not fare any better. Plaintiffs provide only a handful of customer emails inquiring about the expansion. Many simply ask questions about the view without refusing to purchase tickets; others decline to purchase tickets for other reasons. (*E.g.,* Pl. Br., Ex. C, Hamid Decl. Ex. C-3 at 34 ("How are you guys going to fair with the upcoming construction??"); *id.* at 37 ("[T]ruth be told the first quote was above what we can afford right now.")) And these emails fail to provide any evidence of customers saying they will forever refuse to patronize the businesses or of imminently failing businesses. At most, plaintiffs have demonstrated they may lose some sales during the 2015 season. But this can be remedied through money damages at the end of trial, if plaintiffs prevail, by examining historical sales or other rooftop profits for the 2015 season. (*See infra* 16-19)

Equally important, other evidence undermines plaintiffs' speculative harm. *First*, plaintiffs already have started selling tickets to Cubs' games and various concert events at

Wrigley Field this summer. Plaintiffs' websites reveal tickets to 58 events at Skybox on Waveland and 59 events at Lakeview Baseball Club that are already no longer available. (Ex. 12) That accounts for more than 60 percent of the games this season at Wrigley Field. *Second*, even if customers cancel reservations due to an obstruction, plaintiffs admit they will retain 50 percent of the deposit from some customers, and other reservations are non-refundable. (Pl. Br., Ex. C, Hamid Decl. ¶ 17; Ex. 13, Skybox on Sheffield, "Buy Tickets: Terms and Conditions"; Ex. 14, Lakeview Baseball Club, Terms and Conditions) *Third*, customers already understand the risk of obstruction when they purchase their tickets. The Terms and Conditions for both rooftops state:

> Rooftop does not guarantee any particular sight lines or view of Wrigley Field or the playing field or other Event stage. . . . Rooftop also shall not be responsible for the presence of obstructions outside of Rooftop's control, including but not limited to special signage, construction activities, sound equipment, video screens and light towers for Events that may affect the view of the field, stage area or performance of an Event from the Rooftop Facility . . . and the presence of such obstructions will not entitle Client to a discount, refund or rebate of any fees paid or payable.

(Ex. 13; Ex. 14)[4] To pretend plaintiffs suddenly will lose all customers because their warnings come to pass defies reality. *Fourth*, many customers attend the rooftops for reasons other than the views, meaning an obstruction will not dissuade those customers.[5]

---

[4] For each and every major concert at Wrigley Field since 2004, the stage has faced ***away*** from the outfield (toward the grandstands), meaning for years, plaintiffs have successfully sold tickets to view events, be it concerts, the NHL Winter Classic, the Allstate Wrigleyville Classic, and others, with views obstructed by stages, light poles, video boards, and other event-required obstructions. (Ex. 1, Rice Decl. ¶ 29)

[5] *See, e.g.*, Ex. 16, Carlos Nazario, "Wrigley Field Renovation Will Be An Epic Battle For Cubs", Fansided, June 4, 2014, http://www.fansided.com/2014/06/04wrigley-field-renovations-will-epic-battle-cubs/ ("The rooftop atmosphere is now more corporate-friendly than fan-friendly. . . . Whereas the fans who got on the roofs in the early days just wanted to enjoy a Cubs game for free, now the game may be the last thing anyone is interested in. It is more for socializing or getting business deals done."); Pl. Br., Ex. A, Lombardo Decl. Ex. A-2 at 30 ("The businesses serve beer and food, and some have indoor lounges[.]"); *id.* at 31 ("The windscreens didn't put a dent in the festivities for [a customer] and his friends from Cincinnati during their rooftop party in April. They drank beer and dined on hamburgers and sausages, included in the price of admission."); Pl. Br., Ex. B, Anguiano Decl. ¶ 3 (rooftops "serve food and beverages, and provide[ ] other amenities to its customers"); *id.*, Ex. C, Hamid Decl. ¶ 3

The evidence also shows customers will return to rooftop businesses after the 2015 season if plaintiffs prevail at trial (if those customers ever left). According to plaintiffs, the rooftops are all "similar." (Pl. Br., Ex. C, Hamid Decl. ¶ 3; *id.*, Ex. D, McCarthy Decl. ¶ 4; *see* Ex. 15, *Chicago Nat'l League Ball Club, LLC v. T. Lamb, Inc., d/b/a Lakeview Baseball Club*, No. 09-1523, Lakeview Baseball Club Mtn. for Temporary Restraining Order, Dkt. 22 at 1-2 (N.D. Ill. March 16, 2009) ("customers do not typically differentiate one rooftop from another")) So long as plaintiffs offer competitive prices in the 2016 season, there is no reason to think customers will not return. The experience of other rooftops confirms this. One of the nearby rooftops, Annex Club, closed operations for the entire 2008 baseball season and a substantial part of the 2009 season while it renovated its facilities. (Ex. 1, Rice Decl. ¶ 28) That rooftop survived during its hiatus—opening for business again for the 2010 baseball season—and remains in business today. (*Id.*) Thus, even assuming plaintiffs would close their doors while this litigation proceeds, there is no reason to think they could not simply reopen next year.

Ultimately, this is not the first time one of these rooftops has speculated blocked views would destroy its business. Defendants and one rooftop plaintiff here became embroiled in litigation in early 2009, shortly after the NHL Winter Classic hockey game. *Chicago National League Ball Club, LLC v. T. Lamb, Inc., d/b/a Lakeview Baseball Club*, No. 09-1523 (N.D. Ill. 2009). The Lakeview Baseball Club rooftop then moved for a TRO and preliminary injunction to enjoin defendants "from erecting any obstructions of LBVC's views of Wrigley Field." (Ex. 15, *id.,* Lakeview Baseball Club Mtn. for Temporary Restraining Order, Dkt. 21 at 1 (N.D. Ill. March 19, 2009) The rooftop claimed its business would be "destroyed" by defendants' proposed obstruction. (*Id.*, Dkt. 23 at 3) Judge Darrah rejected this argument as "speculative"

(same); *id.*, Ex. D, McCarthy Decl. ¶ 4 (same); Ex. 17, http://wrigleyfieldrooftopclub.com/ ("Premier Corporate Meeting Location").

and "nothing a concrete nature."[6]  (Ex. 18, 3/18/09 Hr'g Tr. at 45)  The same sort of speculation should be rejected here again.

### 2. None Of Plaintiffs' Cases Support Irreparable Harm.

Plaintiffs essentially ask the Court to adopt a rule that a plaintiff can satisfy the irreparable harm standard without offering evidence so long as it claims a "life or death" business situation.  But the law requires more.  It is plaintiffs' burden to produce actual evidence irreparable harm would occur while litigation proceeds.  Plaintiffs' own cases prove the point. Two of plaintiffs' cases actually denied or reversed preliminary injunctions for this very reason. *Nat'l Mining Assoc. v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[T]he plaintiff here is offering nothing more than a 'prediction' that is 'at best, remote and speculative.'  Something more than Mr. Johnson's conclusory projection is necessary to show . . . certain, imminent business closings."); *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005) (no imminent irreparable harm; "plaintiffs are basically predicting . . . they will be forced out of business").[7]  And in each of plaintiffs' cases granting a preliminary injunction, the plaintiff offered actual *evidence* of a business shut down before a trial on the merits.  *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 789, 795-96 (7th Cir. 2013) (absent order enjoining statute, abortion clinics would be forced to close due to impossibility of complying in time permitted by statute); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1200 (2d Cir. 1970) (evidence dealership would be terminated by letter absent injunction).  Plaintiffs have done nothing of the sort here.

---

[6] Notably, although they claimed "the Jumbotron essentially obstructed almost half of the playing surface for the Winter Classic," at least 200 patrons—the rooftop legal capacity—still viewed the game from that rooftop.  (Ex. 19, 4/23/2009 Hr'g Tr. at 6, 45)

[7] Similarly, plaintiffs rely on *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 391, 395 (7th Cir. 1984), which reversed an injunction because the balance of the equities weighed in favor of the defendant where there was no evidence plaintiff would go out of business.

Tellingly, plaintiffs do not cite a single case finding irreparable harm on an out-of-business claim where the plaintiff had an established profit history and a fixed-length contract, as is the case here (*see infra* 16-18). For good reason—the past years of operation allow for a money damages calculation for the contract years that remain precluding a finding of irreparable harm. *See, e.g.*, *Marketing Werks, Inc. v. Brian Fox & Foxsano Mktg., Inc.*, 2013 WL 5609339, at *3 (N.D. Ill. Oct. 11, 2013) ("This dispute concerns a fixed-length contract. . . [and] at least three years of data . . . permit an expert to predict what the value of the 2014 IRL account to Marketing Werks would have been."); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-02 (3d Cir. 1989) ("Any damage to [plaintiff] is susceptible of precise measurement in light of the volume of freight [plaintiff] has handled for [defendant] over the period of the contract.").

### B.    Traditional Legal Remedies Will Adequately And Fully Compensate Plaintiffs For Any Harm Through Trial.

Plaintiffs do not argue anywhere in their 50-page brief that traditional legal remedies are inadequate here. Plaintiffs say simply, "there is no adequate remedy at law." (Pl. Br. at 46-47) That is their entire argument on the issue. Plaintiffs' conclusion is not supported by any analysis, explanation, or evidence—and hardly rises to the "clear showing" needed to justify a preliminary injunction. As courts have held time and again, the adequate legal remedy prong is a distinct requirement, and an absence of proof on it will doom a plaintiff's injunction request. *Ditton*, 2014 WL 4435928, at *3, *6 ("If the party cannot make a showing as to *each* of these threshold requirements," including "that traditional legal remedies would be inadequate," then "the preliminary injunction must be denied."); *see also Charles River Labs, Inc. v. Beg*, 2014 WL 4100714, at *2 (N.D. Ill. Aug. 19, 2014) (denying preliminary injunction where there was an adequate remedy at law); *NTE LLC v. Kenny Constr. Co.*, 2015 WL 500623, at *4 (N.D. Ill. Feb.

4, 2015) (same). Plaintiffs' brief offers nothing at all to meet their burden on this separate injunction requirement.

Plaintiffs ignore the legal remedy prong because they cannot satisfy it. Again, as plaintiffs recognize (Pl. Br. at 2), the only period that matters here is from entry of the injunction to a trial on the merits—*i.e.*, the 2015 baseball season. There can be no doubt money damages can fully remedy any alleged harm the right field videoboard causes for that short period if plaintiffs later prevail. That is a simple money damages calculation based on lost profits.[8] And even if one assumes, without any evidence at all, plaintiffs will forever go out of business after this one season, plaintiffs offer no reason why money damages would not be adequate for that harm as well. There are several well-accepted economic principles to make plaintiffs whole, making an injunction inappropriate. *See, e.g., Charles River Labs*, 2014 WL 4100714, at *2 ("[T]he record supports that any injury arguably suffered by Plaintiff will be compensable by money damages."); *NTE LLC*, 2015 WL 500623, at *4 ("All of these alleged losses are calculable and compensable through monetary damages at law. Plaintiff has an adequate remedy at law.").

### 1. Plaintiffs' Fixed-Term Contract Allows A Money Damages Calculation.

For starters, a lost profits calculation can compensate for either an interrupted or out-of-business claim. Plaintiffs concede their contract with defendants has a 20-year fixed length. (Pl. Br. at 1 ("20-year contract[ ]"); *id*. at 4 ("a binding 20-year contract"); *id*. at 22 (contract extends through 2023); *id*. at 26 ("20-year term"); *id*. at 28 ("a 20-year royalty arrangement"); *id*. at 48

---

[8] "Illinois courts have consistently held that money damages are the appropriate remedy for breach of contract." *Ill. Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Bd. v. Ill. Inst. of Tech.*, 946 N.E.2d 1118, 1122 (Ill. 2011); *see Lake in the Hills Aviation Grp. Inc. v. Vill. of Lake in the Hills*, 698 N.E.2d 163, 185 (Ill. Ct. App. 1998) ("In cases involving breach of contract, a monetary damage award is more complete, practical, and efficient than injunctive relief."). This case is no different.

("a 20-year contract"); Cplt. ¶ 40 ("period of twenty years, not terminating until December 31, 2023"), ¶ 42 ("20-year term"); *see* Ex. 3, 2004 Agreement § 4.1)  Any rights they have end at that time.  (Pl. Br. at 25 ("the Cub Organization is prohibited from erecting windscreens or other barriers to obstruct the views . . . *until December 31, 2023*."))  So too does any claimed loss.  Removing any doubt, one of the plaintiffs twice admitted, in pleadings filed in prior litigation, that without the contract, "[t]he Cubs have the legal right to build a fence or wall that blocks rooftop viewing of games."   (Ex. 20, *Chicago Nat'l League Ball Club, Inc. v. Skybox on Waveland et al.*, No. 02-9105 (N.D. Ill. 2002), Proposed Findings of Fact, Proposed Conclusions of Law at ¶ 27; Ex. 21, *id.*, Dkt, 125, at 14)

Historical data from this fixed-length contract can be used to calculate any alleged damages in this case.  The contract at issue charges a royalty based on gross revenue and annual reporting.  For 11 years plaintiffs sold tickets to customers, operated their businesses, and reported profits to substantiate the royalty to which they agreed.  Just as the parties relied on these records to calculate the applicable royalty, experts can rely on this financial data to assess any future loss, for either the 2015 season or beyond.  (*See* Ex. 11, Dudney Decl. ¶¶ 28-29, 35-36)  This is "[t]he long-standing rule in Illinois[.]"  *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1236 (Ill. Ct. App. 1992); *see Excelsior Motor Mfg. & Supply Co. v. Sound Equip., Inc.*, 73 F.2d 725, 728-29 (7th Cir. 1934) ("[D]amages for the interruption of a going business with consequent loss of profits may be recovered where proof is introduced as to the amount of profit made in the past during a like period . . . ."); 11 Corbin on Contracts, § 56.20 ("If the business is one that already has been established, a reasonable prediction can often be made as to its future on the basis of its past history.").[9]

---

[9] Applying this principle, courts time and again calculate damages based on estimated profitability for the remaining years under a contract.  *See, e.g., Tower Oil & Tech. Co. v. Buckley*, 425 N.E.2d 1060, 1068 (Ill. Ct. App. 1981)

This Court's decision in *Marketing Werks, Inc. v. Brian Fox & Foxsano Marketing, Inc.*, confirms damages are an available remedy. There, the plaintiff sought to enjoin its former employee from working with a client with which it had a three-year contract. 2013 WL 5609339 (N.D. Ill. Oct. 11, 2013). But the plaintiff's fixed-length contract provided sufficient data for a lost profits calculation:

> This dispute concerns a fixed-length contract. [Plaintiff] has at least three years of data that shows the value of the [customer's] account to [plaintiff]. Should [the customer] award its account to [defendant], the parties will know the value of the 2014 [customer] account. To the extent that the value of the [customer] account to [defendant] differs to that of [plaintiff], [plaintiff's] confidential information at issue here will likely permit an expert to predict what the value of the 2014 [customer] account to [defendant] would have been.

*Id*. at *3. This Court thus found an adequate remedy at law. *Id*. The same result is warranted here. *See also, e.g., Lake in the Hills*, 698 N.E.2d at 185 (reversing preliminary injunction: "if an improper termination of the operating agreement occurred, the plaintiffs' damages would be their lost profits for the duration of the agreement").

## 2. Any Lost Business Damages Can Be Calculated From Other Rooftops' Profits For The 2015 Season.

A second way to monetize lost business during the litigation is to examine other rooftops' profits during the 2015 season. Plaintiffs repeatedly concede their businesses are "similar to the businesses operated at fifteen other buildings located on the 3600 block of North Sheffield, and the 1000 block of West Waveland." (*E.g.*, Pl. Br., Ex. C, Hamid Decl. ¶ 3; *id.*, Ex. D, McCarthy

---

(calculating damages in contract action: "one can make a reasonable prediction of future profits of an established business on the basis of its prior sales"); *Hubbard v. Logsdon*, 372 N.E.2d 101, 108 (Ill. Ct. App. 1978) (calculating future lost profit for ten years by examining plaintiff's gross income over nine month period); *Kokomo Opalescent Glass Co. v. Arthur W. Schmid Int'l, Inc.*, 371 F.2d 208, 214-15 (7th Cir. 1966) ("The evidence introduced to establish damages included testimony concerning loss of profit on glass the defendant would have produced during the last four months of 1962 but for defendant's failure to deliver an operable machine which would produce saleable glass until January of 1963."); *see also Barnett v. Caldwell Furniture Co.*, 115 N.E. 389, 390 (Ill. 1917) ("[T]he amount of sales made by plaintiff for a certain number of months prior to his discharge was proved as a basis upon which to estimate his probable earnings in the future.").

Decl. ¶ 4; *see id.* Ex. E, Schlenker Decl. ¶ 3)   Under the contract, these other rooftops also maintain financial information, including ticket sales and profits, for each season, sufficient to calculate the applicable royalty.  Comparing plaintiffs' figures for the 2015 season to these other rooftops can help compute any sales plaintiffs lost.  (*See* Ex. 11, Dudney Decl. ¶¶ 30, 36) This is a simple math problem.

### 3. Plaintiffs Have Offered Several Ways To Compute Alleged Damages, Even Under Their Speculative Out-Of-Business Claim.

To the extent plaintiffs prevail at trial, there are several additional ways to calculate damages for plaintiffs' wholly speculative—and unsupportable—claim they somehow will be out of business by the time a trial ends and the 2016 season begins.  Plaintiffs themselves say they can prove at trial damages "commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value" and property loss.  (Cplt. ¶ 148) Another approach is to look to the "fair market value" of the businesses—a number plaintiffs had no trouble determining before filing this case or when purchasing one of the rooftops in 2012. (*Id*. ¶¶ 94, 100)   Yet another is to consider recent sales of other rooftops, which one rooftop owner said sold at a "fair price."  (*See* Ex. 11, Dudney Decl. ¶¶ 41-42)  And as a fourth, the parties themselves even negotiated a damages remedy in the contract if a bleacher expansion fully obstructed the rooftops' views and put them out of business in the first 8 years of the contract's 20-year term.  Clearly a similar remedy exists if the same thing happens in contract year 11.  The point is simply this:  the claimed harm here is easily calculated.

### a. By Claiming An Antitrust Damages Remedy, Plaintiffs Concede Money Damages Would Be Adequate.

Plaintiffs' own requested remedy undermines their claim of no adequate money damages here:

[A] money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Businesses *in an amount commensurate with their actual lost business revenue, future lost business revenue, and reduction in company value*, which amounts *will be proven at trial*;

[A] money judgment jointly and severally against all defendants and in favor of the Plaintiff Rooftop Properties *in an amount commensurate with the decline in their property values*, which amounts *will be proven at trial*;

(Cplt. ¶ 148 (emphases added))   That is, as even plaintiffs acknowledge, lost profits and decreased property values are a perfectly appropriate way to calculate damages.   This Circuit has emphasized equitable relief is not appropriate where the plaintiff's complaint seeks compensatory damages.   *See, e.g., Lancaster Found., Inc. v. Skolnick*, 1992 WL 211063, at *5 (N.D. Ill. Aug. 21, 1992) (no irreparable harm where "plaintiffs themselves have been able to place a monetary value on their alleged injuries in their request for compensatory damages").

> ### b.   Plaintiffs Concede There Is A Fair Market Value For Their Property And Businesses.

According to the Complaint and reiterated in the preliminary injunction request, plaintiffs "offered to sell the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization at *fair market value*."   (Cplt. ¶ 94 (emphasis added); Pl. Br. at 14)   That is, just months before plaintiffs filed suit, they had no problem valuing their businesses.   It is nonsensical to now think a money damages figure no longer exists.   Fair market value was then, and remains now, a perfectly appropriate measure for plaintiffs' businesses.

Moreover, plaintiffs' buildings and businesses have been sold several times since 2004. (Cplt. ¶¶ 39, 50; Pl. Br., Ex. C, Hamid Decl. ¶¶ 5, 7)   One sale valued the 3627 N. Sheffield Avenue property and business at $7 million and expressly delineated the value of "rooftop seat rights" and intangible assets.   (Ex. 22, Real Estate Sales Contract for 3627 N. Sheffield) Plaintiffs in this case likewise assessed a fair market value when they purchased the 3633 N. Sheffield Avenue property and business in 2012 and bought out an owner—in the face of

defendants' proposed expansion plan.  (*See* Cplt. ¶ 50)  They valued the property then and can do so now.  *See, e.g., Five Mile Capital Westin N. Shore SPE, LLC v. Berkadia Commercial Mtg., LLC*, 2012 Ill. App. (1st) 122812 122812, ¶ 18 (denying injunction: "plaintiff itself has provided an idea of what the potential damages would be" by arguing property was worth $14 million more); *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 378 F.3d 29, 35 (1st Cir. 2004) (denying preliminary injunction:  "[A] damages remedy was adequate to redress wrongful termination [of a license].  After all, in the months leading up to the parties' falling out, a buy-out of the license was discussed. Such a sale would put a price on the value of the license to Matrix."); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 2014 WL 1227311, at *7 (N.D. Ill. Mar. 25, 2014) ("When a defendant's breach of contract deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the 'market value' of the asset.").

> ### c.    Recent Rooftop Transactions Confirm The Ability To Value The Two Rooftop Plaintiff Businesses And Properties.

Looking at sales of comparable businesses is another well-accepted approach to put a damages number on plaintiffs' claims.  *See, e.g., United Airlines, Inc. v. Pappas*, 809 N.E.2d 735, 743 (Ill. Ct. App. 2004) ("The sales comparison approach [ ] is the preferred method and should be used when market data is available."); *Willow Hill Grain, Inc. v. Prop. Tax Appeal Bd. of the State*, 549 N.E.2d 591, 596 (Ill. Ct. App.. 1989) ("Where there is evidence of comparable sales, the market approach should be used."); *see also In re Marriage of Perlmutter*, 587 N.E.2d 609, 619 (Ill. Ct. App. 1992) (recognizing comparable sales as an accepted valuation method in determining value of hotel).  Standard valuation textbooks and journals endorse this method. (*See* Ex. 11, Dudney Decl. ¶¶ 16-25)

Interests in six different rooftop buildings and businesses have traded hands in the last two months, three to entities in which the Ricketts family invests and three to a real estate

business.[10]  These transactions included both the rooftop property and the rooftop business.  As one of the rooftop owners put it:  "I wanted to make the best decision for myself and for my family for the long term.  And they gave me a fair price, which is what I was asking for."[11]  One purchase contract even acknowledged "[t]he Purchase Price reflect[ed] the fair market value of the Property and the Assets."  These sales offer perfect data to determine valuations and adequate money damages for the two rooftop businesses here.  *See, e.g., Kreg Therapeutics*, 2014 WL 1227311, at *7 ("[E]vidence such as expert opinions, evidence of sales of comparable assets, or testimony of the asset's owner may be used to establish fair market value."); *see also Bremer Bank, Nat'l Ass'n v. John Hancock Life Ins. Co.*, 2006 WL 1205604, at *3 (D. Minn. May 2, 2006) (denying TRO: "Courts routinely determine damages in cases similar to this through the use of experts and comparable sales."); Ex. 11, Dudney Decl. ¶¶ 41-42.  This is particularly true where plaintiffs recognize other rooftops are "similar" to their own.  (Pl. Br., Ex. C, Hamid Decl. ¶ 3; *id.*, Ex. D, McCarthy Decl. ¶ 4)

> **d.    The Parties Contemplated That Money Damages Were Available, And Adequate, As A Make-Whole Remedy.**

Apart from these well-accepted damages measures, the parties themselves contractually agreed on several mathematical formulae to calculate damages in the event of a partial or

---

[10] *See, e.g.*, Cplt. ¶ 105; Ex. 23, Ameet Sachdev, "Cubs owner buys 3 Wrigley rooftops", Chicago Tribune, Jan. 16, 2015, http://www.chicagotribune.com/business/breaking/ct-wrigley-rooftop-sale-0117-biz-20150116-story.html; Ex. 24, Ameet Sachdev, "Cubs Owner Pays $3 Million For Two Rooftop Apartment Buildings", Chicago Tribune, Jan. 21, 2015, http://www.chicagotribune.com/business/breaking/ct-cubs-wrigley-rooftops-0122-biz-20150121-story.html; Ex. 25, Jared S. Hopkins, "Wrigley rooftop owner, bank reach settlement", Chicago Tribune, Jan. 9, 2015, http://www.chicagotribune.com/business/breaking/ct-wrigley-rooftop-foreclosure-suit-0110-biz-20150109-story.html.; Ex. 26, Jared S. Hopkins, "Wrigley rooftop owners go to court to block signs' installation", Chicago Tribune, Feb. 13, 2015, http://www.chicagotribune.com/business/breaking/ct-wrigley-rooftops-lasky-0213-biz-20150212-story.html ("Jerry Lasky and Murray Peretz, partners in a Chicago commercial real estate business, have purchased some of the distressed mortgage debt of two buildings on Sheffield Avenue.").

[11] Ex. 24, Ameet Sachdev, "Cubs Owner Pays $3 Million For Two Rooftop Apartment Buildings", Chicago Tribune, Jan. 21, 2015, http://www.chicagotribune.com/business/breaking/ct-cubs-wrigley-rooftops-0122-biz-20150121-story.html.

completely obstructed view from the rooftops, as plaintiffs even concede. (Cplt. ¶ 42 ("the Cubs and the Rooftop Businesses agreed to certain compensation mechanisms and formulas . . .")) Specifically, Section 6.2 of the contract provides a formula to calculate damages if a bleacher expansion obstructed a rooftop's view and forced it out of business. (Ex. 3, 2004 Agreement § 6.2) Defendants would reimburse the rooftop for 50 percent of the royalties paid to defendants from the start of the contract to the date of the bleacher expansion. (*Id.*)

The point is not whether the contractual damages remedy still applies. It does not—the liquidated damages formula expired in 2012. What matters is the contract figure confirms the availability of a monetary remedy in the event a rooftop business became "no longer viable" because an expansion "so impair[ed] the view from any Rooftop into Wrigley Field." (Ex. 3, 2004 Agreement § 6.2) There is no reason why this financial calculation would be appropriate in the earlier years of the contract than in later years when *fewer* years remain. In other words, it would make no sense for a damages remedy to be available (and agreed-upon as appropriate) for a complete obstruction with 19 years left on the contract (*i.e.*, in year 1), but not adequate at all with only nine years remaining. The opposite is true. Eleven years of experience provides ample data for an easy math calculation of expected lost profits for the remainder. *Cf. Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1255 (D. Colo. 2001) (denying preliminary injunction: "Any difficulty in calculating damages . . . has been addressed by the Licensing Agreement [which] includes a liquidated damages clause requiring Defendants to pay $50,000 for a breach of the Agreement."); *Aznaran v. Church of Scientology of California, Inc.*, 937 F.2d 611, at *2 (9th Cir. 1991) (affirming denial of preliminary injunction: "[T]he releases which

[plaintiff] prepared provide liquidated damages for violation of these provisions. Thus, under the agreement it drafted, any injury that would result from a breach would be compensable.").[12]

### C. Plaintiffs Cannot Establish A Likelihood Of Success Because The Contract Permits This Government-Approved Expansion.

Plaintiffs' contract claim has no chance of succeeding on the merits, much less a reasonable likelihood.[13] Plaintiffs agree the Court need look no further than the "four corners" of the parties' contract. (Pl. Br. at 24) That unambiguous, fully-integrated agreement expressly allows defendants to undertake any expansion of Wrigley Field so long as defendants obtain government approval—which they indisputedly did. (Ex. 3, 2004 Agreement § 6.6; *see* Pl. Br. at 10, 15, 18 (discussing government approval); *supra* at 7-8) Plaintiffs concede this provision contains "plain, everyday words and phrases" without "ambiguity." (Pl. Br. at 25)

There can be no question the outfield signs are an expansion of Wrigley Field. The signs are interrelated with other expansion features, including the right field bleachers: both use the same structural support system, and the right field videoboard structure provides a permanent overhang needed for new concessions on the expanded fan deck. In addition, the videoboards and signs expand Wrigley Field out and upward, increasing the height, size, and volume of Wrigley Field in several ways. (Ex. 1, Rice Decl. ¶¶ 17-21)

---

[12] Section 6.4 of the contract—which contains no time limitation—underscores the point. Under 6.4, if a bleacher expansion "impairs the view" from a rooftop and causes the rooftop's gross revenue to fall by more than 10 percent, then the rooftop can "seek a reduction in the Royalty rate for all subsequent years" of the contract. (Ex. 3, 2004 Agreement § 6.4) Whether a complete obstruction or just a partial one, the parties agreed some monetary relief would suffice.

[13] Plaintiffs argue they are simply required to establish a "better than negligible" chance of succeeding on the merits. (Pl. Br. at 20) But courts in this Circuit apply a more stringent standard. As one court noted, the "better than negligible" standard comes from a nearly 20-year-old case and "since that time, the Seventh Circuit has held repeatedly that a party must prove that it is 'reasonably likely to succeed on the merits' in order to obtain a preliminary injunction." *Triumph*, 834 F. Supp. 2d at 805 & n.7 (citing cases). A plaintiff must instead show he is "reasonably likely to succeed on the merits" or "likely to win its suit in the district court." *Triumph*, 834 F. Supp. 2d at 805 & n.7; *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014). Regardless which standard applies, plaintiffs have not met it here.

Plaintiffs nonetheless argue defendants should be precluded from installing the right field videoboard because, they say, the preceding sentence in the same contract section prohibits "windscreens or other barriers" to "obstruct the views of the Rooftop[s.]" (*See* Cplt. ¶ 248; Pl. Br. at 22) This ignores the plain language in the sentence that immediately follows. The contract makes *expressly clear* government approval trumps all other provisions in the contract, including the only limitation in the only section plaintiffs cite: "Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, ***including this section***." (Ex. 3, 2004 Agreement § 6.6 (emphasis added)) Thus, the "including this section" language *is* the windscreens section—entirely refuting plaintiffs' proposed construction. That is why plaintiffs avoid the "including this section" language in their brief and their Complaint. Ultimately, plaintiffs cannot overcome defendants' clear contract rights and, therefore, cannot establish a likelihood of success on their claim. *See, e.g., Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 747-49 (7th Cir. 2006) (affirming denial of preliminary injunction where "there was no evidence to demonstrate a likelihood of success on the merits" based on contract's express terms); *McCoy v. Gamesa Tech. Corp., Inc.*, 2012 WL 983747, at *3-4 (N.D. Ill. Mar. 22, 2012) (denying preliminary injunction where plain-text interpretation of contract permitted defendants' action).[14]

### 1. The Contract Confirms Defendants Have The Right To Construct Government-Approved Outfield Signs At Wrigley Field.

Section 6.6 of the contract expressly permits defendants to undertake any government-approved expansion: "Any expansion of Wrigley Field approved by governmental authorities

---

[14] Plaintiffs likewise have not established a likelihood of success on their antitrust claims for all the reasons outlined in defendants' accompanying motion to dismiss (incorporated by reference). In addition, plaintiffs' antitrust claims cannot support a preliminary injunction because (1) plaintiffs' Complaint expressly seeks money damages, which is incompatible with a preliminary injunction request; (2) plaintiffs do not even seek a preliminary injunction in their Complaint; and (3) plaintiffs identify no irreparable harm or inadequate legal remedy for Counts I or II.

shall not be a violation of this Agreement, including this section." (Ex. 3, 2004 Agreement § 6.6) The challenged videoboard here is an expansion of Wrigley Field in two separate ways: *first*, the videoboard is an integral structural component of the bleacher, wall, and overall expansion of Wrigley Field approved by multiple government authorities; *second*, even if viewed in isolation, a practical impossibility, the videoboard itself remains an approved expansion of Wrigley Field.

Defendants' expansion of Wrigley Field includes several interconnected features, including new outfield bleachers, a new fan deck, expanded property lines and walls, and the signs. (Ex. 1, Rice Decl. ¶ 19) Two examples illustrate how these features fit together. First, the same six steel columns provide the structural support for both the bleachers and the right field videoboard. (*Id*. ¶ 20) These columns extend 10 feet above ground and 4 feet above the fan deck. Engineers specifically designed these columns to stabilize both the bleachers and signs on windy days, and would have selected other materials but-for the videoboard's significant weight. (*Id*. ¶¶ 19-21, 24) That is, without the anticipated signs, the bleacher expansion project would have been designed differently (and at a lower cost) and the steel currently ordered and being installed would have taken a much different shape. (*Id*.) As another example, the structure for the right field videoboard will provide a permanent fixed overhead cover for a new expanded concessions area. (*Id*. ¶ 17) A large team of architects, engineers, and building experts designed the various expansion features as part of a single plan. (*Id*. ¶ 19) It is simply not possible, or appropriate, as plaintiffs attempt (Pl. Br. at 25), to isolate the videoboard from the remaining expansion pieces.[15] (Ex. 1, Rice Decl. ¶ 19)

---

[15] Plaintiffs argue the signs somehow are not an expansion because they "do not expand the area for the fans to sit, stand, or eat" and "do not expand the playing area of the field itself." (Pl. Br. at 25-26) That is not a limitation anywhere in the agreement—the agreement speaks to "[a]ny expansion of Wrigley Field."

Government authorities agree the signs are part of the Wrigley Field expansion. (*See supra* at 7-8)  In approving every aspect of the overall expansion of Wrigley Field, the Commission on Chicago Landmarks, Chicago Plan Commission, and City Council repeatedly recognized how defendants' plan expanded each of the bleachers, the signage, the outfield walls, and the property lines. (*E.g.*, Ex. 6, 2013 Am. PD at ¶ 6 ("Applicant shall have the right to expand the Wrigley Field bleachers to install [various signs]"), *id.* ("all other signage contemplated by this Planned Development, is integral to the expansion and renovation of Wrigley Field"); Ex. 4, 7/18/2013 Chicago Plan Comm'n Hr'g at 13 ("On Waveland this will also allow us to build the signage further to the north, above the left-field bleachers, lessening the impact on the roof tops on Waveland and providing space inside the park for food and beverage and back-of-house mechanical rooms and field equipment.").  For example, the Commission on Chicago Landmarks stated at its November 7, 2013 hearing, "there is a 2-foot air right expansion just next to the rail of the bleacher deck.  And this is to allow for any extension of possible structure that may be necessary for the right-field sign[.]"  (Ex. 9, 11/7/2013 Landmarks Hr'g at 10-11, 30-31)

Even if the Court views the signs in isolation, the videoboard unquestionably remains an expansion of Wrigley Field.  As plaintiffs recognize, the plain meaning of "expand" includes "spreading out," "increasing in size or in volume," "enlargement," "anything spread out," and "an expanded, dilated or enlarged portion or form of a thing." (Pl. Br. at 25)  According to plaintiffs, anything that "expand[s], spread[s] out or enlarge[s] Wrigley Field" or "increase[s] the volume of Wrigley Field" meets this definition. (*Id.*)  The videoboard and signs fall precisely within this definition in three different ways.

27

*First*, the videoboard and signs expand Wrigley Field both *out* and *up*. Plaintiffs concede defendants are expanding "the stadium" and "adding more bleacher seats." (Pl. Br. at 25-26) But there is nothing in the contract that limits "any expansion of Wrigley Field" only to expansions *out*. Here, the videoboards and signs expand the height, size, and volume of Wrigley Field upward as well. The current height of the right field bleacher and fan deck structure is about 16 feet above ground. (Ex. 1, Rice Decl. ¶ 17) The top of the additional videoboard and sign extend approximately 40 feet above this structure, and will expand and enlarge Wrigley Field by approximately 250 percent higher in right field. (*Id.*) The right field videoboard also expands and enlarges the Wrigley Field right field structure by 2250 square feet in total, 75 feet wide and 30 feet high. (*Id.*) Indeed, plaintiffs concede the signs "will sit atop Wrigley Field" (Pl. Br. at 25)—*i.e.,* enlarging and increasing its height, volume, and size.[16]

*Second*, the right field videoboard increases both the number and volume of LED boards at Wrigley Field and spreads advertisements and information among these boards. (Ex. 1, Rice Decl. ¶ 16) There currently is one LED board defendants installed prior to the 2012 baseball season adjacent to the right field bleachers. (*Id.*) The new right field videoboard adds a second LED board to right field and both increases and expands the volume of the physical LED space at Wrigley Field by approximately 350 percent. (*Id.*)

*Third*, the right field videoboard and signs increase and expand the volume of information available at the ballpark. (*Id.* ¶ 15) Specifically, the videoboard and sign increase the amount of available team, player, and game statistics; the amount of historical information and behind-the-scenes content provided to fans; the number of advertisements during games and

---

[16] Defendants are also installing a right field light structure, extending approximately 102 feet above ground, which expands, enlarges, and increases the size of Wrigley Field in right field in connection with the right field videoboard and sign. (Ex. 1, Rice Decl. ¶ 18) If the unopposed light structure expands Wrigley Field vertically, so does the right field videoboard.

events; the information, scores, and highlights from other Major League Baseball games; and the ability to show video replays.  (*Id.*)

This is why the government authorities recognized they were approving the "*[e]xpansion of outfield signs*" at Wrigley Field, as the Landmarks Commission explained in its own recommendation report.  (Ex. 10, 7/10/2014 Landmarks Commission Rec. at 3-4 (emphasis added); *see* Ex. 27, 7/10/2014 Comm'n on Chicago Landmarks Hr'g at 21 ("an expansion of the signs in right field"), *id.* at 24 ("the sign and bleacher expansion in the outfield"); *id.* at 33 ("the sign and light expansion in the outfield"); *id.* at 51 ("Expansion of outfield signs and light: The proposed five outfield signs and two new light standards are approved as proposed."))  The additional signs and videoboard, in short, "expand Wrigley Field" in every possible way.

> ## 2. The Agreement Confirms The Approved Expansion Does Not Violate "This Section"—The "Windscreen Or Other Barriers" Provision On Which Plaintiffs Rely

Plaintiffs' claim that defendants cannot add government-approved signs, billboards, or videoboards to the ballpark they own flies in the face of the contract's plain meaning.  The only provision plaintiffs cite is the "windscreens or other barriers" sentence in Section 6.6.  (Pl. Br. at 25; Cplt. ¶ 248)  But the same provision—indeed, the very next sentence—expressly allows defendants to move forward with any approved expansion:

> The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops.  ***Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.***

(Ex. 3, 2004 Agreement § 6.6)  The last clause of Section 6.6 is key.  It makes clear defendants will not violate "this Agreement, ***including this section***"—that is, the "windscreen or other barriers" section—so long as their expansion is government approved.

Plaintiffs go to great lengths to ignore the "including this section" language. They selectively quote around it in their motion (Pl. Br. at 25-28), and entirely exclude it from their Complaint. That is because it removes any doubt defendants can proceed with any government-approved expansion of signs, videoboards, or other features that obstruct plaintiffs' view. Indeed, the only contractual limitation plaintiffs point to is the language in Section 6.6, so if "any expansion of Wrigley Field" approved by government authorities does not violate "this section," then it does not violate the windscreen provision. The Court cannot excise the "including this section" clause from the contract as plaintiffs suggest. *See Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*, 608 F. Supp. 2d 981, 987 (N.D. Ill. 2009) ("the defendants' preoccupation with the italicized sentences ignores the informing context of what comes after the relied-upon statement . . ."); *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 623 (7th Cir. 1995) ("GNB's interpretation of the term 'incurred' fails to give meaning to a significant portion of [the rest of] paragraph three.").

To be sure, governmental approval was always intended to be, and is, the key deciding factor under the contract. The contract expressly permits, in the preceding section of the contract, plaintiffs to "oppose any request for expansion of Wrigley Field" (Ex. 3, 2004 Agreement § 6.5)—which plaintiffs would only need to do to protect against obstructions. That is why plaintiffs fought defendants so hard throughout the government approval process. And is why they openly admitted to the Commission on Chicago Landmarks that the Commission's decision was the only thing standing in the way of defendants' right to construct the outfield signs:

> If you [Landmark Commission] choose to relax the landmark ordinance today and grant permission to the Ricketts family to place a sign in right field, ***you will block the views of my customers.***

(Ex. 8, 7/11/2013 Landmark Hr'g at 151)   Plaintiffs fought at the Commission and other governmental hearings, and lost.   Defendants secured the right plaintiffs acknowledged defendants needed to expand Wrigley Field and put up the approved signs.

### 3. Plaintiffs' Other Contractual Interpretation Arguments Also Ignore The Contract's Plain Language.

Plaintiffs assert various other arguments they claim prevent defendants from erecting the videoboard.  None has any merit.  Plaintiffs state throughout their brief the contract provided "twenty years of guaranteed unobstructed views into Wrigley Field."  (*E.g.*, Pl. Br. at 1, 26)  Not so.  The contract provision they cite (Section 4.1) simply creates a 20-year fixed term and says nothing about any rights under the agreement.  Plaintiffs cannot now create new rights they never negotiated.  *See Gallagher v. Lenart*, 854 N.E.2d 800, 807 (Ill. Ct. App. 2006) ("[A] court cannot . . . add new terms or conditions to which the parties do not appear to have assented [or] write into the contract something which the parties have omitted . . .  A presumption exists against provisions that easily could have been included in the contract but were not."); *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 154 (Ill. Ct. App. 2000) ("[W]here the terms of a contract are clear and unambiguous, they must be enforced as written, and no courts can rewrite a contract to provide a better bargain to suit one of the parties.").

Plaintiffs next assert their contract interpretation is necessary to "avoid absurd results" because "[n]one of the[ ] terms and provisions make sense if the Cubs Organization could effectively terminate the Rooftop License Agreement moments after signing it" by obstructing their views.  (Pl. Br. at 26-27)  But that is exactly what the parties negotiated and the contract allowed.  In fact, Sections 6.2 and 6.4 expressly contemplated defendants could immediately destroy plaintiffs' views by building bleachers within the first eight years of the agreement.  (Ex. 3, 2004 Agreement §§ 6.2, 6.4)  The contract provided a remedy if this occurred any time

during the eight year period—meaning defendants could have blocked plaintiffs' views just "moments after signing" the agreement. This is the plain language of the contract plaintiffs negotiated and signed, not an absurd result. The same is true for the government-approval provision.

Finally, plaintiffs plead defendants should not be "given carte blanche to obstruct [their views] by obtaining either a building permit or a finding from the Landmark Commission that a proposed sign package did not violate Wrigley Field's Landmark status." (Pl. Br. at 28) But that is what the parties negotiated and the contract expressly allows. (Ex. 3, 2004 Agreement § 6.6) Plaintiffs had the opportunity to oppose government approval of defendants' expansion of Wrigley Field (*id*. § 6.5)—which they did and lost. They now must live with the consequences of their bargain.

### 4. The Extrinsic Evidence, Which The Court Need Not Consider, Demonstrates Plaintiffs' Claims Are Meritless.

Plaintiffs assert the parties' contract is unambiguous and should be interpreted by this Court "as a matter of law without the use of parol evidence." (Pl. Br. at 24 (citing cases)) Defendants agree. The Court should not consider any extrinsic evidence in the face of an unambiguous, fully integrated agreement. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 879 (7th Cir. 2005) ("The introduction of parol evidence to establish ambiguity in a facially unambiguous, signed, dated and fully integrated contract is a practice which the Illinois Supreme Court has, to this date, neither condoned nor sanctioned, and accordingly we refuse to do so today."); Ex. 3, 2004 Agreement § 12. Yet plaintiffs go on to argue "extrinsic evidence" anyway. None of their arguments can save plaintiffs' strained interpretation.

Plaintiffs claim extrinsic evidence suggests "any expansion" does not mean what it says, but instead is actually just limited to a "bleacher expansion" or, worse yet, the 2005-06 bleacher

expansion. (Pl. Br. at 27, 28) This argument is entirely without merit and fails for at least four different reasons. *First*, Section 6.6 discusses "[a]ny expansion," and there is absolutely no limit on this term—to a bleacher expansion, the 2005-06 bleacher expansion, or anything else. Courts routinely hold that the adjective term "any" is unambiguous and means "all or every" and "without limit." *E.g., Owens*, 736 N.E.2d at 154 ("any securities" was unambiguous: "The word 'any' has broad and inclusive connotations. . . . We also note that at least one definition found in Black's Law Dictionary states that the term 'any' as synonymous with 'either, every or all.'").[17]

*Second*, the use of the specific phrase "bleacher expansion" elsewhere in the contract undermines any claim that "any expansion of Wrigley Field" really just refers to "a bleacher expansion." (Ex. 3, 2004 Agreement §§ 4.3, 6.1, 6.2, 6.4) As the Seventh Circuit has held, "when parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744-45 (7th Cir. 1996) (declining to find contract imposed same indemnity obligations for two different facilities, where language describing one set of obligations was broader than other); *accord Woods v. Elgin, Joliet & Eastern Ry. Co.,* 2000 WL 45434, at *5 (N.D. Ill. Jan. 11, 2000) ("When parties to a contract use different terms to address similar issues, it is reasonable to infer they intend these terms to have different meanings."); *Swplaza III, LLC v. TSA Stores, Inc.*, 2008 WL 703871, at *8 (C.D. Ill. 2008) (finding that "then-total reconstruction cost" and "actual construction cost" unambiguously meant different things in

---

[17] *See also Dows v. Nike, Inc.*, 846 So. 2d 595 (Fla. Dist. Ct. App. 2003) ("The definition of 'any' . . . means 'one or another without restriction or exception,' often synonymous with 'either,' 'every' or 'all.'"); *BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 836-37 (Okla. 2005) ("any insured" is "unambiguous and expresses a definite and certain intent to deny coverage to all insureds—even to innocent parties."); *State Farm Auto. Ins. Co. v. Kiehne*, 641 P.2d 501, 502 (N.M. 1982) ("We find that the endorsement excluding 'any kind' of liability when [a third party] was the driver of one of the insured automobiles is clear and unambiguous. . . . 'Any', in its usual and ordinary sense, means 'without limit'"); *Lopez v. Dairyland Ins. Co.*, 890 P.2d 192, 194-95 (Colo. App. 1994) ("The term 'any' in its ordinary sense means 'every,' 'all,' 'the whole of,' and 'without limit.'").

the same contract: "had the parties meant actual cost [in the disputed provision], they would have said so.").[18]

*Third*, plaintiffs' limited reading of "any expansion" does not even help, as the signs are part of the bleacher expansion, as discussed *supra* 26-29. Indeed, government authorities recognized the signs are "part of the bleacher expansion." (Ex. 6, 2013 Am. PD at ¶ 6)

*Finally*, plaintiffs' claimed limitation is belied by other rooftop contracts post-dating the 2005-06 bleacher expansion. Several other rooftops entered into contracts with defendants in 2008—***after*** the 2005-06 bleacher expansion was complete—and all of those contracts include the same "any expansion" language. (Ex. 29, 2008 Annex Am.; Ex. 30, 3/30/2008 Wrigley Rooftops III Agreement; Ex. 31, 3/30/2008 Wrigley Rooftops IV Agreement) There would have been no reason to include the "any expansion" language in these post-2006 agreements if the language only applied to previously constructed, pre-2006 bleachers. The same is true for one plaintiff here, who claims to have entered the contract here with defendants in 2012. (Pl. Br., Ex. E, Schlenker Decl. at ¶ 9; Pl. Br. at 5)

In short, as the parties agree, this Court need not consider extrinsic evidence. (Pl. Br. at 24) And plaintiffs' arguments on the issue actually underscore what matters: because they

---

[18] *Accord Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("Because the parties used the term 'improvements' in section 2A of the contract, and used the term 'replacement' in section 2B of the contract, we presume that the parties chose the word purposefully, and will give effect to that language."); *Penncro Assoc., Inc. v. Sprint Spectrum, LP*, 499 F.3d 1151, 1156-57 (10th Cir. 2007) ("When a contract uses different language in proximate and similar provisions, we . . . assume that the parties' use of different language was intended to convey different meanings."); *Great American Ins. Co. v. Norwin School Dist.*, 544 F.3d 229, 246 (3rd Cir. 2008) ("The use of different language to address the same or similar issue—namely, retainage—strongly implies that a different meaning was intended . . . . The same language was *not* used, however; and we must assume that the choice of different words was deliberate."); *Int'l Fidelity Ins. Co. v. Cnty of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ('[S]ophisticated lawyers ... must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so.'); *Fowler v. Gartner*, 89 So. 3d 1047, 1048-49 (Fla. App. 2012) (refusing to equate "day" with "business day" in contract: "As a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended.").

cannot live with the plain language of the agreement, they try to come up with a limitation that does not exist.

## II. PLAINTIFFS CANNOT SATISFY THE BALANCING PHASE REQUIRED FOR A PRELIMINARY INJUNCTION.

Because plaintiffs cannot establish any threshold element required for a preliminary injunction—irreparable harm, inadequate remedy at law, nor any likelihood of success on the merits—the Court need not proceed to the balancing phase. *See Charles River Labs.*, 2014 WL 4100714, at *3 (where "the plaintiff has failed to satisfy th[e] threshold requirement[s]," "it is unnecessary to . . . weigh the balance of harms"); *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996) ("[I]f it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms.").

Nonetheless, the balancing phase only confirms the "extraordinary and drastic" remedy of a preliminary injunction is inappropriate here. At the balancing phase, the court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Charles River*, 2014 WL 4100714, at *2. "The court is also obligated to consider the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* Both factors weigh heavily against a preliminary injunction.

### A. The Balance Of Equities Favors Defendants.

Plaintiffs claim defendants will suffer no harm without the videoboard. (Pl. Br. at 47) This is simply wrong. Plaintiffs understood since May 2013 the right field videoboard would obstruct their views. (Dkt. 21, Pl. Br. at 8-18; *id.*, Ex. B, Anguiano Decl. ¶ 17; *id.*, Ex. C, Hamid Decl. ¶ 16; Dkt. 1, Cplt. ¶¶ 73, 92, 94, 97, 106) But while they "threatened to take legal action" against defendants both in July 2013 and again in May 2014 (Cplt. ¶ 88; Pl. Br., Ex. A-4-1), they

sat on their legal rights for *months* until January 2015. During this time, defendants expended considerable resources on the Wrigley Field expansion project, including approximately $2 million designing, purchasing, and constructing the custom Daktronics video scoreboard at issue here and millions more for steel for its structural support system. (Ex. 1, Rice Decl. ¶¶ 21, 24, 26) Defendants also navigated the extensive government approval process, receiving approval from Chicago City Council, Chicago Plan Commission, and the Commission on Chicago Landmarks to construct the signs. (*Supra* at 7-8)

To be sure, this case is no different from *J.C. Penney Corp. v. Milwaukee Golf Dev. Co.*, 2006 WL 1215376 (N.D. Ill. May 3, 2006). There, the plaintiff voiced its opposition to a lease in October 2005, but waited to seek injunctive relief until April 2006, after the defendant expended millions of dollars on renovations and obtained permits for a new store. *Id.* at *4. The court determined the balance of harms weighed in the defendant's favor:

> [Defendant] claims that it has spent over $1.7 million on renovations so far, in addition to the resources that it spent to obtain the necessary licensing and permits for its operations. These significant investments will lay idle and not generate any return to [defendant] if the operation of the [store] is enjoined for the duration of this action. . . . [Plaintiff] has not provided a sufficient explanation for why it did not file the instant action and motion until April 2006, which was more than five months after it first objected to the [lease]. Due to [plaintiff's] late filing of the instant motion, Defendants have expended significant amounts of money that it would not have spent had [plaintiff] been successful in obtaining a preliminary injunction at an earlier date.

*Id.* Other courts, including this Court, have reached similar results. *See, e.g., Marketing Werks*, 2013 WL 5609339, at *3 (denying TRO where plaintiff "delayed in seeking emergency relief" until October 2013 after learning of conduct in September 2013: "the events leading up to this motion and the effects they have had or will have do not warrant a TRO"); *Real-Time Reporters*, 2013 WL 5818460, at *1 (no irreparable harm where plaintiff was aware of conduct in April

2013 but did not sue until July 2013: plaintiff's "claims are not consistent with its unhurried approach in seeking injunctive relief in this case").

In addition, a preliminary injunction here would harm defendants' revenue immediately and impact its sponsorship relationships. Defendants already are under contract with Anheuser-Busch to provide an advertisement on top of the right field videoboard, and Anheuser-Busch has paid defendants under this agreement. (Ex. 1, Rice Decl. ¶ 27) Anheuser-Busch is one of defendants' Legacy Partners, the highest tier of corporate partnership, and among defendants' most important business relationships.[19] (*Id.*) In short, a preliminary injunction now would substantially harm defendants and outweighs any harm plaintiffs claim.[20] *See, e.g., EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 845 (N.D. Ill. 2011) (balance of the equities favored defendant where preliminary injunction "would require [defendant] to change a significant amount of its marketing materials"); *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 359 (7th Cir. 1997) (vacating preliminary injunction where defendant would forgo "a sizeable sum in application and user fees" while case was litigated).

### B.    The Public Will Suffer If Plaintiffs' Motion Is Granted.

Plaintiffs devote just a short paragraph to the public harm, claiming elsewhere "the effect on third parties, and the public interest, may not be implicated in all cases." (Pl. Br. at 22, 48) This is certainly a case where it is. Public support for the preservation of Wrigley Field is strong. Cubs fans have signed petitions and voiced support for the entire plan. Business and trade groups like Illinois Chamber of Commerce, the United States Chamber of Commerce, and the

---

[19] Plaintiffs claim defendants will not suffer harm because they "are not having any problems making money." (Pl. Br. at 48) Plaintiffs ignore, however, the substantial cost of the privately-financed expansion project—money that was spent while plaintiffs sat on their legal rights. They likewise ignore the additional harm outlined above.

[20] Plaintiffs claim "the need to show irreparable harm [is] less important" because they claim to have strong merits arguments. (Pl. Br. at 48) But, as explained above, they have no chance of winning their antitrust or contract claims, much less a reasonable chance.

Chicago & Cook County Building & Construction Trades Council[21] concur.[22]  Mayor Emanuel

has even echoed this public sentiment, personally supporting defendants' planned development.[23]

Moreover, after lengthy debate and extensive public hearings, the Chicago City Council,

Plan Commission, and Commission on Chicago Landmarks each approved all aspects of the

Wrigley Field expansion plan following several public hearings and issued public decisions

expressly allowing the outfield signs to be built.  (*See supra* 7-8)  As plaintiffs concede, "[c]ourts

have found a strong public interest in the enforcement of public laws and regulations."  (Pl. Br. at

22 (citing cases))  Plaintiffs cannot end run around these decisions now.  *See J.C. Penney Corp.*,

2006 WL 1215376, at *5 ("the public interest is in favor of allowing the OTB Parlor to open and

operate, as reflected by the actions of the municipal and state authorities, who have issued the

necessary permits and licenses for the OTB Parlor to open and operate at the Shopping Center");

*Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1223 (D. Utah 2004), *aff'd*,

425 F.3d 1249 (10th Cir. 2005) (denying preliminary injunction that "would undermine the

public process by nullifying the decision of the City's elected officials").  This is particularly

---

[21] Pursuant to a multi-year Project Labor Agreement with the members of the Chicago & Cook County Building & Construction Trades Council, hundreds of highly skilled union tradespeople are employed on the 1060 Project to restore Wrigley Field, including many dedicated to the steel in the bleachers.  (Ex. 1, Rice Decl.¶ 25)

[22] Ex. 32, Doug Whitley, "Give Cubs Free Rein On Wrigley", Chicago Sun-Times, June 26, 2014, http://chicago.suntimes.com/uncategorized/7/71/182856/give-cubs-free-rein-on-wrigley/ ("Our support for the Cubs plan is a matter of simple business interests:  Wrigley Field is a gem that all baseball fans appreciate, and the Cubs are asking for reasonable changes to keep up with their competitors.  They should be given the go-ahead to make these changes; even landmarks need the wherewithal to keep up with expectations and demands of the fans, the players and the industry. . . . [T]he Chamber believes their request is reasonable, prudent and worthy of support from the city and its Landmark Commission."); Ex. 33, U.S. Chamber of Commerce, Let's Stay Ball? Regulations Threaten Wrigley Field Upgrades, June 3, 2014, 6:00 PM, https://www.uschamber.com/blog/let-s-stay-ball-regulations-threaten-wrigley-field-upgrades.

[23] *See, e.g.*, Ex. 34, Fran Spielman, "Cubs to push forward with expanded plan for Wrigley renovations," Chicago Sun-Times, May 22, 2014, http://chicago.suntimes.com/chicago-politics/7/71/165690/cubs-to-push-forward-with-expanded-plan-for-wrigley-renovations ("[Mayor] Emanuel would dearly love to break ground on the revenue- and job-creating Wrigley project" and that his office issued a statement saying "the mayor doesn't want to wait for next year"); Ex. 35, Washington Times, "Mayor supportive of Cubs owners' moves on Wrigley," May 22, 2014, http://www.washingtontimes.com/news/2014/may/22/mayor-supportive-of-cubs-owners-moves-on-wrigley/ (same).

important here, where plaintiffs themselves participated in the government approval process and lost that key fight, every time.

Separately, as discussed above, Anheuser-Busch already contracted to provide an advertisement on top of the right field videoboard and would be harmed too if it loses its ability to advertise to customers at the ballpark. Plaintiffs' own caselaw confirm an injunction is inappropriate in light of this harm. *See, e.g., Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974) (reversing preliminary injunction where "the New York and Baltimore port areas suffer injury by the grant of the injunction") (Pl. Br. at 22).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' preliminary injunction request.

Date:   February 17, 2015                    Respectfully submitted,


                                             /s/ *Andrew A. Kassof, P.C.*
                                             Andrew A. Kassof, P.C.
                                             Daniel E. Laytin, P.C.
                                             Diana M. Watral
                                             KIRKLAND & ELLIS LLP
                                             300 North LaSalle
                                             Chicago, Illinois  60654
                                             Telephone:    (312) 862-2000
                                             Facsimile:    (312) 862-2200

                                             *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Diana M. Watral, hereby certify that on this 17th day of February 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the electronic service list:

> Thomas M. Lombardo
> Abraham E. Brustein
> Di Monte & Lizak
> 216 Higgins Road
> Park Ridge, IL 60068
> Telephone:    (847) 698-9600
> Facsimile:    (847) 698-9623
> tlombardo@dimontelaw.com
> abrustein@dimontelaw.com
>
> *Attorneys for Plaintiffs*

/s/ *Diana M. Watral*
Diana M. Watral