# Exhibit 3

**AGREEMENT**

This Agreement (the "Agreement") is made and entered into as of this 27th day of January, 2004 (the "Effective Date"), by and between Chicago National League Ball Club, Inc., a Delaware corporation located at 1060 W. Addison Street, Chicago, Illinois, 60657 (the "Cubs"), and separately with each entity listed in Exhibit A hereto (the "Rooftops").

**WITNESSETH**

WHEREAS, the Cubs filed a civil lawsuit against the Rooftops, entitled Chicago National League Ball Club, Inc., v. Skybox on Waveland, et al., No. 02 C 9105, in the United States District Court for the Northern District of Illinois (the "**Action**"), alleging copyright infringement, violation of the Lanham Act, misappropriation and unjust enrichment; and

WHEREAS, the Rooftops deny all claims in the Action and assert they are operating their businesses lawfully; and

WHEREAS, the parties wish to avoid the expense and uncertainty of a trial; and

WHEREAS, the parties wish to compromise and settle the dispute and to resolve all the claims that were or could have been brought in the above-captioned lawsuit without any admission of fault or determination as to the merits of the lawsuit.

NOW, THEREFORE, for and in consideration of the agreements, covenants and conditions herein, and for good and valuable consideration the sufficiency and receipt of which are expressly acknowledged, the Cubs and Rooftops (collectively, the "**Parties**"), agree as follows:

1. ***Definitions***. The terms used in this Agreement will have the meaning in Exhibit C.

2. ***Dismissal of Action***. Within three business days of execution of this Agreement, the Cubs shall dismiss each Rooftop defendant that executes this Agreement from the Action with prejudice and withdraw all pending motions or matters related to any such Rooftop. The parties understand the Action will continue against other defendants named in the Action who have not executed this Agreement. The Parties reserve all rights not specifically granted in this Agreement.

3. ***Payment obligations***.

3.1 **Royalty**.

a) Each Rooftop shall pay the Cubs, on an annual basis, an amount equal to 17% of its Gross Revenues and 11% of its Billboard Revenues, if any (together, the "Royalty").

b) The Parties agree Rooftops are currently prohibited from displaying Billboards under City of Chicago law. Nothing in this Agreement will preclude the Cubs from opposing any change to the current law, including the placement of Billboards or any other advertising visible from inside Wrigley Field on any of the buildings in the Wrigley Field Adjacent Area.

c) Payment of the Royalty shall be an independent obligation of each Rooftop and, except as provided in Section 6 hereof, shall not be reduced, offset or otherwise altered for any reason.

d) The Cubs recognize that attendance at Rooftops includes a number of groups and individuals who do not pay the Rooftop (in money, goods or services) and from which no Royalty payment will be due. The Rooftop shall provide on the Royalty Statement the name of each such non-paying group (15 guests or more) receiving complimentary use of the rooftop, the date of such use and the number of attendees.

e) The Cubs recognize that attendance at Rooftops includes fundraisers to support various organizations or groups who do not pay the Rooftop (in money, goods or services) and from which no Royalty payment will be due. The Rooftop shall provide on the Royalty Statement the name of each organization or group receiving complimentary use of the rooftop for a fundraiser or otherwise, the date of such use and the number of attendees.

f) The Cubs recognize that Rooftops receive referrals from third parties that have no relationship with their Rooftop (such as an independent event or party planner). Fees, if any, paid by customers directly to such third parties from which Rooftop receives no payment, rebate or consideration from the third party are not subject to a Royalty payment.

3.2 **Royalty due date.** The Royalty shall be paid to the Cubs on or before December 15th of each calendar year for the preceding baseball season. In addition to the Royalty payment, each Rooftop shall provide the Cubs with a written statement (the **"Royalty Statement"**), on a form to be agreed to by the parties showing: (i) attendance for the Rooftop for each regular season and postseason Game; (ii) Gross Revenues for the season; (iii) the name of each non-paying group or organization receiving complimentary use of the Rooftop, the date of such use and the number of attendees; and (iv) Billboard Revenues, if any. The Royalty Statement shall be executed in good faith by the person principally responsible for operating the Business and by one of the Rooftop owners.

3.3 **Periodic statements.** On or before each of April 15, July 15 and October 15, each Rooftop shall provide the Cubs with a good faith estimate of the Gross Revenues and Billboard Revenues, if any, received by Rooftop for the calendar year through, respectively, March 31, June 30 and September 30. Each such estimate shall be executed in good faith by the person principally responsible for operating the Business and by one of the Rooftop owners.

3.4 **Audit.**

a. **Books and Records**. Each Rooftop will maintain complete and accurate books and records regarding its Gross Revenues and Billboard Revenues, if any, (the "**Records**"). Each Rooftop will retain its Records for at least 18 months following the close of the calendar year to which the Record pertains. The Cubs and rooftops shall select, within 30 days of the Effective Date, an independent auditor ("Auditor") from among the firms of Deloitte & Touche, Ernst & Young, KPMG, Grant Thornton, or such other firm as the parties agree, to serve as the Auditor under this

Agreement. Auditor shall, when requested to do so by the Cubs and at the Cubs' cost, examine, audit, copy and verify the Records, during normal business hours at any time (no more than once each calendar year per Rooftop), for the purpose of ascertaining Rooftop Gross Revenues and Billboard Revenues, if any, for the prior calendar year. Rooftops will supply any information reasonably requested by the auditor for this purpose within 30 days of request. Except as required to disclose discrepancies discovered in the audit, the Auditor shall keep all information disclosed in the audit confidential, including all customer lists. The Auditor shall serve for 5 years from the date of his selection, at which time he may be terminated at the request of either Party and, while completing any outstanding audit, be replaced with a new Auditor chosen by the Parties within 30 days from among the same (or similar) firms as listed above. The Auditor selected shall not at any time have a business relationship, unless disclosed and the conflict is waived in writing, with any of the parties bound by this Agreement other than that as a customer who attends a Cubs game or Rooftop. The Cubs shall have 90 days from the receipt of the Royalty Payment and Royalty Statement to elect whether or not they wish to conduct an audit for that period. In the event the Cubs do not elect to conduct an audit within the 90 day period, the Royalty Payment and Royalty Statement shall be deemed accepted as accurate.

b. **Adjustments**. At the conclusion of its audit, the Auditor shall prepare a written report. In the event the audit shows an underpayment of Royalties, Rooftop shall pay the underage to Cubs within 15 days of such determination. In the event of an overpayment, the overage shall be refunded to the Rooftop or credited to the following season's royalty at the option of the Rooftops. In the event the audit shows an underpayment of Royalties of 10% or more, Rooftop shall pay, within 15 days of such determination: (i) the underpayment; (ii) 50% of the cost of the Cubs portion of the audit, and (iii) the Penalty described in Section 3.5 below.

3.5 **Penalty**. In the event an audit of a Rooftop shows an underpayment of 10% or more of any Royalty, the Rooftop shall pay Cubs a Penalty equal to a multiple of such underpayment as follows: in the first instance of underpayment, 50% of such underpayment; in the second instance of underpayment by the same Rooftop, 100% of such underpayment; in the third instance of underpayment by the same Rooftop, 150% of such underpayment; and in any subsequent instance of underpayment by the same Rooftop, an additional 50% of the underpayment.

3.6 The Rooftops may request at any time and at their own expense an internal preliminary audit by the Auditor to assist Rooftops in developing procedures or practices to comply with the provisions of this Agreement. This internal preliminary audit is solely for the use of the Rooftops and is not subject to the provisions of 3.4 and 3.5 of this Agreement.

4. ***Term and termination.***

4.1 This Agreement will commence on the Effective Date and expire December 31, 2023 (the "**Term**"), unless earlier terminated as provided herein.

4.2 Expiration of this agreement at the end of its 20 year term shall be without prejudice to any Rooftop's ability to assert no license or permission from the Cubs is required for the right to sell admission to view Games from a Rooftop and without prejudice to the Cubs'

ability to assert a license or other permission from the Cubs is required for the right to sell admission to view Games from the Rooftops.

4.3 The Cubs may terminate the Agreement as to any individual Rooftop in the event of the following:

a. in the event such Rooftop fails to pay any undisputed royalty payment required under this Agreement, plus interest (computed according to the formula in 28 U.S.C. § 1961), within 90 days of the date due.

b. in the event an independent audit as set forth in Section 3.4 above finds an underpayment of more than 10% in the Royalty payment from that Rooftop three times in any five consecutive calendar years.

c. in the event such Rooftop is no longer viable as a business following expansion of the Wrigley Field bleachers pursuant to Section 6.2 below.

4.4 Notwithstanding Section 4.2 above, in the event of termination for any reason set forth in Section 4.3, no terminated Rooftop may thereafter engage in the sale of admission to view Cubs games or collect any other compensation or benefit related to activity on a rooftop on the day of a Game through December 31, 2023, provided, however, that such Rooftop may receive Billboard Revenue and, if it does, pay 11% to the Cubs as provided in Section 3, above.

5. ***Transfer.***

5.1 **Transfer or assignment.** Each Rooftop may, by operation of law, sale, merger, reorganization or otherwise, transfer or assign any of its rights or delegate any of its obligations under this Agreement to any third party provided such third party agrees to accept all the Rooftop's rights and obligations under this Agreement. In addition, each Rooftop shall have the right and obligation to operate any new rooftop facility under the terms of this Agreement, except that the provisions of ¶¶ 6.1-6.4 shall not apply to any such new facility.

5.2 **Successors.** This Agreement shall bind the Cubs, each Rooftop, and their respective parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.

5.3 The Rooftops agree that it is not their intent and they will not make transfers of payment or ownership for the purpose of trying to defeat any payment obligations they have under the Agreement.

6. ***Wrigley Field bleacher expansion.***

6.1 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable unless it increases the height of its available seating, then such Rooftop may in its discretion elect to undertake construction to raise the height of its seating to allow views into Wrigley Field and the Cubs shall reimburse the Rooftop for 17% of the actual cost of such construction.

6.2 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable even if it were to increase its available seating to the maximum height permitted by law, and if such bleacher expansion is completed within eight years from the Effective Date, then if such Rooftop elects to cease operations before the beginning of the next baseball season following completion of such expansion, the Cubs shall reimburse that Rooftop for 50% of the royalties paid by that Rooftop to the Cubs during the time between the Effective Date and the date of expansion of the Wrigley Field bleachers. The Cubs shall pay such reimbursement to the Rooftop within 30 days of receiving notice from the Rooftop it is no longer viable and has ceased operations. Any Rooftop receiving payment from the Cubs pursuant to this provision shall cease operations for the remainder of the Term and shall not seek or accept any compensation or benefit related to activity on a Rooftop on a day of a Game.

6.3 In the event of a dispute between the Cubs and any Rooftop regarding whether such Rooftop remains viable pursuant to Section 6.1 or 6.2 or whether (or to what extent) construction of new seating is required pursuant to Section 6.1, either Party may request such dispute be resolved pursuant to binding arbitration between the Parties pursuant to Section 9 below.

6.4 If the Cubs expand the Wrigley Field bleacher seating and such expansion impairs the view from any Rooftop into Wrigley Field such that the Rooftop's Gross Revenue in the year of expansion is more than 10% below the average Gross Revenue for that Rooftop in the two years prior to expansion (normalizing for number of Games played, rain-outs and doubleheaders, playoff games, work stoppage, replacement players, and the like), then the affected Rooftop can seek a reduction in the Royalty rate for all subsequent years of the Term. Upon such request, the parties shall meet and negotiate in good faith a new Royalty. If the Parties cannot agree, then the Rooftop may submit the issue of its appropriate Royalty rate to binding arbitration pursuant to Section 9.

a. In the event any Royalty is reduced pursuant to this Section 6.3, the Cubs may seek to raise or restore the Royalty at a later date (e.g., in the event the Rooftop subsequently builds higher or the Rooftop's drop in business proves temporary). Such revision may be negotiated between the Parties or submitted to arbitration. Notwithstanding the foregoing, in no event may the Royalty exceed 17%.

6.5 Nothing in this Agreement limits the Cubs' right to seek approval of the right to expand Wrigley Field or the Rooftops' right to oppose any request for expansion of Wrigley Field.

6.6 The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

7. ***Marketing.*** At the request of the Rooftops, acting jointly with other rooftops that have executed this Agreement, the Cubs agree to reasonable participation in marketing efforts to promote the sale of Rooftop products or services for which the Cubs are paid the Royalty set forth above. Such efforts shall be as agreed by the Parties and shall include (without limitation) the following:

7.1 WGN-TV will show and comment upon the Rooftops' facilities during broadcasts of Cubs games and the Cubs will request other Cubs television broadcasting partners to do the same. If, however, there is a Billboard or other advertising on a Rooftop, WGN will not be required to show that Rooftop or comment on it and Cubs may request others not to show or comment.

7.2 Each Rooftop shall have a license during the Term to use the Cubs' Marks identified in Exhibit B solely for the purpose of marketing and promoting the sale of admissions to its Rooftop. The Cubs will not object to the Rooftops' use, solely for the same purpose, of the term "Wrigley Field". Each use of the Cubs Marks must include a trademark notice of registration or protection as shown on Exhibit B. The Cubs may revise Exhibit B from time to time in their discretion. Rooftops may not use Cubs' Marks on merchandise, apparel, Billboard or to promote the sale of any other product or service.

7.3 From time to time during each season, the Cubs shall authorize WGN-TV or other Cubs broadcasting partner(s) to identify a phone number where fans can call to reserve Rooftop seating. Such phone number will be provided to Cubs by the Rooftops jointly. The Rooftops shall determine how calls to that phone number will be apportioned among the various Rooftop businesses.

7.4 The Rooftops shall have the right to inform the public that they are endorsed by the Cubs.

7.5 The Cubs director of marketing shall meet with Rooftops before the start of each Major League Baseball season to discuss opportunities for joint marketing.

7.6 The Cubs shall include a discussion about the Rooftops on their tour of Wrigley Field and shall include stories positive about the Rooftops in *The Vine Line*.

7.7 Each of the Rooftops may display broadcasts of Cubs games to patrons at its facility, including displaying such broadcasts on multiple television sets, without any infringement of any copyright owned by the Cubs or its assignees.

8. ***Non-disparagement.***

8.1 Each Rooftop agrees that it will not publicly disparage, abuse, or insult the business of the Cubs or the moral character of the Cubs or any of its employees.

8.2 The Cubs will not publicly disparage, abuse or insult the business of any Rooftop or the moral character of any Rooftop or any Rooftop employee.

9. ***Arbitration***. All disputes arising under this Agreement shall be arbitrated according to the rules of the American Arbitration Association (or such other organization as the parties agree upon), except as noted in this Section.

9.1 The arbitrators shall be chosen as follows: each of the Cubs and the Rooftop shall nominate three individuals to serve as arbitrator. None of these persons may be an employee of the Cubs or any Rooftop nor have any financial interest in the Cubs or any Rooftop. The affected Rooftop will then choose one of the three individuals nominated by the Cubs and the Cubs will choose one of the three individuals nominated by the Rooftop. The two individuals selected as arbitrators will then meet and choose a third arbitrator to complete the panel, which third arbitrator must be an independent, third

party with no relationship to or interest in (including without limitation any related or unrelated financial or business relationship) the Cubs or any Rooftop. If the arbitrators cannot agree on a third arbitrator, then each Party's arbitrator shall nominate one independent, third party who shall have no relationship to or interest in (including without limitation any related or unrelated financial or business relationship) the Cubs or any Rooftop and who is not a current or former elected official or employee of the City of Chicago or any organization or entity who has received money from the Cubs or any Rooftop. The third arbitrator shall be chosen by lot from among those two individuals.

9.2 In the event more than one Rooftop is involved in a similar dispute related to this Agreement, the Parties may agree, but are not required to, arbitrate such dispute collectively. In such event, the affected Rooftops will agree on arbitrators pursuant to Section 9.2 and collectively submit one set of choices to the Cubs.

9.3 Each Arbitration decision shall be binding on the Parties to that Arbitration and, unless the Cubs and all Rooftops agree in advance of the decision, shall be binding vis-à-vis each other only.

9.4 The losing party in the Arbitration shall bear the costs and fees of the Arbitration as well as the costs and fees of the prevailing party.

10. ***Warranties; Indemnification.***

10.1 Each Party represents and warrants it has the authority to enter into this Agreement and perform all obligations hereunder, and that it will obtain any and all licenses required and other approvals required to operate under this Agreement., Each party is solely responsible for the actions and activity of its own business.

10.2 The Cubs hereby indemnify and will defend and hold harmless each Rooftop, its parent and affiliated companies, subsidiaries and each of their officers, directors and employees against every claim, action, suit, loss, damages, liability, settlement cost or expense of any kind including attorneys fees and court costs occasioned by or relating to (i) any tort that may occur to someone in Wrigley Field or resulting from conduct by someone in Wrigley Field, provided that this indemnity would not apply if any tort was occasioned by conduct by someone on a Rooftop, and (ii) any contract entered into by the Cubs to which a Rooftop is not a party.

10.3 The Rooftops hereby indemnify and will defend and hold harmless the Cubs, its parent and affiliated companies, subsidiaries and each of their officers, directors and employees against every claim, action, suit, loss, damages, liability, settlement cost or expense of any kind including attorneys fees and court costs occasioned by or relating to (i) any tort that may occur to someone on a Rooftop or resulting from conduct by someone on a Rooftop, provided that this indemnity would not apply if any tort was occasioned by conduct by someone in Wrigley Field, and (ii) any contract entered into by a Rooftop to which the Cubs is not a party.

11. ***Releases.***

11.1 ***Release of Cubs.*** Each Rooftop, on behalf of itself, its parent companies, subsidiaries and affiliates, and all individuals holding any ownership interest in any of the foregoing, all entities under common ownership with any of the foregoing, and each employee,

successor, assign, heir, administrator, attorney, and executor of any of the foregoing, hereby release the Chicago National League Ball Club, Inc., its parent companies, directors, officers, representatives, predecessors, successors, assigns and attorneys from any claim, loss, damage, harm or cause of action relating in any way to the operation of a Rooftop business from the beginning of time until the execution of this agreement, including but not limited to, all claims which are unasserted or unknown at the execution of the agreement.

11.2 ***Release of Rooftops.*** The Chicago National League Ball Club, Inc., its parent companies, directors, officers, representatives, predecessors, successors, and assigns hereby release each Rooftop, its parent companies, subsidiaries and affiliates, and all individuals holding any ownership interest in any of the foregoing, all entities under common ownership with any of the foregoing, and each employee, successor, assign, heir, administrator, attorney and executor of any of the foregoing, from any claim, loss, damage, harm or cause of action relating in any way to the operation of a Rooftop business from the beginning of time until the execution of this Agreement, including but not limited to, all claims which are unasserted or unknown at the execution of the agreement.

12. ***Entire agreement.*** This Agreement constitutes the entire understanding of the Parties concerning the subject matter hereof and supersedes and cancels all prior or contemporaneous oral or written communications, agreements or understandings between the Parties or their predecessors. This Agreement may be modified only by a writing signed by the duly authorized representatives of the affected Party(ies).

13. ***Waiver.*** Failure of a Party to insist upon or enforce strict performance of any provision of this Agreement or failure, delay or omission in exercising any right with respect to any term of this Agreement, will not be construed as a waiver or relinquishment to any extent of a Party's right to assert or rely upon any such provision or right in that or any other instance.

14. ***Remedies.*** Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15. ***Governing Law.*** This Agreement will be governed by and construed and interpreted, as if written jointly by the Parties, in accordance with the laws of the State of Illinois, without giving effect to the conflict of law principles thereof.

16. ***Notice.*** Notices to the Cubs will be sent to the address shown above for the Cubs with a copy to Office of the General Counsel, Chicago National League Ball Club, Inc., 435 N. Michigan Avenue, Chicago, IL, 60611, and notices to each Rooftop will be sent to the address shown on Schedule D with a copy to their attorney or representative as indicated.

17. ***Construction; Severability.*** In the event any provision of this Agreement conflicts with applicable law or is held invalid, illegal or unenforceable, such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law and the remaining terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect. Each provision hereof is intended to be severable and the validity, legality or enforceability of any provision of this Agreement will not affect the validity, legality or enforceability of the remainder of this Agreement.

18. ***Independent contracting parties.*** The Parties enter this Agreement as independent contracting parties. No Party will have the power to obligate or bind any other Party in any manner whatsoever. No Party will represent itself to others as an agent or joint venturer with any other Party.

19. ***Counterparts.*** This Agreement may be executed in counterparts, in which case each such counterpart will be deemed an original and collectively such counterparts will form the Agreement between the parties.

20. ***Headings.*** Section headings are for convenience only and will in no way affect the construction or interpretation of this Agreement.

21. ***Survival.*** Notwithstanding anything contained herein to the contrary, the following sections of this Agreement shall survive termination or expiration of the Agreement: Section 3.4 (Audit, which shall survive for 18 months), 4.4, 5 (transferability, restriction survives only as to termination and only until December 31, 2023), 10 (indemnification, which shall survive as to claims related to events occurring prior to termination or expiration of the Agreement), 11 (releases) and any other provision for which survival is equitable.

22. ***No admission or waiver.*** This Agreement does not constitute an admission by any Party of any liability of any kind. Each Party expressly denies it is in any way liable to any other Party.

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as of the date first above written.

CHICAGO NATIONAL LEAGUE BASEBALL CLUB, INC.

By: Mark E. McGuire
Print Name: MARK E. McGUIRE

3639 L.L.C.

By: [signature]
Print Name: James [illegible] Managing Member

AIDAN, INC.:

By: Aidan Duncan
Print Name: AIDAN DUNCAN.

BEYOND THE IVY, INC.:

By: [signature]
Print Name: James W. Purcell

BRIXEN IVY, L.L.C.:

By: [signature]
Print Name: MARK SCHLENKER

MURPHY'S ROOFTOP COMPANY:

By: Elizabeth Murphy
Print Name: ELIZABETH MURPHY

QUOIN, LTD.:

By: Tim A. Grodrian
Print Name: TIM A. GRODRIAN

SHEFFIELD-WAVELAND ROOFTOPS, INC.:

By: George Loukas
Print Name: GEORGE LOUKAS

TAILGATORS ON NORTHWEST HIGHWAY, INC.:

By: Joseph R Harrasz
Print Name:
JOSEPH R HARRASZ

## EXHIBIT A

### The "Rooftops"

1. 3639 L.L.C., 3639 N. Sheffield Avenue, Chicago, Illinois 60613.

2. Aidan, Inc., 1050 W. Waveland Avenue, Chicago, Illinois 60613.

3. Beyond the Ivy, Inc. (i) 1008-1010 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 1048 W. Waveland Avenue, Chicago, Illinois 60613.

4. Brixen Ivy, L.L.C., 1044 W. Waveland Avenue, Chicago, Illinois 60613.

5. Murphy's Rooftop Company, 3649 N. Sheffield Avenue, Chicago, Illinois 60613.

6. Quoin, Ltd., doing business as Skybox on Sheffield, 3627 N. Sheffield Avenue, Chicago, Illinois 60613.

7. Sheffield-Waveland Rooftops, Inc., (i) 1032-34 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 3643-45 N. Sheffield Avenue, Chicago, Illinois 60613.

8. Tailgators on Northwest Highway, Inc. 3621-25 N. Sheffield Avenue, Chicago, Illinois 60613.

Note: as used in the Agreement, "Rooftop" shall mean each of the entities above, their parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.

## EXHIBIT B

## MARKS

CUBS®
CHICAGO CUBS®
"C"®
"WALKING BEAR"®

## EXHIBIT C

### Definitions

**"Billboard"** means any advertisement legible from home plate in Wrigley Field, not currently permitted under City of Chicago law, and later erected as permitted by City of Chicago Municipal Code.

**"Billboard Revenue"** means any compensation and/or benefit received directly or indirectly by a Rooftop in connection with a Billboard, including without limitation compensation from any barter transactions.

**"Days"** as used in this Agreement, whether capitalized or lower case, means calendar days, not business days, unless otherwise specified.

**"Game"** shall mean, without limitation, any Major League baseball games, non-professional baseball games, National Football League games, non-professional football games, concerts or any other event taking place in Wrigley Field.

**"Gross Revenue"** means any compensation and/or benefit received by a Rooftop in connection with scheduled Game days, and related to the operation of the Premises, with no deductions for expenses. Billboard Revenue is excluded from Gross Revenue. Without limiting the foregoing, Gross Revenue includes any compensation related to individual or group ticket sales, provision of rooftop, balcony or other seating to view into Wrigley Field, provision of party rooms, bars, media centers, television monitors for viewing of the games, barter transactions, membership fees, dues, rental fees, surcharges, packages, concessions, food, beverages, souvenirs, marketing fees, sponsorship fees, advertising fees, product placement fees and any other products or services offered by, on behalf of or through a Rooftop. For the avoidance of doubt, in the event a Rooftop refunds any portion of Revenue to a customer in the event of a rainout, cancellation or other reason, then the amount actually refunded to the customer shall be excluded from the definition of Revenue. For the avoidance of doubt, any compensation and/or benefit received directly or indirectly by a rooftop in connection with any advertising other than Billboard Revenue shall be included as part of Gross Revenue. For the avoidance of doubt, Gross Revenue to a Rooftop shall not include payments to that Rooftop by an unrelated Rooftop for services provided (e.g., catering services), provided such services are not related to the operation of the Premises of the Rooftop providing the service. For the avoidance of doubt, Gross Revenue shall not include funds received pursuant to a sale of the Rooftop business or real estate wherein the Rooftop is located. For the avoidance of doubt, Gross Revenue shall not include funds received pursuant to a lease, of one year or more, of the Rooftop business to an operator who is bound by this Agreement.

**"Marks"** means the trademarks listed in Exhibit B.

**"Premises"** means, for each physical location identified in Exhibit A and the physical location of each new rooftop facility operated by a Rooftop pursuant to ¶ 5.1 of this Agreement, any portion of the building, the operation of which is (or is required to be) licensed by the City of Chicago under the Rooftop's Special Club License (as defined in Section 4-388-010(c) of the City of Chicago Municipal Code).

**"Revenue"** means Gross Revenue and Billboard Revenue.

**"Rooftop"** has the meaning stated in Exhibit A.

**EXHIBIT D**

The "Rooftops"

1. 3639 L.L.C., 3639 N. Sheffield Avenue, Chicago, Illinois 60613, with a copy to James Lourgos, 3N503 Townhall Road., Elburn, Illinois 60019.

2. Aidan, Inc., 1050 W. Waveland Avenue, Chicago, Illinois 60613, with a copy to James Lourgos, 3N503 Townhall Road., Elburn, Illinois 60019.

3. Beyond the Ivy, Inc. (i) 1008-1010 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 1048 W. Waveland Avenue, Chicago, Illinois 60613, with a copy to BJB Partners, LLC, c/o Jamie Purcell, 324 West Touhy, Park Ridge, Illinois 60068; and Michael Perlstein, Attorney at Law, 111 East Wacker Drive, Suite 2600, Chicago, Illinois 60601.

4. Brixen Ivy, L.L.C., 1044 W. Waveland Avenue, Chicago, Illinois 60613, with a copy to Mark Schlenker (in care of).

5. Murphy's Rooftop Company, 3655 N. Sheffield Avenue, Chicago, Illinois 60613, with a copy to Michael E. Lavelle, Suite 102, 218 N. Jefferson St., Chicago, IL 60661.

6. Quoin, Ltd., doing business as Skybox on Sheffield, 3627 N. Sheffield Avenue, Chicago, Illinois 60613, with a copy to Quoin, Ltd., 464 Central Avenue, Suite 4, Northfield, Illinois 60093.

7. Sheffield-Waveland Rooftops, Inc., (i) 1032-34 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 3643-45 N. Sheffield Avenue, Chicago, Illinois 60613, with a copy to c/o George Vranas, 3464 N. Clark Street, Chicago, Illinois 60657.

8. Tailgators on Northwest Highway, Inc. 3621-25 N. Sheffield Avenue, Chicago, Illinois 60613, with a copy to Tailgators, 6726 N. Northwest Highway, Chicago, Illinois 60631.

**EXHIBIT A**

**The "Rooftops"**

1. 3639 L.L.C., 3639 N. Sheffield Avenue, Chicago, Illinois 60613.

2. Aidan, Inc., 1050 W. Waveland Avenue, Chicago, Illinois 60613.

3. Beyond the Ivy, Inc. (i) 1008-1010 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 1048 W. Waveland Avenue, Chicago, Illinois 60613.

4. Brixen Ivy, L.L.C., 1044 W. Waveland Avenue, Chicago, Illinois 60613.

5. Murphy's Rooftop Company, 3649 N. Sheffield Avenue, Chicago, Illinois 60613.

6. Quoin, Ltd., doing business as Skybox on Sheffield, 3627 N. Sheffield Avenue, Chicago, Illinois 60613.

7. Sheffield-Waveland Rooftops, Inc., (i) 1032-34 W. Waveland Avenue, Chicago, Illinois 60613; (ii) 3643-45 N. Sheffield Avenue, Chicago, Illinois 60613.

8. Tailgators on Northwest Highway, Inc. 3621-25 N. Sheffield Avenue, Chicago, Illinois 60613.

Note: as used in the Agreement, "Rooftop" shall mean each of the entities above, their parent companies, subsidiaries and affiliates, and each employee, successor, assign, heir, administrator and executor of any of the foregoing.