**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, d/b/a | ) | |
| SKYBOX ON SHEFFIELD; RIGHT FIELD | ) | No. 1:15-cv-00551 |
| PROPERTIES, LLC; 3633 ROOFTOP | ) | |
| MANAGEMENT, LLC, d/b/a LAKEVIEW | ) | Judge Virginia M. Kendall |
| BASEBALL CLUB; and ROOFTOP | ) | |
| ACQUISITION, LLC, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; AND | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

RELEVANT BACKGROUND ................................................................................................1

I.     PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED. ...............................2

     A.     Baseball's Antitrust Exemption Bars Plaintiffs' Antitrust Claims. .........................2

     B.     Plaintiffs Cannot State Any Antitrust Claim. ..........................................................4

            1.     Plaintiffs Do Not Allege A Plausible Relevant Market. .............................4

            2.     Plaintiffs Cannot Base Attempted Monopolization Claims On Defendants Allegedly Taking Over The Distribution Of Their Own Product. ......................................................................................................8

            3.     Plaintiffs Cannot Base Any Attempted Monopolization Claim On Any Of The Specific Conduct Alleged In The Complaint. ......................12

                  a.     Plaintiffs Cannot Base Antitrust Claims On The Installation Of Outfield Signs At Wrigley Field................................................13

                  b.     Plaintiffs Cannot Base Antitrust Claims On Any Efforts To Purchase Or Actual Purchases Of Rooftop Businesses. ................14

II.     PLAINTIFFS' CLAIMS BASED ON MR. RICKETTS' STORY AT DEFENDANTS' CONVENTION (COUNTS III-VII AND IX) SHOULD BE DISMISSED. ...........................................................................................................17

     A.     Counts III-VII and IX Should Be Dismissed Because Mr. Ricketts' Story Does Not Contain A False Statement. ....................................................................18

     B.     Counts III-VII and IX Fail Because Mr. Ricketts' Story Is A Non-Actionable Opinion..................................................................................................19

     C.     To The Extent Plaintiffs Allege Defamation *Per Se*, Counts VI and VII Fail For Several Additional Reasons. ......................................................................21

III.     COUNT VIII SHOULD BE DISMISSED BECAUSE THE PARTIES' CONTRACT PERMITS CONSTRUCTION OF THE ADDITIONAL WRIGLEY FIELD SIGNS..............................................................................................................23

CONCLUSION................................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
  881 F.2d 1396 (7th Cir. 1989) .......................................................................... 15

*Abbyy USA Software House, Inc. v. Nuance Communications Inc.*,
  2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) .................................................. 15

*Adams v. Sussman & Hertzberg, Ltd.*,
  292 Ill. App. 3d 30 (1st Dist. Ill. Ct. App. 1997) ............................................ 21

*Appraisers Coal. v. Appraisal Inst.*,
  845 F. Supp. 592 (N.D. Ill. 1994) .................................................................... 17

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
  917 F.2d 1413 (6th Cir. 1990) ............................................................................ 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .......................................................................................... 10

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .......................................................................................... 16

*Ball Mem'l Hosp. v. Mut. Hosp. Ins.*,
  784 F.2d 1325 (7th Cir. 1986) .......................................................................... 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 4

*Belsky v. Field Imports, Inc.*,
  2013 WL 5819232 (N.D. Ill. Oct. 29, 2013) ................................................... 23

*Brennan v. Kadner*,
  351 Ill. App. 3d 963 (1st Ill. Ct. App. 2004) .................................................. 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .......................................................................................... 14

*Charles O. Finley & Co. v. Kuhn*,
  569 F.2d 527 (7th Cir. 1978) .............................................................................. 3

*Chicago Nat'l League Ball Club v. Skybox on Waveland*,
  No. 02-9105 (N.D. Ill. 2001) ....................................................................... 1, 13

i

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Christy Sports, LLC v. Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009) ........................................................................ 12, 13, 14

*City of San Jose v. Office of the Comm'r of Baseball*,
  2015 WL 178358 (9th Cir. Jan. 15, 2015) ........................................................... 3

*Collins v. Assoc. Pathologists, Ltd.*,
  844 F.2d 473 (7th Cir. 1988) ............................................................................. 5

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) .......................................................................................... 16

*Coughlan v. Beck*,
  2013 Ill. App. (1st) 120891 ............................................................................... 20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .......................................................................................... 7, 13

*Elliott v. United Ctr.*,
  126 F.3d 1003 (7th Cir. 1997) ........................................................................... 5, 6

*Elliott v. United Ctr.*,
  1996 WL 400030 (N.D. Ill. July 15, 1996), *aff'd*, 126 F.3d 1003 (7th Cir. 1997) ............ 9

*Fed. Base Ball Club v. Nat'l League*,
  259 U.S. 200 (1922) .......................................................................................... 2

*Flood v. Kuhn*,
  407 U.S. 258 (1932) .......................................................................................... 2

*Flynn v. Philip Morris USA*,
  2006 WL 211823 (N.D. Ill. Jan. 19, 2006) ........................................................ 5

*G.K.A. Beverage Corp. v. Honickman*,
  55 F.3d 762 (2d Cir. 1995) ................................................................................ 4

*Garber–Pierre Food Prods., Inc. v. Crooks*,
  78 Ill. App. 3d 356 (1st Dist. Ill. Ct. App. 1979) ............................................... 23

*Global Discount Travel Servs. v. Trans World Airlines*,
  960 F. Supp. 701 (S.D.N.Y. 1997) .................................................................... 7, 8

*Golden v. Wiznitzer*,
  2014 WL 1329397 (N.D. Ill. Apr. 2, 2014) ....................................................... 23

ii

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Great Escape, Inc. v. Union City Body Co.*,
    791 F.2d 532 (7th Cir. 1986) ..................................... 12

*Green v. Rogers*,
    234 Ill. 2d 478 (2009) ..................................... 18, 22

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*,
    398 U.S. 6 (1970) ..................................... 20

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995) ..................................... 21

*Hack v. President & Fellows of Yale Coll.*,
    237 F.3d 81 (2d Cir. 2000) ..................................... 6

*Harrison v. Chicago Sun-Times, Inc.*,
    341 Ill. App. 3d 555 (1st Dist. Ill. Ct. App. 2003) ..................................... 22

*Hodges v. WSM, Inc.*,
    26 F.3d 36 (6th Cir. 1994) ..................................... 13

*Hongbo Han v. United Cont. Holdings, Inc.*,
    762 F.3d 598 (7th Cir. 2014) ..................................... 2

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) ..................................... 18

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    2014 WL 64657 (N.D. Ill. Jan. 8, 2014) ..................................... 5, 6, 7, 8

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    2014 WL 6845862 (N.D. Ill. Dec. 4, 2014) ..................................... 6

*Huon v. Breaking Media, LLC*,
    2014 WL 6845866 (N.D. Ill. Dec. 4, 2014) ..................................... 19

*Institutional Foods Packing, Inc. v. Creative Products, Inc.*,
    1992 WL 111133 (N.D. Ill. May 12, 1992) ..................................... 9, 10

*Int'l Equip. Trading, Ltd. v. AB Sciex LLC*,
    2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ..................................... 5, 6, 7, 13

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
    737 F.2d 698 (7th Cir. 1984) ..................................... 10

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) .......................................................................... 5

*Kirk v. CBS, Inc.*,
1987 WL 11831 (N.D. Ill. June 4, 1987) ......................................................... 21

*Knafel v. Chicago Sun-Times, Inc.*,
2004 WL 628242 (N.D. Ill. Mar. 25, 2004).................................................... 22

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
551 U.S. 877 (2007)......................................................................................... 16

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981) .......................................................................... 15

*Lerma v. Univision Communications, Inc.*,
52 F. Supp. 2d 1011 (E.D. Wisc. 1999).......................................................... 10

*Lexmark Int'l, Inc. v. Transp. Ins. Co.*,
327 Ill. App. 3d 128 (1st Dist. Ill. Ct. App. 2001)......................................... 18

*M&M Med. Supp. & Svc., Inc. v. Pleasant Valley Hosp.*,
981 F.2d 160 (4th Cir. 1993) ............................................................................ 8

*Madison v. Frazier*,
539 F.3d 646 (7th Cir. 2008) .......................................................................... 20

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
2010 WL 3000178 (N.D. Ill. July 28, 2010).................................................. 20

*McWane, Inc. v. Crow Chicago Indus., Inc.*,
224 F.3d 582 (7th Cir. 2000) .......................................................................... 23

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) .......................................................................... 12

*MJ & Partners Rest. Ltd. P'ship v. Zadikoff*,
10 F. Supp. 2d 922 (N.D. Ill. 1998) ............................................................... 18

*Morris Communications Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ...................................................................... 10

*Novell v. Microsoft*,
731 F.3d 1064 (10th Cir. 2013) ...................................................................... 12

iv

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

*O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*,
    819 F. Supp. 771 (S.D. Ind. 1992), *aff'd*, 36 F.3d 565 (7th Cir. 1994) ........................... 15

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ................................................................................................ 20

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ........................................................................... 11, 15

*Opoka v. INS*,
    94 F.3d 392 (7th Cir. 1996) ................................................................................... 2

*Owen v. Carr*,
    134 Ill. App. 3d 855 (4th Dist. Ill. Ct. App. 1985) ......................................... 23

*Pharm. Horizons, Inc. v. SXC Health Solutions, Inc.*,
    2012 WL 1755169 (N.D. Ill. May 15, 2012) ................................................... 24

*Piersall v. SportsVision of Chicago*,
    230 Ill. App. 3d 503 (1st Ill. Ct. App. 1992) ................................................... 20

*Port Dock & Stone Corp. v. Oldcastle Northeast*,
    507 F.3d 117 (2d Cir. 2007) ................................................................................. 12

*Premier Elec. Constr. Co. v. N.E.C.A., Inc.*,
    814 F.2d 358 (7th Cir. 1987) ............................................................................... 10

*PSKS, Inc. v. Leegin Creative Leather Prods*,
    615 F.3d 412 (6th Cir. 2010) ................................................................................. 6

*Queen City Pizza v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................................. 6

*Reisner v. Gen. Motors Corp.*,
    671 F.2d 91 (2d Cir. 1982) ................................................................................... 14

*Republic Tobacco, L.P. v. N. Atl. Trading Co.*,
    1999 WL 261712 (N.D. Ill. Apr. 9, 1999) ......................................................... 8

*Rohlfing v. Manor Care, Inc.*,
    172 F.R.D. 330 (N.D. Ill. 1997) ........................................................................... 5

*Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*,
    2005 WL 3557947 (N.D. Ill. Dec. 26, 2005) ................................................... 19

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC*,
    2008 WL 540091 (S.D.N.Y. Feb. 27, 2008) ................................................................. 10

*Safety Solutions, Inc. v. City of Chi.*,
    2011 WL 3652446 (N.D. Ill. Aug. 18, 2011) ............................................................... 24

*Schivarelli v. CBS, Inc.*,
    333 Ill. App. 3d 755 (1st Ill. Ct. App. 2002) ......................................................... 18, 20

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ....................................................................................... 11

*Serfecz v. Jewel Food Stores*,
    67 F.3d 591 (7th Cir. 1995) ........................................................................................... 4

*Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*,
    2010 WL 3835874 (N.D. Ill. Sept. 24, 2010) ............................................................. 24

*Siemer v. Quizno's Franchise Co.*,
    2008 WL 904874 (N.D. Ill. Mar. 31, 2008) .................................................................. 5

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993) .................................................................................................... 4, 8

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ....................................................................................... 6

*Theatre Party Assocs. v. Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) ........................................................................... 9, 10

*Toolson v. N.Y. Yankees*,
    346 U.S. 356 (1953) .................................................................................................... 2, 3

*Trembois v. Standard Ry. Equip. Mfg. Co.*,
    337 Ill. App. 35 (1st Dist. Ill. Ct. App. 1949) ............................................................ 22

*Troy Grp., Inc. v. Tilson*,
    364 F. Supp. 2d 1149 (C.D. Cal. 2005) ...................................................................... 21

*Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter Carriers*,
    2007 WL 1030237 (N.D. Ill. Mar. 30, 2007) ............................................................... 2

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ........................................................................................... 8

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Verizon Communications v. Law Offices of Curtis V. Trinko,*
  540 U.S. 398 (2004) ............................................................................................ 11

*Weber-Stephen Prods. LLC v. Sears Holding Corp.,*
  2014 WL 656753 (N.D. Ill. Feb. 20, 2014) ............................................. 12, 14

*Wilkow v. Forbes, Inc.,*
  2000 WL 631344 (N.D. Ill. May 15, 2000) .................................................. 21

*Xylem Dewatering Solutions, Inc. v. Szablewski,*
  2014 IL App (5th) 140080-U ........................................................................ 20

*Zucker v. Chicago Tribune Co.,*
  2004 WL 3312757 (1st Ill. App. Ct. Mar. 12, 2004) ...................................... 19

**Statutes**

15 U.S.C. § 26b ...................................................................................................... 3

**Rules**

Federal Rules of Evidence 201 ............................................................................. 2

> ***"The Cubs have the legal right to build a fence or wall that blocks rooftop viewing of games."***[1]
> -- Plaintiff Lakeview Baseball Club, February 2, 2004 & February 18, 2004

This is how plaintiff Lakeview Baseball Club, in prior litigation, described defendants' legal right in the absence of a contract between the parties. Plaintiffs' complaint now argues the opposite: no matter what the contract says, the antitrust laws should prevent defendants from adding government-approved videoboards and signs to the Wrigley Field outfield.

Plaintiffs' litigation flip flop is telling. After years of chest-thumping their contract rights, plaintiffs now bury at paragraph 247 of the complaint any suggestion the contract prevents defendants' government-approved expansion. The interpretation they now advance would require the Court to excise and ignore key language from the agreement. And most of plaintiffs' claims are based not on the contract at all, but what they admit was a "story" owner Tom Ricketts told in response to a fan's question at defendants' January 2014 fan convention. Long on sensational accusations, but short on any legal merit, the complaint should be dismissed in its entirety with prejudice.

## RELEVANT BACKGROUND

Certain rooftop plaintiffs or their predecessors entered into a fully integrated, 20-year contract in 2004. (Cplt. ¶¶ 38, 40, 42; Ex. 1, 1/27/2004 Agreement between Chicago National League Ball Club, Inc. and Rooftop Owners, § 4.1) The contract expressly and unambiguously allows defendants to undertake "[a]ny expansion of Wrigley Field" with government approval:

> The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. ***Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.***

---

[1] *See* Ex. 9, *Chicago Nat'l League Ball Club v. Skybox on Waveland*, No. 02-9105 (N.D. Ill. 2001), ECF 125, Defs.' Motion for Judgment on the Pleadings, at 10.

(Ex. 1, § 6.6 (emphasis added)[2])  Defendants received governmental approval for all aspects of the Wrigley Field expansion project, including the additional outfield signs and videoboard, from the Chicago City Council, Chicago Plan Commission, and Commission on Chicago Landmarks, as the Complaint acknowledges, over the last two years.  (Cplt. ¶¶ 75, 91; Ex. 2, 11/7/2013 Landmarks Hr'g at 10-11, 30-31; Ex. 3, 12/4/2014 Landmarks Hr'g at 13-24, 77-79; Ex. 4, 7/18/2013 Plan Commission Hr'g at 150-52; Ex. 5, 11/21/2013 Plan Commission Hr'g at 102-03; Ex. 6, 1/22/2014 Chicago City Ordinance on Planned Development at ¶ 6)[3]

## I.      PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED.

Plaintiffs cannot transform a simple contract dispute into precedent-shattering antitrust claims.  Baseball's antitrust exemption bars both claims under the Sherman Act and, even if it did not, plaintiffs cannot allege the elements of an attempted monopolization claim as a matter of law.

### A.      Baseball's Antitrust Exemption Bars Plaintiffs' Antitrust Claims.

The Supreme Court has exempted the business of baseball from antitrust scrutiny for nearly a century.  *See Flood v. Kuhn*, 407 U.S. 258, 279 (1932) ("[T]he business of baseball [is] outside the scope of the [Sherman] act.") (citing *Fed. Base Ball Club v. Nat'l League*, 259 U.S. 200, 207 (1922)); *Toolson v. N.Y. Yankees*, 346 U.S. 356, 357 (1953).  As the Supreme Court has explained, "Congress had no intention of including the business of baseball within the scope of

---

[2] The Court may consider the parties' contract in ruling on this motion to dismiss.  *See Hongbo Han v. United Cont. Holdings, Inc.*, 762 F.3d 598, 601 n.1 (7th Cir. 2014).

[3] The Court may take judicial notice of materials from the Commission on Chicago Landmarks, Chicago City Council and Chicago Plan Commission in ruling on this motion to dismiss.  *See Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter Carriers*, 2007 WL 1030237, at *7 (N.D. Ill. Mar. 30, 2007) (court may take "judicial notice of matters in the public record, including materials from proceedings in other courts and administrative agencies"); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (decisions from other courts and administrative agencies proper subject of judicial notice); Fed. R. Evid. 201.

the federal antitrust laws." *Toolson*, 346 U.S. at 357.[4]   Consistent with this authority, the Seventh Circuit has applied the exemption broadly, stating "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978); *see also City of San Jose v. Office of the Comm'r of Baseball*, 2015 WL 178358, at 8 (9th Cir. Jan. 15, 2015) (holding exemption "clearly extend[s] the baseball exemption to the entire 'business of providing public baseball games for profit between clubs of professional baseball players'").

The two antitrust counts here fit squarely within the antitrust exemption.  Both relate to selling tickets to view baseball games—activity which is at the core of "the business of baseball."  Count I alleges anticompetitive behavior by defendants "engaging in conduct that could increase the prices it charges consumers" to watch live Cubs games—certainly within "the entire business of providing public baseball games for profit."  (Cplt. ¶ 131; *accord id.* ¶¶ 129, 133-34)  The same is true for Count II, which makes similar claims regarding the prices for watching Cubs games from rooftops.  (*See, e.g., id.* ¶¶ 169, 172)  Plaintiffs even allege the public display of baseball as the product markets in this case.  (*Id.* ¶¶ 112 (asserting a market limited to Wrigley Field and rooftops), 152 (limiting market to rooftops))  Whether viewing from a seat in Wrigley Field or on a rooftop, plaintiffs' allegations center on the public display of baseball. The allegations go to the defendants' core product, which is central to the business of baseball. As a result, they are barred by the baseball antitrust exemption.

---

[4] *See also* 15 U.S.C. § 26b(b)(3) (legislating the baseball antitrust exemption would not apply to claims regarding employment of players, but stating Congress did not thereby "apply the antitrust laws to, any conduct, acts, practices, or agreements . . . including but not limited to . . . the marketing or sales of the entertainment product of organized professional baseball and the licensing of intellectual property rights owned or held by organized professional baseball teams individually or collectively").

### B.    Plaintiffs Cannot State Any Antitrust Claim.

The premise of plaintiffs' two attempted monopolization claims is that by owning Wrigley Field and an alleged share in one rooftop, defendants have a "93% market share" in a "Live Cubs Game" market and a "26% market share" in a "Live Rooftop Games" market—the former gerrymandered to include seats at Wrigley Field and the rooftops, and the latter only the rooftops.   (Cplt. ¶¶ 140, 162)[5]   Plaintiffs allege defendants are spending millions of dollars putting up outfield signs and buying rooftops to "monopolize" those so-called markets—that is, to increase their market share slightly in the Wrigley-Field-plus-rooftops market and in the rooftops market.   (*Id.* ¶¶ 140, 170)   Plaintiffs ignore the "obvious alternative explanation" for this investment—to renovate Wrigley Field and win a World Series.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007).

Not surprisingly, these allegations cannot state an attempted monopolization claim as a matter of law.   Plaintiffs cannot allege two fundamental elements:  either a dangerous probability of achieving monopoly power in the relevant market or an anticompetitive act.   *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).[6]

### 1.    Plaintiffs Do Not Allege A Plausible Relevant Market.

At the outset, plaintiffs' antitrust claims fail because it "is impossible to monopolize a market that does not exist."   *Collins v. Assoc. Pathologists, Ltd.*, 844 F.2d 473, 480 (7th Cir.

---

[5] Defendants do not admit they acquired or own any interest in a rooftop business.

[6] In addition, plaintiffs Right Field Properties, LLC and Rooftop Acquisition, LLC lack standing to claim attempted monopolization of "Live Cubs Games" and "Live Rooftop Games."   Only Right Field Rooftops, LLC, d/b/a Skybox on Sheffield and 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club allegedly sell a competing "ability to view professional baseball games."   (Cplt. ¶¶ 1-4)   Right Field Properties, LLC and Rooftop Acquisition, LLC simply own the properties where these "lessees" operate.   (*Id.*)   That does not make them "consumers or competitors" with standing to bring antitrust claims.   *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598-99 (7th Cir. 1995) (lessor of retail grocery property lacked standing to claim monopolization of retail grocery market).   "[A] business relationship" with Skybox and Lakeview Club and alleged injury is not enough.   *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995).

1988). Here, neither a "Live Cubs Games" market (Count I) nor a "Live Rooftop Games" market (Count II) is plausible. (*See* Cplt. ¶¶ 116, 152, 157) Indeed, the Seventh Circuit has already rejected the argument a single major Chicago sports venue could constitute its own market. *Elliott v. United Ctr.*, 126 F.3d 1003, 1004-05 (7th Cir. 1997). In *Elliott*, the Seventh Circuit affirmed the dismissal of an antitrust claim against Chicago's United Center based on a market limited to "food concessions at the United Center." *Id.* While "the United Center is certainly a popular facility in Chicago," the court held, the relevant product market "should be expanded to all other comparable places in the Chicago area." *Id.* (recognizing this would allow the United Center wide latitude to control its product, including to "'monopolize' the parking lots around it").

In this case, as in *Elliott*, both markets alleged by plaintiffs hinge on defendants' own product, Cubs baseball. The Seventh Circuit has "explicitly rejected the proposition that a firm can be said to have monopoly power in its own product" as plaintiffs allege here. *Elliott*, 126 F.3d at 1005. Consistent with *Elliott*, courts in this district routinely dismiss antitrust cases based on single-brand product markets. *See, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014) (dismissing "Alfred Angelo wedding products" market); *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (AB Sciex-produced mass spectrometers); *Siemer v. Quizno's Franchise Co.*, 2008 WL 904874, at *10 (N.D. Ill. Mar. 31, 2008) ("Quick Service Toasted Sandwich Restaurant Franchises"); *Flynn v. Philip Morris USA*, 2006 WL 211823, at *5 (N.D. Ill. Jan. 19, 2006) ("Philip Morris installation work in Florida"); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330 (N.D. Ill. 1997) (sale of pharmaceutical products to particular nursing home's residents).[7] In

---

[7] Other circuits are in accord. *See, e.g.*, *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337-38 (11th Cir. 2010) (affirming dismissal of antitrust claim based on "visco-elastic foam mattresses"); *PSKS, Inc. v. Leegin Creative*

each case, the court concluded the complaint lacked "sufficient factual allegations that make it plausible there is no substitute." *Int'l Equip. Trading*, 2013 WL 4599903, at *4; *Elliott*, 126 F.3d at 1005.

Plaintiffs here cannot meet this standard. Although their complaint's allegation there are no reasonable substitutes for watching a live Cubs game or watching a Cubs game from a rooftop might appear be true for some die-hard Cubs fans (Cplt. ¶¶ 119-20, 158), these "spare assertions of consumer preferences" and "legal conclusions couched as factual allegations" cannot establish a single-branded product market. *House of Brides*, 2014 WL 64657, at *6. Indeed, the *House of Brides* allegations mirrored those here: a proposed "inelastic" market of a particular manufacturer's allegedly "highly differentiated" and "unique" wedding products without "suitable substitutes." *Id*. at *5-6.

The court explained these "conclusory" allegations "fall short of plausibly drawing the boundaries of the relevant product market around a single brand." *Id.* The court reached the same conclusion even after the plaintiff amended its complaint to further allege brides "typically want a certain AA dress that they have selected for their wedding, a once in a lifetime special event, and are not willing to substitute the AA dress with a dress made by a different manufacturer." *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 6845862, at *4 (N.D. Ill. Dec. 4, 2014) ("No matter how distinctive the work of a wedding dress designer may be, House of Brides' unsupported contention that there are no adequate substitutes for Alfred Angelo bridal

---

*Leather Prods.*, 615 F.3d 412, 418 (6th Cir. 2010) (same, "retail market for Brighton's women's accessories"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (same, "UCLA women's soccer program" market); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85-87 (2d Cir. 2000) (same, "Yale education" market); *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-42 (3d Cir. 1997) (same, "ingredients, supplies, materials and distribution services used in the operation of Domino's stores" market).

gowns is implausible, to say the least."); *see also*, Ex. 7, Second Amended Complaint, *House of Brides v. Alfred Angelo, Inc.*, No. 11 C 07834 (N.D. Ill. Feb. 2, 2014), ECF No. 59, ¶ 38.[8]

Then-judge Sotomayor has explained why "'the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.'" *Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997). In rejecting an antitrust claim based on an alleged market of TWA airline tickets, she reasoned that consumer preferences alone cannot establish that a single product is a relevant market:

> The plaintiff's argument is analogous to a contention that a consumer is "locked into" Pepsi because she prefers the taste, or NBC because she prefers "Friends," "Seinfeld," and "E.R." A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network. *Id.*

Likewise, while it is no doubt true some Cubs fans prefer to see live Cubs baseball games (Cplt. ¶ 120), this does not make Cubs games viewed at Wrigley Field or from across the street—or just from across the street—a relevant market. Consumers have many alternatives: other live major league baseball games in Chicago and nearby (some involving the Cubs, *e.g.*, when they play the White Sox or Brewers); live minor league baseball games (some involving future Cubs players); other ways to experience Cubs games, like at home on TV or radio or at sports bars; other live sports; and other entertainment options.[9] And, as Justice Sotomayor

---

[8] And like in *House of Brides*, "the allegations in this case are not remotely analogous to those in *Eastman Kodak*," where aftermarket customers were "locked in" to buying a particular brand because they had already bought a particular manufacturer's product. *House of Brides*, 2014 WL 64657, at *7 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)); *Int'l Equip. Trading*, 2013 WL 4599903, at *3 (distinguishing *Eastman Kodak* because service and parts limited substitutes available to Kodak customers).

[9] This is particularly true for the "Live Rooftop Games" market; other facilities certainly can "offer all-you-can-eat and all-you-can-drink menu[s]" and "interior lounge-like atmosphere" to Cubs' fans. (*See* Cplt. ¶¶ 159-60)

explained, even if brand-specific loyalty results in deeply-embedded consumer preferences (as defendants recognize they are lucky enough to enjoy with some fans), this cannot be confused with the definition of a relevant product market in an antitrust case. *See Global Disc. Travel Servs.*, 960 F. Supp. at 705.

In short, because neither a Wrigley-Field-plus-rooftops nor a rooftops-only market is plausible, plaintiffs' attempted monopolization claims fail as a matter of law. *House of Brides*, 2014 WL 64657, at *7 ("Since the complaint fails to allege a plausible relevant product market . . . this Court need not examine whether House of Brides has adequately pleaded other elements."); *Global Disc. Travel Servs.*, 960 F. Supp. at 706 ("Because Global cannot define a relevant product market in a single branded product, it is impossible to assess the anticompetitive effects of the challenged practices.").[10]

### 2. Plaintiffs Cannot Base Attempted Monopolization Claims On Defendants Allegedly Taking Over The Distribution Of Their Own Product.

The antitrust laws are not designed to give one party access to the products of others. Plaintiffs allege defendants sell live access to defendants' product, Cubs baseball games, via a "dual distributor" model, "both at the distribution level [to the rooftops] and also at the retail level" directly to ticket buyers. (Cplt. ¶¶ 111-12, 114, 151-52, 154) Plaintiffs complain defendants are buying rooftops and erecting signs to eliminate the distribution level—that is, so

---

[10] Count II also fails because a current 26% market share in a so-called rooftop market and, if plaintiffs exit the market, a 30% market share, cannot establish "a dangerous probability of achieving monopoly power" in that market. (Cplt. ¶¶ 162, 170; *see Spectrum Sports*, 506 U.S. at 456) Plaintiffs' own TRO brief states that "claims of less than 30% market shares should presumptively be rejected." Pl. Inj. Br. at 37 (citing *M&M Med. Supp. & Svc., Inc. v. Pleasant Valley Hosp.*, 981 F.2d 160, 168 (4th Cir. 1993); *see also Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 1999 WL 261712, at *11 (N.D. Ill. Apr. 9, 1999) (dismissing: "50% does not constitute dominance"); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) (no dangerous probability of success as matter of law where defendant "possessed less than 50% of the market at the time the alleged predation began and throughout the time when it was alleged to have continued"); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432-34 (6th Cir. 1990) (market share of approximately 30% insufficient).

only defendants are selling tickets to live Cubs baseball games. (*Id.* ¶¶ 128-32, 167-71)  Even if this were true (which it is not), it is not an anticompetitive act and cannot cause an antitrust injury.

As this Court has explained, the "only injury plaintiff alleges is to itself.  The act of vertical integration, in this case that of a manufacturer taking over the distribution of its own product, is not an impermissible act rising to the required level" to state an attempted monopolization claim. *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, 1992 WL 111133, at *3 (N.D. Ill. May 12, 1992).  *Institutional Foods* dismissed a claim very similar to plaintiffs' here; there, the plaintiff asserted the defendant was "attempting to monopolize the distribution of the product by terminating its relationship with plaintiff and selling directly to customers formerly serviced by plaintiff." *Id.* at *1.  But "while an injury to a former distributor is not pleasant for that party, it is not enough to allege injury to the consumer" for purposes of an antitrust claim. *Id.* at *3.

Likewise, in *Elliott*, the district court dismissed the plaintiff's claims not only on relevant market grounds, but also because "a manufacturer's monopoly over the distribution of its own product cannot form the basis of a valid monopolization claim." *Elliott v. United Ctr.*, 1996 WL 400030, at *3 (N.D. Ill. July 15, 1996), *aff'd*, 126 F.3d 1003 (7th Cir. 1997) (quoting *Theatre Party Assocs. v. Shubert Org., Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988)).  While the Seventh Circuit did not need to reach this basis to affirm the dismissal in *Elliott*, *see supra*, it has explained in other cases that a manufacturer's decision "to take over the distribution of his product" is not grounds for a distributor to sue under the antitrust laws:  "Vertical integration is a universal feature of economic life and it would be absurd to make it a suspect category under the

antitrust laws just because it may hurt suppliers of the service that has been brought within the firm." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984).[11]

As the Eleventh Circuit said in upholding the PGA Tour's right to deny a plaintiff's ability to create a "derivative product" from PGA's exclusively-owned scoring system, "Section 2 of the Sherman Act does not require PGA to *give* its product freely to its competitors." *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004). Because that is the essence of plaintiffs' antitrust claims here, the Court should dismiss the claims with prejudice for that reason as well. *See Institutional Foods Packing*, 1992 WL 111133, at *3; *see also Theatre Party Assocs.*, 695 F. Supp. at 155 (dismissing claim theater monopolized alleged market for its own shows; "[e]ven if defendant changed its distribution system, this would constitute no violation of the antitrust laws"); *Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011, 1020 (E.D. Wisc. 1999) ("The fact that Univision is changing distributors of its product does not constitute anticompetitive conduct []. Suppliers should have the discretion to structure their own distribution."); *S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC*, 2008 WL 540091, at *4-5 (S.D.N.Y. Feb. 27, 2008) ("changes in distribution strategy are not anticompetitive").

Plaintiffs' TRO brief suggests *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), somehow guarantees plaintiffs an unfettered view of Wrigley Field. (Pl. Inj. Br. at 32-34) Plaintiffs' reliance on *Aspen Skiing* is misplaced. To begin with, the plaintiffs and defendants in *Aspen Skiing* each had their own products, separate ski slopes, and also sold a joint product. Not so here; plaintiffs' "product" is simply viewing *defendants'* product. No matter

---

[11] *See also Premier Elec. Constr. Co. v. N.E.C.A., Inc.*, 814 F.2d 358, 369 (7th Cir. 1987) ("If the manufacturer adopts a restricted distribution policy in order to serve its own interests, therefore, there is no reason to doubt that the policy is beneficial to consumers and consistent with the purposes of antitrust law.").

how this case is decided, plaintiffs will still own their buildings and can sell or rent the space. The only issue is the right to view Cubs games, which plaintiffs concede belong to defendants. (Cplt. ¶ 111)  The antitrust laws do not create a new right for plaintiffs.

In addition, plaintiffs' reading of *Aspen Skiing* ignores the Supreme Court's later cases, such as *Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 411 (2004). *Trinko* made clear that, even after *Aspen Skiing*, a business, monopoly or not, has "no duty to aid competitors."  *Id*.  Moreover, the *Trinko* Court carefully restricted any application of *Aspen Skiing*, to where the defendant had "turned down a proposal to sell at its own retail price." *Trinko*, 540 U.S. at 409.[12]  Plaintiffs make no allegation defendants did so here.

Plaintiffs also ignore post-*Aspen Skiing* cases where the Seventh Circuit has even more forcefully declined to extend *Aspen Skiing* to allegations like those advanced here: "If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not."  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376, 379 (7th Cir. 1986) (questioning whether the "narrowly written" *Aspen Skiing* opinion "stands for any principle that goes beyond its unusual facts").  Thus, in *Olympia*, the Court stated that even after *Aspen Skiing*, a "firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches."  *Id.* at 375.  More recently, the Seventh Circuit explained, "antitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete.  Cooperation is a *problem* in antitrust, not one of its obligations."  *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (citing *Trinko*); *see also Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2014

---

[12] The *Trinko* Court also specifically distinguished the pre-*Aspen Skiing* authority on which plaintiffs also rely. *Trinko*, 540 U.S. at 410 & n.3.

WL 656753, at *7 (N.D. Ill. Feb. 20, 2014) ("[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.") (quotation omitted).[13]

In sum, "a complaint pleading that a defendant expanded vertically and as a result, decided to discontinue doing business with its erstwhile trading partners at the next level down, does not plead an actionable refusal to deal." *Port Dock & Stone Corp. v. Oldcastle Northeast*, 507 F.3d 117, 125 (2d Cir. 2007) (affirming dismissal). Because that is all plaintiffs' complaint does here, the Court should dismiss it with prejudice.

### 3. Plaintiffs Cannot Base Any Attempted Monopolization Claim On Any Of The Specific Conduct Alleged In The Complaint.

The specific acts plaintiffs assert form the basis of their attempted monopolization claims fall into two categories: (1) threats to install outfield signs, and their actual installation; and (2) efforts to buy and actual purchases of rooftop businesses. (Cplt. ¶¶ 142, 143, 179, 180) They also irresponsibly allege purported unsuccessful attempted "price-fixing" (*e.g.*, *id.* ¶¶ 127, 178), and an intent to "destroy" the rooftops (*e.g.*, *id.* ¶¶ 129, 181). None of these allegations can support any viable antitrust claim in this case.

Conduct is only anticompetitive under the antitrust laws when it "is in itself an independent violation of the antitrust laws or [it] has no legitimate business justification other than to destroy or damage competition." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986); *see also Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (anticompetitive conduct is "predatory or unjustifiable"). And the conduct must

---

[13] This extends to any duty to "share (or continue to share)" property with competitors. *See, e.g., Novell v. Microsoft*, 731 F.3d 1064, 1074 (10th Cir. 2013); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1196 (10th Cir. 2009) ("antitrust will not force a resort developer to share its internal profit-making opportunities with competitors").

be tethered to "the use of monopoly power." *Eastman Kodak*, 504 U.S. at 482-83 (defining anticompetitive conduct as "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'") (citation omitted); *see also Int'l Equip. Trading*, 2013 WL 4599903, at *5 (quoting *Eastman Kodak*).  None of plaintiffs' allegations can meet this test to form the basis of any antitrust claim here.

**a.** **Plaintiffs Cannot Base Antitrust Claims On The Installation Of Outfield Signs At Wrigley Field.**

Plaintiff Lakeview Baseball Club put it best in prior litigation:  "[t]he Cubs have the legal right to build a fence or wall that blocks rooftop viewing of games."  (*See* Ex. 9, *Chicago Nat'l League Ball Club v. Skybox on Waveland*, No. 02-9105, ECF 125, Defs.' Motion for Judgment on the Pleadings, at 10)  As the owner of Wrigley Field, defendants have a common law property right to expand the property they own.  And with government approvals in hand, the parties' contract does not prevent it either.

In other words, property and contract rights empower defendants' conduct, not any monopoly.  Acting on those legal rights does not involve "*the use of monopoly power*," *Eastman Kodak*, 504 U.S. at 482-83 (emphasis added), and does not cause an antitrust injury.  The analysis in *Hodges v. WSM, Inc.* is instructive.  26 F.3d 36, 39 (6th Cir. 1994).  There, a plaintiff bus company sued the owner of the Grand Ole Opry for refusing to provide access to its property.  The court explained that because the property owners had the property right to deny access to the Grand Ole Opry, their "lawful refusal to grant plaintiffs access to their private property" could not violate the antitrust laws.  *Id*. at 39.  Similarly, in *Christy Sports, LLC v. Deer Valley Resort Co.*, the Tenth Circuit affirmed the dismissal of an attempted monopolization claim based on a resort's decision to enforce, after 15 years, a restrictive covenant authorizing it to disallow a competitor ski rental business.  555 F.3d 1188, 1196 (10th Cir. 2009) ("having

13

created a resort destination, antitrust will not force a resort developer to share its internal profit-making opportunities with competitors.")  Given defendants' "legal right to build a fence or wall that blocks rooftop viewing of games," like the ski rental shop in *Christy Sports*, plaintiffs "should have been aware that the relationship was temporary and subject to [defendants'] business judgment."  *Id*. at 1197.  This is particularly true where plaintiff purchased one of the rooftops years after the contract was entered, with the government approval process and planned expansion well underway.  (*E.g.*, Cplt. ¶ 50)

At bottom, while plaintiffs may dispute defendants' contract rights, that cannot transform their dispute into an antitrust case.  *See, e.g., Weber*, 2014 WL 656753, at *8 (rejecting antitrust claims where "allegations boil down to a mere contract dispute"); *Reisner v. Gen. Motors Corp.*, 671 F.2d 91, 100 (2d Cir. 1982) (refusing to "convert what is essentially a claim sounding in contract into an antitrust conspiracy claim" because "antitrust laws were 'not designed to police the performance of private contracts'") (citation omitted).

### b. Plaintiffs Cannot Base Antitrust Claims On Any Efforts To Purchase Or Actual Purchases Of Rooftop Businesses.

Nor can plaintiffs state a claim based on alleged efforts to purchase other rooftop businesses for two separate reasons.  *First*, as alleged competitors to defendants, plaintiffs cannot allege defendants acquiring other rooftops causes *them* an antitrust injury—"the type the antitrust laws were intended to prevent."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The "antitrust laws . . . were enacted for the protection of competition not competitors."  *Id*. at 488 (internal quotations omitted).  According to plaintiffs, the competitive effect of buying other rooftops is a more concentrated market, which would allow defendants to increase their ticket prices.  (*See, e.g.*, Compl. ¶¶ 169, 172)  Higher ticket prices would benefit plaintiffs, not cause *them* antitrust injury.  For this reason, the court in *Abbyy USA Software*

14

*House, Inc. v. Nuance Communications Inc.* dismissed attempted monopolization claims based on allegations the plaintiff's competitor "acquired and sought to acquire competitors to reduce supply and raise prices." 2008 WL 4830740, at *5 (N.D. Cal. Nov. 6, 2008). *Abbyy* recognized the plaintiff could not suffer antitrust injury because as "a competitor, Abbyy stands to profit from the alleged reduced supply and raised prices." *Id.*; *see also O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 819 F. Supp. 771, 791 (S.D. Ind. 1992) (concluding that competitor did not suffer antitrust injury from allegedly higher prices), *aff'd*, 36 F.3d 565 (7th Cir. 1994). Like the plaintiff in *Abbyy*, the alleged concentration of rooftop ownership would only increase prices under plaintiffs' theory, not cause antitrust injury.

*Second*, the alleged rooftop purchases cannot constitute anticompetitive acts under the antitrust laws. Acquisitions "are not generally considered predatory and are therefore rarely condemned unless they occur within an overall context of unfair monopolistic practices." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271-72 (7th Cir. 1981). Despite pages of baseless allegations, there is no "context" of anticompetitive conduct here. Exercising property rights to expand Wrigley Field after a hard-fought government approval for all aspects of the expansion is not anticompetitive in any way. Nor do allegations of an intent to "destroy the Competitor Rooftops" (*e.g.,* Cplt. ¶ 129) add anything. As the Seventh Circuit has ruled repeatedly, "if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant." *Olympia Equip. Leasing*, 797 F.2d at 379; *see also Ball Mem'l Hosp. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1338-39 (7th Cir. 1986) ("[I]ntent to harm rivals is not a useful standard in antitrust"); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) ("[I]ntent is not a basis of liability (or a ground for inferring the existence of such a basis).").

Finally, plaintiffs' specious allegations of attempted "price fixing" bear mention. Plaintiffs concede there was no agreement related to pricing (Cplt. ¶¶ 55, 56, 64), and plaintiffs do not assert a price fixing claim. Inflammatory labels aside, there is nothing improper about the commonplace practice of discussing a minimum resale price for one's product. The product for sale here—viewing of live Cubs games—is defendants' core product they create and own. The licensing of the right to view Cubs games is defendants' to control. As the Supreme Court has explained, "economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 889 (2007). Nor is there anything wrong with discussing a potential venture between parties or a "management firm." Plaintiffs do not allege such arrangement was agreed upon or undertaken here (ironically, plaintiffs allege they formed a "committee" of competing rooftop owners to discuss these issues (Cplt. ¶ 55), but then challenge the Cubs' alleged exploration of the same topic). In any event, for over 30 years—since *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), and its progeny—ventures operating as a single entity (*e.g.*, a joint venture or management firm selling Cubs game viewing as alleged here) have been "incapable of conspiring with each other for purposes" of the antitrust laws.

Plaintiffs' "price fixing" allegations are also flatly inconsistent with plaintiffs' case. Not only would such an agreement—had it occurred—not put plaintiffs out of business, but any agreement to raise rooftop prices would *help* the rooftops, precluding any antitrust injury. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990) ("A competitor 'may not complain of conspiracies that . . . set minimum prices at *any* level.'") (emphasis in original). In

sum, plaintiffs' incendiary allegations lack any basis, and there is no basis for any attempted monopolization claim in this case.[14]

## II. PLAINTIFFS' CLAIMS BASED ON MR. RICKETTS' STORY AT DEFENDANTS' CONVENTION (COUNTS III-VII AND IX) SHOULD BE DISMISSED.

Plaintiffs allege Mr. Ricketts "falsely accused the Rooftop Businesses of criminal conduct" by "telling the consumer public and media outlets that the Rooftop Businesses were thieves that were preventing the Cubs from winning the World Series." (Cplt. ¶¶ 82-83) But, as the Complaint itself makes clear, Mr. Ricketts did not say any of these things. He never called the rooftops any names—much less "thieves." Not only did he not mention a single plaintiff by name, the example he provided was not even an example of criminal conduct. Rather, in response to "an audience question about whether the rooftops were 'holding up the renovation'" of Wrigley Field, Mr. Ricketts provided a truthful, metaphorical story:

> It's funny — I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching "Homeland." You pay for that channel, and then you notice your neighbor looking through your window watching your television. And then you turn around, and they're charging the other neighbors to sit in the yard and watch your television. So you get up to close the shades, and the city makes you open them. That's basically what happened.

(Cplt. ¶ 80) There is nothing actionable about anything he said.

To be sure, plaintiffs already brought—and lost—a case last year against Marc Ganis, a sports marketing consultant, based on a statement that more closely hinted at criminal conduct.

---

[14] Plaintiffs' antitrust claims (Counts I and II) against Mr. Ricketts fail as a matter of law for an additional reason as well. *See Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592, 602-03 (N.D. Ill. 1994) (dismissing attempted monopolization claims against individual defendants: "Plaintiffs make no allegation with respect to the market power of any individual"). The Complaint includes no allegations Mr. Ricketts personally engaged in any anticompetitive act, had the specific intent to monopolize, or had a dangerous probability of achieving monopoly power. Indeed, it does not allege Mr. Ricketts acted in any capacity other than as the Cubs' owner. Counts III-VII, based on Mr. Ricketts' alleged statement during the 2014 fan convention, should be dismissed against Mr. Ricketts for the same reason, in addition to the reasons explained in Section II.

In that case, Mr. Ganis allegedly called unnamed rooftops "carpetbaggers stealing the product paid for by others for their own profit[.]" (Ex. 8, Memorandum Order and Opinion, *3639 LLC v. Ganis*, No. 2014-L-628 (Ill. Cir. Ct. Cook County Law Div. June 30, 2014) at 6 ("*Ganis* Op.")) Mr. Ganis specifically used the words "stealing" and "carpetbaggers." Yet the Circuit Court of Cook County dismissed the case at the pleadings stage with prejudice, holding Mr. Ganis' statement was "ambiguous" and non-actionable opinion subject to an innocent construction under Illinois law. (*Id.* at 3-20) Certainly if Mr. Ganis' accusation is not actionable, Mr. Ricketts' story—which does not even describe criminal conduct—is not either. All six counts based on this statement should be dismissed.

### A. Counts III-VII and IX Should Be Dismissed Because Mr. Ricketts' Story Does Not Contain A False Statement.

There is nothing actionable about Mr. Ricketts' statement. He was simply telling what he called a "story" in response to a fan's question. His story contained no false statements; indeed, it contained no facts about the rooftops at all. And without a false statement of fact, Counts III-VII and IX fail as a matter of law. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (Lanham Act claim must allege "false statement of fact by the defendant"); *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) ("[T]he legal inquiry is the same under the Lanham Act as under the Consumer Fraud Act and the Deceptive Trade Practices Act."); *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009) (defamation requires allegation that "defendant made a false statement about the plaintiff"); *Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 764 (1st Ill. Ct. App. 2002) ("[S]tatements that are . . . devoid of any factual content are not actionable as false light claims."); *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 327 Ill. App. 3d 128 (1st Dist. Ill. Ct. App. 2001) (commercial disparagement contract claim requires allegation of "untrue or misleading" statement).

18

The Illinois Appellate Court's decision in *Zucker v. Chicago Tribune Co.* is instructive. 2004 WL 3312757, at *3 (1st Ill. App. Ct. Mar. 12, 2004). In that case, the defendant wrote a story about the plaintiff's attempts to gain access to a former client's funeral, and the plaintiff sued for defamation. *Id*. at *1. The appellate court rejected this claim:

> [E]ven if plaintiff was not present and did not attempt to enter the memorial service, we do not find the conduct attributed to him in the story to be defamatory. Plaintiff claims that the story accused him of "essentially stalking a former client even in death" and its main point was his lack of professionalism. Plaintiff's rhetoric notwithstanding, we find the story was about no such thing.

*Id*. at *3. Rather, the defendant's story "could only be interpreted as expressing the author's point of view" and thus was "not actionable." *Id*. at *4. This case is no different. Mr. Ricketts' story did not include any false statement about the rooftops—much less a false statement they committed a crime—and thus cannot survive a motion to dismiss. In fact, if it referred to the rooftops at all, it likened them to neighbors and said he wanted to close a shade to stop them from looking in. Nowhere is any illegal conduct alleged or a defamatory statement made. *See also, e.g., Huon v. Breaking Media, LLC*, 2014 WL 6845866, at *8 (N.D. Ill. Dec. 4, 2014) (dismissing claim based on statement that "Our next story [is] from the files of the wanton and depraved . . . [A]pparently there are a lot of depraved dudes walking around out there that are potential rapists."); *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.,* 2005 WL 3557947, at *10 (N.D. Ill. Dec. 26, 2005) (dismissing Lanham Act, Illinois Consumer Fraud, and Deceptive Business Practices Act claims where "the allegedly false statement is a subjective statement" and thus "not actionable").

### B. Counts III-VII and IX Fail Because Mr. Ricketts' Story Is A Non-Actionable Opinion.

Even if one ignores Mr. Ricketts' actual statement and instead accepts plaintiffs' mischaracterization—allegedly calling the rooftops "thieves"—plaintiffs still cannot state a

claim.  Statements of opinion are not actionable as a matter of law.[15]  *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 2010 WL 3000178, at *3 (N.D. Ill. July 28, 2010) (statements of opinion "are not generally actionable under the Lanham Act"); *Xylem Dewatering Solutions, Inc. v. Szablewski*, 2014 IL App (5th) 140080-U ¶ 23 ("[S]tatements of opinion cannot form the basis for a commercial disparagement claim."); *Schivarelli*, 333 Ill. App. 3d at 764 ("As in defamation actions, statements that are expressions of opinion … are not actionable as false light claims."). To be actionable, a statement must have a firm factual basis "capable of objective verification as true or false."  *See Piersall v. SportsVision of Chicago*, 230 Ill. App. 3d 503, 510 (1st Ill. Ct. App. 1992); *Coughlan v. Beck*, 2013 Ill. App. (1st) 120891, ¶ 40 ("[O]nly statements capable of being proven true or false are actionable; opinions are not."); *Brennan*, 351 Ill. App. 3d at 969 (if the speaker "is exploring a 'subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable'").

Nothing in Mr. Ricketts' story purports to assert facts.  Mr. Ricketts did not say a crime was committed, what was allegedly stolen, how it was stolen, or who specifically committed the crime.  Nor did he provide an objective history of negotiations with the rooftops and then say they engaged in criminal conduct.  Even the mischaracterization of his statement constitutes non-actionable opinion under well-settled law.  *See, e.g., Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) (claim that plaintiff engaged in "blackmail" was non-actionable); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 285-86 (1974) (describing plaintiffs as "traitors" was a non-actionable opinion); *Wilkow v. Forbes, Inc.*,

---

[15] Whether Mr. Ricketts' story is an opinion is a question of law this Court can resolve on a motion to dismiss.  *See Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008) ("Whether a statement is an opinion or fact is a question of law."); *Brennan v. Kadner*, 351 Ill. App. 3d 963, 969 (1st Ill. Ct. App. 2004) (same).

2000 WL 631344, at *14 (N.D. Ill. May 15, 2000) (dismissing defamation and false light claims based on statements that plaintiff was "stiffing," "shafting," and "rob[bing]" creditors as non-actionable opinions); *Kirk v. CBS, Inc.*, 1987 WL 11831, at *4-5 (N.D. Ill. June 4, 1987) (dismissing claims that doctor was an "unscrupulous charlatan" and "cancer con artist" involved in "medical quackery" as non-actionable opinion); *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1157 (C.D. Cal. 2005) (dismissing claim that plaintiffs were "the biggest crooks on the planet").[16]   Indeed, the Circuit Court of Cook County held Mr. Ganis' "stealing carpetbaggers" statement was not actionable at the pleadings stage on this very ground.  (Ex. 8, *Ganis* Op. at 15 ("Ganis's statements are constitutionally protected expressions of opinion[.]"))

### C.    To The Extent Plaintiffs Allege Defamation *Per Se*, Counts VI and VII Fail For Several Additional Reasons.

To the extent plaintiffs are alleging defamation *per se* (Cplt. ¶ 233), Counts VI and VII fail for at least two additional, independent reasons.  *First*, plaintiffs identify no statement by Mr. Ricketts alleging they engaged in any specific criminal conduct.  They instead argue Mr. Ricketts' story "*imputes* that the Plaintiff Rooftop Businesses are committing theft or other criminal offenses."  (*Id.* (emphasis added))   But the law requires more.  To be actionable as defamation *per se*, a statement must "clearly and definitively refer to a specific offense that is indictable and punishable by death or imprisonment."  *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 47 (1st Dist. Ill. Ct. App. 1997).  Mr. Ricketts did not allege the rooftops engaged in trademark or copyright infringement or otherwise identify any specific criminal act they committed.  His actual statement is a far cry from defamation *per se* under Illinois law.  *See, e.g., Adams*, 292 Ill. App. 3d at 47 (statement that plaintiff was involved in "past offenses in other

---

[16] *See also Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) (holding that advertisement claiming individual was "GUILTY OF MISLEADING THE AMERICAN PUBLIC" did not violate the Lanham Act because it "is obviously a statement of opinion that could not reasonably be seen as stating or implying provable facts").

places along with cars, something to do with car theft" did "not impute the commission of a crime"); *Trembois v. Standard Ry. Equip. Mfg. Co.*, 337 Ill. App. 35, 43-44 (1st Dist. Ill. Ct. App. 1949) (statements that plaintiff was "mixed up in a rape charge" and that "police arrested him for jumping bond on the rape charge" did not impute commission of crime); *Knafel v. Chicago Sun-Times, Inc.*, 2004 WL 628242, at *5 (N.D. Ill. Mar. 25, 2004) (statement that plaintiff was "like someone who once worked in a profession that's a lot older than singing or hair designing" did not impute the crime of prostitution).

*Second*, under plain Illinois law, "even if an alleged statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent [i.e., non-defamatory] construction." *Green*, 234 Ill. 2d at 499; Ex. 8, *Ganis* Op. at 19 ("Illinois courts have determined that when the innocent construction rule precludes a defamation claim, it also precludes a false light claim."). Mr. Ricketts' story has an innocent construction: Mr. Ricketts was expressing an analogy to the predicament defendants faced with regard to the rooftops and the expansion plans.

Again *Ganis* is instructive. There, the court determined, "the logical inference from the comments at issue is that Ganis was characterizing certain expansion opponents as opportunists who were holding up a stadium deal, not criminals who had committed an indictable offense." Ex. 8, *Ganis* Op. at 12. Certainly, if Mr. Ganis' statement that the rooftops are "carpetbaggers stealing" is capable of an innocent construction, so too is Mr. Ricketts' story. *See also Green*, 234 Ill. 2d at 499 (statements that little league coach "abused" children were capable of innocent construction); *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 570 (1st Dist. Ill. Ct. App. 2003) (statement that mother "kidnapped" daughter was capable of an innocent construction, as it did not "necessarily denote a criminal offense"); *Owen v. Carr*, 134 Ill. App.

22

3d 855 (4th Dist. Ill. Ct. App. 1985) (statement that plaintiffs were trying to "intimidate" judge could include conduct other than crime of intimidation); *Garber–Pierre Food Prods., Inc. v. Crooks*, 78 Ill. App. 3d 356, 360 (1st Dist. Ill. Ct. App. 1979) (letter accusing plaintiff of "blackmail" and "extortion" reasonably capable of innocent construction: that "plaintiff's negotiating position concerning the payment for goods was unreasonable").

## III.   COUNT VIII SHOULD BE DISMISSED BECAUSE THE PARTIES' CONTRACT PERMITS CONSTRUCTION OF THE ADDITIONAL WRIGLEY FIELD SIGNS.

Plaintiffs' contract claim presents a matter of simple contract interpretation. The key provision at issue is Section 6.6, which allows defendants to undertake "[a]ny expansion of Wrigley Field approved by governmental authorities." (Ex. 1, § 6.6) The parties agree "there is no ambiguity in these plain, everyday words and phrases." (Pl. Inj. Br. at 25) Accordingly, as the parties again agree, the Court should examine only the four corners of the agreement and interpret this language "as a matter of law." (*Id*. at 23-24) That exercise leads to one result: the contract indisputably allows defendants to undertake the Wrigley Field expansion, including construction of the right field videoboard, for the reasons explained in defendants' preliminary injunction opposition. Count VIII thus cannot stand as a matter of law.[17] *See, e.g., McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) ("[T]he Letter of Understanding is unambiguous and the district court correctly dismissed the claim."); *Golden v. Wiznitzer*, 2014 WL 1329397, at *1 (N.D. Ill. Apr. 2, 2014) (dismissing contract claim: "The language of the contract is clear and unambiguous and does not encompass the relief sought by

---

[17] Rather than repeat their arguments here, defendants point the Court to their preliminary injunction opposition, which they incorporate by reference, including in particular pages 24 to 35. As discussed above, this Court can consider the parties' contract and materials from the Commission on Chicago Landmarks, Chicago City Council, and Chicago Plan Commission when deciding the motion to dismiss. Courts also regularly examine dictionaries to support the "plain and ordinary meaning" of the contract at this stage. *See, e.g., Belsky v. Field Imports, Inc.*, 2013 WL 5819232, at *12 (N.D. Ill. Oct. 29, 2013) (dismissing where dictionary definition supported unambiguous meaning of contract).

23

Golden"); *Safety Solutions, Inc. v. City of Chi.*, 2011 WL 3652446, at *8 (N.D. Ill. Aug. 18, 2011) (dismissing where contract was unambiguous and did not support plaintiff's characterization); *see also Pharm. Horizons, Inc. v. SXC Health Solutions, Inc.*, 2012 WL 1755169, at *6 (N.D. Ill. May 15, 2012) (granting judgment on the pleadings where contract was unambiguous); *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 2010 WL 3835874, at *3 (N.D. Ill. Sept. 24, 2010) (same).

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Complaint in its entirety with prejudice.

Date: February 17, 2015

Respectfully submitted,

/s/ *Andrew A. Kassof, P.C.*
Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel for Defendants*

24

**<u>CERTIFICATE OF SERVICE</u>**

I, Diana M. Watral, hereby certify that on this 17th day of February 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the electronic service list:

Thomas M. Lombardo
Abraham E. Brustein
Di Monte & Lizak
216 Higgins Road
Park Ridge, IL 60068
Telephone:     (847) 698-9600
Facsimile:     (847) 698-9623
tlombardo@dimontelaw.com
abrustein@dimontelaw.com

*Attorneys for Plaintiffs*

 /s/ *Diana M. Watral*
Diana M. Watral