IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RIGHT FIELD ROOFTOPS, LLC, et al., | |
| Plaintiffs, | |
| v. | No. 15 C 551 |
| CHICAGO BASEBALL HOLDINGS, LLC, et al., | Judge Virginia M. Kendall |
| Defendants. | |

# **MEMORANDUM OPINION AND ORDER**

Sixteen buildings across from Wrigley Field maintain views into Wrigley Field from seating erected on their rooftops. The Plaintiffs (the "Rooftops") operate two of these buildings and sell tickets to view Chicago Cubs games and other events from the Rooftops. In 2004, the Cubs and the Rooftops entered into a contract granting the Rooftops a license to sell these tickets in exchange for seventeen percent of the Rooftops' gross revenues. (Dkt. No. 21-3, Ex. C-2-A, Rooftop Licensing Agmt. § 3.1a). The Agreement expires December 31, 2023. (*Id.* at § 4.1). Despite the Agreement, the Rooftops allege that current Cubs ownership has threatened to and is in the process of erecting video boards and billboards in an effort to obstruct the Rooftops' views into Wrigley Field. The Rooftops contend that the Cubs' conduct both breaches the existing Agreement and violates the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and seek a Temporary Restraining Order ("TRO") enjoining the Cubs from installing the video boards and any other signage before the Court holds a preliminary injunction hearing.

A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Goodman v. Ill. Dep't of Fin.*

*& Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Moreover, the Rooftops must demonstrate that they will suffer irreparable harm between now and a preliminary injunction hearing. *See Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) ("common formula" is that TROs are intended to preserve the status quo only for so long as is needed to hold a hearing). The Rooftops have not satisfied this burden of demonstrating an immediate harm. As the Court stated, the preliminary injunction hearing will be expedited and resolved well before the baseball season begins. The Court will rule on the Rooftops' request for a preliminary injunction once it receives the full presentation of facts and law. Primarily because the Rooftops have failed to demonstrate that they will suffer irreparable harm in the absence of a TRO and because an adequate remedy at law exists, the Court denies the Rooftops' motion. The other factors of the TRO are discussed below.

## **BACKGROUND**

The Plaintiffs in this case are four affiliated entities that own and operate the Rooftops. The Rooftops allege that from 2009 to the present day, the Cubs have attempted to either acquire the Rooftops or destroy their businesses by blocking their views with video boards and billboards, notwithstanding the twenty-year Agreement entered into in 2004 guaranteeing the Rooftops unobstructed views into Wrigley Field.

The Agreement was the resolution of a lawsuit the Cubs filed against the Rooftops after the 2002 baseball season, claiming that the Rooftops were misappropriating the Cubs' property by charging admission fees to watch Cubs games from the Rooftops. The Agreement contains a number of provisions discussing the expansion of Wrigley Field, its potential effect on the Rooftops, and consequences:

2

6. *Wrigley Field bleacher expansion.*

> 6.1 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable unless it increases the height of its available seating, then such Rooftop may in its discretion elect to undertake construction to raise the height of its seating to allow views into Wrigley Field and the Cubs shall reimburse the Rooftop for 17% of the actual cost of such construction.
>
> 6.2 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the View from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable even if it were to increase its available seating to the maximum height permitted by law, and if such bleacher expansion is completed within eight years from the Effective Date, then if such Rooftop elects to cease operations . . . the Cubs shall reimburse that Rooftop for 50% of the royalties paid by that Rooftop to the Cubs . . .
> . . .
> 6.6 The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

The Rooftops allege that from 2010 onward, the Cubs started to backtrack from the Agreement. In late 2011 and early 2012, the Cubs began lobbying the City for approval of an outfield sign and video board package that would block the Rooftops. The Rooftops contend that the Cubs want to erect the billboards to drive the Rooftops out of business because their existence reduces demand for tickets within Wrigley Field. The Rooftops state that the Cubs attempted to force the Rooftops into a price-fixing scheme, threatening them with being blocked unless they acquiesced.

In April 2013, the Cubs announced a new renovation plan for Wrigley, including a "jumbotron" video board and an advertising sign in right field. The Cubs sought permission from the City Landmarks Commission to begin construction, and on July 10, 2014, the City approved

the Cubs' request to install seven signs, including two advertising signs and a 2,200 square foot video board above the right field bleachers. The Cubs' renderings of the renovations demonstrate that the right field signage will substantially block the views from the Rooftops. The Cubs announced the current plan on December 4, 2014.

## LEGAL STANDARD

The standard for the issuance of a TRO is the same as that required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 F. A'ppx 546, 548 (7th Cir. 2014). To obtain a preliminary injunction, the movant must demonstrate (1) a likelihood of success on the merits, (2) that he or she will suffer irreparable harm absent injunctive relief, and (3) that he or she has no adequate remedy at law. *See Smith v. Executive Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). If the party seeking the TRO meets these requirements, then the Court must balance the harm that party will suffer without a TRO against the harm the other party would suffer should the Court grant the TRO. *See Incredible Techs.*, 400 F.3d at 1011. The Court must also consider the public interest in granting or denying an injunction. *See Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## DISCUSSION

As to the first cause of action pertaining to the contract, the Court is unable to conclude, at this point, that the Rooftops have no likelihood of success on the merits on their breach of contract. *See Lundeen v. Kelly*, 502 F. A'ppx 584, 586-87 (7th Cir. 2013) (to establish the first element for a TRO or preliminary injunction, movant need only demonstrate "that his chances of succeeding on the merits are better than negligible"). As to the second cause of action, however, the Rooftops at this stage have failed to demonstrate a likelihood of success on their antitrust

claims. Moreover, the harm to the Rooftops if they do not receive a TRO is not irreparable. Nor are the Rooftops without an adequate remedy at law. Consequently, the Rooftops have not shown that a TRO is appropriate in this case. Moreover, having considered the balance of harms between the parties as well as the public interest, the Rooftops have not demonstrated that equitable considerations warrant a TRO.

I. **Likelihood of Success on the Merits**

A. **Anticipatory Breach of Contract**

Under Illinois law,[1] "[a]n anticipatory breach [of contract], also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 940 (Ill. App. Ct. 2007). Section 6.6 of the Agreement prohibits the Cubs from "erect[ing] windscreens or other barriers to obstruct the views of the Rooftops" but that "any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement." (Rooftop Licensing Agmt. § 6.6). The Rooftops do not dispute that the Cubs received governmental approval for their proposed renovation of Wrigley Field and construction of the signage; instead, the Rooftops argue that the section's use of the term "expansion" applies only to construction that increases the amount of available space or seating within Wrigley Field and that the signage accomplishes neither. Meanwhile, the Cubs contend that the section's terminology was intentionally broadly drafted to cover this type of construction.

Both parties present plausible interpretations of the Agreement. "When there is a choice among plausible interpretations," courts should choose a reading that makes commercial sense.

---

[1] Suits for breach of contract, including those to enforce ordinary settlements, arise under state law. *Jones v. Ass'n of Flight Attendants-CWA*, No. 14-1482, 2015 WL 400905, at *2 (7th Cir. Jan. 30, 2015).

5

*Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004). This determination relies on factors outside of the actual text of the contract. *See id.* ("To interpret a contract or other document, it is not enough to have a command of the . . . language in which the document is written. One must know something about the practical . . . context of the language to be interpreted.") (internal citation omitted); *see also, e.g.*, *Thompson v. Gordon*, 241 Ill.2d 428, 441 (2011) (where language is susceptible to more than one meaning, a court may consider extrinsic evidence to determine its intent); *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp.2d 798, 803 (N.D. Ill. 2008) (disputes regarding interpretation of contract terms, while not sufficient to warrant TRO, required preliminary injunction hearing). The Court cannot determine the proper interpretation of the Agreement on the record currently before it. Therefore, the Court requires more evidence before ultimately concluding whether the Rooftops are likely to succeed on their contract claims.

Because both parties, at this stage of the proceedings, have offered plausible interpretations of Section 6.6 of the Agreement, primarily hinging on the interpretation of the term "expansion," the Court cannot conclude that the Rooftops have a likelihood of success on the merits of their contract claims. It may be possible that with further briefing and analysis under the preliminary injunction hearing which this Court will set within a matter of weeks, that one interpretation of that contract will prevail. This necessarily thorough analysis of the contract and its terms is best suited for the preliminary injunction stage and need not be made at this time due to the Court's conclusions on the other factors to be considered in granting this emergency relief.

## B. Sherman Act Violations

At this emergency stage, the Court does, however, conclude that the Rooftops have not demonstrated a negligible likelihood of success on their anti-trust claims. The Sherman Act prohibits attempts to monopolize interstate commerce and authorizes the Court to issue injunctive relief to prevent monopolization. 15 U.S.C. §§ 2, 26. [2] To prove attempted monopolization, a plaintiff must establish "(1) a specific intent to achieve monopoly power; (2) predatory or anticompetitive conduct toward accomplishing the unlawful end; and (3) a dangerous probability that the attempt to monopolize will be successful." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). The inquiry into whether conduct is predatory or anticompetitive within the meaning of the Act is case specific. *See id.*

At oral argument, counsel for the Rooftops described the Cubs as engaging in "strong-arm" negotiations and efforts to control ticket pricing. He described "threats" by Cub Organization executives to rooftop owners that they would block the views of rooftops with "video boards, jumbotrons, and other advertising signs." However, statements that a party intends to compete, even if perceived as threats, are not unlawful absent "unfair, anti-competitive or predatory conduct." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 273 (7th Cir. 1981). The fact remains that, while the injury to the Rooftops is unpleasant, they have not demonstrated at this stage that it is the result of anything other than a valid business objective. *See Mercatus*, 641 F.3d at 854 (bare statement that defendant's conduct will prevent entry and reduce competition insufficient to establish predatory conduct).

---

[2] Although the Court recognizes that the Act does not restrict "the business of providing public baseball games for profit between clubs of professional baseball players," the Court does not resolve the TRO on this basis. *See City of San Jose v. Office of the Comm'r of Baseball*, --- F.3d ---, No. 14-15139 at *3 (9th Cir. Jan. 15, 2014) (quoting *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357 (1953)) (internal quotation marks omitted); *see also Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.3d 527, 541 (7th Cir. 1978) ("the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws"). Because the Court finds that the Rooftops have not demonstrated a likelihood of success on the merits of their Sherman Act claims, the Court expresses no opinion as to the applicability of the Major League Baseball exemption at this stage.

The Rooftops have not shown at this stage that the Cubs' conduct was "predatory or unjustifiable." *See id.* ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power.") (quoting *State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991)). The Rooftops have not presented evidence that the Cubs are either exercising or attempting to exercise monopoly power to construct the sign in right field. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482-83 (1992) (Section 2 claim requires "the use of monopoly power"). Instead, the Cubs are exercising common law property rights to modify their real property as they see fit. *See, e.g., Chicago Title and Trust Co. v. Village of Inverness*, 735 N.3.2d 686, 691 (Ill. App. Ct. 2000) (noting existence of "common law rights of property owner to unrestricted use of the property"). Moreover, the Cubs have received approval from the Chicago Landmarks Commission to make the proposed changes to the stadium. Additionally, the Act protects competition and does not reach conduct that is only "unfair, impolite, or unethical." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). The Cubs manufacture live baseball games and are taking over the distribution of their own product. This type of vertical integration is "not unlawful or even [a] suspect category under the antitrust laws." *Jack Walters & Sons, Corp. v. Morton Building, Inc.*, 737 F.2d 698, 710 (7th Cir. 1984). At this stage, the Rooftops have not demonstrated anything more than the vague possibility that they will be injured by the Cubs' actions. This is insufficient. *See Mercatus Grp.*, 641 F.3d at 854 (plaintiff's "bare claim that [defendant's] conduct prevented [plaintiff] entry and reduced competition simply does not suffice" to demonstrate antitrust violation).

## II. Irreparable Harm and Inadequate Remedy at Law

To establish irreparable harm, the Rooftops must demonstrate "that irreparable injury is likely in the absence of a [TRO]." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The threat of irreparable injury necessary to justify a TRO "must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural." *See, e.g.*, *Ditton v. Rusch*, No. 14 C 3260, 2014 WL 44359228, at *3 (N.D. Ill. Sept. 19, 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "The normal remedy for breach of contract is an award of damages, not an order of specific performance." *Chicago United*, 445 F.3d at 945.

The Rooftops have argued that without a TRO between now and a preliminary injunction hearing, their businesses will be destroyed and that the destruction of a plaintiff's business constitutes irreparable harm. But the Rooftops have offered no data showing that the businesses will become insolvent absent a TRO before a preliminary injunction hearing. Simply stating that one is in the business of showing Cubs games on rooftops and will be out of the business if they are unable to do so, does not provide the Court with sufficient evidence to reach the same conclusion. *See id.* (merely asserting that "without this injunction, the Plaintiffs' business will die" was insufficient to "explain why an award of damages would not make it whole"); *see also, e.g.*, *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *10 (N.D. Ill. Dec. 15, 2014) (failing to "convincingly explain" why lost profits would not remedy misappropriation of confidential information claim doomed TRO); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, No. 11 CV 6771, 2011 WL 5325545, at *5 (N.D. Ill. Nov. 3, 2011) (persuasive showing of irreparable harm necessary to justify TRO). Businesses can operate in difficult times and in lucrative times and whether they can weather any storm (including a number of weeks when they cannot sell their product) depends significantly on their bottom line, their operating expenses, their costs,

and their assets. No such documentation has been provided to the Court at this early stage to show that if the Court reaches its final decision within six weeks, for example, that this six week period of lack of income will make the business collapse. Even accepting the Rooftops' position offered at oral argument that now is the prime time to sell tickets for the upcoming season, any lost revenue is easily ascertainable and remediable through monetary damages. A TRO that is seeking irreparable injury based on complete business collapse must support that conclusion with documentation. None has been provided to the Court except a number of emails describing that certain customers will not purchase tickets if there is not view. That is not the same as saying that without that stream of income over the next few weeks, the company will not be able to survive.

Nor are the Rooftops faced with an inadequate remedy at law. On the contrary, any harm the Rooftops may suffer between now and a preliminary injunction hearing is entirely financial in nature, ascertainable, and calculable. This conclusion is bolstered not only by the fact that the dispute concerns a fixed-length contract, *see Marketing Werks, Inc. v. Fox*, No. 13 C 7256, 2013 WL 5609339, at *3 (N.D. Ill. Oct. 11, 2013) (dispute concerning fixed-length contract presented an adequate remedy at law), but also because the Court will institute an expedited schedule concerning the preliminary injunction hearing. At this moment in time, there is a very calculable amount of income that would be lost until a ruling on the preliminary injunction and that amount of income will comprise a bond that this Court will mandate during the pendency and review of the preliminary injunction. Additionally, the Rooftops are only guaranteed a view into Wrigley Field until December 31, 2023. The Rooftops are in the business of selling tickets to watch Cubs games and other events taking place at Wrigley Field and they have no expectation that they will be able to maintain that business after this eight-year term. Because this end date is so

identifiable and because the Rooftops have at least ten years of data showing their revenues, a loss amount is simple to calculate. Without evidence that the Rooftops will be foreclosed upon or become insolvent in the absence of a TRO between now and the preliminary injunction hearing, any alleged irreparable injury is too speculative to warrant the imposition of injunctive relief. *See Chicago United*, 445 F.3d at 945 ("persuasive showing of irreparable harm" required for TRO to issue). At this stage, the Rooftops have not demonstrated that they have no adequate remedy at law.

## III. Other Considerations

Even if the Rooftops had demonstrated the threshold requirements of a TRO, other considerations counsel against granting a TRO. *See Merritte*, 561 F. App'x at 548 ("If those three [threshold] factors are shown, the court must then balance the harm to each party and to the public interest from granting or denying the injunction."). In balancing the harms, the Court applies a sliding scale approach. *See Christian Legal Soc'y v. Walker¸* 453 F.3d 853, 859 (7th Cir. 2006). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (internal quotation marks and citation omitted). In other words, the Court "sit[s] as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Id.* (internal quotation marks and citation omitted) (alteration in original).

Here, the monetary loss to the Rooftops in the absence of a TRO will be, at most, a small portion of its annual revenue. Counsel for the Cubs stated at oral argument, and the Rooftops did not deny, that the Rooftops have already sold a substantial proportion of the tickets that they

11

intend to sell for the 2015 season. Neither party presented evidence on the expected revenue between now and the expedited preliminary injunction hearing. In any case, it is clear that the Rooftops face no risk of missing a game in the absence of a TRO. Opening Day is nearly two months away on April 5. The Cubs, however, represented at oral argument that any impediment to the construction at Wrigley Field could cause a significant hardship in that the stadium would remain under construction on Opening Day. The Cubs have already entered into a sponsorship agreement for the video board. The Cubs have purchased the materials to construct the board. Counsel for the Cubs represented that there is simply no time to redesign the project before Opening Day. A TRO would require the Cubs to refund tickets, forego other income, and could cause reputational harm. On balance, the events leading up to this motion and the effects they have had or will have do not warrant a TRO and the public interest does not dictate otherwise.

## CONCLUSION

For the reasons contained herein, the Court denies the Rooftops' motion for TRO.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 19, 2015