**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, | ) | |
| d/b/a SKYBOX ON SHEFFIELD; | ) | |
| RIGHT FIELD PROPERTIES, LLC; | ) | |
| 3633 ROOFTOP MANAGEMENT, LLC, | ) | |
| d/b/a LAKEVIEW BASEBALL CLUB; and | ) | |
| ROOFTOP ACQUISITION, LLC, | ) | Case No. 15cv551 |
| | ) | |
| Plaintiffs, | ) | Hon. Virginia M. Kendall |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; and | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

The plaintiffs, (i) Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, (ii) Right Field Properties, LLC, (iii) 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club, and (iv) Rooftop Acquisition, LLC (collectively, "Plaintiffs"), for their Response in Opposition to Defendants' Motion to Dismiss, submit the following:

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………… ii

TABLE OF AUTHORITIES……………………………………………..iv

I.   OVERVIEW………..……..………………………………….…….…..1

II.  STANDARD ON MOTION TO DISMISS……………………..….….1

III. MAJOR LEAGUE BASEBALL'S ANTITRUST EXEMPTION
     DOES NOT APPLY.......................................................................................2

IV.  THERE IS A PLAUSIBLE RELEVANT MARKET
     FOR PLAINTIFF'S SHERMAN ACT CLAIMS………………..…...8

V.   THE CUBS ATTEMPTED TO REACH AN UNLAWFUL
     SECTION I RESULT………………………………………………..23

     A. Vertical Integration is a Basis for Antitrust Liability………..25

     B. Refusals to Deal and Denials of Access To Essential Facilities May Form
        The Basis for Antitrust Liability………………………………..28

     C. The Allegations in This Case Reflect A Plausible Antitrust Claim…………35

     D. The Defendants' Case Law Is Inapplicable To These Facts………… 40

VI.  THE ANTICOMPETITIVE NATURE OF THE DEFENDANTS' CONDUCT…….45

VII. THE PLAINTIFFS HAVE A VIABLE ANTICIPATORY
     BREACH OF CONTRACT CLAIM……………………………...53

     A. The "Four Corners Rule" Rejects Literal Interpretations And Absurd Results…...53

     B. The Defendants' Interpretation Calls For An Irrational, Absurd Result……..57

     C. The Cubs' Cases Are Not Supportive Of Their Interpretation……………60

     D. Parol Evidence Reaches the Same Result……………………… 64

     E. The City is Not the Final Arbiter…………………………….65

VIII. RICKETTS COMMITTED DEFAMATION *PER SE*……………...66

     A. Ricketts' Statement is Defamation *Per Se*……………...67

B.   Ricketts' Statement is Verifiably False and Not a Protected Opinion…………….67

C.   The Innocent Construction Rule Does Not Shield Ricketts' Statement………..71

IX.   THE FALSE LIGHT CLAIM IS ACTIONABLE……………………………..75

X.   THE PLAINTIFFS' LANHAM, DECEPTIVE TRADE PRACTICE, AND
     DECEPTIVE BUSINESS PRACTICE ACT CLAIMS ARE WELL PLED………..76

XI.   PLAINTIFFS' CONTRACTUAL NON-DISPARAEMENT
     CLAIM IS WELL-PLED…………………………………………………………..79

XII.  CONCLUSION…………………………………………………………………… 79

# TABLE OF AUTHORITIES

## Cases

*3639 LLC v. Ganis*,
    No. 2014-L-628 (Ill. Cir. Ct. Cook  June 30, 2014) ..72

*A & A Disposal and Recycling, Inc. v. Browning-Ferris Indus. of Ill., Inc.*,
    664 N.E.2d 351 (Ill. App. 1996) 11

*Abbyy USA Software House, Inc. v. Nuance Communications*,
    2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) 51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .1

*Aspen Skiing v. Aspen Highlands Skiing*,
    472 U.S. 585 (1985) ..31

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
    168 F.3d 967 (7th Cir. 1999) 77

*Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*,
    392 F.3d 881 (7th Cir. 2004) .55

*Bank of America Nat'l. Trust and Sav. Ass'n v. Schulson*,
    714 N.E.2d 20  (Ill. App. 1999) .54

*Beanstalk Group, Inc. v. AM General Corp.*,
    283 F.3d 856 (7th Cir. 2002) .55

*Beatrice Foods Co. v. F.T.C.*,
    540 F.2d 303 (7th Cir. 1976) .10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .1

*Board of Trade of City of Chicago v. United States*,
    246 U.S. 231 (1918) ...24

*Brown Shoe v. United States*,
    370 U.S. 294 (1962) .8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)……………………………………………………...…49

*Bryson v. News America Publs., Inc.*,
  672 N.E.2d 1207 (Ill. 1996)………………………………………………...67

*Bourke v. Dun & Bradstreet*,
  159 F.3d 1032 (7th Cir. 1998)……………………………………………...53

*Byars v. Bluff City News Co., Inc.*,
  609 F.2d 843 (6th Cir. 1979)……………………………………………….26

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998)…………………………………………….29

*Central States, Southeast, Southwest Areas Pension Fund v. Kroger Co.*,
  226 F.3d 903 (7th Cir. 2000)……………………………………………….64

*Charles O. Kinney & Co., Inc. v. Kuhn*,
  569 F.2d 527 (7th Cir. 1978)……………………………………………...4

*Chicago National League Baseball Club, Inc. v. Sky Box on Waveland, LLC*,
  02-cv-9105 (N.D. Ill. 2002)……………………………..………………….65

*Chicago United Industries, Ltd. v. City of Chicago*,
  685 F. Supp. 2d 791 (N.D. Ill. 2010)……………………………………….62

*Christou v. Beatport, LLC*,
  849 F. Supp. 2d 1055 (D. Colo. 2012)…………………………………...10

*Christy Sports, LLC v. Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009)…………………………………………….47

*City of San Jose v. Office of the Commissioner of Baseball*,
  2015 WL 178358 (9th Cir. January 15, 2015)…………………………….4

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999)……………………………………………….78

*Continental Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)……………………………………………………….24

*Deal v. United States*,
    508 U.S. 129 (1993)……………………………………………...56

*Dispatch Automation, Inc., v. Richards*,
    208 F.3d 1116 (7th Cir. 2002)…………………………………54

*Dubinsky v. United Airlines Master Executive Council*,
    708 N.E.2d 441 (Ill. App. 1999)……………………………...….68

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)……………………………………………….8

*Elliott v. United Center*,
    126 F.3d 1003 (7th Cir. 1997)……………………………....….40

*Federal Base Ball Club of Baltimore, Inc. v. National League of Prof. Base Ball Clubs, et al.*,
    259 U.S. 200 (1922)……………………………………………….2

*Fishman v. LaSalle Nat. Bank*,
    274 F.3d 300 (1st Cir. 2001)………………………………..….54

*Flood v. Kuhn*,
    407 U.S. 258 (1972)…………………………………………….4

*Flynn v. Philip Morris USA, Inc.*,
    2006 WL 211823 (N.D. Ill. Jan. 19, 2006)……………………22

*Geneva Pharma. v. Barr Labs, Inc.*,
    386 F.3d 485 (2nd Cir. 2004)………………………………….10

*Giant Screen Sports v. Canadian Imperial Bank of Commerce*,
    553 F.3d 527 (7th Cir. 2009)…………………………….…71

*Global Disc. Trav. Svcs., LLC v. T.W.A., Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997)……………………………22

*Green v. Rogers*,
    917 N.E.2d 450 (Ill. 2009)……………………………………….70

*Grengs v. Twentieth Century Fox Film Corp.*,
    232 F.2d 325 (7th Cir. 1956)……………………………….26

*Henderson Broadcasting v. Houston Sports Assn.*,
    541 F. Supp. 263 (S.D. Tex. 1982)íííííííííííííííííí 5

*Hodges v. WSM, Inc.*,
    26 F.3d 36 (6th Cir. 1994)ííííííííííííííííííííí .46

*Hooper v. California*,
     155 U. S. 648 (1895)íííííííííííííííííííííííí ..3

*Hoppe v. Great Western Business Services, LLC*,
    536 F. Supp. 2d 888 (N.D. Ill. 2008)ííííííííííííííí .54

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    2014 WL 64657 (N.D. Ill. Jan. 8, 2014)íííííííííííííí 13

*Int'l Equip. Trading, Ltd. v. Ab Sciex, LLC*,
    2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)ííííííííííí 12

*Imperial Apparel, Ltd v. Cosmo's Designer Direct, Inc.*,
    882 N.E.2d 1011 (Ill. 2008)ííííííííííííííííííí ...67

*In re Apple & AT&T Antitrust Litigation*,
    96 F. Supp. 2d 1288 (N.D. Cal. 2008)íííííííííííí ...í 9

*Institutional Foods Packing, Inc. v. Creative Prods., Inc.*,
    1992 WL 111133 (N.D. Ill. May 12, 1992)ííííííííííí ...27

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
    737 F.2d 698 (7th Cir. 1984)ííííííííííííííííííí .26

*Knafel v. Chicago Suntimes, Inc.*,
    413 F.3d 637 (7th Cir. 2005)ííííííííííííííííííí .74

*L.G. Balfour Co. v. F.T.C.*,
    442 F.2d 1 (7th Cir. 1971)ííííííííííííííííííííí .11

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1982)ííííííííííííííííííí .52

*LePage's Inc. v. Kroll Assoc's, Inc.*,
    324 F.3d 141 (3rd Cir. 2003)ííííííííííííííííííí .29

vii

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951).................................................................23

*Madison v. Frazier*,
    539 F.3d 646 (7th Cir. 2008)......................................................67

*McElroy v. B.F. Goodrich Co.*,
    73 F. 3d 722 (7th Cir. 1996)......................................................55

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
    2010 WL 300178 (N.D. Ill. July 28, 2010)...............................78

*MCI Communications Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983)....................................................33

*Morningware, Inc. v. Hearthware Home Products, Inc.*,
    673 F. Supp. 2d 630 (N.D. Ill. 2009)........................................76

*Morris Commun. Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004).................................................35

*Muzikowski v. Paramount Pictures Corp.*,
    322 F.3d 918 (7th Cir. 2003)......................................................71

*National League of Prof. Baseball Clubs, et al. v. Federal Baseball Club of Baltimore*,
    269 F. 681 (D.C. Cir. 1920)........................................................2

*Newcal Indus. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008).....................................................9

*O.K. Sand and Gravel, Inc. v. Martin Marietta Corp.*,
    819 F. Supp. 771 (S.D. Ind. 1992).............................................51

*Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*,
    797 F.2d 370 (7th Cir. 1986).....................................................34

*Omnitrus Merging Corp.v. Illinois Tool Works, Inc.*,
    628 N.E.2d 1165 (Ill. App. 1993)..............................................64

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)...................................................................30

*Pampered Chef, Ltd. v. Alexanian*,
  2011 WL 6046896 (N.D. Ill. Dec. 5, 2011)………………………. 54

*Port Dock & Stone Corp. v. Oldcastle Northeast*,
  507 F.3d 117 (2nd Cir. 2007)…………………………………. 44

*Portland Baseball Club, Inc. v. Kuhn*,
  491 F.2d 1101 (9th Cir. 1974)…………………………………. 4

*Postema v. National League of Prof. Baseball Clubs*,
  799 F. Supp. 1475 (S.D.N.Y. 1992)………………………… 6

*Reisner v. General Motors Corp.*,
  671 F.2d 91 (2nd Cir. 1982)…………………………………. 48

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)………………………………………. 56

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997)………………………………. 22

*Rohm and Haas Co. v. Dawson Chem. Co., Inc.*,
  557 F. Supp. 739 (S.D. Tex. 1983)……………………………. 12

*Rose v. Hollinger Int'l, Inc.*,
  889 N.E.2d 644 (Ill. App. 2008)……………………………… 67

*Rosenthal Collins Group, LLC v. Trading Technologies International*,
  2005 WL 3557947 (N.D. Ill. Dec. 26, 2005)………………… 78

*S.W.B. New England, Inc. v. R.A.B. Food Group, LLC*,
  2008 WL 540091 (S.D.N.Y. Feb. 27, 2008)………………… 41

*Sargent-Welch Scientific Co. v. Ventron Corp.*,
  567 F.2d 701 (7th Cir. 1978)…………………………………. 11

*Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*,
  586 F.3d 500 (7th Cir. 2009)………………………………… 77

*Schivarelli v. CBS, Inc.*,
  776 N.E.2d 693 (Ill. App. 2002)……………………………… 70

*Siemer v. Quiznos Franchise Company LLC*,
    2008 WL 904874 (N.D. Ill. Mar. 31, 2008)í í í í í í í í í í í í í í ...21

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006)í í í í í í í í í í í í í í í í í í .42

*Solaia Technology, LLC v. Specialty Pub. Co.*,
    852 N.E.2d 825 (Ill. 2006)í í í í í í í í í í í í í í í í í í í í 67

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)í í í í í í í í í í í í í í í í í í í í í ...í 28

*Swanson v. Citibank, N.A.*,
    614 F.3d 400 (7th Cir. 2010)í í í í í í í í í í í í í í í í í .......í 2

*Taracorp, Inc. v. NL Industries, Inc.*,
    73 F.3d 738 (7th Cir. 1996)í í í í í í í í í í í í í í í í í í í ...60

*Theater Party Associates v. Shubert Org.*,
    695 F. Supp. 150 (S.D.N.Y. 1988)í í í í í í í í í í í í í í í í ...40

*Times-Piscayne Pub. Co. v. United States*,
    345 U.S. 594 (1953)í í í í í í í í í í í í í í í í í í í í í í í .í 9

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2nd Cir. 2001)í í í í í í í í í í í í í í í í í í í 12

*Toolson v. New York Yankees, Inc., et al.*,
    101 F. Supp. 93 (S.D. Cal. 1951)í í í í í í í í í í í í í í í í í .3

*Toolson v. New York Yankees, Inc., et al.*,
    200 F.2d 198 (9th Cir. 1952)í í í í í í í í í í í í í í í í í í í ...3

*Toolson v. New York Yankees, Inc. et al.*,
    346 U.S. 356 (1953)í í í í í í í í í í í í í í í í í í í í í í í í .4

*Trembois v. Standard Ry. Equip. Mfg. Co.*,
    84 N.E.2d 862 (Ill. App. 1949)í í í í í í í í í í í í í í í í í í ..74

*Tuite v. Corbitt*,
    866 N.E.2d 114 (Ill. 2006)í í í í í í í í í í í í í í í í í í í í .74

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir. 1975)í í í í í í í í í í í í í í í í í í í .5

*Utility Audit, Inc. v. Horace Mann Service Corp.*,
 383 F.3d 683 (7th Cir. 2004)……………………………………….54

*United States v. Arnold, Schwinn, & Co.*,
 388 U.S. 365 (1967)……………………………………………...25

*United States v. Bethlehem Steel Corp.*,
 168 F. Supp. 576 (S.D.N.Y. 1958)……………………………… 11

*United States v. Citizens & Southern National Bank*,
 422 U.S. 86 (1975)……………………………………………….32

*United States v. E.I. du Pont de Nemours & Co.*,
 351 U.S. 377 (1956)…………………………………………….8

*United States v. Paramount Pictures, Inc. et al*,
 334 U.S. 131 (1948)……………………………………………...25

*United States v. Terminal R.R. Assn.*,
 224 U.S. 383 (1912)……………………………………………...29

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*,
 2014 WL 656753 (N.D. Ill. Feb. 20, 2014)……………………...44

*Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*,
 608 F. Supp. 2d 981 (N.D. Ill. 2009)…………………………….54

*Woods v. Elgin, Joliet & Eastern Railway Co.*,
 2000 WL 45434 (N.D. Ill. Jan. 11, 2000)……………………..61

*Wynee v. Loyola Univ.*,
 741 N.E.2d 669 (7th Cir. 2000)………………………………….71

*Yates v. U.S.*,
 No. 13-7451 (S. Ct. Feb. 25, 2015)……………………………… 56

*Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 742 F. Supp. 1359 (N.D. Ill. 1990)……………………………… 75

*Zucker v. Chicago Tribune Co.*,
 2004 WL 3312757 (Ill. App. 2004)……………………………..68

xi

**Statutes**

15 U.S.C. § 1í í í í í í í í í í í í í í í í í í í í í í í í í í í í í í ..23

## I.    <u>Overview</u>

There is very little substance behind the Defendantsø Memorandum [Doc. 30] and Opposition Brief [Doc. 27] which would support a Rule 12(b)(6) dismissal. Instead, there is merely an amalgamation of one-sentence excerpts from one hundred fifteen (115) different cases, none of which cases lend support for dismissal under the facts presented in this Complaint. But the Defendants do not spend time dissecting any of their authority, and instead rely upon their sweeping and broad, yet out-of-context recitations of law, to attempt to frame a coherent argument for dismissal. Upon examination, it turns out that the Defendantsø supposed arguments are without merit, and therefore their Motion to Dismiss should be denied.

## II.    <u>Standard on Motion to Dismiss</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only õstate a claim to relief that is plausible on its face.ö *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). õA claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.ö *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard calls for a õcontext-specificö inquiry that requires the court õto draw on its judicial experience and common sense.ö *Id*. at 679. This is õnot akin to a ÷probability requirement,øö but the plaintiff must allege õmore than a sheer possibility that a defendant has acted unlawfully.ö *Id*. at 678.

õPlausibilityö in this context does not imply that a district court should decide whose version to believe, or which version is more likely than not. Indeed, the Court expressly distanced itself from such an approach in *Iqbal*. (õ[T]he plausibility standard is not akin to a probability requirement.ö) *Id*. The Seventh Circuit has explained, õAs we understand it, the [Supreme] Court is saying instead that the plaintiff must give enough details about the subject-

matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## III.     Major League Baseball's Antitrust Exemption Does Not Apply

The so-called "baseball exemption" from federal antitrust law does not apply to individual team franchises.  It also does not apply to matters which are not necessary to produce the game on the field.  For the reasons that follow, the baseball exemption offers the Defendants no protection from the Sherman Act.

The baseball exemption was judicially created in *Federal Base Ball Club of Baltimore, Inc. v. National League of Prof. Base Ball Clubs, et al.*, 259 U.S. 200 (1922).  The facts of that case and most of the analysis adopted by the Court were provided in the circuit court's decision on review, *National League of Prof. Baseball Clubs, et al. v. Federal Baseball Club of Baltimore*, 269 F. 681 (D.C. Cir. 1920).  Between 1913 and 1915, the Federal League operated as a rival to the National and American Leagues. *Id* at 682.  In 1915, the Federal league disbanded when all of the teams, except Baltimore, either dissolved or merged into the National and American Leagues. *Id*.  Baltimore, the last remaining Federal League team, filed suit against the National and American Leagues alleging, *inter alia*, that the leagues were engaged in monopolistic, anti-competitive behavior in violation of the Sherman Act.  *Id* at 682.

The circuit court stated,

> A game of baseball is not susceptible of being transferred. The players, it
> is true, travel from place to place in interstate commerce, but they are not
> the game. Not until they come into contact with their opponents on the
> baseball field and the contest opens does the game come into existence. It
> is local in its beginning and in its end. Nothing is transferred in the process
> to those who patronize it. The exertions of skill and agility which they
> witness may excite in them pleasurable emotions, just as might a view of a

2

> beautiful picture or a masterly performance of some drama; but the game effects no exchange of things according to the meaning of –trade and commerce÷as defined above.

*Id.* at 684-85.

Justice Holmes delivered the opinion of the Supreme Court, writing:

> But we are of opinion that the Court of Appeals was right. The business is giving exhibitions of base ball, which are purely state affairs. It is true that in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. According to the distinction insisted upon in <u>Hooper v. California</u>, 155 U. S. 648, 655, 15 Sup. Ct. 207, 39 L. Ed. 297, the transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade of commerce in the commonly accepted use of those words.

259 U.S. 200, 208-09. Thus, from its earliest days, the baseball exemption only applied to putting on the game, not to incidental matters.

A subsequent case involved õthe regulations which govern the structure of organized baseball,ö and in particular, something known as the õreserve system.ö[1] *Toolson v. New York Yankees, Inc., et al.*, 101 F. Supp. 93 (S.D. Cal. 1951). In that case, the plaintiff, a baseball player, was traded by one team to another, but he did not like the trade and refused to show up and play for his new team. *Id.* Therefore, the league placed him on its ineligible list pursuant to league regulations. *Id.* The trial court and Ninth Circuit essentially found that *Federal* governed. *Id.*; *Toolson v. New York Yankees, Inc.*, 200 F.2d 198 (9th Cir. 1952).

---

[1] The õreserve systemö comes from the õreserve clauseö of a playerøs contract in which the rights to the player were owned by the team, which could reassign, trade, sell or release in its own discretion.

3

In a one paragraph *per curiam* decision, the Supreme Court affirmed, noting that the "business of providing public baseball games for profit" was not within the scope of the federal antitrust laws." *Toolson v. New York Yankees, Inc. et al.*, 346 U.S. 356, 357 (1953). Once again, like in *Federal*, the decision centered on the league, league rules, and the game itself. *Id.*

More recently, in *Flood v. Kuhn*, 407 U.S. 258 (1972), the Supreme Court determined, primarily on principles of *stare decisis* and congressional inaction, that *Federal* continued to be good law with respect to major league baseball's reserve system, which permitted the league to approve or veto player trades. *Id.* at 284-85. The Court noted recognition of the "chaotic" conditions which prevailed in professional baseball when there was no reserve system. *Id.* at 272. However, the *Flood* court also held that professional baseball *was* engaged in interstate commerce, that *the reserve system* enjoys exemption from federal antitrust laws, this is an "exception and an anomaly," and *Federal* and *Toolson* have become an "aberration confined to baseball." *Id.* at 282.

After *Flood*, the Seventh Circuit decided *Charles O. Kinney & Co., Inc. v. Kuhn*, 569 F.2d 527 (7th Cir. 1978). In that case, the court held that the Major League Baseball Commissioner's decision to void certain trades was within his power under the league's exemption from the Sherman Act. *Id.* at 541. Once again, the baseball exception was merely applied to the league, and to league rules.

At least one court has questioned whether *Flood* limited the baseball exemption solely to the reserve clause, holding that the exemption was at least slightly more expansive. *City of San Jose v. Office of the Commissioner of Baseball*, 2015 WL 178358 (9th Cir. January 15, 2015). In *San Jose*, the plaintiff challenged the league's refusal to allow a team to relocate to another city. *Id.* at 3-4. Citing its own earlier decision in *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101

4

(9th Cir. 1974), the court rejected an interpretation of *Flood* that limited the baseball exemption solely to the reserve clause. *Id.* at 1103. Instead, the court focused on *Federal*, and later *Toolson*, which applied the exemption to the "business of providing public baseball games for profit between clubs of professional baseball players." *San Jose*, 2015 WL 178358 at *8. The court reasoned,

> The designation of franchises to particular geographic territories is the league's basic organizing principle. Limitations on franchise relocation are designed to ensure access to baseball games for a broad range of markets and to safeguard the profitability– and thus viability– of each ball club. Interfering with franchise relocation rules therefore indisputably interferes with the public exhibition of professional baseball.

*Id.* The *San Jose* court also stated, however, "That doesn't necessarily mean all antitrust suits that touch on the baseball industry are barred," referring to *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975), allowing an antitrust claim between a team and its stadium concessionaires to proceed *Id.* at 9. Regardless, even *San Jose* merely involved a *league policy*, not the conduct of an individual team franchise. Moreover, league restrictions on moving an entire team is conceptually similar to the reserve system governing the moves of individual players, but unlike what happens across the street from a stadium.

Indeed, when asked to apply the baseball exemption to individual teams or incidental activities, courts have decidedly refused. For example, in *Henderson Broadcasting v. Houston Sports Assn.*, 541 F. Supp. 263 (S.D. Tex. 1982), the plaintiff-radio station had a contract with the owner of the Houston Astros, the Houston Sports Association ("HSA"), to radio broadcast Houston Astros baseball games. *Id.* at 264. HSA also contracted with a rival radio station at the time. *Id.* The plaintiff sued the team, alleging a conspiracy to eliminate competition for advertising revenue and audiences in an attempt to "impose horizontal restraints on that radio

market." *Id.* In denying the team's motion to dismiss, the court held that the baseball exemption did not apply because radio broadcasts were not central to the "unique characteristics and needs of the game (of baseball)," which the baseball exemption was created to protect, and that radio broadcasting was "distinct and separate" from the game itself. *Id* at 271.

Similarly, in *Postema v. National League* of *Prof. Baseball Clubs*, an umpire sued the American and National Leagues (major league baseball divisions), and their minor league counterpart, alleging that they were engaged in anti-competitive restraint-of-trade practices. 799 F. Supp. 1475, 1486-87 (S.D.N.Y. 1992), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993). Specifically, a female umpire was denied promotion and eventually terminated by Major League Baseball, allegedly because of her gender. *Id.* at 1478-80. The plaintiff alleged, *inter alia*, that the American and National Leagues, and their minor-league counterpart, were engaged in anti-competitive practices, and filed a restraint of trade claim which defendants moved to dismiss under the baseball exemption. *Id* at 1486.

Observing that *Flood* limited the scope of the exemption to the "unique characteristics and needs" of baseball, the court in *Postema* held that the defendants could not avail themselves of the exemption because the league's relationship with its umpires was too remote to those unique characteristics and needs of the game. *Id* at 1489. The court further held that, unlike league structure or the reserve system, "[B]aseball's relations with non-players are not a unique characteristic or need of the game," and "Anti-competitive conduct towards umpires is not an essential part of baseball and in no way enhances its vitality or viability." *Id*. Similarly here, baseball does not *need* video boards or jumbotrons to survive. And the Defendants' relationship with the Plaintiffs, non-players, are not a unique characteristic or need either.

Here, much like in *Henderson* with radio broadcasting, the viewing of a baseball game is entirely incidental to the game on the field, which is what the baseball exemption narrowly protects from antitrust scrutiny. In this case, the viewing of a baseball game from across the street does not affect the product on the field, and thus it is incidental commerce not subject to the baseball exemption. Without a doubt, Cubs games can be played regardless of whether there are signs or Rooftop Businesses. And surely, if the league's relationship with its umpires, who actively participate in the game on the field calling balls and strikes, is not protected by the baseball exemption as in *Posterma*, then a single team's (or its landlord's) relationship with downstream sellers of tickets and neighboring property owners is even more remote. The audience's perception of a baseball game is incidental to the exhibition itself, and antitrust exemptions do not extend to the tangential commerce arising therefrom. As recognized by *Federal*, "Nothing is transferred in the process [the game] to those who patronize [watch] it." 269 F. at 684-85. So saying that spectators "need" to see video boards is inapposite as well.

Furthermore, in a blatant attempt to mischaracterize and ignore the realities of the baseball exemption, the Cubs completely fail to recognize that one of the defendants in this case, Wrigley Field Holdings, LLC, is not even engaged in the "business of organized baseball," but rather it is in the business of owning and renting property to a baseball team. Wrigley Field Holdings, LLC is not a member or affiliate of Major League Baseball or any other professional baseball organization, and thus it surely cannot avail itself of the protections of the baseball exemption.

The providing of facilities for rent, regardless of use, is not the "business of organized baseball." The commerce surrounding baseball is incidental to baseball, and it is the "personal effort not related to production" that is exempted from antitrust legislation. *Federal*, 259 U.S. at

209.     Collecting rents from an organization desiring to use the playing field is, at most, commerce merely incidental to baseball as contemplated by Justice Holmes.  Starting nearly every October, when other teams head to the playoffs, Wrigley Field suddenly becomes available for a multitude of other events, including football games, hockey games, soccer matches and concerts, none of which are even related to the game of baseball, but all of which assuredly provide revenue to the owner of Wrigley Field.  Such activities even occur before the Cubs lose a playoff spot.  For example, during the summer of 2015, musical groups including the Foo Fighters, Billy Joel, and AC/DC, are all scheduled to perform at Wrigley Field.  Unless a game is taking place at the same time, this is certainly not the business of baseball.  The baseball exemption does not apply to the Cubs in this case, nor to its affiliates.

## IV.     There is a Plausible Relevant Market for Plaintiffs' Sherman Act Claims

It is patently untrue that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).  To the contrary, the Supreme Court stated, ōWe disagree.  The relevant market for antitrust purposes is determined by the choices available [to consumers].ö *Id.* According to the Court in *Kodak*, a proper market definition ōí  can be determined only after a factual inquiry into the ÷commercial realitiesø faced by consumers.ö *Id.* at 482.  In making such a determination, ōthe market is composed of products that have reasonable interchangeability.ö *Id.*, citing *United States v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377 (1956).

The concept of market determination, and more significantly submarkets, was most fully explained by the Supreme Court in *Brown Shoe v. United States*, 370 U.S. 294 (1962).  In *Brown Shoe*, the Court expanded upon *E.I. du Pont*, stating,

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand

> between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.
>
> The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Id.* at 325.

Discussing the submarket concept established by *Brown Shoe*, and more specifically in the narrower context of single-brand markets, the court in *In re Apple & AT&T Antitrust Litigation* explained, "ō an antitrust plaintiff may allege a submarket, which must be economically distinct from the general product market. Relatedly, a cognizable antitrust claim can be based on allegations of a relevant market containing only a single brand of the product at issue.ö 596 F. Supp. 2d 1288, 1302 (N.D. Cal. 2008). See also *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1048 (9th Cir. 2008). (ōFirst, the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue.ö).

In *Times-Piscayne Pub. Co. v. United States*, the Supreme Court stated in a frequently-quoted footnote,

> For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small. Useful to that determination is, among other things, the trade's own characterization of the products involved. The advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media.

345 U.S. 594, fn. 31 (1953). For antitrust purposes, product "cross-elasticity" and "interchangeability" have the same meaning. *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1065 (D. Colo. 2012).

Furthermore, "The emphasis is always on the actual dynamics of the market rather than rote application of any formula." *Geneva Pharma. v. Barr Labs, Inc.*, 386 F.3d 485,496 (2nd Cir. 2004). In *Geneva Pharma*, for example, the appellate court determined, in reliance on the *Brown Shoe* factors, that generic warfarin sodium was a distinct product from name-brand warfarin sodium, called Coumadin. *Id.* at 496. Of particular importance in this determination was the fact that the generics were 70% less expensive than Coumadin, and yet a substantial number of customers remained loyal to name-brand Coumadin after the generic was made available. *Id.* at 496-97. The appellate court stated, "That this group has remained loyal despite Coumadin's conspicuously higher prices strongly suggests inelastic demand." *Id.* at 497. The court expanded,

> Here we find a substantial gap in pricing indicative of separate markets. Nor do we treat pricing as dispositive, but rather use pricing trends as one indicator of the impact each market participant has on overall price and output… Customers that have remained with Coumadin clearly do not perceive generics to be a reasonable substitute for it.

*Id.*

Submarkets were also considered by the Seventh Circuit in *Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303 (7th Cir. 1976). Relying on *Brown Shoe*, the court in *Beatrice* stated, "The mere fact that several products are limited substitutes for one another and thus form a broad product market is not dispositive of whether they form a relevant product market for antitrust purposes." *Id.* at 308-09. (Concluding that while aerosol paint and spray painting equipment were

10

interchangeable with brushes and rollers for some uses, they could also form distinct submarkets for purposes of the antitrust laws).

Also relying on *Brown Shoe*, the Seventh Circuit again recognized submarkets in *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1978). In *Sargent-Welch*, the court explained, "The area of effective competition may be a small submarket supplying specialized products or services." *Id.* at 710. Furthermore, "if the goal is to delineate markets which conform to areas of effective competition and to the realities of competitive practice." *Id.* In making this determination of submarkets, the *Sargent-Welch* court first cited the criteria identified above as announced by *Brown Shoe*, and furthered, "a market definition which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Sargent-Welch*, 567 F.2d at 710. ("Yet the unmistakable imprint of the evidence is that competition was not significant.") See also *L.G. Balfour Co. v. F.T.C.*, 442 F.2d 1 (7th Cir. 1971) ("We agree with the court in United States v. Bethlehem Steel Corp., 168 F. Supp. 576 (S.D.N.Y. 1958), that any test which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.")

The supply side of the market is, of course, also a factor. "Substitutability in production refers to the ability of firms in a given line of commerce to turn their productive facilities toward the production of commodities in another line because of similarities in technology between them." *A & A Disposal and Recycling, Inc. v. Browning-Ferris Indus. of Ill., Inc.*, 664 N.E.2d 351 (Ill. App. 2nd Dist. 1996) (applying federal antitrust precedent). In *A & A Disposal*, the court concluded that commercial garbage collection was reasonably interchangeable with residential garbage collection because the same equipment, personnel and companies handled both types. *Id.* at 354-55.

11

Many other cases have found separate, or submarkets, where there were even somewhat interchangeable products. For example, in *Rohm and Haas Co. v. Dawson Chem. Co., Inc.*, the court found that the rice herbicide product, propanil, was a separate market from other rice herbicides, despite the fact that the other rice herbicides "performed the same function as propanil." 557 F. Supp. 739, 839 (S.D. Tex. 1983). It made such a finding because there were differences relating to the timing of the application, cultural practices, and the effectiveness of each. *Id.* "Despite the presence of these other herbicides in the market place, propanil remains the herbicide of choice of rice farmers, and no other herbicide has supplanted propanil. Consequently, the Court is of the opinion that no herbicidal substitutes exist which are reasonably interchangeable with propanil." *Id.* (The court found that there was some, but not enough cross-elasticity between propanil and other herbicides to expand the product market definition to all rice herbicides.) *Id.* at 839.

It is readily apparent that the determination of the marketplace, and of submarkets within larger marketplaces, turns on the application of the *Brown Shoe* factors to the facts of a particular case. According to then-Circuit Judge Sotomayor, in reversing a trial court's dismissal of an antitrust complaint, "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2nd Cir. 2001). "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a ̶rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Id.* at 200. See also *Christou*, 849 F. Supp. 2d at 1066 (same); *Int'l Equip. Trading, Ltd. v. Ab Sciex, LLC,* 2013 WL 4599903, at *6 (N.D. Ill. Aug. 29, 2013) (same). Cross-elasticity of demand, according to the *Todd* court, "̶ exists if

consumers would respond to a slight increase in the price of one product by switching to another product.ö 275 F.3d at 202.

Since determination of a market or submarket is a deeply fact-intensive inquiry, an antitrust complaint should not be dismissed if a plaintiff alleges enough factual matter, taken as true, which nudges their claim across the line from conceivable to plausible. *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014). The Complaint in this case contains substantial, detailed and well-pleaded facts which, if true, satisfy all the *Brown Shoe* elements to establish a relevant product market or submarket. The Complaint alleges the following market facts:

<u>COUNT I</u>

116.  The relevant market in this Count I is the market for watching Live Cubs Games, which consists of consumers who pay money to watch live-action Cubs Games, in person, as the games take place on the field at Wrigley Field.

117.  For each Live Cubs Game event, there are a total of 44,160 tickets available. The Cubs Organization can sell up to 41,960 Live Cubs Games tickets at retail per event, and the Competitor Rooftops can sell up to 2,200 Live Cubs Games tickets at retail per event.

118.  The Cubs therefore have over 93% of the market for retail sales of the Live Cubs Games Product, which constitutes a monopoly share of the market for the Live Cubs Games Product.

119.  There are no reasonable substitutes for the Live Cubs Games Product. The Cubs Television Product involves a limited number of cameras which typically focus on limited aspects of a Cubs Game, such as the pitcher, the batter, and the play of the baseball. Consumers of the Cubs Television Product have no ability to see other action on the field at any given moment, such as infield and outfield player positioning, coaching signals, or bullpen activity. The Cubs Radio Product offers an even less reasonable substitute for the Live Cubs Games Product, as literally nothing can be viewed on a radio and consumers of the Cubs Radio Product have no input on what the announcer describes.

120.  Attendance at other live sporting events is also not a reasonable substitute for the Live Cubs Games Product, and thus tickets to other events are not reasonably interchangeable with tickets for the Live Cubs Games Product. In professional

sports, members of the consumer public are generally fans of a specific team, often based on their geographic location or upbringing, and thus when they want to see a live Cubs game, they are unlikely to patronize another team's live games, especially those of bitter rivals such as the Chicago White Sox, even if those other teams' tickets are much less expensive.

121. Geographically, the market for the Live Cubs Games Product consists of just Wrigley Field and the sixteen total Rooftop Businesses located on the 3600 block of North Sheffield Avenue and on the 1000 block of West Waveland Avenue, all in Chicago, Illinois.

122. There are significant barriers to any newcomers attempting to join in the retail market for the Live Cubs Games Product. To begin with, nobody else can sell tickets inside Wrigley Field, which has a limited capacity. Furthermore, there are only three parcels on Sheffield Avenue and Waveland Avenue which presently do not have Rooftop Businesses, none of which are well-suited to possess a Rooftop Business.

123. Other significant barriers to any retail newcomers to the Live Cubs Games Product market are: (i) the difficult and complex permitting process with the City, (ii) the extremely high cost of construction versus return-on-investment, (iii) the refusal of the Cubs Organization to enter into new rooftop license agreements with any new competitors, and (iv) the ongoing construction by the Cubs Organization which threatens to install signage which will effectively block any newcomer's views into Wrigley Field.

124. Despite the Cubs Organization's 93% monopoly share of the Live Cubs Games Product, the Rooftop Businesses have partially challenged the ability of the Cubs Organization to charge monopoly prices for the Live Cubs Games Product tickets, as there is sometimes capacity in excess of demand for the Live Cubs Games Product.

125. The Cubs Organization has acknowledged that the Competitor Rooftops are its direct competitors in the Live Cubs Games Product market, and that the Competitor Rooftops do challenge the Cubs Organization's ability to increase prices for the Live Cubs Games Product.

126. The Cubs Organization has repeatedly complained that the Competitor Rooftops have been successful in challenging ticket prices for the Live Cubs Game Product.

131. Elimination of the Competitor Rooftops will further diminish the competition in the Live Cubs Games Product market by reducing the total number of Live Cubs Game Product tickets that are available per event, increasing the Cubs Organization's total market share, and permitting the Cubs Organization to increase the prices it charges consumers in the Live Cubs Game Product market.

133.    If unchecked, the Cubs Organization's anticompetitive conduct will adversely
        affect consumers by reducing competition in the Live Cubs Games Product
        market, reduce choice among consumers from whom they purchase the Live Cubs
        Games Product, and lead to increased prices for the Live Cubs Games Product.

<u>COUNT II</u>

152.    There is another market, the watching of live Cubs Games as they take place from
        the Rooftop Businesses (the "Live Rooftop Games Product"). But unlike the
        Cubs Radio Product and the Cubs Television Product, which are only sold by the
        Cubs Organization at the distributor level to retailers who then sell those products
        to consumers, the Cubs Organization sells the Live Rooftop Games Product both
        at the distributor level and also at the retail level.

153.    Specifically, the Cubs Organization sells up to 800 Live Rooftop Games Product
        tickets, per event, at retail directly to consumers at the Rooftop Businesses it owns
        (the "Cubs Rooftops"). The Cubs Organization also sells up to 2,200 Live
        Rooftops Games Product tickets, per event, at the distributor level to twelve
        competitor Rooftop Businesses who then compete with the Cubs Organization
        (the "Competitor Rooftops") at the retail level for consumers of the Live Rooftops
        Games Product.

154.    Consequently, the Cubs Organization is a vertically integrated enterprise which
        manufactures the Live Rooftop Games Product, distributes the Live Rooftops
        Games Product to Competitor Rooftop retailers, and also sells the Live Rooftop
        Games Product at the retail level with tickets to Cubs Rooftops in direct
        competition with Competitor Rooftops.

155.    The Cubs Organization, through its Cubs Rooftops, and the 12 unaffiliated
        Competitor Rooftops, are direct competitors in the sale of the Live Rooftop
        Games Product, at the retail level, to Live Rooftop Games Product consumers.

156.    The Wrigley Tickets Product is not reasonably interchangeable with the Live
        Rooftop Games Product.

157.    The relevant market in this Count II is the market for the Live Rooftop Games
        Product, which consists of individuals and groups of consumers who pay money
        to watch live-action Cubs Games from Rooftop Businesses, in person, as the
        games take place on the field at Wrigley Field.

158.    There are no reasonable substitutes for the Live Rooftop Games Product. The
        Cubs Television Product involves a limited number of cameras which typically
        focus on limited aspects of a Cubs Game, such as the pitcher, the batter, and the
        play of the baseball. Consumers of the Cubs Television Product have no ability to
        see other action on the field at any given moment, such as infield and outfield
        player positioning, coaching signals, or bullpen activity. The Cubs Radio Product

offers an even less reasonable substitute for the Live Rooftop Games Product, as literally nothing can be viewed on a radio and consumers have no input on what the announcer describes.

159.    Tickets to Live Rooftop Games are also not reasonably interchangeable with tickets to watch live action baseball from inside Wrigley Field. In addition to offering a different vantage point from which to view a live Cubs game, the Live Rooftop Games Product typically includes an all-you-can-eat and all-you-can-drink menu, for a flat fee, which has not historically been available from inside Wrigley Field.

160.    The Live Rooftop Games Product is also not reasonably interchangeable with tickets to watch live action baseball from within Wrigley Field because many of the Rooftop Businesses offer an interior lounge-like atmosphere for private groups of hundreds of people, along with numerous flat-screen televisions showing the baseball action, which is not available inside Wrigley Field.

161.    There are very few retailers of the Live Rooftop Games Product – only the four Cubs Rooftops and the twelve Competitor Rooftops. Geographically, the market for Live Rooftop Games consists of just the 3600 block of North Sheffield Avenue, and the 1000 block of West Waveland Avenue, in Chicago, Illinois.

162.    There are only 3,000 tickets for the Live Rooftop Games Product available for each Cubs game. Of this total, and as of January 6, 2015, the Cubs Organization, through the Cubs Rooftops, controls 800 tickets, and the Competitor Rooftops control 2,200 tickets. The Cubs Organization thus controls 26.6% of the Live Rooftop Games Product market.

163.    Prior to January 6, 2015, the Cubs Organization only owned one Rooftop Business, and therefore only controlled 6.6% of the market for the Live Rooftops Games Product.

164.    There are significant barriers to any newcomers attempting to join in the market for the Live Rooftop Games Product. There are only three parcels on Sheffield Avenue and Waveland Avenue which presently do not have Rooftop Businesses, none of which are well-suited to possess a Rooftop Businesses.

165.    Other significant barriers to any retail newcomers to the Live Rooftop Games market are: (i) the difficult and complex permitting process with the City, (ii) the extremely high cost of construction versus return-on-investment, (iii) the indication that the Cubs Organization will not enter into new rooftop license agreements with any new competitors, and (iv) the ongoing construction by the Cubs Organization which threatens to install signage which would effectively block any newcomer's views into Wrigley Field.

169.    Elimination of the Competitor Rooftops will diminish the competition in the Live Rooftops Games Product market by reducing the total number of Live Rooftops Games Product tickets that are available per event, increasing the Cubs Organization's total market share in the Live Rooftops Games market, and permitting the Cubs Organization to increase the prices it charges consumers in the Live Rooftops Game Product market.

170.    If the new outfield signage is installed, there is a dangerous likelihood that the Cubs Organization will succeed on its attempt to monopolize the Live Rooftops Games Product market. Eliminating the Plaintiff Rooftop Businesses alone will result in 400 fewer retail tickets for the Live Cubs Games Product, per event, and increase the Cubs Rooftops' market share in the Live Rooftops Games Product market to 30.7%.

171.    Furthermore, the Cubs Organization's anticompetitive conduct was aimed squarely at, and had a dangerous probability of successfully, eliminating all Competitor Rooftops and thereby result in the Cubs Organization obtaining 100% of the market for the Live Rooftops Games Product market.

172.    If unchecked, the Cubs Organization's anticompetitive conduct will adversely affect consumers by reducing competition in the Live Rooftops Games Product market, reduce choice among consumers from whom they purchase the Live Rooftops Games Product, and lead to increased prices for the Live Rooftops Games Product.

The *Brown Shoe* elements of: (i) distinct customers, (ii) distinct prices, (iii) sensitivity to price changes, and (iv) public recognition, all support a distinct product markets as separate economic entities. Many of these factors are supported by easily proven facts. In 2014, the Cubs had an average home-game attendance of 32,742 fans. Exhibit 1. Also in 2014, the Cubs' average ticket price was $44.16, and their average premium ticket price was $110.49. Exhibit 2. At the same time, the Chicago White Sox averaged just 20,896 fans for their home games in 2014. Exhibit 1. During 2014, the average ticket price for a Chicago White Sox ticket was just 26.05, and their average premium ticket price was just $86.94. Exhibit 2.

Unquestionably, sports fans in Chicago are extremely brand-loyal. Based upon empirical evidence, Cubs fans will not attend a White Sox game despite an average ticket price costing 59% more than a White Sox game. Notably, this phenomenon occurs in other large cities with

two professional major league baseball teams. For example, the New York Yankees had an average ticket price of $51.55 in 2014, with an average premium ticket price of $305.39. Exhibit 1. The New York Mets had an average ticket price of just $25.30 and an average premium ticket price of $83.78 during this same time. However, the Yankees managed to sell an average of 42,520 tickets per home game, while the Mets only sold 26,860 tickets per home game. Exhibit 1. Just like in Chicago, empirical evidence reflects that major league baseball fans are extremely team-loyal, and will not attend another team's baseball game, even in the same city, despite a nearly 50% difference in prices. *Geneva Pharma* is directly on point and supportive of a distinct market based on these factors. The Defendants' suggestion that its fans would rather go to a White Sox game to save money is false, and at best a question of fact.

Cross-elasticity of demand, "í exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Todd*, 275 F.3d at 202. There is no cross-elasticity of demand between Cubs and White Sox tickets, arguably the next closest thing. Empirical data supports the conclusion that the Cubs have distinct customers, distinct prices, public recognition of the distinct product, and that their customers do not attend supposed competitor's events to save money, even with substantial price differences.

Furthermore, there are myriad examples of the major league baseball industry recognizing separate markets. For example, there are blackout policies which prohibit teams from broadcasting their games in certain markets. Additionally, the Major League Constitution establishes distinct operating territories and prohibits other teams from entering those territories. Exhibit 3.

Turning to another *Brown Shoe* element, viewing live Cubs games has a peculiar characteristic and use. The Complaint contains well-pled allegations demonstrating that fans

cannot see all the live, on-field action through any medium other than attending a live Cubs game at Wrigley Field or the Rooftop Businesses. With a limited number of cameras, only one of which is active at any given moment, television viewers and radio listeners cannot see what is taking place throughout the playing field, such as coaching signals or player positioning. They also cannot tell a television station which camera to activate at a particular moment, so they cannot decide what part of the game they want to watch – they are usually stuck with the pitcher or batter. The product markets may be similar, but they are, at most, submarkets of a larger one.

There are also *Brown Shoe* unique production facilities, in this case Wrigley Field and the surrounding area, including the Rooftop Businesses. One need not look any further than the fact that Wrigley Field has been landmarked, and a significant component of that landmark status is the "uninterrupted sweep" looking out over the walls and into the neighborhood – at the Rooftop Businesses. It is not possible to enjoy these elements of the live event market by watching television or listening to the radio, and these unique elements cannot be enjoyed at a White Sox game or any other sporting event.

Finally, in considering whether a plaintiff has stated a plausible claim for purposes of a motion to dismiss, courts should draw upon their experience and common sense. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). The plaintiffs submit that this Court's common sense and experience as a member of the Chicagoland community should support the notion that the Cubs have a dedicated and loyal fan base, that Cubs fans and White Sox fans are bitter rivals, and that Cubs fans will not flock to U.S. Cellular field to save a few bucks, not even to save 50% of their ticket dollars. Moreover, the Cubs have managed to become the fourth most valuable team in baseball, with the highest operating income of any major league team. Exhibit 4.

Each and every one of the *Brown Shoe* factors strongly support the conclusion that there is a distinct Live Cubs Games product market. Whether that market is characterized as a "submarket" of all major league baseball games, or a "submarket" of all live sporting events in the Chicago metropolitan area, versus its own primary market, is not significant at this stage and can be determined with the aid of discovery and experts. What is significant is that the live event market has industry and public recognition as a separate economic entity, the product has peculiar characteristics and uses, it has unique production facilities, distinct customers, distinct prices, there is no sensitivity to price changes in comparison with other teams or events, and certainly specialized vendors – just the Cubs and the Rooftop Businesses. This is all well-pled plausibility.

The Cubs rely on *House of Brides*, *Int'l Trading*, *Siemer*, *Flynn* and *Rohlfing*, for the sweeping proposition that courts "routinely dismiss" single-brand antitrust cases. [Doc. 30, p. 5.] But the Cubs also admit that each of those cases were dismissed because the plaintiffs did not provide enough factual support to make it plausible that there was no substitute product. That is far from the case here.

In *House of Brides*, the plaintiff tried to establish that one designer's brand of wedding gowns was a separate market from other designers' gowns. 2014 WL 64657, *5 (N.D. Ill. Jan. 8, 2014). But that plaintiff merely offered a conclusory allegation that many customers would only buy the "AA" brand, regardless of price. *Id.* at *6. Not surprisingly, the trial court dismissed that case because there were no back-up factual allegations, just conclusions. *Id.* at *7. More significantly, the trial court had given the plaintiff an opportunity to amend its complaint, and even the amended complaint lacked more factual substance on substitutability. *Id.* at *11.

The Complaint in this case is nothing like the original or amended complaint in *House of Brides*. Here, the Plaintiffs have submitted facts with respect to why live Cubs games differ from television and radio, and also that sports fans are highly brand loyal and will not attend other events. This takes the Plaintiffs' claims from merely conceivable to highly plausible. Furthermore, notice pleading does not require the Plaintiffs to supply all of their evidence in their Complaint. However, if the Court found it necessary for the Plaintiffs to amend their Complaint in order to supply more facts on substitutability, the information set forth above concerning ticket pricing, attendance levels, consumer and industry recognition, would all support a highly plausible, relevant market.

The Cubs' reliance on *Int'l Equip. Trading, Ltd. v. Ab Sciex LLC*, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013), is also misplaced. In that case, the plaintiff attempted to exclude competitors from its market definition, but admitted in its complaint that there were competitive alternatives to the product in question and that customers actually bought from competitors. *Id.* at *4. This Court stated, "There is no dispute that a relevant market can be limited to a single brand; rather, the question is whether the plaintiff adequately alleged that there are no interchangeable substitutes to that single brand." *Id.* at *4. Just because one plaintiff does not sufficiently allege something in one case does not mean the Plaintiffs did not here.

*Siemer v. Quiznos Franchise Company LLC* likewise offers no help to the Cubs' argument. 2008 WL 904874 (N.D. Ill. Mar. 31, 2008). In that case, the court found that the plaintiffs, Quiznos franchisee-operators, could have simply selected to be a pizza or other fast food franchisee-operator if they did not like the terms of their supply agreement with Quiznos. *Id.* at *10-11. The relevant market in that case was consequently the market for becoming a fast

food operator, not the market for Quiznos franchisee-operators to buy their supplies solely from Quiznos pursuant to contract. *Id.* No logical relationship to *Siemer* exists here.

*Flynn v. Philip Morris USA, Inc.* is even easier to distinguish. 2006 WL 211823 (N.D. Ill. Jan. 19, 2006). In *Flynn*, the plaintiff installed cigarette displays, and attempted to establish a market that only included him. *Id.* at *1, 5. The trial court had an obvious problem with this proposal, in the absence of any facts to show why nobody else could possibly provide that service in Florida. *Id.* at *5. And in *Rohlfing v. Manor Care, Inc.*, the court simply concluded that if a nursing home resident did not like their nursing home's sales of pharmaceuticals, the residents could simply have chosen to live in a different nursing home in the area, all of which were reasonably interchangeable. 172 F.R.D. 330, 346-47 (N.D. Ill. 1997). Simply none of these cases support the proposition that an antitrust complaint should be dismissed where there is a plausible single-brand market theory.

This case is also nothing like *Global Disc. Trav. Svcs., LLC v. T.W.A., Inc.*, 960 F. Supp. 701 (S.D.N.Y. 1997). In that case, the plaintiff wanted to establish a single-brand market, airplane tickets on a particular airline between particular cities. *Id.* at 701, 705. The court focused on the rule of interchangeability, concluding that the market needed to include all airlines that offered tickets between the same cities. *Id.* at 704-05. At its base, the court found that the purpose of an airline ticket was to get a consumer from point A to point B. *Id.* Those consumers might prefer one airline over another, but the products provided the same service. *Id.* at 705-06.

The decision in *Global* is readily distinguishable. The very purpose of an airline ticket is travel from A to B. In other words, people do not fly for the sake of flying. People do not wake up and decide that their entertainment for the day will be a flight on T.W.A. because they like the

pillows, the views, or the airplane food. People fly to get from A to B, and that function is provided by many interchangeable airlines. This is entirely unlike Cubs games, where people desire to watch a Cubs game for the sake of seeing the Cubs play. They do not go watch a Cubs game because they need to perform some utility. The Cubs' notion, on page 7 of their Motion to Dismiss, that their fans will go see a minor league baseball game to satisfy their appetite for baseball, instead of going to a Cubs game, is laughable. It is also insulting to their dedicated fans who have gone over 100 years without a World Series title, still flocking in droves to shell out big bucks to catch a Cubs game and making the Cubs the most valuable and profitable team in baseball despite abysmal performance. To accept the Cubs' argument would be to accept that Cubs baseball is entirely fungible with all other sporting events, including White Sox baseball – a conclusion that defies history and tradition, as well as demonstrable attendance and ticket price statistics. There is an abundance of plausible facts to establish a market here, and one highly questions whether the Cubs would even attempt to make such an argument at trial in light of the damage they would cause to their loyal fan base.

## V.     The Cubs Attempted to Reach an Unlawful Section 1 Result

Section 2 of the Sherman Act prohibits attempts to reach the ends outlawed by section 1 of the Act. *Lorain Journal Co. v. United States*, 342 U.S. 143, 153-54 (1951). The Cubs appear to be arguing that, regardless of whether they engaged in the conduct Plaintiffs allege, and assuming a relevant market exists, their success would not constitute a violation of section 1.[2] Therefore, an exploration of section 1 is required. Read literally, section 1 states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.

---

[2] For section 2 attempt cases, it is the attempt that is the offense, even if unsuccessful. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270-71 (7th Cir. 1982)

§ 1. But, "Since the early years of this century a judicial gloss on this statutory language has established the ‑rule of reason" as the prevailing standard of analysis." *Continental Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

In *Board of Trade of City of Chicago v. United States*, the Court stated the rule of reason as follows:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. 231, at 238 (1918). As explained in *Continental*, "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.*

The Cubs argue that they should be shielded from antitrust liability because the sought-after results were: (i) to take over the distribution of their product, or in other words, vertically integrate; and (ii) to select who they do business with or refuse to do business with, and refrain from aiding their competitors. [Doc. 30, pp. 8-12.] These sweeping generalities, and the cases cited by the Cubs attempting to support same, are replete with exceptions which give rise to antitrust liability under the facts in this case. And while the Cubs selectively provide a few good-sounding case law quotes, they omit the "however" from those cases, as well as the facts and reasoning behind those quotes, while at the same time ignoring the more significant, more

on-point cases (usually from higher courts) which establish that their goals are anticompetitive and actionable.

A. <u>Vertical Integration Is A Basis For Antitrust Liability</u>

In *Continental* the Supreme Court specifically held that the rule of reason applied to vertical restriction cases. 433 U.S. at 58. ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act.") So the Cubs are patently mistaken in claiming that vertical restrictions cannot form a basis for antitrust liability.[3]

Indeed, many cases recognize the potential evils of vertical integration for antitrust purposes. For example, the Supreme Court found a Sherman Act violation under a vertical integration theory in *United States v. Paramount Pictures, Inc. et al*, 334 U.S. 131 (1948). In *Paramount*, the Court stated,

> In the opinion of the majority the legality of vertical integration under the Sherman Act turns on (1) the purpose or intent with which it was conceived, and (2) the power it creates and the attendant purpose or intent. First, it runs afoul of the Sherman Act if it was a calculated scheme to gain control over an appreciable segment of the market and to restrain or suppress competition, rather than an expansion to meet legitimate business needs.

*Id.* at 174. The Court also stated, "Likewise bearing on the question of whether monopoly power is created by the vertical integration, is the nature of the market to be served, and the leverage on the market which the particular vertical integration creates or makes possible." *Id.* The decision

---

[3] Also dismissive of the Cubs' argument that vertical integration is "never" an antitrust violation, it is noteworthy that vertical integration was actually a *per se* violation of the Sherman Act for a decade, beginning with the Supreme Court's decision in *United States v. Arnold, Schwinn, & Co.*, 388 U.S. 365 (1967). It was not until *Continental* that the Court returned to the rule of reason for vertical integration cases and instructed courts to look to pre-*Schwinn* cases for guidance. *Continental*, 433 U.S. at 59.

in *Paramount* has been cited without negative treatment by the Seventh Circuit. See *Grengs v. Twentieth Century Fox Film Corp.*, 232 F.2d 325 (7th Cir. 1956). Furthermore, vertical integration was likewise recognized as a viable theory in *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir. 1984), a case the Cubs rely on for the opposite conclusion.

The Cubs cite several cases in which vertical integration was rejected as a plausible basis for antitrust liability, but such rejection was only because of the facts of those cases, and not a blanket rejection of the theory itself. In fact, an analysis of those very cases cited by the Cubs actually reveal why this case involves a strong vertical integration theory. For example, in *Jack Walters*, the Seventh Circuit plainly explained that vertical integration is *usually* not an improper objective, because it is *usually* procompetitive. *Id.* at 710. The court identified a number of pro-competitive factors commonly associated with vertical integration, such as: cost savings when a company performs for itself what it used to pay others to perform, and placing pressure on former service providers to be more competitive for the costs of their. *Id.* On the other hand, the *Jack Walters* court also noted that there are some concerns about monopolistic firms which might vertically integrate in order to deny supplies or outlets to competitors. *Id.* The court only rejected the vertical integration theory in that case, because õí nothing of that kind is suggested here.ö *Id.* at 711.

A highly informative analysis of the pros and cons of vertical integration was performed in *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir. 1979). That court explained,

> In theory, a monopolist will only take over lower level operations if it is at least as efficient as the lower-level firm. In other words, a monopolist will only vertically integrate if it can do the job cheaper than having someone else do it. If the lower level firm, (i.e. a distributor) is more efficient, it should be able to sell more and thus increase the monopolist-manufacturerøs sales.
> í .

26

> And to the extent that economies of scale result from the vertical integration, then the consumer will benefit. The monopolist will reap more profit, but the optimal monopoly price to the consumer will be lower.

*Id.* at 861. The court in *Byars* then cautioned, "There are situations, however, where a refusal to deal as part of a vertical integration scheme is anticompetitive." *Id.* It is for the district judge, as fact finder [it was a bench trial case], to analyze the evidence and make a determination whether [the defendant's] cut-off of [the plaintiff] was justifiable on efficiency grounds." *Id.* at 862.

This exact same reason, but under different facts, supported the trial court's dismissal of the plaintiff's case in *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, 1992 WL 111133 (N.D. Ill. May 12, 1992). There, the court stated, "A refusal to deal only becomes unreasonable when it produces an unreasonable restraint on trade." *Id.* at *3. "Plaintiff has not alleged that Creative's conduct will have an unreasonable restraint on trade." *Id.* "Vertical integration is *usually* pro-competitive rather than anticompetitive." *Id.* (emphasis added).

The Plaintiffs in this case, unlike the plaintiffs in *Jack Walters* and *Institutional Foods*, do allege many facts showing that the Cubs' conduct will have an unreasonable restraint on trade, and that the conduct is anticompetitive, not procompetitive. Specifically, the Plaintiffs allege that the Cubs are trying to reduce (through acquisition or elimination) competition in the downstream market, for the purpose of raising prices and reducing the number of alternative sellers for consumers to choose from. The Cubs are not trying to increase efficiency and lower costs in order to sell more products by lowering their end prices, they want the opposite. They already admitted they cannot compete with the Rooftop Businesses' margins – the Cubs cannot compete on a level playing field with the Rooftops. The Cubs needed to resort to more illicit conduct to achieve their improper ends. These are well-pled facts which rise to the level of

plausible – something the plaintiffs failed to achieve in the cases cited by the Cubs, and like in *Bryer*, it should be up to a finder of fact.

B. Refusals to Deal and Denials of Access to Essential Facilities May Form the Basis for Antitrust Liability

Vertical integration is unlawful in certain circumstances. The question thus becomes whether the Cubs have the right to refuse to do business with the Plaintiffs under the facts alleged in this case, or as they frame it, whether the Cubs have a duty to aid their competition. The answer to this question turns on the Cubs' intent and means employed to achieve that intended result. Under the facts of this case, the Cubs do not have the right to use their monopoly power in the upstream market, which includes owning the Cubs and Wrigley Field, to eliminate their existing competitors in the downstream market through anticompetitive conduct, as opposed to better business acumen.

According to the Supreme Court, "Monopoly power is the power to control prices or exclude competition." *E.I. du Pont*, 351 U.S. at 391. To prevent monopolization, "¶ § 2 [of the Sherman Act] addresses the actions of single firms that monopolize, or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993). The Court in *Spectrum* continued,

> Consistent with our cases, it is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

*Id.* at 456.

Anticompetitive conduct comes in many forms. In fact, the Sherman Act does not define "predatory" or "anticompetitive" conduct. As noted by the Third Circuit, "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court

28

or commentator ever to have enumerated all the varieties." *LePage's Inc. v. Kroll Assoc's, Inc.*, 324 F.3d 141, 152 (3rd Cir. 2003) (citing *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998)).

One recognized form of anticompetitive or exclusionary conduct is a monopolist's "refusal to deal" or "refusal to cooperate." One of the earliest refusal to deal cases was *United States v. Terminal R.R. Ass'n*, 224 U.S. 383 (1912), which involved twenty four different railroads converging at St. Louis, Missouri. *Id.* at 399. Six of the railroads acted together to acquire a terminal which, as a practical matter, no railroad could pass through St. Louis or cross the Mississippi River without using. *Id.* These six railroads contracted amongst themselves to prohibit any non-members of their association from using the terminal. *Id.*

Finding a Sherman Act violation, the Court in *Terminal* explained,

> But when, as here, the inherent conditions are such as to prohibit any other reasonable means of entering the city, the combination of every such facility under the exclusive ownership and control of less than all of the companies under compulsion to use them violated both the first and second sections of the act, in that it constitutes' an attempt to monopolize commerce among the states which must pass through the gateway at St. Louis.

*Id.* at 409. The Court thus remanded the case to the district court with directions to enter a decree providing for the admission of any other railroad company (to use the terminal) upon equal terms with the existing members of the terminal association. *Id.* at 411. Thus, the Supreme Court ordered private landowners to "share" their essential facility, their private property, with others.

In 1951, the Supreme Court again considered a refusal-to-deal form of anticompetitive conduct in *Lorain Journal*. 342 U.S. at 143. In *Lorain Journal*, the sole newspaper in Lorain County, Ohio had an effective monopoly on mass media advertising until a radio station began

operating nearby. *Id.* at 150. When the radio station entered the market and began to sell advertising time on the air, the newspaper refused to accept newspaper advertising from companies that also advertised on the newcomer radio station. *Id.* at 148. The lower court "expressly found that the purpose and intent of this procedure was to destroy the broadcasting company." *Id.* at 148-49. The lower court also found that, "the very existence of [the radio station] is imperiled by this attack upon one of its principal sources of business." *Id.* at 149.

The Court held that this conduct was an attempt to monopolize interstate commerce by reducing the number of advertising customers available to the radio station. The refusal to deal strengthened the newspaper's existing monopoly in the advertising market, and "more significantly, [it] tended to destroy and eliminate [the radio station] altogether." *Id.* at 149-50; 153. The *Lorain Journal* Court also affirmed the lower court's issuance of injunctive relief, explaining that, "The injunctive relief under [the Sherman Act] sought to forestall that success. While [the newspaper's] attempt to monopolize did succeed insofar as it deprived [the radio station] of income, [the radio station] has not yet been eliminated. The injunction may save it." *Id.* at 153. The Court concluded, "It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the -attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Id.* at 154.

Consequently, in *Lorain Journal*, the Supreme Court again, like in *Terminal*, told a private company that it did not have an unfettered right to refuse to deal with others. After *Lorain Journal*, the Supreme Court considered another "refusal to deal" case in *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). In *Otter Tail*, a power company: (i) generated electricity, (ii) transmitted its own and other generators' electricity over intermediary networks,

and (iii) sold electricity at retail in 465 towns over its municipal-level grids. *Id.* at 368-70. When several municipalities decided to operate their own municipal-level grids, the power company refused to sell the municipalities power at wholesale rates, and also refused to transmit or õwheelö power from other generators to the municipalities over its intermediary networks. *Id.* Having been unable to renew its contracts to operate the municipal-level grids in those towns, õOtter Tail simply refused to deal, although according to the findings it had the ability to do so.ö *Id.* at 371.

The Court found,

> The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws. The District Court determined that Otter Tail has "a strategic dominance in the transmission of power in most of its service area," and that it used this dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply. Use of monopoly power "to destroy threatened competition" is a violation of the "attempt to monopolize" clause of § 2 of the Sherman Act.

*Id.* at 377. Once again, the Supreme Court told a private enterprise that it had to share its private property, an exclusive facility, with its competitors.

The Courtøs decision in *Aspen Skiing v. Aspen Highlands Skiing*, 472 U.S. 585 (1985), is also significant and instructive. In *Aspen*, four adjacent ski resorts had coexisted for years with different owners, and had jointly marketed an õall mountainö ski pass that allowed consumers to ski any of the four competitor mountains with a single lift ticket. *Id.* at 589-90. During the life of the all-mountain pass, the competing companies would distribute income amongst each other based upon surveys or counting methods which determined how frequently the passes were used at each mountain. *Id.*

Eventually, "Ski Co." acquired control over three of the four resorts, and its president thereafter "... expressed the view that the 4-area ticket was siphoning off revenues that could be recaptured by Ski Co. if the ticket was discontinued." Id. at 592. Therefore, Ski Co. offered an unreasonably low, fixed percentage of total all-mountain revenue to "Highlands," the smaller competitor. One member of Ski Co. candidly admitted that Ski Co. made Highlands "an offer that [it] could not accept." Id. This effectively left "Highlands," the smaller competitor, with the ability to sell its customers and patrons with tickets to just one mountain. Id. at 592-93. With Ski Co.'s effective discontinuation of the all-mountain pass, Highlands attempted to compete for retail customers by creating an "Adventure Pack" to replace the all-mountain pass. Highlands purchased Ski Co.'s tickets at retail, and then bundled those tickets with its own tickets. Id. at 593-94. To counter this, Ski Co. simply refused to sell Highlands any Ski Co. passes, even at retail rates. This doomed the "Adventure Pack," and made it effectively impossible for Highlands to compete in the Aspen ski market. Id. at 594.

The *Aspen* Court focused on whether one competitor ever has a duty to cooperate with its rivals. The Court started its analysis by explaining that, "The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion -- that is, by competing successfully rather than by arranging treaties with its competitors." Id. at 600, citing *United States v. Citizens & Southern National Bank*, 422 U.S. 86 (1975). The Court continued,

> Ski Co., therefore, is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor. Ski Co. is quite wrong, however, in suggesting that the judgment in this case rests on any such proposition of law. For the trial court unambiguously instructed the jury that a firm possessing monopoly power has no duty to cooperate with its business rivals.

> The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.

*Id.* at 600-601.

Citing *Lorain Journal*, the Court explained that a private business' right to refuse to deal with others is prohibited by the Sherman Act where that right is exercised purposefully to monopolize interstate commerce. *Id.* at 602. By changing a long-standing, and profitable business practice with its competitor, the Court found sufficient evidence in the record to support the jury's verdict that a Sherman Act violation had occurred. *Id.* at 604. ("The jury must, therefore, have drawn a distinction ‑between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other."). The Court went on to note, "If a firm has been ‑attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Id.* at 605.

A number of other refusal-to-deal cases similarly involve one party seeking to compel its monopolist competitor to "share" something that the monopolist owns, which the first party needs in order to compete. In *MCI Communications Corp. v. AT&T Co.*, AT&T controlled the telephone lines and infrastructure that connected long distance lines to people's homes. 708 F.2d 1081, 1093-96 (7th Cir. 1983). MCI, a newcomer to the long-distance telephone market, wanted AT&T to connect MCI's long distance network to people's homes over AT&T's lines and infrastructure, so that MCI could compete with AT&T in selling long-distance telephone service. *Id.* AT&T was generally unwilling to share its network resources with its new competitor. *Id.*

When AT&T did provide access, it did so on unequal footing with the access it provided to itself.

*Id.*

> Citing *Otter Tail* and *Lorain Journal*, the Seventh Circuit explained,

>> A monopolist's refusal to deal under these circumstances is governed by the so-called essential facilities doctrine. Such a refusal may be unlawful because a monopolist's control of an essential facility (sometimes called a "bottleneck") can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms.

>> The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*Id.* at 1132-33. Affirming the trial court's decision that a Sherman Act violation had occurred, the Seventh Circuit reasoned, "the evidence supports the jury's determination that AT&T denied the essential facilities, the interconnections for FX and CCSA service, when they could have been feasibly provided. No legitimate business or technical reason was shown for AT&T's denial of the requested interconnections." *Id.* at 1133. Furthermore, "MCI produced sufficient evidence at trial for the jury to conclude that it was technically and economically feasible for AT&T to have provided the requested interconnections, and that AT&T's refusal to do so constituted an act of monopolization." *Id.*

The Seventh Circuit considered a refusal to deal in the context of an essential facility in *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986). In *Olympia*, the court stated,

>> Some cases hold, however, that a firm which controls a facility essential to its competitors may be guilty of monopolization if it refuses to allow them access to the facility. We accept the authority of these cases absolutely. They are well illustrated by *Otter Tail* where a wholesale supplier of

> electricity refused to supply electric power to a power system that
> competed with it in the retail electrical power market and had no other
> source of supply.

*Id.* at 376.  The *Olympia* court continued, "If a competitor is also a customer his relationship to

the monopolist is not only a competitive one.  The monopoly supplier who retaliates against his

customers who have the temerity to compete with him, by cutting such customers off, is severing

a collateral relationship in order to discourage competition." *Id.*  The court in *Olympia* found for

the defendant because there was a legitimate and clear business justification for its business

decision to refuse to cooperate – it simply wanted to get out of the sale business and liquidate its

remaining inventory. *Id.* at 378.

Initially, the burden is on a defendant to show a valid business justification for refusing to

deal. *Morris Commun. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004).  If the

defendant makes such a showing, then the burden shifts to the plaintiff to show that the

purported justification is pretextual. *Id.*  This is necessarily a factual question not properly

decided on a motion to dismiss. *Byars*, 609 F.2d at 862.  Moreover, "A monopolist's self-

serving, Ex post facto business justifications must be examined with care." *Id.* at 863.

As set forth below, the Cubs *admitted* that they are trying to exclude the Plaintiffs on

some basis other than efficiency.  The Cubs *admitted* that the Plaintiffs were direct competitors.

The Cubs *admitted* that they wanted more money through higher prices on the backs of

consumers.  The Cubs *admitted* that they could not compete with the Plaintiffs' margins.  The

Cubs *admitted* that they wanted to control the Rooftops to control and increase prices.  The Cubs

used private property exclusively in their control to destroy the Plaintiffs and achieve their

unlawful goals.

C.  The Allegations of Fact in this Case Reflect A Plausible Antitrust Claim

The Complaint alleges the following facts, all of which must be taken as true for purposes

of a motion to dismiss:

i.  Plaintiffs own and operate Rooftop Businesses and underlying real estate, from which tickets to watch live Cubs games and other live Wrigley Field events are sold to consumers. [Complaint, Doc. 1, ¶¶ 1-4.]

ii.  Plaintiffs pay the Cubs Organization 17% of their gross revenue in return for a license to sell tickets to watch these Cubs games and other live events. [Doc. 1, ¶ 40.]

iii.  The Cubs Organization, previously not owning any Rooftop Businesses, began to acquire Rooftop Businesses in 2009. [Doc. 1, ¶¶ 44, 47.]

i.  In 2009, Cubs Organization acquires interest in Rooftop Business ōDown the Line.ö [Doc. 1, ¶ 47.]

ii.  In 2011, Cubs Organization attempts to acquire Rooftop Business Lakeview Club. [Doc. 1, ¶ 50.]

iii.  In 2011, Cubs Organization engages individual Rooftop Business owners in separate purchase negotiations. [Doc. 1, ¶ 49.]

iv.  Late 2011 ó Early 2012, Cubs Organization seeks approval from City to install signs. [Doc. 1, ¶ 50.]

v.  May 8, 2012 ó Ricketts and other Cubs Organization executives met with Rooftop Business owners, calling the Rooftop License Agreement a ōbad dealö for the Cubs Organization because the parties were involved in a ōprice warö and a ōrace to the bottomö on ticket prices.  Cubs Organization complains about Rooftop Businesses selling discount tickets, thereby reducing demand for tickets inside Wrigley Field. [Doc. 1, ¶¶ 52-55.]

vi.  May 8, 2012 ó Ricketts and other Cubs Organization executives demand that Rooftop Businesses agree on coordinated, minimum ticket prices, or be blocked by signs, stating ōwhatever you give us is in return for not being blocked.ö [Doc. 1, ¶¶ 52-55.]

vii.  June of 2012, Lufrano suggests the Rooftop Businesses and Cubs Organization create a ōmanagement firmö with power to set ticket prices.  Sugarman tells Anguiano that the Rooftop Businesses need to raise revenue for the Cubs Organization or be blocked. [Doc. 1, ¶¶ 55-56.]

viii.  September, 2012 – Cubs Organization rejects proposal from Rooftop Businesses to permit large signs on top of Rooftop Businesses, to let Cubs Organization control such signage and give 100% of sign revenue to Cubs Organization. [Doc. 1, ¶ 70.]

ix.  February 4, 2013 – Ricketts tells Rooftop Businesses that they are "direct competitors" with the Cubs Organization, complains that Rooftop Businesses sell tickets too inexpensively, and complains this is hurting Cubs Organization's Wrigley Field ticket sales. [Doc. 1, ¶ 62]

x.  April 15, 2013 – Following Rooftop Businesses' ongoing refusal to fix ticket prices, Cubs Organization makes good on threats to block Rooftop Businesses, and announces 6,000-square-foot jumbotron and 1,000-square-foot advertising sign. [Doc. 1, ¶ 65.]

xi.  May 1, 2013 – Ricketts complains in speech at City Club of Chicago that Rooftop Businesses are "direct competitors" and criticizes them for selling discounted tickets, blames Rooftop Businesses for causing $20 million in annual lost revenue, announces intent to install jumbotron and other sign in outfield. [Doc. 1, ¶¶ 66-68.]

xii.  July, 2013 – Cubs Organization makes offers to numerous Rooftop Business owners, below market value, using signage plan as a threat and as leverage. [Doc. 1, ¶ 77.]

xiii.  Summer, 2013 – Kenney tells Schlenker that the Cubs Organization wanted control of the Rooftop Businesses, so it could control pricing. [Doc. 1, ¶ 72.]

xiv.  August 15, 2013 – Sugarman and Lufrano tell Anguiano and Finkel that Rooftop Business ticket prices are too low and that the Cubs Organization cannot compete with Rooftop Business margins, and said solution was to raise ticket prices.

xv.  January, 2014 – At annual Cubs Convention, Ricketts likens Rooftop Businesses to thieves stealing someone else's property, and Lufrano says the Rooftop Businesses are a $20 million drag on business which is preventing Cubs Organization from affording great baseball players. [Doc. 1, ¶ 78.]

xvi.  February 1, 2014 – Cubs Organization threatens to move team out of Wrigley Field if it does not get the signs it wants. [Doc. 1, ¶ 86.]

xvii.  May 21, 2014 – Ricketts publishes video complaining that Rooftop Businesses cost Cubs Organization millions in annual revenue and that he will proceed with more signage because the Rooftop Businesses did not acquiesce to the 2-sign proposal. [Doc. 1, ¶ 88.]

xviii.  July 7, 2014 – Lufrano tells Finkel, "First we want to get the right to block you, then we will negotiate." [Doc. 1, ¶ 90.]

xix.  July 10, 2014 – Cubs Organization secures City Landmarks approval for seven signs. [Doc. 1, ¶ 91.]

xx.  July, 2014 – Kenney, in response to offer from McCarthy to sell Plaintiffs' two Rooftop Businesses at fair market value, "That's a good deal if you have a rooftop business, but once we put up the signs you don't have a rooftop business." Kenney also tells McCarthy, "We control the City." [Doc. 1, ¶ 95.]

xxi.  Later July, 2014 – Kenney tells McCarthy, "We don't like you competing with our bleachers and grandstands. We don't like you competing with our gate." Kenney tells McCarthy the Cubs Organization will operate any Rooftop Business it acquires, and "Whatever we don't buy, we're going to block." Kenney offers grossly low price for Plaintiffs' Rooftop Businesses. [Doc. 1, ¶ 96.]

xxii.  July, 2014 – Cubs Organization executives tell Rooftop Owner that the Cubs Organization would "destroy the rooftops" if he did not sell. [Doc. 1, ¶ 98.]

xxiii.  September 9, 2014 – Kenney tells Finkel that they had to "finish the deal this week, or I order the steel [for the signs]." [Doc. 1, ¶ 99.]

xxiv.  September 29, 2014 – Cubs Organization begins construction efforts at Wrigley Field which includes outfield signage to block the Rooftop Businesses. [Doc. 1, 100.]

xxv.  October, 2014 – Kenney leaves voicemail message for Purcell indicating that the Cubs Organization just reached a deal to buy several other Rooftop Businesses, and that the Cubs Organization would rearrange where the signs were going if he did not sell. [Doc. 1, ¶ 101.]

xxvi.  October, 2014 – Kenney tells Rooftop Business Owner that the Cubs Organization will move signs to block Rooftops that did not sell. [Doc. 1, ¶ 101.]

xxvii.  October 21, 2014 – Cubs Organization attempts to purchase Finkel's three Rooftop Business loans in order to foreclose on Finkel. [Doc. 1, ¶ 103.]

xxviii.  December 4, 2014 – After getting contracts to certain Rooftop Businesses, and expecting to acquire three others, the Cubs Organization alters its signage plans to greater block the Plaintiffs who still refused to sell. [Doc. 1, ¶ 106.]

The only question on the table is whether the Complaint alleges sufficient facts plausibly suggesting that the Cubs engaged in anticompetitive conduct with a specific intent to

monopolize. *Spectrum*, 506 U.S. at 454.[4]  The rule of reason answers that question in the affirmative by looking at such things as the before and after, the potential effect of the conduct, the purpose or end sought, and the evil alleged. *Board of Trade of City of Chicago*, 246 U.S. at 238 (1918).  The defendant's intent may shed light on the answer as well. *Id.*

Here, the "before" is the existence of sixteen Rooftop Businesses in direct competition with the Cubs, which successfully competed with the Cubs in the consumer marketplace and challenged the Cubs' ability to charge monopolistic prices for tickets to live events.  These are well-pled facts.  The "after," the "purpose or end sought," the "evil alleged," and the "potential effect" are essentially the same: the Cubs wanted to sell more of their own tickets, but they were losing sales to the Rooftops because of discounting, game day sales, and Groupon promotions. The Cubs also did not give fans an all you can eat and drink incentive, but the Rooftops did.  The Cubs could not compete with the Rooftops' margins.  The purpose, the end, the evil and the potential effect were the same: making customers pay more, while giving them less.

The Cubs' intent also sheds light into the anticompetitive nature of their conduct.  The Cubs were upset that the Rooftop Businesses charged less for tickets than the Cubs charged for Wrigley Field tickets, the Cubs admitted they were unable to compete with the Rooftop Businesses' margins, and the Cubs wanted to make more money.  But they admittedly could not compete on the merits, so they had to resort to their predatory and anticompetitive conduct instead by denying access to an essential facility, and refusing to deal with their competitors notwithstanding a long-standing, profitable relationship.  The ex post facto business justification, which is highly suspect given the Cubs' refusal to undertake an on-the-rooftops sign proposal, is at best a fact question for a jury.

---

[4] The Cubs do not raise the dangerous probability element in their Motion to Dismiss, and thus it is waived.

The Plaintiffsø well-pled facts are a far cry from the vertical integration cases which reflected that benefits to consumers would follow the defendantsø conduct. Here, the Cubs were not trying to displace competitors at the retail level so that they could increase efficiency and perform a lower-market service cheaper, thus leading to lower prices and more sales. The exact opposite was their goal, and was the likely outcome. The Cubs wanted to destroy competitors so they could charge consumers more, while offering even fewer services. The Cubs tried to acquire the downstream competition to harm consumers by destroying competition, not to increase competition. They did this by using their leverage and power in the upstream market ó the control over Wrigley Field (which does happen to be an essential facility as there is no other source of product / views) to destroy competition. The decisions in *Terminal*, *Otter Tail*, *Lorain Journal* and *Aspen*, as well as the other cases cited above, all support the Plaintiffsø theory in this case, which rises well above the level of plausible based on the facts alleged.

       D.   <u>The Defendantsø Case Law is Inapplicable to These Facts</u>

Each and every case cited by the Cubs is distinguishable. In *Elliott v. United Center*, 126 F.3d 1003 (7th Cir. 1997), the defendant was not even in the peanut business, the õmarketö in which the plaintiff peanut vendor operated. *Id.* at 1005. (õThe United Center is obviously not monopolizing the market for peanuts: it is staying strictly out of the peanut business.ö) In *Theater Party Associates v. Shubert Org.*, 695 F. Supp. 150 (S.D.N.Y. 1988), the õPlaintifføs complaint is that there is *more* competition among ±theater party agents.øö *Id.* at 156 (emphasis added). Also there, the defendantøs vertical integration was lawful there because it was the result of opportunity and business acumen following competitive bidding. *Id.* (õPlaintiff has alleged no illegal act by Shubert.ö) The Cubs are not competing on a level playing field here ó e.g., they cannot compete with the Rooftop Businessesø margins.

*Morris* is also highly distinguishable. There, the PGA refused to permit the plaintiff to "free ride," in other words obtain the PGA's intellectual property product for free so that it could be resold for profit. 364 F.3d 1288, 1295. The court explained, "If Morris wishes to sell PGA's product, it must first purchase it from PGA." *Id.* at 1296. Moreover, "PGA is willing to sell its product to its competitors, including Morris." *Id.* The Rooftop Businesses pay millions for access to Wrigley Field views, and do not seek to discontinue paying for same.

Likewise distinguishable is *S.W.B. New England, Inc. v. R.A.B. Food Group, LLC*, 2008 WL 540091 (S.D.N.Y. Feb. 27, 2008). A more complete quote from that case, compared to the excerpt offered by the Cubs, is that, "[T]he termination of one distributor of a product for another in a given market is not, *standing alone*, a violation of antitrust laws." *Id.* at *4 (emphasis added). It is that "standing alone" language that is the key distinction. Also, the allegations are not that the Cubs are trying to replace the competition with others, but rather take over or eliminate the competition altogether. A refusal to deal is only permissible "in the absence of any purpose to create or maintain a monopoly." *Aspen*, 472 U.S. at 601.

The Cubs give the *Aspen* decision short shrift. According to the Cubs, the parties in *Aspen* each had their own product, each had their own property, and happened to sell a joint product as well. [Doc. 30, p. 10.] Then the Cubs say that unlike *Aspen*, this case involves just one product, owned by the Cubs. This is an unintelligible and desperate attempt to distinguish a Supreme Court case which defeats the Cubs' entire argument for dismissal, and this attempt must be rejected.

The only product at issue in *Aspen* was the all-mountain pass. The parties in that case also had their own separate products, but those were not the products that the Court focused on, nor were those the product that the plaintiff's claims were based upon. To the contrary, the

Court plainly focused on "a particular cooperative venture," a "long-standing, and profitable business practice with its competitor," and the defendant's "attempting to exclude rivals on some basis other than efficiency." Absent entirely from the *Aspen* decision's reasoning was any suggestion that separate products were competing with one another – except perhaps to show that those other products were useless, unviable alternatives in the relevant market.

And *like* the *Aspen* decision, the Plaintiffs and the Cubs do each own their own property. The Cubs' suggestion that the Plaintiffs can still use their properties for something else finds no logical or legal support from *Aspen*. The Plaintiff's properties, like the lonely competitor ski hill in *Aspen*, will become uncompetitive, useless and unproductive properties. Certainly the ski hill operator could theoretically do something else with acres of mountain land, just like the Plaintiffs could theoretically do something else. But the *Aspen* Court was not interested in such hypotheticals, the Court was interested in the product at issue in that case, the relevant market at issue in that case, the impact on consumers at issue in that case, and the anticompetitive exclusionary conduct at issue in that case.

The Cubs also cite *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006), where that court stated, "antitrust law does not require monopolists to cooperate with rivals by selling them products that would help rivals to compete. Cooperation is a problem in antitrust, not one of its obligations." But pulling random quotes from case law, without discussing the facts or reasoning behind such quotes, is the Cubs' downfall. Anyone can find a sentence in a case, place it into a brief without proper context and make it sound like something it is not. This unorthodox, and perhaps strategic, style of writing serves only to impose unnecessary burdens on the Plaintiffs, and this Court, who must then sift through over 100 cited cases for themselves to realize that the Cubs' treatment of those cases is misleading.

In *Schor*, defendant Abbott held a patent on a drug called Norvir. *Id.* at 609. Used alone in effective doses, Norvir caused serious side effects. *Id.* Therefore, companies mixed smaller quantities of Norvir with other drugs, to create an effective product with fewer side effects. *Id.* Abbott combined its Norvir product with other drugs, making Kaletra to sell to consumers. *Id.* Competitors bought Norvir from Abbott and mixed their own drugs with it, to sell products that competed with Kaletra. *Id.* The plaintiff in Schor complained that Abbott was able to sell Kaletra for less than competitor's products finished products, because Abbott charged them too much for the Norvir component. *Id.*

The court in *Abbott* noted, however, that Abbott was willing to sell Norvir to anyone willing to pay its price – there was no refusal to deal. *Id.* at 610. The court also noted that patent holders may lawfully charge whatever they want for their patented products, including Norvir. *Id.* The court reasoned, "The antitrust laws condemn high prices, not low ones, and it would be wholly inappropriate to use the Sherman Act to oblige Abbott to raise its price for Kaletra" [so the competitors could also charge more and make more money]. *Id.* at 611. Furthermore, none of Abbott's rivals claimed that they were unable to sell their finished products profitably, even at the current price Abbott charged for Norvir. *Id.*

The court also explained that Abbott would actually benefit from more competition in the finished product market, because the more of the finished product that the competitors sold, the more Norvir they would have to buy from Abbott. *Id.* at 612. Thus, surely Abbot was not trying to benefit itself from injuring consumers through lower output and higher prices, and therefore there was no role for antitrust law to play. *Id.* This case has absolutely no relevance in the case at bar. The Cubs are not trying to increase the price they charge the Rooftop Businesses, they are refusing to deal, seeking to eliminate competitors and increase consumer prices.

43

Likewise unhelpful to the Cubs, notwithstanding their selective, once-sentence quip that businesses are free to choose who to deal with, is *Weber-Stephen Prods. LLC v. Sears holding Corp.*, 2014 WL 656753 (N.D. Ill. Feb. 20, 2014). In that case, Weber chose to stop selling its products to retailer Sears. *Id.* at *1. Acknowledging that a refusal to deal could be an antitrust violation, the trial court concluded that the facts of *Weber* did not fall into cases like *Aspen*. *Id.* at *7. The problem for the court in *Weber* was that Sears offered no factual allegations to suggest that competition or consumers would be harmed by Weber's decision. *Id.* at 8. Specifically, no product was withdrawn from the market, as both Weber and Sears would continue to sell grills and related products. *Id.* Furthermore, Sears continued to have access to Weber grills and parts, albeit only at the retail level, whereas the plaintiff in *Aspen* was cut off completely. *Id.* Finally, Sears offered no facts to support an intent on the part of Weber to monopolize any particular market. *Id.* This is nothing like the instant case, where the Cubs are attempting to harm consumers with higher prices, remove competitors from the market, and discontinue all avenues for the Plaintiffs to secure the Cubs' product, and the Plaintiffs supply ample facts of same.

Lastly, *Port Dock & Stone Corp. v. Oldcastle Northeast*, 507 F.3d 117 (2nd Cir. 2007), offers no support to the Cubs. The court in that case stated, "Vertical expansion by a monopolist, without more, does not violate section 2 of the Sherman Act." *Id.* at 124. It is that "without more" that eliminates any comfort the Cubs might otherwise find in *Port Dock* or their other cases. The court in *Port Dock* continued, "There may be special circumstances in which a monopolist's vertical expansion could be anticompetitive." *Id.* at 125. Merely in that case, "The complaint pleads no facts that would show that Tilcon's vertical expansion was for an anticompetitive purpose rather than for the purpose of improving efficiency." *Id.* The Plaintiffs' Complaint does plead many salient facts.

44

**VI.**  **The Anticompetitive Nature of the Cubs' Conduct**

Beginning on page 12 of the Motion to Dismiss, the Cubs acknowledge that conduct must be "anticompetitive" to implicate federal antitrust laws. The Cubs cite *Eastman Kodak* to define unlawful anticompetitive conduct as "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." [Doc. 30, p. 13.] The Plaintiffs agree with this recitation of the law.

The Cubs claim that the Plaintiffs somehow "admitted" in a prior lawsuit that the Cubs had property rights to build "walls." [Doc. 30, p. 13.] But the exhibit referenced by the Cubs could not be more irrelevant. That memorandum challenged the Cubs' claims of misappropriation of trade secrets (viewing Cubs games from Rooftops), arguing that their decision to allow neighbors to watch events at Wrigley Field, for decades, constituted an affirmative defense to a later misappropriation claim. Nothing whatsoever in that document spoke of the Sherman Act, or to whether building walls or barriers would constitute anticompetitive conduct for antitrust purposes. It is simply irrelevant. Moreover, it is not conceivable that a private person or company could "say" something about misappropriation in an out-of-context brief and somehow grant another party immunity from federal antitrust law for future events that had not even transpired yet.

The Cubs' next assertion likewise suspends any employment of logic. Instead of arguing that they were not trying to foreclose competition, gain a competitive advantage or destroy a competitor, the Cubs proclaim that they were not using any "monopoly power" when they tried to destroy the Plaintiffs in order to eliminate competition, reduce consumer choice and increase prices. The Cubs' rationale is that they are property owners (Wrigley Field), and they are simply denying others access to their property. [Doc. 30, p. 13.] This argument is not supported by the

authority cited by the Cubs, and directly conflicts with *Lorain Journal*, *Terminal*, *Aspen* and *Otter Tail*, to name just a few relevant cases.

In *Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994), defendant Opryland, an amusement park, made a deal with some airport shuttle companies whereby those companies would no longer shuttle people from the airport to Opryland. In return, Opryland agreed to rent vans from those companies and shuttle customers for itself. *Id.* at 37-38. In order to make sure the shuttle companies did not continue transporting customers, Opryland stopped letting *any busses* on its property. *Id.* The plaintiff, another shuttle company, complained that this denial of access violated the antitrust laws and deprived it of the opportunity to compete in the airport shuttle transportation market. *Id.*

The court in *Hodges* had an understandable problem with the plaintiff's theory. Any harm the plaintiff suffered was not because of the allegedly anticompetitive conduct – the agreement between Opryland and the other shuttle companies. *Id.* at 38. If anything, that agreement actually helped the plaintiff by eliminating some of the plaintiff's competition, since the court noted that the plaintiff could still shuttle passengers from the airport to Opryland, presumably just not drop them off *inside* the theme park. *Id.* The injury (if any actually existed) was instead caused merely by one company telling another company to stay off its property. There was no connection with any anticompetitive conduct. *Id.* at 38-39.

*Hodges* has no similarity to this case. Here, the Cubs' conduct will not leave the Plaintiffs with the ability to continue selling tickets, unlike in *Hodges*. Second, unlike in *Hodges* where there was no showing whatsoever of harm to competition, but rather a *benefit* to the plaintiff who would actually have less competition, in this case the Plaintiffs clearly allege antitrust harms that the laws are designed to protect. Specifically, the Plaintiffs allege that the

Cubs are attempting to eliminate competition altogether, in order to raise prices. This is not a pro-consumer goal; it is monopolistic by every sense of the word.

*Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009), is unsupportive of the Cubs for similar reasons to *Hodges*. In *Christy*, a ski resort which was also in the ski rental business decided not to let competitors continue operating ski rental shops on its property. *Id.* at 1191. The crux of *Christie* was that the relevant market was not determined to be ski rentals on the resort property, but instead ski resorts generally. *Id.* at 1194. Consumers would be protected from monopolistic rental prices because the court found that families select ski resorts based on quality and price, and they could just select another resort altogether if they did not like the rental or other prices at one resort. *Id.* at 1194-95. Thus, the defendant's decision would have no effect on the ski vacation market as a whole. *Id.* at 1195.

The court in *Christie* accepted that, generally speaking, property owners like restaurants do not need to let outsiders compete for sales on their property. *Id.* at 1194. Of course, the court properly recognized that in some circumstances, such as *Aspen* and *Trinko*, a refusal to cooperate with competitors could constitute a section 2 violation. *Id.* The difference between *Christie* and *Aspen* was that in *Christie*, "we have no indication that [defendant] is terminating a profitable business relationship. There is no allegation that [defendant] was motivated by anything other than a desire to make money for itself." *Id.* at 1197. But in *Aspen*, the court in *Christie* pointed out, the defendant had no legitimate justification for discontinuing a profitable arrangement. *Id.*

In this case, like in *Aspen*, the Cubs are discontinuing a profitable arrangement without any valid business justification. The Cubs do attempt to justify their conduct as simply wanting to make more money from large signs and jumbotrons, but they also stated repeatedly before sign revenue ever came into the picture that they wanted to eliminate the Rooftop Businesses

47

because the Cubs could not compete with the Rooftop Businesses on the merits – on their margins. The Cubs wanted to force the Rooftop Businesses to make the Cubs more money, by raising and fixing prices, which harms consumers, and when the Rooftop Businesses refused, then the Cubs came up with a plan to destroy the Rooftop Businesses, and their ad revenue justification is merely a pretext, ex post facto, to try and hide their true anticompetitive goals. In any event, the legitimacy of these "justifications" are questions of fact which were absent in *Christie* and *Hodges*, and should not be decided on a motion to dismiss.

The Cubs' reliance on *Weber*, and on *Reisner v. General Motors Corp.*, 671 F.2d 91 (2nd Cir. 1982), for the proposition that this is a mere contract dispute, is also misplaced. Significantly, the Cubs offer no explanation as to why either of those cases bears any resemblance to this case. Instead, they just say that those cases were contract disputes, and nothing more. An examination of those cases reflects their irrelevance here. The problem for the court in *Weber*, discussed above, was that plaintiff offered no factual allegations to suggest that competition or consumers would be harmed by Weber's decision to stop doing business with Sears. 2014 WL 656753, *7 (N.D. Ill. Feb. 20, 2014). No product was withdrawn from the market, Weber and Sears would continue to sell grills and related products, and Sears continued to have access to Weber grills and parts. *Id.*. Moreover, Sears offered no facts to support an intent on the part of Weber to monopolize any particular market. *Id.* at 8.

*Reisner* is also entirely different. The plaintiff in *Reisner* failed to establish a relevant market, after extensive discovery. 671 F.2d at 98-99. (Describing the "constant shifting and refusal to specify the relevant markets;" and "Reisner continually changes his allegations concerning the relevant markets and failed to answer properly GM's interrogatories.") Faced with this, the appellate court "could imagine no relevant market." *Id.* at 99. So *that* case was

48

only a contract dispute. But here, the Plaintiffs plausibly suggest a relevant market. Furthermore, the plaintiff in *Reisner* had the benefit of discovery before the court concluded that a relevant market did not exist. The Cubs would have the Court in this case cut off the Plaintiffs on a motion to dismiss, improperly attacking the well-pled facts in the Complaint that create a plausible relevant market and antitrust claim.

Next, the Cubs argue that if they raised their prices, the Plaintiffs would benefit, not be harmed. [Doc. 30, p. 14.] The Cubs therefore conclude, erroneously, that the Plaintiffs have not stated an antitrust injury. But the Cubs have misstated the allegations in the Complaint, and they types of harm that would be suffered if the Cubs' anticompetitive attempts had been successful. The Complaint alleges that the Cubs' anticompetitive conduct would reduce the number of competitors, because the Cubs would gain market share by either destroying competitors like the Plaintiffs, or by taking over competitors like the ones they have already purchased and all the other Rooftop Businesses they repeatedly attempted to acquire.

The harm, therefore, is not higher ticket prices which will let the Plaintiffs charge more money. The harm to competition is that competition will be reduced, consumers will have fewer sellers to choose from, and they will eventually pay more money for tickets. Moreover, consumers will ultimately pay more money for less service, as the Cubs do not provide that all-inclusive food and drink option inside Wrigley Field. This is harm to competition and consumers. The harm to the Plaintiffs is that they will be destroyed by this anticompetitive conduct. How can the Cubs possibly claim that the Plaintiffs will be able to charge more money, when the Plaintiffs will have no views into Wrigley Field and thus nothing to sell?

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), also does not support the Cubs' illogical theories. In that case, Brunswick sold bowling equipment to bowling alley

operators on secured credit. *Id.* at 479. When many operators defaulted, Brunswick took them over and operated the bowling alleys. *Id.* at 479-80. Pueblo, which owned several competitor bowling alleys, complained that if Brunswick had just let those defaulting bowling alleys close, or fail, Pueblo would have had less competition and would have made more money. *Id.* at 481. The only question before the Supreme Court was "whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares." *Id.* at 484.

Two things were particularly significant in *Brunswick*. First, Pueblo would have suffered the same "injury" regardless of whether a large, national "deep pocket" had acquired the competitor bowling alleys, or a small, "shallow pocket" operator had acquired them. *Id.* at 487. Thus, the injury alleged bore no relationship to whether there was a monopolist or monopoly power. *Id.* Second, antitrust laws were enacted to protect competition, not competitors, and Brunswick's conduct promoted competition by keeping more competitors in business. *Id.* at 487-88.

The Plaintiffs do not allege that the Cubs are attempting to promote competition, and the Cubs provide no such evidence, which would be improper at this stage anyhow. To the contrary, the well-pled facts in this case, which must be taken as true, allege that the Cubs are trying to destroy competition by eliminating competitors through anticompetitive conduct derived from their monopoly power in an upstream market. Their specific intent and conduct tends to eliminate competitors, and therefore less competition. It was not the Cubs' demands that the Rooftop Businesses raise ticket prices, in a vacuum, that was the anticompetitive conduct. It is that when the Rooftop Businesses decided to run their own businesses in the manner they elected

to do so, that the Cubs attempted to destroy, eliminate and acquire them to obtain their anticompetitive goals.

The Cubs' citation to *Abbyy USA Software House, Inc. v. Nuance Communications*, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008), is another example of why pulling one sentence out of an unpublished district court order is unhelpful in deciding the questions before this Court. In *Abbyy*, the plaintiff offered conclusory allegations that the defendant acquired competitors to reduce supply and increase prices. *Id.* at \*5. Without more, that activity would necessarily result in Abbyy also being able to charge more because its competitor was charging more. *Id.* ("Competitors do not suffer antitrust injury and cannot recover damages where the only injury alleged is increased prices.") *Id.* at \*4. The notion that this proposition of law helps the Cubs in any fashion is beyond belief, and is based on an untrue interpretation of the Complaint which explains why the Plaintiffs will not be around very long.

For similar reasons, the decision in *O.K. Sand and Gravel, Inc. v. Martin Marietta Corp.*, 819 F. Supp. 771 (S.D. Ind. 1992), is inapplicable here. *O.K. Sand* involved predatory pricing. *Id.* at 790-91. Thus, the plaintiff there would have to show that the defendant tried to drive it out of business with temporary, artificially low prices. *Id.* Mere speculation that something like that could occur in the future was not enough, facts were needed (but absent) to show such predatory intent. *Id.* at 791. How is *O.K. Sand* relevant here? It simply is not; this is not a predatory pricing case.

The Plaintiffs are not going to be harmed by the Cubs raising their own prices. The Plaintiffs are going to be harmed because the Cubs are driving them out of business after the Plaintiffs refused to raise *their own prices*. The Cubs earned a percentage of the Plaintiffs' sales, the Cubs wanted more revenue, decided to destroy the Plaintiffs completely, acquire competitors,

and will subsequently raise all prices across the board. The Plaintiffs will not be around to enjoy the increase in prices that the Cubs admittedly desire.

The Cubs' next one-liner is from *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir. 1982). There, the Seventh Circuit stated, "It is true that acquisitions can sometimes provide evidence of predatory conduct" *Id.* at 271. "Such actions *alone*, however, are not generally considered predatory and are therefore rarely condemned unless they occur within an overall context of unfair monopolistic practices" *Id.* The Cubs argue that there is "no context of anticompetitive conduct here." [Doc. 30, p. 15.] This statement ignores all of the facts in the Complaint surrounding a series of actions focused on: (i) attempting to reduce competition in a downstream market, (ii) by either eliminating or acquiring competition, (iii) through the use of superior monopoly power in an upstream market, (iv) with the intent of increasing prices to consumers while providing fewer alternative sources of supply and less product for the money.

There is also nothing noteworthy about the Cubs' quotation from *Olympia*, explaining that if conduct is not anticompetitive, it does not matter that it is hostile to competitors. [Doc. 30, p. 15.] There is a distinction between hostility to competitors, and hostility to competition – the latter of which is prohibited as anticompetitive. *Board of Trade of City of Chicago*, 246 U.S. at 238; *Paramount*, 334 U.S. at 174; *E.I. du Pont*, 351 U.S. at 391. As indicated above, there is plenty of intent and effort to hurt competition here.

Lastly, the Cubs argue that the Complaint's factual statements surrounding attempts at price fixing do not identify any impropriety. [Doc. 30, p. 16.] However, the Complaint does not attempt to state a cause of action arising from price fixing, the facts are pled to give color to the overall set of facts and circumstances supporting the various causes of action set forth in the Complaint. The Cubs demanded that the Plaintiffs and other Rooftop Businesses raise prices so

that the Cubs, who earn a percentage of all Rooftop Business sales, would earn more. The Cubs also made this demand because it would have helped them sell more tickets inside Wrigley Field, a problem they admitted they were having because they could not compete (on the merits) with the Rooftop Businesses. This establishes the framework, and provides color to the Cubs intent, in explaining the unlawful events and attempts that followed.

## VII.   **The Plaintiffs Have A Viable Anticipatory Breach Of Contract Claim**

Eleven years into a 20-year contract, the Cubs' new owners want to redefine its terms in a fashion that defeats the very purpose of the Agreement, ignores the facts and circumstances giving rise to the Agreement, and leads to the most absurd of results. For the reasons that follow, the Plaintiffs' anticipatory breach of contract claim should not be dismissed.

### A.   The "Four Corners Rule" Rejects Literal Interpretations And Absurd Results

The "Four Corners Rule" does not permit a court to employ a rigid application of a single word, reach a conclusion that is illogical, or ignore the circumstances surrounding the formation of the agreement in question. To the contrary, courts should consider the entire agreement, the circumstances in which it was formed, and commercial realities, all of which considerations do not violate the "Four Corners Rule."

The applicable principals of contract interpretation and construction are well established. *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1035-37 (7th Cir. 1998). The analysis begins with a determination of whether the contract is ambiguous; whether the language used is reasonably or fairly susceptible to more than one meaning. *Id*. at 1036. A contract "is not ambiguous if a court can discover its meaning simply through knowledge of those facts which give it meaning as gleaned from the general language of the contract." *Id*. However, must look at the contract as a

whole, not just the portion in dispute. *Id*. at 1038. As stated in *Bank of America Nat'l. Trust and*

*Sav. Ass'n v. Schulson*:

> In determining whether a contract is ambiguous, a court must construe the contract as a whole, reading each term in light of others. It is presumed that each part of a contract was inserted deliberately and for a purpose consistent with the overall intention of the parties. If possible, we must interpret a contract in a manner that gives effect to all its provisions.

714 N.E.2d 20, 24 (Ill. App. 1999). (Internal citations omitted).

The process of finding the plain meaning was explained in *Utility Audit, Inc. v. Horace*

*Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004), as follows:

> Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent. The terms should be construed so that the contract is "fair, customary, and such as prudent persons would naturally execute," and is "rational and probable." (Internal citations omitted)

Magistrate Judge Cole has performed an insightful and expanded analysis on determining

whether a contract is ambiguous in several decisions in recent years, drawing upon applicable

Seventh Circuit precedent. *See, Hoppe v. Great Western Business Services, LLC*, 536 F. Supp. 2d

888, 893-95 (N.D. Ill. 2008); *Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*, 608 F.

Supp. 2d 981, 987-90 (N.D. Ill. 2009); *Pampered Chef, Ltd. v. Alexanian,* 2011 WL 6046896,

**15-16 (N.D. Ill. Dec. 5, 2011). These decisions are instructive. Courts should reject a

contractual interpretation that makes no sense because there is a presumption that parties to a

commercial contract are trying to accomplish something rational. *Dispatch Automation, Inc., v.*

*Richards,* 280 F.3d 1116, 1119 (7th Cir. 2002). The court continued, "Common sense is a much

a part of contract interpretation as is the dictionary or the arsenal of cannons." *Id*., citing

*Fishman v. LaSalle Nat. Bank*, 274 F.3d 300, 302 (1st Cir. 2001).

Moreover, one of the cases cited by the Defendants, *Wells Fargo Funding v. Draper & Kramer Mort. Corp.*, 608 F. Supp. 2d 981, 989 (N.D. Ill. 2009), adds that courts do not interpret contracts in a vacuum. A Court must place itself in the position of the parties. *Id.* at 989-990. As such, "[A] court may look to the circumstances surrounding the transaction in order to discern the parties' intent." *Id.* at 990. This is similar to the Seventh Circuit's instruction in *McElroy v. B.F. Goodrich Co.*, 73 F. 3d 722, 725 (7th Cir. 1996), where the court explained that a contract has to be interpreted "with due regard to commercial realities."

In *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004), the Seventh Circuit again emphasized the need to interpret business contracts in the context of the transaction, and in a way that makes sense given the context the contract was formed in. The court in *Baldwin* relied on the reasoning of *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002), explaining, "Businesses are not *compelled* to make sensible bargains, but courts should not demolish the economic basis of bargains that would be sound if the contract were given a natural meaning." *Baldwin*, 392 F.3d at 883.

In *Beanstalk*, the plaintiff entered into an exclusive representation agreement with AMG to license AMG's "Hummer" trademark. 283 F.3d at 858. Two years later, AMG entered into a joint venture agreement with GM which transferred the Hummer trademark to GM. *Id.* at 859. The plaintiff claimed that it was entitled to a commission for any "License Agreement," which his contract defined as "any agreement or arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in the Property," which in turn was defined to mean trademarks and related rights. *Id.* at 858.

In affirming the district court's dismissal of the complaint, the *Beanstalk* court relied on two principles of contract interpretation. "The first is that a contract will not be interpreted

literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Id.* at 860. Second, a contract has to be read as a whole, keeping in mind, "sentences are not isolated units of meaning, but take meaning from other sentences in the same document." *Id.* The court reasoned that the business context of the formation of the agreement should be considered. *Id.* Applying these principles, the court in *Beanstalk* concluded that the parties could not have intended that the plaintiff would receive a commission after the trademark was transferred. *Id.* at 861. (The parties "must have known when they signed the representation agreement that if AM General ever sold its Hummer business, the trademark would go with it…")

The Supreme Court recently interpreted words in the highly similar field of statutory construction. *Yates v. U.S.*, No. 13-7451 (S. Ct. Feb. 25, 2015). There. The Court had to decide whether the words "tangible object," as used in 18 U.S.C § 1519, were limited to documents or all physical things. Slip. Op., p. 1, 4. The government acknowledged that the statute was enacted to deter systematic destruction of documents involving financial fraud, but argued that the statute should be applied more broadly so that the term "tangible objects" also encompassed objects having nothing to do with documents. *Id.* at 6-7. There, the Court rejected the argument that the ordinary meaning of a term can be derived solely looking at a dictionary. *Id.* at 7. The Court summarized the applicable principles as follows:

> Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, "[t]he plainness of ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997). See also *Deal v. United States,* 508 U.S. 129, 132 (1993) (it is a "fundamental principle of

56

> statutory construction and, indeed, of language itself) that the meaning of
> a word cannot be determined in isolation, but must be drawn from the
> context in which it is used"). Ordinarily, a word's usage accords with its
> dictionary definition. In law as in life, however, the same words, placed in
> different contexts, sometimes mean different things.

*Id.* at 7. The *Yates* principles are a reiteration of prevailing Seventh Circuit law.

   B. <u>The Defendants' Interpretation Calls For An Irrational, Absurd Result</u>

   Count VIII of the Complaint alleges that the outfield sign project now underway, which

will almost completely block the Plaintiffs' views, violates § 6.6 of the Agreement, which

provides:

> The cubs shall not erect windscreens or other barriers to obstruct the views
> of the Rooftops, provided however that temporary items such as banners,
> flags, and decorations for special occasions, shall not be considered as
> having been erected to obstruct views of the Rooftop. Any expansion of
> Wrigley Field approved by governmental authorities shall not be a
> violation of this Agreement, including this section.

   This Agreement was formed for the specific purpose of settling litigation initiated by the

Cubs in 2002 seeking to prohibit the Rooftop Businesses from commercially exploiting their

views into Wrigley Field. [Doc. 1, ¶¶ 35, 38.]  Prior to filing that suit, the Cubs installed a

windscreen to obstruct the view from the Rooftop Businesses. [Doc. 1, ¶ 35.]  And while the

2002 Lawsuit was pending, the City was considering the adoption of the Wrigley Field

Landmark Ordinance, which became effective on February 11, 2004. [Doc.1, ¶ 37.]

   Since at least 2001, the Cubs had been seeking approval of bleacher expansion at Wrigley

Field.  The Associated Press was reporting at the time that the Cubs proposed an expansion of 10

to 12 rows. <u>Exhibit 5.</u>  The Chicago Tribune reported at the time that views from the Rooftop

Businesses would be blocked as a result of that expansion. <u>Exhibit 6</u>.  And, Philly.com reported

that the bleacher expansion likely meant the end of the Rooftop Businesses. <u>Exhibit 7</u>.  The wind

screens, the proposed 10 ó 12 rows of bleachers, the pending Landmark Ordinance, and the 2002 Lawsuit, all provide necessary context for the Agreementøs formation.

In reaching the Agreement, the parties focused their attention on the problems that were important to both sides. The Cubs wanted a share of the Rooftop Businessesø view-derived income, the very point of the 2002 Lawsuit. The Cubs intention to seek approval for the bleacher expansion was public knowledge, and an important subject of discussion during the settlement process supervised by Magistrate Judge Schenkier. <u>Exhibit 8.</u> The proposed bleacher expansion, if approved, would impact sight lines from the Rooftop Businesses. The Rooftop Businesses needed to make sure this issue was addressed in the Agreement.

And it was. The Cubs and the Rooftop Businesses knew that bleacher expansion was on the horizon. They specifically included language in the Agreement that would address both the Cubsø bleacher expansion plans, and the Rooftop Businessesø need to ensure that their only source of revenue would not be cut off. The Rooftop Businesses might have to increase the height of their grandstands to see over the bleacher expansion. The Cubs agreed to share in those costs if the bleacher expansion affected the Rooftop Businessesø views.

So the Cubs needed the right to expand the bleachers, and the Rooftop Businesses needed the right to have unobstructed views for 20 years in order to defray the costs of building up over the bleacher expansion. Therefore, the parties drafted § 6 of the Agreement to provide for both the bleacher expansion then being discussed, and the elimination of windscreens and other barriers that would block the Rooftop Businesses. They compromised those issues by agreeing upon a set of remedies in §§ 6.1 to 6.4 to deal with the economic realities of raising the height of the bleachers. However, the construction of permanent barriers to obstruct views from the Rooftop Businesses was absolutely prohibited. The last sentence of § 6.6, expressly prohibiting

barriers (to protect the Rooftop Businesses), also clarified that a government approval of the forthcoming bleacher expansion would not violate that blanket ban (to protect the Cubs). This give-and-take interpretation of the Agreement, in the context of the facts and circumstances surrounding the Agreement, reflects in a commercially logical fashion how each party achieved its goals.

This interpretation of the Agreement applies the "Four Corners Rule" as proscribed by the Seventh Circuit, and gives full effect to the various provisions and clauses of § 6. This interpretation is also consistent with the mandate of *McElroy, Beanstalk*, and *Baldwin*. No rational business person could truthfully think that the parties intended the phrase, "any expansion of Wrigley Field," to give the Defendants a blanket right to install barriers at any time during the 20-year term, so long as they obtained government approval. Such an interpretation completely disregards the circumstances surrounding the formation of the agreement, and the notion that business people try to accomplish something rational when forming an agreement.

There are two key reasons for this conclusion. First, the only expansion being contemplated when the Agreement was negotiated was the additional 10-12 rows of bleacher seating. In 2002, nobody in their wildest dreams ever thought Wrigley Field would ever have jumbotrons or video boards. Second, after having just given up 17% of their future revenue for 20 years; committing themselves to an expensive capital improvement program; and having experienced blocked views from the windscreen "spite fence," no rational business person would then agree that the Cubs could build a permanent obstruction, in a form of a sign, under the guise of an expansion of Wrigley Field.

Thus, the Plaintiffs' explanation of "expansion" and "government approval" in § 6 is reasonable, logical, reflects sound business judgment in the context of the world at the time, and

resolves a number of complex issues in a prudent fashion. The Cubs' current interpretation disregards all of these factors and would lead to a completely one-sided agreement that no prudent business person would have ever signed given the context of this case.

### C. The Cubs' Cases Are Not Supportive Of Their Interpretation

The Cubs attempt to distinguish between the phrase "expand the Wrigley Field bleacher seating," as used in §§ 6.1-6.4, with the phrase, "Any expansion of Wrigley Field," as used in § 6.6, to argue that the parties intended to let the Cubs erect any barrier, at any time, with government approval. The Cubs contend that the language in §§ 6.1 through 6.4 is so radically different from § 6.6 that these sections must necessarily be interpreted as having a different meaning. The Cubs overstate their argument, and the cases relied upon by the Cubs do not require the conclusion that "any expansion" must mean something different than "bleacher expansion."

The Cubs rely on *Taracorp, Inc. v. NL Industries, Inc.*, 73 F. 3d 738, 744-45 (7th Cir. 1996), which recognizes the maxim that different words are presumed to have different meanings when addressing analogous issues. But *Taracorp* further recognizes that this presumption is utilized while giving meaning to the context of the entire agreement. *Id.* at 745. Indeed, *Taracorp* instructs that in applying this principle, a court should consider the coherency of the agreement as a whole, and other contract language which might undercut the conclusion that a textual difference must mean a different intent. *Id.* In *Taracorp*, the court had to determine the scope of a seller's environmental cleanup obligation at two different geographic locations, where the contract used the phrase "at, on or near" with respect to one location, and the phrase "associated with" for the other location. *Id.* at 743. The court in *Taracorp* found that the two phrases were substantially different; one being locational and the other being relational. *Id.* at

60

744.   Here, the two phrases at issue are far from the clearly distinct words in *Taracorp*. Moreover, finding that "any expansion," as used in § 6.6, is limited to bleacher seating expansion, as used elsewhere, results in an interpretation that gives meaning to the entire contract, and avoids a result that would be incredibly absurd, ignorant of the context of the agreement's negotiations, and illogical from a business perspective.

Similarly, the court in *Woods v. Elgin, Joliet & Eastern Railway Co.*, 2000 WL 45434 (N.D. Ill. Jan. 11, 2000), determined that the word "coverage," when used with respect to an insurance policy, had a different meaning then the term "scope." *Id.* at *5. *Woods* and *Taracorp* both made sense based on the facts before those two courts.   The reasoning by those courts would only make sense here if the Cubs' interpretation is rejected.

The Cubs' literal interpretation of the Agreement is no more plausible than the Plaintiffs' literal interpretation.   The Plaintiffs consider the textbook meaning of expansion to be to make a thing larger, not to change that thing by adding new things to it.   The Cubs think adding new things, because they are secured with concrete, nuts and bolts, make larger what is already there (but different).

The Cubs' definition of "expand" is simplistic and antithetical to the guiding principles of both the Seventh Circuit and the Supreme Court in relating to textual interpretation of contracts and statutes.    The Cubs, for instance, posit that a video board increases the volume of information and therefore is an expansion of Wrigley Field (See Opposition for Motion for Preliminary Injunction (incorporated into Motion to Dismiss) at 28-29).   But the Agreement exists to settle litigation which had nothing to do with signs or any form of expansion other than the anticipated 2005 bleacher expansion.   On the other hand, it makes perfect sense that a video board could be exactly type of a universe of theoretical permanent barriers that are absolutely

prohibited by the first sentence of Section 6.6. Within the context of the Agreement, signs, and anything other than bleachers, are a permanent barrier.

In attempting to rewrite the Agreement to suit their current objectives, the Cubs also argue that "any expansion" is greater in scope than "bleacher expansion," because "any" must mean there are no limitations on what they may install, so long as it is approved by the government. This interpretation disregards the rest of the Agreement as a whole, and its purpose.

Moreover, construction of the word "any" is not so simple. *Schulson*, 714 N.E.2d at 25. (Adopting the principle that a contract clause canot be read in isolation.) Rather, that word must also be viewed in light of the other contract terms. *Id.* In *Schulson*, the court explained that, "the word ‑any' may be limited when other language cannot be given effect without limitation." *Id.* There, guarantors were entitled to a reduction of their exposure equal to 36% of "any principal payments." *Id.* at 23. The *Schulson* court concluded that the term "any" was limited in the context of the applicable contract, and that the applicable language did not apply to principal reductions made from collateral proceeds, after default, because that interpretation would conflict with other text that clearly stated that the guaranty was one of payment, not collection. *Id.* at 25-26. Applying that principle, *Schulson* rejected the broad interpretation of "any" advocated by the guarantors. *Id.* at 26. The same reasoning applies here. Any "expansion" in § 6.6 must refer to any expansion of bleacher seating. Just as the court in *Schulson* would not interpret "any" in a way that turned a guaranty of payment into a guaranty to collection, this court should find that "any expansion" means any bleacher expansion.

This Court may, and should, also look at how the parties performed under the Agreement. *Chicago United Industries, Ltd. v. City of Chicago,* 685 F. Supp. 2d 791, 823 (N.D. Ill. 2010). ("Under Illinois law, a course of dealing between contracting parties is admissible ‑to explain or

supplement the terms of an agreement even without a determination that the agreement is ambiguous.ö)   The Cubsø conduct since entering into the Agreement demonstrates their understanding that the Agreement prohibits outfield signs that will block the Rooftop Businessesø views.

First, the Cubs have never attempted to install any windscreens, signs, video boards or other barriers since the *execution* of the Agreement, until they changed owners.  Significantly, prior to the Tribuneøs sale of the Cubs to the Ricketts family, the Cubs demonstrably knew that õAny expansionö in the last sentence of § 6.6 of the Agreement was limited to bleacher expansion.   In early 2008, the newly constructed Rooftop Properties at 3617 and 3619 N. Sheffield were negotiating an agreement with the Cubs.  Michael Lufrano, who worked for the Cubs before and after their sale to Ricketts, was responsible for negotiating and drafting the Agreement with the attorney for the 3617-19 N. Sheffield owners.  Lufrano took the existing Agreement from the 2002 Lawsuitøs settlement, but made s significant and revealing change in the paragraph that prohibits the Cubs from erecting permanent barriers.  In 2008, Lufrano replaced the phrase, õAny expansion of Wrigley Field approvedí ö, with, õAny expansion of *or modification to* Wrigley Field approvedí ö (emphasis added).  This proposed insertion of the words, õor modification to,ö reflects a recognition by the Cubs that signage did not fall within the definition of õany expansionö as used in the 2004 Agreement.  The owners of the new buildings, who already were part of the 2004 Agreement on another building, rejected the proposed modification and it was not included in the final version of the Agreement between them and the Cubs in 2008.  If the Cubs believed that installation of a sign fell within the definition of õany expansion,ö there would have been no need to try and add the phrase õor modification.ö

Moreover, even Ricketts acknowledged a number of times that the Cubs could not do whatever they wanted in the outfield until after the Agreement concluded in 2023. Around January 8, 2014, Ricketts stated about the Rooftop Businesses:

> It's just another one of the things that we basically inherited that we're working to address. All the rooftop owners – I do like them personally and the experience is unique and it does give Wrigley a little bit of charm. But (if) this is a private investment of hundreds and hundreds of millions of dollars, we just have to know in 2023 when we no longer have a contract (with the rooftop owners) that we can do anything we want to the park and do what's right for the team and not have to worry about the people across the street.

[Doc. 1, at Exhibit A-8-6.] Moreover, if the Cubs could have always done whatever they wanted, why did they continually complain to the press and the public that the Rooftop Businesses would not agree to their 2-sign proposal? Why did the Cubs repeatedly try to get the Rooftop Businesses on board? Why did they hold a mock-up event to show the Rooftop Businesses what they wanted the Rooftop Businesses to agree to? All this is because the Cubs always knew, since 2004, that they were allowed to expand the bleachers, and not put up huge signs a few years later that would vitiate the entire Agreement.

### D. Parol Evidence Reaches the Same Result

If the Court finds the Agreement ambiguous with respect to the present dispute, it must allow a trier of fact to consider parol evidence. The classic definition of ambiguity in Illinois is whether the language at issue is susceptible to more than one reasonable interpretation. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. 1993). When a contract term is deemed to be ambiguous, the business context from which the agreement arises, and the mandate to avoid absurd results, requires a finder of fact to consider the intent of the parties. *Central States, Southeast, Southwest Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 911 (7th Cir. 2000). (Bench trial). This Court may find the meaning of the last sentence of § 6.6

as susceptible to more than one interpretation when viewing all of the "Four Corners" factors as a whole.

Should the Court find the agreement ambiguous, the Plaintiffs have presented sufficient evidence to state a plausible claim for anticipatory breach of contract to present to a jury. The Agreement was entered into at the conclusion of a court-supervised settlement conference overseen by Magistrate Judge Schenkier in *Chicago National League Baseball Club, Inc., v. Sky Box on Waveland, LLC* (No. 02-cv-9105). (Agreement, first Recital and § 2.) In that litigation, the Cubs contended that the owners of Rooftop Businesses across from Wrigley Field had no legal right to commercially exploit their ability to view events inside Wrigley Field without the permission of the Cubs. At the time the Agreement was executed, the City of Chicago was considering the ordinance that designated Wrigley Field as a Chicago Landmark, ultimately adopted on February 11, 2004. Since 2001, the Cubs had been planning the construction of new bleachers that would necessarily expanded the outfield walls at Wrigley Field and impair the views from Rooftop Businesses by 10-12 rows. This context was public knowledge. The Cubs abided by the Agreement for ten years, and acknowledged its meaning to the public. The Rooftop Businesses would not have entered into an agreement that let the Cubs block their views whenever they wanted, as long as the City let them do it. A mountain of extrinsic evidence will prove these facts.

### E. The City is Not the Final Arbiter

This court should give no credence to the Cubs' argument that the City was intended to be the final arbiter of what constitutes permissible obstructions of the Rooftop views. It is plainly obvious that any construction at Wrigley Field would require government approval. The City does not care whether the Cubs call their project an "expansion" or an "addition." The City

just cares about building code, zoning and landmark ordinance compliance. Therefore, the fact that the Cubs intentionally called their sign proposal an "expansion" when pitching it to the City is irrelevant.

## VIII. Ricketts Committed Defamation *Per Se*

In front of a large crowd of Cubs fans, and radio, television and print media correspondents, defendant Ricketts stated in January of 2014:

> It's funny – I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching "Homeland." You pay for that channel, and then you notice your neighbor looking through your window watching your television.
>
> And then you turn around, and they're charging the other neighbors to sit in the yard and watch your television. So you get up to close the shades, and the city makes you open them. That's basically what happened.

[Doc. 30, ¶80.] One wonders what other audiences Ricketts meant when he said that he would "always tell this story when someone brings up the rooftops."

In the context of his speech and Q&A session, Ricketts informed a global audience of Cubs fans, all of them actual or potential Rooftop Business customers, that the Cubs could not field a competitive team because the rooftop owners were stealing – unlawfully charging money, without permission, to view the Cubs' product. The Cubs' attempt to spin Ricketts' remarks as innocent necessarily scoffs at the obvious: Mr. Ricketts' statement accuses the Rooftop Businesses of the textbook definition of copyright infringement, identifying the perpetrator and method.

On pages 17 through 21 of their Motion to Dismiss, the Cubs lump a number of the Plaintiffs' claims together, overlooking and generalizing material components of each distinct claim. A more thorough analysis of each of those claims, provided below reflects their validity.

A. Ricketts' Statement is Defamation *Per Se*

In Illinois, "To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. *Solaia Technology, LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). Defamation *per se* includes, among other things, (i) words that impute a person has committed a crime; (ii) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; and (iii) words that impute a person lacks ability or otherwise prejudices that person in her or his profession. *Id.* A plaintiff is not required to prove specific damages in defamation *per se* cases. *Bryson v. News America Publs., Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996).

Whether a statement constitutes actionable defamation is a question of law. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). In a conclusory fashion, the Cubs argue that Mr. Ricketts' statement was not false, it was a non-actionable opinion, and it is subject to innocent construction. For the reasons that follow, these arguments are incorrect in law.

B. Ricketts' Statement Is Verifiably False And Not A Protected Opinion

As noted above, defamation involves a false statement of fact. In determining this question, courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Rose v. Hollinger Int'l, Inc.*, 889 N.E.2d 644, 648 (Ill. App. 2008); *Imperial Apparel, Ltd v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1022 (Ill. 2008). In particular, courts heavily weigh whether the statement is "capable of objective verification." *Rose*, 889 N.E.2d at 648.

"A defamatory statement is constitutionally protected [as opinion] only if it cannot be reasonably interpreted as stating actual fact." *Solaia*, 852 NE.2d at 840. Certain defamatory expressions of opinion are protected under the first amendment, and are thus considered non-actionable. *Rose*, 889 N.E.2d at 647. Ricketts' statement does not fall into this category.

Furthermore, even opinions can be an actionable defamation *per se. Solaia*, 852 N.E.2d at 840. ("There is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole.") Also see *Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 447 (Ill. App. 1st Dist. 1999) ("expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable.")

Mr. Ricketts' statement is a metaphor for copyright infringement and theft of a product. The 2004 agreement between the Cubs and the Rooftop Owners establishes Mr. Ricketts' statements as false. The Cubs argue otherwise, relying upon incomplete and incorrect application of the prevailing law.

To support its opinion argument, the Cubs rely upon *Zucker v. Chicago Tribune Co.*, 2004 WL 3312757 at *4, to argue that Mr. Ricketts' statement was a non-actionable opinion. However, *Zucker* is distinguishable from the instant action. In *Zucker*, the defendant newspaper and story author wrote:

> What was he thinking? The *last* person we expected to see Wednesday at Ch.2 sportscaster Tim Weigel's tearful, joyful memorial service was his ex-agent, Steve Zucker. Weigel and Zucker had a legendary falling out dating back many years, fueled by dueling lawsuits and a restaurant confrontation just last year. So imagine our stunned disbelief to see Zucker trying to get past three different checkpoints at the church service. Each time, he was politely turned away.

*Id.* at *1. Holding that this article was not defamation *per se*, the appellate court explained, "Plaintiff claims that the story accused him of ¬essentially stalking a former client even in death" and its main point was his lack of professionalism. Plaintiff's rhetoric notwithstanding, we find the story was about no such thing. The story is about a single incident, the sighting of an individual (plaintiff) with whom Weigel had previously had a professional relationship, trying to attend Weigel's memorial service." *Id.* at *3.

Simply put, there is no similarity whatsoever to the statement in *Zucker* and Ricketts' statement in this case. On the other hand, the *Solaia* decision is more pertinent to the instant action. In *Solaia*, the magazine defendants published numerous articles questioning the supposed patent trolling tactics of the plaintiff. 852 N.E.2d at 836. One published article included a "letter" from an anonymous industry veteran, which referred to one of the plaintiff's patents as "essentially worthless," noted that they only paid $1.00 for it, and compared the plaintiffs to "ñ people in the world who want to make a lot of money and don't care how they do it," such as O.J. Simpson's criminal defense attorney Johnny Cochran, Enron and WorldCom executives charged with various financial improprieties, the Washington D.C. sniper, a group of muggers armed with baseball bats. *Id.* at 836. The Court found certain the statements in the letter to be actionable, stating, "The letter undoubtedly employs hyperbole, but this statement is not an opinion. Under its metaphorical chaff hides a kernel of fact: Solaia Technology secured a worthless patent and filed infringement claims with the sole aim of extracting settlements." *Id.* at 841. Continuing, "The statement directly impugns the plaintiffs' integrity by questioning the validity of the patent and consequently the validity of Solaia Technology's infringement claims..." *Id.* at 842.

Like *Solaia*, under Mr. Ricketts' supposed "opinion" lie kernels of fact: allegations that the Plaintiffs are stealing the Cubs product by selling tickets to view Cubs events without the Cubs' authorization. In fact, Mr. Ricketts' statement was an exact metaphorical depiction of the Cubs' arrangement with the Rooftops: that the person outside (the Rooftops) was charging people to peek into the neighbor's (the Cubs) window (Wrigley Field) to watch Homeland (live Wrigley events). However, the statement was patently false: Ricketts omitted that there was a 20-year contract whereby the Cubs allowed the Rooftops to charge people to look in, and it was not the City that made the Cubs open the curtains, it was the Cubs' decision to enter into that contract.

The specificity of Ricketts' remarks is what makes them actionable; they can be proven false. The Cubs do not attempt to perform the correct defamation analysis in their Motion to Dismiss, but the cases relied upon by the Cubs do make that analysis. In *Green v. Rogers*, 917 N.E.2d 450, 460 (Ill. 2009), the Illinois Supreme Court found that the plaintiff's allegedly defamatory statements, such as "the Plaintiff [a baseball coach] exhibited a long pattern of misconduct with children which was not acceptable for CHLL coaches," and "Plaintiff abused players, coaches, and umpires in CHLL," were non-actionable. The *Green* Court explained, "[t]o begin with, these allegations are completely devoid of any specifics, such as what type of misconduct plaintiff exhibited; that nature of any alleged "abuse"; or how that abuse manifested itself in relation to players, coaches and umpires." *Id*. All of these specifics are plainly apparent in Ricketts' statement. The who, the what, the where and the other key details are all contained in his statement.

In *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 696 (Ill. App. 2002), at issue was a 30-second promotional commercial depicting Pamela Zekman, an investigative reporter, stating to

the plaintiff, "Let's sum this up for a second, the evidence seems to indicate that you're cheating the city." *Id.* The *Schivarelli* court held that this statement was not specific enough to be objectively verifiable because it was not made in any specific factual context. *Id.* at 699. Notably, "Ms. Zekman did not explain the evidence that she was referring to, nor did she state why she thought [the plaintiff] was cheating the city, how he was cheating the city, or even what she meant by the term 'cheating'." *Id.* There is no such uncertainty in Ricketts' statement. He was talking about the Rooftop Businesses, his statement said so. He was talking about the Rooftops charging money (specific fact) to consumers (specific fact) supposedly without the permission of the Cubs (specific untrue fact) to watch something they had no right to sell (specific untrue fact).

Conversely, in *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527 (7th Cir. 2009), the Seventh Circuit found the defendant's statement to a third party insurance company, that the plaintiff had breached a contract, as actionable. *Id.* In making this finding, the court noted, "in one sense all opinions imply facts, the question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is non-actionable as a matter of law." *Id.*, *quoting Wynee v. Loyola Univ.*, 741 N.E.2d 669, 676 (7th Cir. 2000). Ricketts' statement was also very clear, not at all vague, and clearly meant something specific (yet untrue): that the Rooftops were stealing his product.

C. The Innocent Construction Rule Does Not Shield Ricketts' Statement

Certain otherwise defamatory expressions are not actionable because they are subject to an "innocent construction." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). In *Solaia*, the court explained:

71

> The so-called "innocent-construction rule" requires a court to consider the statement in context and to give the words of the statement, and any implications arising from them, their natural and obvious meaning. [A] court must interpret the words of the statement as they appear to have been used and according to the idea they were intended to convey to the reasonable reader. When the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement.

852 N.E.2d at 839.

The context of Ricketts' statement reveals an obvious meaning with clear intent. Ricketts intended to convey the message that the Rooftop Businesses were charging people money for a product they did not own or have the right to sell, which is untrue. Ricketts intended to hide the fact that the Cubs and the Rooftop Businesses had a 20-year contract, instead stating that the City made them do it. The statement was made in the context that the Rooftop Businesses were a drag on the Cubs and were affecting their ability to make enough money to afford winning a World Series.

The Cubs rely upon the trial court's decision in *3639 LLC v. Ganis*, No. 2014-L-628 (Ill. Cir. Ct. Cook County Law Div. June 30, 2014), to support its argument that Ricketts' statement is capable of an innocent construction. [Doc. 30, p. 22.] The facts of *Ganis* are readily distinguishable, and even instructive why there cannot be an innocent construction of Ricketts' statement. In *Ganis*, the plaintiffs complained that the statement, "[p]rotecting carpetbaggers stealing the product paid for by others for their own profit," imputed theft on the plaintiffs. *Ganis*, p. 12. The *Ganis* court assessed the context (the article) of which the statements were made within, to determine their "natural and obvious meaning." *Id.* The subject matter of the article "was the political debate surrounding the proposed expansion of Wrigley Field among the Rooftop Owners, the Cubs, and the City of Chicago." *Id* at 11. Ultimately, the Court found that the comment, "[p]rotecting carpetbaggers stealing the product," to be vague and generic, because

72

it provided no specifics as to who the carpetbaggers were, what they stole, how they stole it, how much they have stolen and what crime had been committed. *Id.* at 8. The *Ganis* Court also noted that the word "steal" could have many other connotations beyond a criminal context (i.e. to describe a bargain "for $25 it was a steal"), and that the word "carpetbagger" modified the word "stealing" to imply opportunism. *Id.* at 12-13. Thus, the *Ganis* court concluded that the vague terms and subject matter of the article caused the natural and obvious meaning of the defendant's statements to be that opponents to Cubs expansion were opportunists, "benefitting and profiting from a product they did not create." *Id.* at 13.

First, Illinois law does not permit the citation of unpublished Illinois trial court decisions. Ill. S. Ct. R. 23(e). Second, an unpublished state court trial-level order has no precedential value over state and federal appellate-level decisions. Third, Ricketts' comments at the Cubs convention are starkly different than those in *Ganis*. Mr. Ricketts identified who he was talking about (the Rooftops), what they supposedly stole, (views to a protected product), how they stole it and profited thereby (by charging people for views they did not have a right to), and that the Cubs did not approve of this conduct (the City made the Cubs open the curtains). Of equally important consideration is the context of Mr. Ricketts' remarks: the Cubs Convention and the line of questioning he was responding to. The individuals attending, listening to, and reading about the Cubs Convention were devoted Cubs fans. They knew who the Rooftops were. They knew what the Rooftops business was. In fact, it was a question from the crowd regarding the Rooftops that prompted Mr. Ricketts' actionable statements. Cubs fans knew exactly what Mr. Ricketts comments meant, and even called for a boycott of the Rooftop Businesses just days later.

73

Add to this context that another Cubs executive at the same Cubs Convention commented that "the Cubs are losing $20 million in bleacher sales due to the rooftops," which he said was preventing the acquisition of great baseball players such as Miguel Cabrera, Justin Verlander, Joe Mauer, and Cole Hamels. [Doc. 1, ¶¶ 81, 84.] One would have to strain far beyond reason to find an innocent construction to his comments.

In *Tuite v. Corbitt*, 866 N.E.2d 114, 128 (Ill. 2006), the plaintiff sued a book author who wrote about corruption and organized crime in Chicago. *Id.* The plaintiff, a criminal defense attorney, was named in the book as someone who could help organized crime members avoid criminal convictions through bribery. *Id.* However, bribery was not specifically mentioned in the book, but rather raised through innuendo. The Illinois Supreme Court nevertheless found that innuendo imputing the criminal act of bribery upon the plaintiff was very much actionable, holding, "[a]lthough the book does not explicitly describe bribery" as the plaintiff's method to achieve a favorable outcome, "it also does not mention or describe [his] trial skills as the basis for the criminal defendants' confidence in their acquittals. Based on the wording of the excerpt along with the context of the book as a whole… a reasonable reader would most likely conclude this passage [alluded] to bribery." *Id.* at 129. Like this, Ricketts' metaphorical innuendo plainly, and even more directly than in *Tuite*, imputed theft upon the Rooftops.

The Cubs argue, in an effort to dilute Plaintiff's claims, that even where a plaintiff sues over rape or prostitution-based defamation claims, they might not be actionable. In *Trembois v. Standard Ry. Equip. Mfg. Co.,* 84 N.E.2d 862, 866 (Ill. App. 1949), the court held that mere reference to an arrest and rape *charge* was not defamatory *per se*, because an "[a]rrest is no evidence of guilt." Likewise, in *Knafel v. Chicago Suntimes, Inc.*, 413 F.3d 637 (7th Cir. 2005), an article was written about a woman who sued Michael Jordan in connection with allegations of

hush money to hide an affair. The author of the article referred to the plaintiff, who was an aspiring singer and now a hair designer, as "making herself sound like someone who once worked in a profession that's a lot older than singing or hair designing." *Id.* at 641-42. The *Knafel* Court found that the comment did not impute the crime of prostitution because it said she was "making herself sound like," not that she was being called, a prostitute. *Id.* at 642. Ricketts' statement, conversely, was not a comparison. It affirmatively accused the Rooftops of actively performing an unlawful act just like the neighbor was also a criminal.

## IX.    **The False Light Claim is Actionable**

The Cubs also argue, rather summarily, that the Plaintiffs' false light claim must fail for the same reasons as the defamation claim. However, the false light claim warrants separate consideration because it is not subject to the innocent construction rule. A properly plead false light claim contains allegations showing that a plaintiff was placed in a false light before the public as a result of a defendant's actions; that the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and that the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Dubinsky*, 708 N.E.2d at 451. "[C]ourts universally recognize that a statement need not be defamatory for a false-light privacy action to lie." *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 742 F. Supp. 1359, 1373 (N.D. Ill. 1990). "It follows, then, that the innocent construction rule, which can be recast as the 'non-defamatory' construction rule, does not apply to false-light privacy actions; this court must consider only whether the statement is susceptible of a false meaning that is highly offensive to a reasonable person." *Id.*

75

In *Zechman*, the plaintiff complained of defamation and false light arising from his termination of employment. *Id.* The plaintiff was terminated in the unusual manner of management coming to his office, refusing to let him speak to his staff, escorting him out of the building, and then interrogating other employees regarding his travel and entertainment expense account. *Id.* at 1370. The court dismissed the plaintiff's defamation claim because refusing to let him speak to his employees, and escorting him from the building, did not create an implication of criminal conduct and was susceptible to innocent construction. *Id*. at 1372. However, the court did not dismiss the false light claim, holding, "[u]nlike our analysis under the innocent construction rule, the relevant inquiry here is whether the statement [or series of acts] can reasonably be construed as false and highly offensive, not whether it reasonably can be construed as innocent." *Id.* Accordingly, in this case, the Plaintiffs' false light claims are not subject to the same standards as their defamation claims. Moreover, the court in *Zechman* found it necessary to allow discovery into what was said to the plaintiff's former employees during their interrogation – not grant a motion to dismiss. *Id.* at 1373-74.

## X. The Plaintiffs' Lanham, Deceptive Trade Practice, and Deceptive Business Practice Act Claims Are Well-Pled

The same legal analysis applies in determining whether a plaintiff has stated a cause of action under the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act (the "UDTPA"). *Morningware, Inc. v. Hearthware Home Products, Inc.*, 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009). Additionally, violations of the UDTPA constitute violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "CFA"), except that a person need not have been actually misled, deceived or damaged in such cases under the CFA. 815 ILCS 505/2. As such, the same analysis generally applies to Counts III through V of the Complaint.

76

To state a Lanham Act claim, a plaintiff must allege: "that the defendant (1) made a false or misleading statement, (2) which actually deceives or is likely to deceive a substantial segment of the statement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, and (5) that results in actual or probable injury to the plaintiff." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999). As explained in *B. Sanfield*, "Where the statement in question is actually false, then the plaintiff need not show that the statement either actually deceived consumers or was likely to do so. But where the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is -misleading in context, as demonstrated by actual consumer confusion." *Id.*

Statements are actionable under the Lanham Act under two circumstances: (i) when the statement in question is actually false and in which case the plaintiff need not show actual deception to consumers; and (ii) where the statement is literally true or ambiguous, in which case the plaintiff must allege that the statement is "misleading in context, as demonstrated by actual consumer confusion." *Id.* at 971. Determining actual confusion requires considering the statement in context and with reference to its audience. *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)

The Plaintiffs allege that the Ricketts' statement was both literally false, and also misleading in context causing actual consumer confusion. [Doc. 1, ¶¶195, 199, 200.] The Defendants do not bother attempting to refute, or even address, the issue of consumer confusion. Thus, regardless of whether the statement was literally true, these counts cannot be dismissed because there are well-pled allegations of actual consumer confusion which are not challenged in the Motion to Dismiss. *Id.*

The Defendants choose to dispute the Plaintiffs' Lanham Act claim by arguing that the Defendants have not made any false statements. [Doc. 30, p. 18.]   However, the Defendants provide no analysis, nor any legal support, concerning what qualifies as a "false statement" under the Lanham Act.  Similar to a defamation claim, courts must ask whether the statement, "was . . a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co*., 173 F.3d 725, 731 (9th Cir. 1999).

The Defendants argue that subjective statements are not actionable under the Lanham Act, citing *Rosenthal Collins Group, LLC v. Trading Technologies International*, 2005 WL 3557947 (N.D. Ill. Dec. 26, 2005). [Doc. 30, p. 19.].  In *Rosenthal*, the defendant, a competitor to plaintiff, referred to the defendant's product as "innovative," and "leveling the playing field." *Id*. at 10.  The court rejected the plaintiff's Lanham Act claim because the words "innovative," and "leveling the playing field," were "not specific, not concrete, not measurable, and therefore puffery." *Id*.   Similarly, in *Coastal*, "The statement that Coastal was 'too small' to handle Shearson's business, along with the implication or statement that First American was large enough to handle that business, was exactly the kind of 'puffery' that does not qualify as a statement of fact capable of being proved false." *Id*.  There is no similarity to this case.

The Cubs also rely upon *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 2010 WL 300178 (N.D. Ill. July 28, 2010), to argue that statements of opinion are not actionable in Lanham Act claims. [Doc. 30, p. 20.]   In *McDavid*, defendant Nike told certain university personnel that Nike's contract with the university prohibited players from using plaintiff McDavid's equipment. *Id*. at *1.  McDavid sued for false or deceptive statements in commerce. *Id*. at *1.  The court in

*McDavid* disagreed, ruling that Nike's statement was merely a lay opinion as to the contents of a contract, and thus not actionable. *Id.* at *3.

## XI.  Plaintiffs' Contractual Non-Disparagement Claim is Well Pled

The Defendants provide little argument or analysis for why Count IX, premised on the defendants' breach of contractual non-disparagement clauses, should be dismissed.  Instead, the Defendants lump Count IX into their Lanham, UDTPA and CFA discussion.  However, the proper analysis for the Plaintiffs' breach of contract claim (related to the non-disparagement provisions) is a conventional breach of contract analysis.

The Plaintiffs alleged the existence of a contract between themselves and the Cubs, which contract contains a provision that the Cubs will "not publically disparage, abuse or insult the business of any Rooftop or the moral character of any Rooftop or any Rooftop employee."  The Plaintiffs further allege that this provision in the contract was breached in light of the statement made by Ricketts, and as a result the Plaintiffs have been damaged in the form of lost revenue, negative publicity, and a decrease in property value. [Doc. 1, ¶267.]  Accordingly, the Plaintiffs have alleged a breach of contract action.  The Defendants are free to deny these allegations in an answer to the Complaint, but the elements of a breach of contract action are well-pled and the Defendants provide no legal basis why these claims should be dismissed under a Rule 12(b)(6) analysis.  Any factual dispute concerning the statement or its effects are untimely.

## XII.  Conclusion

For the foregoing reasons, the Plaintiffs request that the Defendants' Motion to Dismiss be denied in its entirety.

WHEREFORE, the plaintiffs, Right Field Rooftops, LLC, d/b/a Skybox on Sheffield, Right Field Properties, LLC, 3633 Rooftop Management, LLC, d/b/a Lakeview Baseball Club,

and Rooftop Acquisition, LLC, respectfully request that this Honorable Court deny the

Defendantsø Motion to Dismiss, and grant any additional relief deemed just and appropriate.

Respectfully Submitted,

Right Field Rooftops, LLC, d/b/a Skybox on
Sheffield, Right Field Properties, LLC, 3633
Rooftop Management, LLC, d/b/a Lakeview
Baseball Club, and Rooftop Acquisition,
LLC

/s/ *Thomas M. Lombardo*
By: Thomas M. Lombardo
One of their Attorneys

Thomas M. Lombardo (6279247)
Abraham Brustein (327662)
Di Monte & Lizak, LLC
216 Higgins Road
Park Ridge, IL 60068
847-698-9600 tel
847-698-9623 fax
tlombardo@dimontelaw.com
abrustein@dimontelaw.com