**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, d/b/a | ) | |
| SKYBOX ON SHEFFIELD; RIGHT FIELD | ) | No. 1:15-cv-00551 |
| PROPERTIES, LLC; 3633 ROOFTOP | ) | |
| MANAGEMENT, LLC, d/b/a LAKEVIEW | ) | Judge Virginia M. Kendall |
| BASEBALL CLUB; and ROOFTOP | ) | |
| ACQUISITION, LLC, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC; | ) | |
| CHICAGO CUBS BASEBALL CLUB, LLC; | ) | |
| WRIGLEY FIELD HOLDINGS, LLC; AND | ) | |
| THOMAS S. RICKETTS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Andrew A. Kassof, P.C.
Daniel E. Laytin, P.C.
Diana M. Watral
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

BACKGROUND ...................................................................................................... 3

I.    CONSTRUCTION TO EXPAND AND RESTORE WRIGLEY FIELD IS WELL UNDERWAY. ..................................................................................................... 3

II.   CHICAGO CITY COUNCIL, CHICAGO PLAN COMMISSION, AND THE COMMISSION ON CHICAGO LANDMARKS REPEATEDLY APPROVED THE PROPOSED EXPANSION AND OVERRULED PLAINTIFFS' OBJECTIONS ...................................................................................................... 5

III.  THE WRIGLEY FIELD EXPANSION TODAY IS NOTHING LIKE THE WINDSCREENS AND OTHER BARRIERS INSTALLED BY DEFENDANTS BEFORE THE 2004 AGREEMENT ........................................................................ 6

IV.  PLAINTIFF LAKEVIEW BASEBALL CLUB AGREED IN 2009 THAT A RIGHT FIELD VIDEOBOARD "DID NOT VIOLATE THE AGREEMENT." ............ 11

V.   BEGINNING IN 2012, PLAINTIFF ROOFTOPS AND BUSINESSES—AND ALL APPLICABLE MORTGAGES—APPARENTLY RUN THROUGH EDWARD MCCARTHY, A WEALTHY INVESTOR. .................................................. 12

ARGUMENT ........................................................................................................... 13

I.    PLAINTIFFS CANNOT SATISFY THE THRESHOLD REQUIREMENTS FOR A PRELIMINARY INJUNCTION ......................................................................... 14

    A.   Plaintiffs Will Not Suffer Irreparable Harm Before Trial In The Absence Of An Injunction. ......................................................................................... 14

        1.   Plaintiffs Still Have *No Evidence* Of Any Business Destruction Before Litigation Resolves. ...................................................................... 15

        2.   Plaintiffs Offer Nothing To Show They Cannot Reopen Their Doors If They Win At Trial. ...................................................................... 22

        3.   All Plaintiffs Can Stay In Business And Continue Operating After A Trial. ............................................................................................................ 24

    B.   Traditional Legal Remedies Will Adequately And Fully Compensate Plaintiffs For Any Harm Through Trial. ........................................................ 29

        1.   Several Damages Calculations Are Available On This Fixed-Length Contract If Plaintiffs Prevail At Trial. ......................................... 29

        2.   Plaintiffs' Cases Do Not Demonstrate Damages Are Inadequate. ........... 34

i

# TABLE OF CONTENTS (CONT'D)

**Page**

C.  Plaintiffs Cannot Establish A Likelihood Of Success Because The Contract Does Not Prohibit The Videoboard And Instead Permits It As A Government-Approved Expansion. .................................................................. 37

  1.  The Contract Confirms Defendants Have The Right To Construct Government-Approved Outfield Signs At Wrigley Field......................... 38

  2.  The Videoboard Is Not A "Windscreen Or Other Barrier To Obstruct The Views Of The Rooftops." .................................................... 42

  3.  The Agreement Confirms The Approved Expansion Does Not Violate "This Section"—The "Windscreen Or Other Barriers" Provision—On Which Plaintiffs Rely ...................................................... 45

  4.  Plaintiffs' Other Contractual Interpretation Arguments Also Ignore The Contract's Plain Language.................................................................. 47

  5.  The Extrinsic Evidence, Which The Court Need Not Consider, Demonstrates Plaintiffs' Claims Are Meritless. ....................................... 50

II.  PLAINTIFFS CANNOT SATISFY THE BALANCING PHASE REQUIRED FOR A PRELIMINARY INJUNCTION........................................................... 54

  A.  The Balance Of Equities Favors Defendants. ........................................ 54

  B.  The Public Will Suffer If Plaintiffs' Motion Is Granted...................... 57

CONCLUSION.................................................................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adiel v. Coca-Cola Bottling Co. of New York, Inc.*,
    1995 WL 329275 (S.D.N.Y. June 2, 1995) .................................................... 37

*Advanced Global Tech., LLC v. XM Satellite Radio Inc.*,
    2008 WL 4387363 (S.D.N.Y. Sept. 24, 2008)...................................... 21, 28, 36

*Air Transp. Int'l Ltd. Liab. Co. v. Aerolease Fin. Grp., Inc.*,
    993 F. Supp. 118 (D. Conn. 1998) ................................................................... 26

*Ajilon Prof'l Staffing, PLC v. Kubicki*,
    503 F. Supp. 2d 358 (D.D.C. 2007) ................................................................. 28

*Am. Brands, Inc. v. Playgirl, Inc.*,
    498 F.2d 947 (2d Cir. 1974)............................................................................. 26

*Arvelo v. Plaza*,
    2014 IL App. (1st) 142494-U ..................................................................... 45, 46

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
    471 F.3d 745 (7th Cir. 2006) ........................................................................... 38

*Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*,
    392 F.3d 881 (7th Cir. 2004) ...................................................................... 46, 48

*Bank of Am. Nat'l Trust v. Schulson*,
    714 N.E.2d 20 (Ill. Ct. App. 1999) ............................................................ 51, 52

*Beanstalk Grp., Inc. v. AM Gen. Corp.*,
    283 F.3d 856 (7th Cir. 2002) ........................................................................... 49

*BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*,
    148 P.3d 832 (Okla. 2005)............................................................................... 51

*Bremer Bank, Nat'l Ass'n v. John Hancock Life Ins. Co.*,
    2006 WL 1205604 (D. Minn. May 2, 2006)..................................................... 33

*Charles River Labs. v. Beg*,
    2014 WL 4100714 (N.D. Ill. Aug. 19, 2014) .................................................. 54

*Chicago United Ind. Ltd. v. City of Chicago*,
    445 F.3d 940 (7th Cir. 2006) ........................................................................... 29

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Cleveland Hair Clinic, Inc. v. Puig*,
    968 F. Supp. 1227 (N.D. Ill. 1996) ................................................................ 28

*Daveri Dev. Grp., LLC v. Village of Wheeling*,
    934 F. Supp. 2d 987 (N.D. Ill. 2013) ............................................................. 14

*Davis v. G.N. Mortg. Corp.*,
    396 F.3d 869 (7th Cir. 2005) ......................................................................... 50

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*,
    501 F.2d 917 (3d Cir. 1974)........................................................................... 58

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
    901 F.2d 1267 (5th Cir. 1990) ....................................................................... 35

*Ditton v. Rusch*,
    2014 WL 4435928 (N.D. Ill. Sept. 9, 2014) ................................................. 19

*Dows v. Nike, Inc.*,
    846 So. 2d 595 (Fla. Dist. Ct. App. 2003) .................................................... 51

*Employers Ins. of Wausau v. Stopher*,
    155 F.3d 892 (7th Cir. 1998) ......................................................................... 48

*EnVerve, Inc. v. Unger Meat Co.*,
    779 F. Supp. 2d 840 (N.D. Ill. 2011) ............................................................ 57

*Excelsior Motor Mfg. & Supply Co. v. Sound Equip., Inc.*,
    73 F.2d 725 (7th Cir. 1934) ........................................................................... 32

*Farley v. Marion Power Shovel Co.*,
    328 N.E.2d 318 (Ill. 1975)............................................................................. 43

*Five Mile Capital Westin N. Shore SPE, LLC v. Berkadia Commercial Mtg., LLC*,
    2012 Ill. App. (1st) 122812............................................................................ 32

*Flagship Fed. Savings Bank v. Wall*,
    748 F. Supp. 742 (S.D. Cal. 1990)................................................................. 36

*Fowler v. Gartner*,
    89 So. 3d 1047 (Fla. App. 2012).................................................................... 53

*Gallagher v. Lenart*,
    854 N.E.2d 800 (Ill. Ct. App. 2006) .............................................................. 47

iv

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Goodman v. Ill. Dep't of Fin. & Prof'l Reg.*,
    430 F.3d 432 (7th Cir. 2005) ................................................................ 14, 15

*Great Am. Ins. Co. v. Norwin School Dist.*,
    544 F.3d 229 (3d Cir. 2008)................................................................ 52

*Hall v. Nat'l Collegiate Athletic Ass'n*,
    985 F. Supp. 782 (N.D. Ill. 1997) ........................................................ passim

*Harrity v. Bank of Am. Corp.*,
    2014 WL 3827802 (D. Nev. Aug. 4, 2014) ........................................ 20

*Holiday CVS, L.L.C. v. Holder*,
    839 F. Supp. 2d 145 (D.D.C. 2012) *vacated and remanded on other grounds*,
    493 F. App'x 108 (D.C. Cir. 2012)........................................ 28, 29, 37

*In re Flexible Automation Sys., Inc.*,
    100 B.R. 986 (N.D. Ill. 1989) ............................................................ 48

*In re Innovatio IP Ventures LLC Patent Litig.*,
    956 F. Supp. 2d 925 (N.D. Ill. 2013) ................................................ 46

*In re Marriage of Perlmutter*,
    587 N.E.2d 609 (Ill. Ct. App. 1992) .................................................. 33

*Int'l Fidelity Ins. Co. v. Cnty. of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000)................................................ 52

*J.C. Penney Corp. v. Milwaukee Golf Dev. Co.*,
    2006 WL 1215376 (N.D. Ill. May 3, 2006) ...................................... 56, 58

*K. Schlanger Co. v. Eastman Kodak Co.*,
    1987 WL 9315 (N.D. Ill. Apr. 6, 1987) ............................................ 31, 35

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*,
    908 F. Supp. 1194 (W.D.N.Y. 1995) ................................................ 20

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*,
    2014 WL 1227311 (N.D. Ill. Mar. 25, 2014)................................ 32, 33

*Lake in the Hills Aviation Grp., Inc. v. Village of Lake in the Hills*,
    698 N.E.2d 164 (Ill. Ct. App. 1998) ................................................ 31

*Lanvin Inc. v. Colonia, Inc.*,
    739 F. Supp. 182 (S.D.N.Y. 1990)................................................ 26

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lopez v. Dairyland Ins. Co.*,
    890 P.2d 192 (Colo. App. 1994) ...................................................................................... 51

*MacDonald v. Chicago Park Dist.*,
    132 F.3d 355 (7th Cir. 1997) ......................................................................................... 57

*Marketing Werks, Inc. v. Brian Fox & Foxsano Mktg., Inc.*,
    2013 WL 5609339 (N.D. Ill. Oct. 11, 2013) ......................................................... 30, 31, 56

*Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*,
    378 F.3d 29 (1st Cir. 2004) ............................................................................................ 32

*McCoy v. Gamesa Tech. Corp., Inc.*,
    2012 WL 983747 (N.D. Ill. Mar. 22, 2012) .................................................................... 38

*Milex Prods., Inc. v. Alra Labs., Inc.*,
    603 N.E.2d 1226 (Ill. Ct. App. 1992) ............................................................................ 32

*Mil-Mar Shoe Co. v. Shonac Corp.*,
    75 F.3d 1153 (7th Cir. 1996) ......................................................................................... 54

*NTE LLC v. Kenny Constr. Co.*,
    2015 WL 500623 (N.D. Ill. Feb. 4, 2015) ...................................................................... 32

*Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*,
    970 F.2d 273 (7th Cir. 1992) .................................................................................... 22, 34

*Orth v. Wis. State Emps. Union Council 24*,
    2007 WL 1029220 (E.D. Wis. Mar. 29, 2007) ............................................................... 26

*Owens v. McDermott, Will & Emery*,
    736 N.E.2d 145 (Ill. Ct. App. 2000) ......................................................................... 47, 51

*Paul B. Episcope Ltd. v. Law Offices of Cambell & Di Vincenzo*,
    869 N.E.2d 784 (Ill. Ct. App. 2007) .............................................................................. 43

*Penncro Assoc., Inc. v. Sprint Spectrum, LP*,
    499 F.3d 1151 (10th Cir. 2007) ...................................................................................... 52

*Real-Time Reporters, P.C. v. Sonntag Reporting Servs., Ltd.*,
    2013 WL 5818460 (N.D. Ill. Oct. 29, 2013) ............................................................. 15, 56

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ......................................................................................... 34

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*RWJ Cos., Inc. v. Equilon Enters., LLC*,
    2005 WL 3544295 (S.D. Ind. Dec. 28, 2005) .................................................................. 31

*Save Our Little Vermillion Env't, Inc. v. Illinois Cement Co.*,
    725 N.E.2d 386 (Ill. Ct. App. 2000) ..................................................................... 42, 43

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir. 1970) ................................................................................. 35

*State Farm Auto. Ins. Co. v. Kiehne*,
    641 P.2d 501 (N.M. 1982) ...................................................................................... 51

*Swplaza III, LLC v. TSA Stores, Inc.*,
    2008 WL 703871 (C.D. Ill. 2008) ...................................................................... 52, 53

*Taracorp, Inc. v. NL Indus., Inc.*,
    73 F.3d 738 (7th Cir. 1996) ................................................................................... 52

*Thompson v. Gordon*,
    948 N.E.2d 39 (Ill. 2011) ...................................................................................... 52

*Triumph Packing Grp. v. Ward*, 834 F. Supp.
    2d 796 (N.D. Ill. 2011) ......................................................................................... 14

*Unite Here Health v. La Plaza Secaucus, LLC*,
    2014 WL 287447 (N.D. Ill. Jan. 27, 2014) ........................................................... 19

*United Airlines, Inc. v. Pappas*,
    809 N.E.2d 735 (Ill. Ct. App. 2004) ..................................................................... 33

*Utah Gospel Mission v. Salt Lake City Corp.*,
    316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) ................ 58

*Willow Hill Grain, Inc. v. Prop. Tax Appeal Bd. of the State*,
    549 N.E.2d 591 (Ill. Ct. App. 1989) ..................................................................... 33

*Woods v. Elgin, Joliet & Eastern Ry. Co.*,
    2000 WL 45434 (N.D. Ill. Jan. 11, 2000) ............................................................ 52

**Other Authorities**

11 Corbin on Contracts, § 56.20 .................................................................................. 32

N.Y. Business Law § 197 ............................................................................................. 35

Despite several chances and numerous lengthy filings, plaintiffs still cannot justify the "extraordinary and drastic remedy" of a preliminary injunction in this case.

*First*, plaintiffs will not suffer irreparable harm in the short period before this case resolves. Plaintiffs still have not come forward with any real evidence they will suffer a permanent business collapse—not temporary business loss—prior to the 2016 baseball season *and* remain closed forever. Plaintiffs offer only limited and deficient information for the two rooftop businesses, but provide nothing at all for the two rooftop properties. This failure is critical: the actual mortgage borrowers apparently are the rooftop *properties* and other entities owned by Edward McCarthy (the wealthy owner of all plaintiffs)—not the rooftop *businesses*. Plaintiffs have put forward not a shred of evidence the *correct* entities will miss a single payment, much less have their properties repossessed. Plaintiffs likewise offer no evidence the McCarthy-owned mortgage lenders would foreclose on McCarthy's own properties, or that McCarthy's co-borrower, non-plaintiff entity could not make any payment instead. More fundamentally, plaintiffs remain unable to meet their burden to establish customers will never return to the rooftop businesses after a trial before the 2016 season. In fact, plaintiffs' counsel got it right at the February 18 hearing when he confirmed plaintiffs' lack of evidence on this key point: "Now, could we reopen? Could we start up business again? ***Who knows?***" (Ex. 1, 2/18/2015 TRO Tr. at 133) There are, in fact, several mitigating options available for plaintiffs, their related entities, and their well-off owner, McCarthy, to avoid a permanent business destruction before trial—all of which demonstrate any harm here is not irreparable.

*Second*, there can be no question an adequate remedy at law exists to compensate plaintiffs if they were to prevail at trial. Plaintiffs concede they "are not claiming that a damages calculation on their breach of contract claim is mathematically impossible." (Dkt. 47, Pl. Reply

at 9)  It certainly is not.  There are several well-accepted damages calculations to make plaintiffs whole in this fixed-term contract case, if they later win at trial.  One well-settled approach is to consider plaintiffs' sales during the first 11 years of the parties' agreement to determine damages (if any) for the remaining nine.  Another approach is to compute the fair market value of plaintiffs' properties and businesses, as plaintiffs did and considered an adequate remedy just months before filing suit—belying their claim this is now an incalculable going-out-of-business case.  (Dkt. 1, Cplt. ¶ 94; Dkt. 21, Pl. Inj. Br. at 14)  There are certainly others.  The point is simply that plaintiffs' contract ends in 2023—and it is not difficult to calculate damages for any period between now and then.

*Third*, plaintiffs' claims have no chance of success, much less a likelihood.  The contract expressly allows defendants to undertake any expansion of Wrigley Field so long as they obtain government approval—which defendants unquestionably did here.  The outfield signs not only are part of the bleacher expansion as the government bodies recognized, but also expand, enlarge, and increase the size of Wrigley Field in several ways.  Moreover, the videoboard does not fall within any contract prohibition—a necessary requirement for a breach of contract action.  While plaintiffs point to Section 6.6's "windscreens or other barriers" language, they ignore this refers only to a narrow class of items like the windscreens, balloons, and inflatable tubes defendants publicly tested before the parties reached their settlement agreement in 2004.  A videoboard is a wholly different item that expands Wrigley Field and provides an amenity to fans in the ballpark.  This provision simply does not apply here.  Plaintiffs' antitrust claims fare no better.  They are barred by baseball's antitrust exemption and fail to meet the legal standard for an attempted monopolization claim.

*Fourth*, the balance of equities tips decidedly in defendants' favor. Plaintiffs knew the outfield signs would impact their views for nearly two years. Indeed, they claim by May 2013 it was "clear" their "sightlines would be substantially, if not completely blocked." (Dkt. 21, Ex. C, Hamid Decl. ¶ 16) Yet they delayed bringing their injunction request until months after construction began—all while defendants expended considerable resources on the videoboard and government-approval process. In addition, defendants already entered a contract with Anheuser-Busch for signage above the right field videoboard and would be harmed if advertisements cannot proceed.

*Finally*, the public will suffer from an injunction. Government authorities undertook an extensive public approval process for all elements of the Wrigley Field expansion project, including the outfield signs. Plaintiffs should not be permitted to override the process they already lost.

At bottom, plaintiffs cannot make the "clear showing" needed for a preliminary injunction and their request should be denied.

## BACKGROUND

## I.     CONSTRUCTION TO EXPAND AND RESTORE WRIGLEY FIELD IS WELL UNDERWAY.

Several years ago, defendants began investigating ways to improve historic Wrigley Field to remain competitive with other Major League ballclubs.[1] (Dkt. 27, Def. Inj. Opp. at 5; *id.* at Ex. 1, Rice Decl. ¶¶ 7-9) They settled on an expansion plan with several interrelated features:

- Bleacher Expansion:  New seats in the right and left field bleachers, a new bleacher fan deck, and improved and covered concessions. (*Id.*, Ex. 1, Rice Decl. ¶ 13)

---

[1] Unless otherwise specifically indicated, for the Court's convenience and ease of reference, this brief incorporates the arguments and evidence from defendants' motion to dismiss, TRO, and preliminary injunction briefing, and incorporates any other arguments and evidence not specifically referenced from those filings, but does not waive any arguments not repeated here.

- <u>Sign Expansion</u>:  Six additional signs structurally connected to the bleachers in the Wrigley Field outfield, including a videoboard in right field.  (*Id*. ¶ 14)

NEW OUTFIELD SIGNS AT WRIGLEY FIELD.

 

- <u>Property Expansion</u>:  Expanded property line by about 15 feet on Sheffield Avenue and 15 feet on Waveland Avenue.  (*Id*. ¶ 11)

- <u>Wall Expansion</u>:  Relocated and reconstructed exterior walls on Sheffield and Waveland avenues.  (*Id*.)

Critically, these expansion features all tie together.  There are not "two distinct construction projects at Wrigley Field" as plaintiffs wrongly claim.  (Dkt. 21, Pl. Inj. Br. at 25; Dkt. 27, Ex. 1, Rice Decl. ¶ 19)  An award-winning team of architects, engineers, and building experts engaged in an extensive, costly, time-consuming process to design the bleachers, fan decks, videoboards and signs, and other expansion features as a single plan with construction commencing during the 2014-15 offseason.  (Dkt. 27, Ex. 1, Rice Decl. ¶ 19)  As part of that interrelated plan, for example, the right field bleachers contain numerous steel structural columns that support *both* the bleachers and the outfield signs.  (*Id*. ¶ 20)  The steel columns extend 16 feet above ground—and protrude 4 feet above the new bleacher deck—and were designed to stabilize the bleachers and videoboard in extreme weather.  (*Id*.)  Six of the steel columns are located in the bleachers directly below the right field videoboard, and others are spread throughout the right field bleachers.  (*Id*.)  It cost defendants many millions of dollars to design the bleachers and order specially engineered steel sized and designed to withstand the weight of

the signs; without the signs, engineers could have used different steel and a different design. (*Id.* ¶¶ 19-21, 24) As another example, the right field videoboard will be installed atop the new, expanded bleacher patio, and the videoboard structure will provide a permanent overhead cover for a new, expanded concessions area. (*Id.* ¶ 17)

Defendants broke ground and began construction six months ago on their multi-year plan. (Dkt. 21, Pl. Inj. Br. at 16; Cplt. ¶¶ 100, 128; Dkt. 27, Ex. 1, Rice Decl. ¶ 12) Defendants tore down the right and left field outer walls, purchased approximately 15 feet of sidewalk and street on Waveland and Sheffield avenues, purchased specially-engineered steel and videoboards, installed steel, and poured a concrete foundation for the new, expanded bleachers. (Dkt. 27, Ex. 1, Rice Decl. ¶ 12) As plaintiffs acknowledge, as they sat and watched, "the construction that commenced on September 29, 2014 included installation of the seven signs announced by the Cubs Organization on May 21, 2014." (Dkt. 21, Pl. Inj. Br. at 16; *see also* Cplt. ¶¶ 100, 128) This includes the installation of millions of dollars of specially ordered steel supporting both the bleachers and signs defendants ordered months before. (Dkt. 27, Ex. 1, Rice Decl. ¶¶ 21-23)

Defendants also contracted with Anheuser-Busch for sponsorship rights above the right field videoboard, and Anheuser-Busch already paid defendants under the contract. (*Id.* ¶ 27) Plaintiffs knew about but allowed defendants to undertake these construction efforts *before* filing suit, and waited even longer to request a preliminary injunction in this case.

## II. CHICAGO CITY COUNCIL, CHICAGO PLAN COMMISSION, AND THE COMMISSION ON CHICAGO LANDMARKS REPEATEDLY APPROVED THE PROPOSED EXPANSION AND OVERRULED PLAINTIFFS' OBJECTIONS.

Defendants obtained government approval from the Chicago Plan Commission, City Council, and Commission on Chicago Landmarks for the entire expansion plan, including the bleachers and signs, following two years of meetings and public hearings during which several rooftops appeared. (*See* Dkt. 27, Def. Inj. Opp. at 7-8) The Landmarks Commission staff itself

recognized the project included the "*[e]xpansion of outfield signs and light[s]*" at the ballpark. (Dkt. 27, Ex. 10, 7/10/2014 Landmarks Comm'n Rec. at 3-4 (emphasis added))   And the additional signs, City Council and Plan Commission recognized, were *"part of the bleacher expansion"* of Wrigley Field.   (Dkt. 27, Ex. 6, 2013 Am. PD at ¶ 6 (emphasis added); *id.* (approving the signs "as an integral part of this Planned Development, the proposed expansion and renovation of Wrigley Field."))

## III.   THE WRIGLEY FIELD EXPANSION TODAY IS NOTHING LIKE THE WINDSCREENS AND OTHER BARRIERS INSTALLED BY DEFENDANTS BEFORE THE 2004 AGREEMENT.

In the early 2000s, the rooftop buildings surrounding Wrigley Field began selling tickets to Cubs fans to view games and events at Wrigley Field from their facilities.   The rooftops charged customers between $150 and $300 per ticket, all of which the rooftops kept as revenue. (Ex. 2, *Chicago Nat'l League Ball Club, Inc. v. Sky Box on Waveland et al. ("2002 Rooftop Litigation")*, No. 02-9105 (N.D. Ill. Dec. 16, 2002), Cplt., Dkt. 1)   The rooftops did not obtain defendants' permission to view and sell their product; nor did they pay any royalty to defendants for their ticket sales.   (*Id.*)

Prior to the 2002 baseball season (and until they settled with all rooftops in 2004), defendants explored ways to prevent the rooftops from using and selling their product for free. In December 2001, defendants attached large windscreens to the fences surrounding the bleachers as a way to obstruct the rooftops' views into Wrigley Field.[2]   The windscreens were made of a dark green material ("a curtain of dark green mesh, the sort that surrounds tennis courts") and hung on the outfield fences.   (Dkt. 41, Ex. 7 at 2)

_____

[2] *See, e.g.,* Ex. 3, Teddy Greenstein, *Cubs Exec Battles on 2 Fronts*, Chicago Tribune (Feb. 17, 2002) ("The fight turned nasty a few months ago when the Cubs attached dark windscreens to the fences that surround the bleachers."); Ex. 4, *Cubs, Rooftop Fans At Odds Again,* ESPN (Apr. 5, 2002) ("Dark screens hanging on the outfield fences to keep fans from getting free peeks inside. Yes, screens. In the latest skirmish between the Cubs and their Wrigleyville neighbors over a stadium expansion plan, greenish-black netting hung on the outfield fences Friday for Chicago's home opener against Pittsburgh.").

**Illustration 1:  2002 Windscreens**



Defendants also contemplated installing other barriers to block the rooftops' views.  For example, defendants publicly tested placing large helium balloons in front of the rooftops to obstruct views into the ballpark.[3]

**Illustration 2: Other Barriers—Helium Balloons**



---

[3] Ex. 5, Fran Spielman, *Cubs Play Hardball:  Tarps, Balloons to Block Rooftop Views of Wrigley*, Chicago Sun-Times (Apr. 4, 2002).  *See also, e.g.,* Ex. 3, Teddy Greenstein, *Cubs Exec Battles on 2 Fronts*, Chicago Tribune (Feb. 17, 2002) ("One idea under consideration is to use inflatable balloons to block the view from the rooftops."); Ex. 6, *Unfriendly Confines*, The American Spectator (Apr. 10, 2002) ("They have also threatened to hoist bunches of helium-filled balloons to further obstruct the sight lines from across the street."); Ex. 7, *Message Is Clear, Views Are Not At Cubs' Game*, The Clarksdale Press Register (Apr. 5, 2002) ("The screens are just part of the plan.  The Cubs also have a 'balloon plan' and can add balloons to the edge of the fence to further block the view from the rooftops."); Ex. 8, *Down In Front! Cubs Erect Tarps To Thwart Rooftop Business*, Sports Business Daily (Apr. 8, 2002) ("The Cubs put up dark screens on the perimeter fences of Wrigley Field before Friday's home opener against the Pirates 'to keep fans from getting free peeks inside' from rooftops . . . . However, the team 'held off on the second half of their plan, which called for helium balloons that would further obscure sight lines.'").

Defendants also tested large inflatable tubes to similarly obstruct the rooftops' line of sight.

**Illustration 3: Other Barriers—Inflatable Tubes**



Defendants ultimately decided to install windscreens for Opening Day in 2002. (Cplt. ¶ 34) The screens stayed in place for the remainder of the season. The rooftops and media viewed the windscreens (like the other barriers) as serving a single purpose: to obscure views from the rooftops into Wrigley Field.[4] They were not understood to enhance the fan experience; they were not part of any permanent Wrigley Field construction or expansion; and they were not approved by government authorities—indeed, the obstructions did not need any government approval or permit at all.

Defendants decided not to install any windscreens or other barriers for the 2003 baseball season. They instead sued 13 rooftops in December 2002 for violating the Lanham Act and various common law rights by freeriding on and profiting from defendants' property. (Ex. 2, *2002 Rooftop Litigation*, Cplt., Dkt. 1) As part of the litigation, defendants sought to enjoin the

---

[4] *See, e.g.*, Ex. 9, Paul Sullivan, *An Evolution to 'Beautiful Wrigley Field'*, Chicago Tribune (Apr. 23, 2014) ("the Cubs put up black windscreens in the back of the bleachers in 2002 to block views"); Ex. 5, Fran Spielman, *Cubs Play Hardball: Tarps, Balloons to Block Rooftop Views of Wrigley*, Chicago Sun-Times (Apr. 4, 2002). *See also, e.g.*, Ex. 10, *Cubs, Rooftop Owners Continue to Pepper Each Other*, Sports Business Daily (Apr. 4, 2002) ("the Cubs have 'ordered dozens of multicolored helium balloons to further obscure the bird's-eye view of the ballpark from the rooftops'").

rooftops from selling "admissions to view live baseball games played at Wrigley Field" and for damages for past profits. (*Id*. at 13) In January 2004, before the 2004 season began, several rooftops decided to enter a settlement agreement with defendants to end the litigation. Defendants agreed to dismiss their case against those rooftops and to no longer seek disgorgement of past profits or an injunction; in exchange, the settling rooftops agreed to pay defendants a 17 percent royalty from any tickets sold to their facilities over the next 20 years. (Dkt. 27, Ex. 3, 2004 Agreement) That is, the rooftops could continue operating without violating defendants' rights and avoided paying defendants for past damages—a sizable amount—provided they paid defendants a royalty on prospective revenue. (*Id.*)

The parties' contract did ***not*** change the fact defendants own Wrigley Field and, as owners, have the absolute right to use their property as they choose. To that end, the agreement contains no provision guaranteeing the rooftops a right to an unobstructed view into Wrigley Field for the life of the agreement. Nor is there any provision precluding the defendants from erecting signs or videoboards in the outfield. Indeed, the agreement contains only ***one*** prohibition, and even that is limited: defendants cannot erect "windscreens or other barriers to obstruct the views of the Rooftops." (Dkt. 27, Ex. 3, 2004 Agreement § 6.6) That is, defendants cannot erect the windscreens, balloons, inflatable tubes, or similar items they previously put up or openly threatened to install to block the rooftops' views prior to 2004. Defendants can otherwise use their property however they want. To make that clear, the contract specifically carves out an exception for "[a]ny expansion of Wrigley Field approved by governmental authorities" and includes no other provision prohibiting defendants from erecting other objects that happen to obstruct the rooftops' views.

Three rooftops refused to sign the January 2004 settlement agreement, including Lakeview Baseball Club. Those rooftops moved for judgment on the pleadings, which the court later denied. (Ex. 12, *2002 Rooftop Litigation*, Order Denying Motion for Judgment on the Pleadings, Dkt. 128) In those papers, plaintiff Lakeview Baseball Club recognized "[t]he Cubs exercised th[e] right of 'self-help' by erecting screens during the 2002 baseball season that impaired rooftop viewing of games." (Dkt. 27, Ex. 21, *2002 Rooftop Litigation*, Defendants' Motion for Judgment on the Pleadings, Dkt. 125 at 11) Importantly, they also acknowledged the status quo was "[t]he Cubs have the legal right to build a fence or wall that blocks rooftop viewing of games." (Dkt. 27, Ex. 20, *2002 Rooftop Litigation*, Proposed Findings of Fact, Proposed Conclusions of Law at ¶ 27; Dkt. 27, Ex. 21, *2002 Rooftop Litigation*, Defendants' Motion for Judgment on the Pleadings, Dkt. 125 at 14) In March 2004, two of these rooftops, including Lakeview Baseball Club, then settled with defendants.[5]

Litigation continued with the remaining rooftop. As the 2004 baseball season approached, defendants again threatened to obstruct that rooftop's views. Defendants considered installing the same windscreens and other barriers they utilized in the past.[6] As defendants informed the court at the time, "The Cubs [ ] intend to exercise their undisputed legal right to block [the remaining rooftop's] views of the Cubs' games" by "erect[ing] passive barriers." (Ex. 16, *2002 Rooftop Litigation*, Plaintiff's Status Report Regarding "Blocking," Dkt. 180 at 2; Ex. 11, *2002 Rooftop Litigation*, Plaintiff's Response To Defendant's Emergency Motion for an

---

[5] All plaintiffs here claim to be subject to the terms outlined in the January 2004 settlement. (Cplt. ¶¶ 39, 50)

[6] *See, e.g.,* Ex. 13, Fran Spielman, *Rooftop Holdout Asks Judge To Thwart Cubs' Reprisal*, Chicago Sun-Times (Apr. 8, 2004) ("[T]he Cubs have hired lighting and scenery experts to devise a way to block the view from Skybox on Waveland"); Ex. 14, Jim Allenspach, *Skybox To Be Blocked From Wrigley View*, Gapers Block (Mar. 22, 2004) ("The one remaining business, Skybox on Waveland, will have its view of the field blocked by the Cubs in some unknown manner. Screens? Big balloons?"); Ex. 15, *Skybox on Waveland Was Last Defendant*, ESPN (Apr. 9, 2004) ("The Chicago Cubs and a holdout rooftop business settled a federal lawsuit Thursday after the team had reiterated its plans to block the business' view of Wrigley Field starting with Monday's home opener.").

Injunction, Dkt. 182 at 11)  Shortly thereafter, the remaining rooftop signed onto the January 2004 settlement agreement, and defendants did not introduce anything to specifically obstruct rooftop views for the 2004 season.  Tellingly, since then, defendants have placed a hot dog cart topped with an advertisement in the same location as the videoboard here, audio speakers attached to support poles, football goal posts, and even a right field videoboard.  None was intended "to obstruct" any rooftop, and each offered an amenity to fans in the ballpark.  Plaintiffs did not challenge any of these features as breaching the parties' agreement, nor did any other rooftop.

## IV.    PLAINTIFF LAKEVIEW BASEBALL CLUB AGREED IN 2009 THAT A RIGHT FIELD VIDEOBOARD "DID NOT VIOLATE THE AGREEMENT."

In early 2009, defendants hosted the NHL Winter Classic hockey game at Wrigley Field and constructed a large, temporary Jumbotron videoboard in right field.  The videoboard was meant to enhance the fan experience, not to obstruct the rooftops' views.  Following the game, defendants and one rooftop plaintiff here became involved in litigation.  (Ex. 2, *Chicago Nat'l League Ball Club, LLC v. T. Lamb, Inc., d/b/a Lakeview Baseball Club ("2009 Rooftop Litigation")*, No. 09-1523 (N.D. Ill. Dec. 16, 2009), Cplt., Dkt. 1)  Lakeview Baseball Club refused to pay its 2008 royalty to defendants, claiming the Jumbotron videoboard "materially obstructed LVBC's view of Wrigley Field" and "obstructed almost half of the playing surface for the Winter Classic."  (Dkt. 27, Ex. 19, *2009 Rooftop Litigation*, 4/23/2009 Hr'g Tr. at 6; Ex. 17, *2009 Rooftop Litigation*, Defendant's Answer to Complaint, Dkt. 18 at 14)  Defendants thus terminated the parties' agreement for failure to pay the royalty and sued the rooftop for Lanham Act and various state law violations.  In response, Lakeview moved for a TRO and preliminary injunction to enjoin defendants "from erecting any [further] obstructions of LVBC's views of

11

Wrigley Field."[7]  (Dkt. 27, Ex. 15, *2009 Rooftop Litigation*, Lakeview Baseball Club Mtn. for Temporary Restraining Order, Dkt. 21 at 1)

Judge Darrah denied Lakeview's request for injunctive relief.  (Dkt. 27, Ex. 18, *2009 Rooftop Litigation*, 3/18/2009 Hr'g Tr. at 45)  Defendants and Lakeview then entered into a settlement agreement.  Defendants agreed to dismiss their lawsuit and reinstate the rooftop's contract; in exchange, Lakeview agreed to pay the 2008 royalty payment and reimburse defendants for attorneys' fees.  (Ex. 18, 3/26/2009 Amendment Between Lakeview Baseball Club and Chicago National League Ball Club, LLC §§ 2-3)  Notably, while Lakeview Baseball Club claimed during the litigation the videoboard "materially obstructed" its views, it expressly agreed during settlement that the videoboard "did not violate the Agreement and [was] not installed to obstruct the views from [the rooftop]."  (*Id.* § 5)  That is, Lakeview expressly acknowledged the right field videoboard did not violate any provision of the parties' agreement—including the windscreens language.

## V.  BEGINNING IN 2012, PLAINTIFF ROOFTOPS AND BUSINESSES—AND ALL APPLICABLE MORTGAGES—APPARENTLY RUN THROUGH EDWARD MCCARTHY, A WEALTHY INVESTOR.

The four plaintiffs here (Skybox on Sheffield, Lakeview Baseball Club, Right Field Properties, and Rooftop Acquisition) all trace back to a common owner:  Edward McCarthy. (Dkt. 21, Ex. C, Hamid Decl. ¶¶ 7, 9; Dkt. 21, Ex. D, McCarthy Decl. ¶¶ 1-2, 4-5, 7; Dkt. 21, Pl. Inj. Br. at 14; Cplt. ¶ 94)  McCarthy is the manager of Skybox and Right Field Properties, and a member of 424 Associates LLC, which in turn is a member of Skybox and Right Field Properties.  (Dkt. 21, Ex. D, McCarthy Decl. ¶ 1)  McCarthy also is the member and manager of

---

[7] Lakeview alleged in a counterclaim, that in 2002, "the Cubs installed windscreens along the fences surrounding the Wrigley Field bleachers. . . . [T]he Cubs' specific intent in installing the windscreens was to obstruct the views of Wrigley Field from the rooftops."  (Ex. 17, Dkt. 18 at 11)

CME Roofing Company LLC, the manager of Rooftop Acquisition LLC.  (*Id*. at ¶ 2)  Plaintiffs

even acknowledge McCarthy controls all four entities:  in July 2014, he was authorized and

offered "to sell the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties" to defendants.

(Cplt. ¶ 94; Dkt. 21, Ex. D, McCarthy Decl. ¶ 7; *see also* Cplt. ¶ 94 (McCarthy is an "owner"))

McCarthy's two rooftop businesses, Skybox and Lakeview, rent space from his rooftop

properties, Right Field Properties and Rooftop Acquisition.  (Dkt. 21, Ex. D, McCarthy Decl.

¶¶ 4, 5)  Notably, although plaintiffs did not provide any mortgage documents, publicly available

information reveals Skybox and Lakeview are not named on any mortgages.[8]  They simply pay

rent.  The rooftop *properties* instead are the mortgage borrowers.  (Exs. 19-21)  McCarthy's

Rooftop Acquisition has a single mortgage from a McCarthy entity, Wrigley Baseball Group

LLC (McCarthy is a member and the manager).  (Ex. 21)  And McCarthy's Right Field

Properties currently has two mortgages:  one from 424 Associates (McCarthy is a member and

the manager) and one from JP Morgan (on which McCarthy's 424 Associates is a co-borrower,

and McCarthy signed for the other borrower as well, Right Field Properties).  (Ex. 19; Ex. 20)

That is, two of McCarthy's other entities are the lenders for the two McCarthy rooftop

properties, and another McCarthy-controlled entity is a co-borrower on the third-party loan in the

mix.

## ARGUMENT

The Seventh Circuit recognizes a preliminary injunction is an "extraordinary and drastic

remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden

---

[8] Despite their burden to make a "clear showing," plaintiffs did not attach any of the actual mortgage or tax documents they reference in their "reply brief" and supplemental declarations.  Nor did they attach evidence of the relationships between the various properties, businesses, and Ed McCarthy.  Defendants have pieced these relationships together in this memorandum using publicly available documents.  (Ex. 19, 4/12/2013 Mortgage between Right Field Properties, LLC and JP Morgan Chase; Ex. 20, 2/26/2013 Mortgage between Right Field Properties, LLC and 424 Associates, LLC; Ex. 21, 1/31/2012 Mortgage between Rooftop Acquisition, LLC and Wrigley Baseball Group, LLC)

of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Reg.*, 430 F.3d 432, 437 (7th Cir. 2005). "A preliminary injunction is 'a very serious remedy,' and it is 'never to be indulged in except in a case clearly demanding it.'" *Triumph Packing Grp. v. Ward*, 834 F. Supp. 2d 796, 805 (N.D. Ill. 2011).

Courts in this Circuit "engage[] in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Daveri Dev. Grp., LLC v. Village of Wheeling*, 934 F. Supp. 2d 987, 995 (N.D. Ill. 2013). The threshold phase requires the plaintiff to satisfy three requirements: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* "If the court determines that the moving party has failed to demonstrate ***any one*** of these three threshold requirements, it must deny the injunction." *Id.* (emphasis added). The court does not even conduct the balancing phase—where it considers the harm to the defendant, public, and third parties—unless the plaintiff first satisfies all three threshold factors. Plaintiffs cannot prevail under either part of this two-tiered approach.

## I. PLAINTIFFS CANNOT SATISFY THE THRESHOLD REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

Plaintiffs' preliminary injunction briefing and declarations make clear plaintiffs cannot satisfy *any* of the threshold elements required for an injunction—much less all three. Any injunction here would be unprecedented and inappropriate.

### A. Plaintiffs Will Not Suffer Irreparable Harm Before Trial In The Absence Of An Injunction.

Plaintiffs do not dispute the only period that matters on this motion is between now and when this case resolves. (*See* Dkt. 27, Def. Inj. Opp. at 10; Dkt. 47, Pl. Reply at 1) "A party seeking a preliminary injunction must initially establish . . . 'absent a preliminary injunction, it

will suffer irreparable harm in the interim period prior to final resolution of its claims.'" *Real-Time Reporters, P.C. v. Sonntag Reporting Servs., Ltd.*, 2013 WL 5818460, at *1 (N.D. Ill. Oct. 29, 2013). As a practical matter here, that period is only several months. Plaintiffs need to show a *permanent* (not temporary) collapse of their businesses from any obstructions between April and October 2015 when the current baseball season ends. That is, a showing that revenue loss in the 2015 season would *permanently* prevent the rooftop businesses from ever operating in any future season, even if they ultimately win their claims at trial before the 2016 season begins. On this issue, plaintiffs offer only a "who knows?" as to whether they could reopen next season, not any evidence they cannot.

Indeed, there is no evidence at all of any permanent destruction. Plaintiffs offer no evidence the entities actually responsible for the mortgage and real estate payments cannot weather the storm during this short period; no evidence suggesting why entities owned by the same wealthy individual would foreclose on his own properties or evict his own companies; no evidence the non-plaintiff co-borrower would allow default on the only third-party loan; no evidence customers will never return in future seasons with or without a videoboard; and no evidence plaintiffs cannot otherwise keep their businesses afloat by restructuring the payment obligations to mitigate any risk of harm. Plaintiffs fall far short of meeting their burden for the "extraordinary and drastic remedy" of a preliminary injunction. *See Goodman*, 430 F.3d at 437.

### 1. Plaintiffs Still Have *No Evidence* Of Any Business Destruction Before Litigation Resolves.

Plaintiffs contend the two rooftop businesses, Skybox and Lakeview, will "become insolvent immediately" due to three large mortgage and real estate tax payments. (Dkt. 47, Pl. Reply at 4) This is both disingenuous and misleading. Nothing in the record shows either Skybox nor Lakeview actually holds any mortgage or pays any real estate taxes at all. Although

plaintiffs fail to provide any evidence of the mortgages, public documents indicate the actual mortgage borrowers are the rooftop *property* plaintiffs (Right Field Properties and Rooftop Acquisition)[9] and 424 Associates LLC—all entities owned and run by Edward McCarthy. (Ex. 19-21) This distinction is critical—the rooftop *property* plaintiffs have provided no evidence whatsoever. Regardless, as illustrated in Figure 1, plaintiffs' business entities apparently all run through McCarthy, and plaintiffs cannot mix and match entities to manufacture irreparable harm:

**Figure 1: McCarthy's Interest In Plaintiff Rooftop Businesses And Rooftop Properties**



_____

[9] As the property owners, Right Field Properties and Rooftop Acquisition are ultimately responsible for paying the property taxes, $6,709.59 and $1,795.87 per month, respectively. (Dkt. 39, Bue Decl. ¶¶ 11, 22)

(Ex. 22, 3/13/2015 Dudney Decl. at ¶ 20)  This is exactly why plaintiffs acknowledge McCarthy held the cards in deciding whether to sell *all* of the plaintiff businesses at "fair market value" to defendants before filing suit.  (Dkt. 27, Ex. D, McCarthy Decl. ¶ 7 ("At the meeting, I offered to sell 3627 Owner, 3633 Owner, Skybox and Lakeview Club to the Cubs for an amount I believed was below market value."); Cplt. ¶ 94 ("At the meeting, McCarthy offered to sell the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization at fair market value."))

There is more.  Another fact hidden by plaintiffs is McCarthy apparently is the common link among the mortgage borrowers ***and*** lenders.  The rooftop properties hold three mortgages in total—all of which involve a McCarthy entity.  McCarthy-controlled entities are the lenders on two.  McCarthy's company Wrigley Baseball Group is the lender for Rooftop Acquisition's only mortgage, and his company 424 Associates is the lender for one of Right Field Properties' two loans.  (Ex. 20; Ex. 21)  These McCarthy loans account for *all* of Rooftop Acquisition's mortgage payments and two-thirds of Right Field Properties' payments.  (*See* Dkt. 39, Bue Decl. ¶¶ 11, 22)  McCarthy also has his hands in the remaining one-third of the other mortgage:  Right Field Properties' mortgage from JP Morgan.  McCarthy's 424 Associates is a co-borrower and independently contractually obligated to pay the JP Morgan mortgage amounts.  (Ex. 19)  In other words, the rooftop property is not solely liable on the loan; McCarthy's 424 Associates separately and independently is responsible for the mortgage payments to JP Morgan.  Thus, McCarthy and his entities not only have an interest in, but also control the financial future of, all plaintiffs.

Plaintiffs have come forward with *zero* evidence Right Field Properties, Rooftop Acquisition, 424 Associates, or McCarthy—the actual entities on the hook for payments on the

loans—will be unable to pay the mortgages or property taxes or otherwise keep the businesses afloat. (*See* Ex. 22, 3/13/2015 Dudney Decl. ¶¶ 6-10, 15-17, 19, 23-29, 35, 44-46, 51-57, 63) Plaintiffs do not, for example, provide any evidence a McCarthy entity will miss a mortgage or rent payment to another, much less default on the mortgage obligations; have their properties repossessed (by McCarthy or anyone else); be unable to stay afloat until a trial on the merits; or somehow be destroyed.[10] *Cf. Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 800-01 (N.D. Ill. 1997) (no irreparable harm where plaintiff "failed to demonstrate that all options for paying . . . have truly been exhausted. . . . funding or financing one year of college education hardly seems an insurmountable burden for the Halls"). This even though Right Field Properties and Rooftop Acquisition are plaintiffs and the only entities (apart from McCarthy or his other companies) with the mortgage and real estate tax obligations plaintiffs reference.

Plaintiffs also do not provide any evidence McCarthy's 424 Associates, Wrigley Baseball Group, CME Roofing, or McCarthy himself could not defer mortgage payments (mostly to McCarthy entities) or take other steps to avoid plaintiffs' claimed insolvency. (*See infra* at 24-29) In fact, plaintiffs do not provide any evidence at all about those entities' or McCarthy's finances, such as their bottom lines, operating expenses, costs, assets, or ability to obtain additional funding. (Ex. 22, 3/13/2015 Dudney Decl. ¶¶ 26-27, 35, 46) Without this evidence, plaintiffs cannot meet their burden of showing irreparable harm for any plaintiffs, much less the ones who actually pay the mortgages and taxes. (*See* Dkt. 35, 2/19/2015 TRO Order at 9-10 ("[W]hether they can weather any storm (including a number of weeks when they cannot sell their product) depends significantly on their bottom line, their operating expenses, their costs,

---

[10] The same is true for rent payments owed by the rooftop businesses, Skybox and Lakeview. Plaintiffs have provided no leases, and there is no evidence the McCarthy-controlled property landlords would evict the McCarthy-controlled business tenants—all plaintiffs here.

and their assets."); *Hall*, 985 F. Supp. at 800-01; *Ditton v. Rusch*, 2014 WL 4435928, at *3 (N.D. Ill. Sept. 9, 2014) ("The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural."); *Unite Here Health v. La Plaza Secaucus, LLC*, 2014 WL 287447, at *2 (N.D. Ill. Jan. 27, 2014) ("Defendants correctly contend that the immediate nature of the stated harms are too undetermined to establish imminent harm."))

Plaintiffs also cannot establish irreparable harm by pointing to the only loan for which McCarthy is not the lender, the JP Morgan loan. For one thing, McCarthy's 424 Associates is a co-borrower and jointly and severally obligated to pay the JP Morgan mortgage amounts. (Ex. 19) That is, even assuming Right Field Properties could not pay the JP Morgan mortgage (which is entirely speculative and not supported by any evidence), 424 Associates would be contractually required to make the monthly mortgage payments itself—meaning no payments will be missed, Right Field Properties will not default, and JP Morgan will not have the right to repossess the property. Plaintiffs proffer *zero* evidence McCarthy's 424 Associates is unable to make its contractually obligated payments. In fact, plaintiffs provide no financial information for 424 Associates or McCarthy at all. But even putting aside 424 Associates' commitment to pay the mortgage, Right Field Properties itself has several alternatives available before a lender like JP Morgan could even consider a foreclosure process. (*Infra* at 24-29) And from there, it would take many months before the property could even be repossessed.

Plaintiffs do not provide the necessary information for Right Field Properties, Rooftop Acquisition, 424 Associates, Wrigley Baseball Group, CME Roofing, and McCarthy, the apparent owner/controller of all of them, for one indisputable reason: it would undermine their going-out-of-business claim. Public records show McCarthy is an active member, manager, or

19

principal of dozens of entities.  This includes Hogs Fly LLC, the registered owner of two private jets.  (Ex. 23, Hogs Fly LLC Business Report at 4)  Indeed, while plaintiffs boldly claim "[t]he Defendants also clearly know that when someone misses mortgage payments, like a Rooftop Business, they get foreclosed on, liquidated and sold for pennies on the dollar" (Dkt. 47, Pl. Reply at 5), they do not come clean on their own facts:  the key lender waiting for much of those payments is apparently McCarthy, the owner himself.  It is not credible that McCarthy's own business would evict his other business for failing to pay rent while this case proceeds to trial.[11] Nor does it make any sense that 424 Associates or Wrigley Baseball Group (both McCarthy entities) would foreclose on the rooftop properties for failing to make mortgage payments.  It may be less money or additional cost for McCarthy and his entities, but it is not irreparable harm. *See, e.g., Harrity v. Bank of Am. Corp.*, 2014 WL 3827802, at *1 (D. Nev. Aug. 4, 2014) ("Because there has not been a foreclosure initiated against the property—nor has one been threatened—the court finds that there is no 'real or immediate threat' of an irreparable injury. The mere fact that defendants have the power to initiate foreclosure at some future point, if they so choose, demonstrates only the potential for a speculative future harm.  This is not enough to warrant the extraordinary relief plaintiff seeks."); *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1194, 1198-1200 (W.D.N.Y. 1995) ("Kamine contends that if an injunction does not issue, Kamine will be forced to default on certain financial obligations to its lender . . . . [The lender] has already displayed some reluctance to take any steps which might drive Kamine out of business or disrupt the operation of the plant, and indeed it seems logically to have little incentive to do so.").

---

[11] And even if they did, the McCarthy-controlled properties could simply keep running rooftop businesses.

Moreover, plaintiffs' claim ignores the fact McCarthy, as lender and borrower, was apparently on both sides of the negotiating table and set the terms of the mortgage and rent payments. (Ex. 22, 3/13/2015 Dudney Decl. ¶¶ 9, 47-49) Plaintiffs cannot use their own artificial financial structure to now claim irreparable harm. And certainly if McCarthy's entities could set the rent and mortgage payments in the first place, they can defer, reduce, readjust, or refinance these payments now while this litigation proceeds. (*Id.*; *infra* at 24-29) *See Advanced Global Tech., LLC v. XM Satellite Radio Inc.*, 2008 WL 4387363 (S.D.N.Y. Sept. 24, 2008) ("While, on its face, the line of credit is limited to expenses associated with the XM agreement and Mrs. Lowinger's capital commitment expires if the relationship between AGT and XM is terminated, neither are arm's length transactions with third-party lenders scrutinizing the terms of financing. Instead, they are Edith Lowinger's financial commitments to herself. That Mrs. Lowinger could readily change those commitments rebuts any suggestion that AGT faces destruction if its relationship with XM ends."). At most, McCarthy and his entities will lose some investment money before trial, but this is nothing that cannot be recouped afterwards if plaintiffs prevail.

Finally, while plaintiffs contend the majority of customers will demand refunds if the rooftop businesses are obstructed, this does nothing to advance their claimed irreparable harm. (*See* Dkt. 47, Pl. Reply at 3-4) First off, that is not the agreement terms many of those customers signed. (Dkt. 27, Def. Inj. Opp. at 12; *id.*, Ex. 13-14) But it is irrelevant in any event. Even if the rooftop businesses had *no revenue at all* during the 2015 season (which they have not shown), these plaintiffs still have not made a "clear showing" they cannot make their rent payments, will be evicted, will become insolvent immediately, and will go out of business forever. (Ex. 22, 3/13/2015 Dudney Decl. ¶¶ 8, 18, 26-27, 36, 44-45, 63) *See Original Great*

*Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992) (Posner, J.) (reversing preliminary injunction after "assum[ing] with [plaintiff] that their income from the store will as a result drop to zero").

>   **2.      Plaintiffs Offer Nothing To Show They Cannot Reopen Their Doors If They Win At Trial.**

Ignoring the financial strength of the actual owner, manager, borrower *and* lender of the businesses, plaintiffs' irreparable harm theory tries to break new ground. Plaintiffs essentially want this Court to find irreparable harm any time an entity selling a single product claims it cannot survive without those sales—even for only a temporary period. (*E.g.*, Ex. 1, 2/18/2015 TRO Tr. at 134 ("[I]f the signs go up tonight, we're out of business simply because we no longer have a product to sell. It's our only product.")) That misses the relevant issue here. Regardless whether plaintiffs can operate during the 2015 baseball season, they must show they will suffer a ***permanent*** business collapse without an injunction. Sixty-five pages of briefing and nine declarations offer no evidence whatsoever they will lose their entire businesses *forever*—without the ability to reopen in the 2016 season or thereafter—solely based on several months of ticket sales. In fact, at the TRO hearing, plaintiffs' counsel removed all doubt plaintiffs have no evidence of any long-term destruction: "Now, could we reopen? Could we start up business again? ***Who knows?***" (Ex. 1, 2/18/2015 TRO Tr. at 133 (emphasis added)) Plaintiffs are the ones who not only need to "know," but also present evidence of permanent business destruction. They have not done so here.[12]

---

[12] Plaintiffs half-heartedly contend they will not be able to "fund the litigation if they are denied injunctive relief." (Dkt. 47, Pl. Reply at 11) Plaintiffs present no evidence they cannot finance their litigation. Indeed, as discussed, they do not provide any financials for the rooftop properties or McCarthy, the jet-owning controller and owner of all plaintiffs.

Plaintiffs claim it "ignores commercial reality" to think they could reopen their businesses in 2016. But they still cannot show why customers would refuse to purchase tickets again if plaintiffs won their claims at trial. Plaintiffs also continue to ignore the experience of other "similar" rooftops. (Dkt. 21, Ex. C, Hamid Decl. ¶ 3; *id.*, Ex. D, McCarthy Decl. ¶ 4; *see* Dkt. 27, Ex. 15, *2009 Rooftop Litigation*, Dkt. 22 at 1-2 ("customers do not typically differentiate one rooftop from another")) Annex Club, one of the nearby rooftops, closed operations for the entire 2008 baseball season and a substantial part of the 2009 season while it renovated its facilities. (Dkt. 27, Ex. 1, Rice Decl. ¶ 28) It survived during its hiatus—opening for business again for the 2010 baseball season—and remains in business today. (*Id.*) Under plaintiffs' view, they could never take the time to renovate their facilities during the baseball season or get through a few months of lost ticket sales because they could never reopen. That defies common sense, is not supported by any record evidence at all, and is contrary to the experience of "similar" rooftops.

The most plaintiffs will suffer is a temporary inconvenience. As plaintiffs' counsel stated at the TRO hearing: "And to say, well, maybe a month or two or three or six or twelve months from now, maybe the sign will come back down and you can go back into business? That's not what we ***want*** to do." (Ex. 1, 2/18/2015 TRO Tr. at 134-35 (emphasis added)) "Not what you want to do" is not evidence of irreparable harm. *See Hall*, 985 F. Supp. at 800-01 ("[T]he Halls presented no evidence that a one season delay will extinguish Reggie's college (and hopeful professional) career, thereby irreparably harming him. In fact, the Court takes judicial notice that numerous basketball players have gone on to stardom in the NBA and other professional leagues despite having missed the first season with their college basketball teams. Thus, while sitting out a year might inconvenience Reggie, he has not shown that such inconvenience would

cause harm that would be irreparable.").    Putting their preferences aside, all evidence demonstrates plaintiffs *can* operate again in 2016 if they close for part of the 2015 season, and there certainly is no evidence they cannot—refuting any irreparable harm claim.

In fact, this is now the third time these plaintiffs have cried wolf.  Back in 2009, one of the rooftop plaintiffs moved for a TRO and preliminary injunction to enjoin defendants "from erecting any obstructions of [Lakeview's] views of Wrigley Field."  (Dkt. 27, Ex. 15, *2009 Rooftop Litigation*, Lakeview Baseball Club Mtn. for Temporary Restraining Order, Dkt. 21 at 1)  The rooftop claimed its business would be "destroyed" by defendants' proposed obstruction. (*Id*., Lakeview Baseball Club Memo. for Temporary Restraining Order Dkt. 23 at 3)  Judge Darrah rejected this argument as "speculative" and "nothing of a concrete nature."  (Dkt. 27, Ex. 18, *2009 Rooftop Litigation*, 3/18/2009 Hr'g Tr. at 45)  Then at the TRO stage here, plaintiffs claimed they could not survive the loss of advanced ticket sales before the injunction hearing and instead would need to "liquidate the bank account."  (Ex. 1, 2/18/2015 TRO Tr. at 136; *id*. at 137 ("So I submit to your Honor that we have irreparable harm even in the period of several weeks."))  Yet here they remain.  Now, plaintiffs repeat the same refrain.  Plaintiffs' empty "destruction" rhetoric and paper mortgage obligation is no evidence they cannot compete again in 2016.

### 3. All Plaintiffs Can Stay In Business And Continue Operating After A Trial.

Plaintiffs also have not put forward a shred of evidence they have taken any steps to prevent the rooftop businesses from allegedly becoming insolvent before the 2016 baseball season or of closing their doors forever, never to reopen.  This Court said it well:  "Businesses can operate in difficult times and in lucrative times[.]"  (Dkt. 35, 2/19/2015 TRO Order at 9) Lakeview and Skybox have ample means of avoiding insolvency (and an eviction) during any

difficult period; the rooftop properties likewise need not face foreclosure; and all plaintiffs can take steps to make sure they can operate after this case is resolved. This is not a going-out-of-business case.

There can be no question plaintiffs can take several steps to avoid even their claimed irreparable harm:

- The rooftop properties could ask the McCarthy lenders, 424 Associates and Wrigley Baseball Group, to defer their mortgage payments pending the litigation; renegotiate the mortgage terms; or forgive portions of the mortgages. (Ex. 22, 3/13/2015 Dudney Decl. ¶¶ 52, 53, *see id.* ¶¶ 23-25, 47, 48, 58)

- McCarthy's entity 424 Associates is a co-borrower on Right Field Properties' JP Morgan mortgage and could pay the mortgage itself until trial concludes—as it is contractually obligated to do as a co-borrower. (*Id.* ¶ 23)

- Right Field Properties or 424 Associates could approach JP Morgan as well about a mortgage abatement or renegotiating mortgage terms. (*Id.* ¶¶ 52-53)

- The rooftop properties could sell non-core assets to make mortgage payments. (*Id.* ¶ 55)

- McCarthy's rooftop properties could defer or forgive rent payments from the rooftop businesses. (*id.* ¶ 49)

Any or all of these cost-free or minimal-cost steps would allow all four plaintiffs to get through any months of loss and remain in business in time for the 2016 season and future seasons. (*Id.* ¶¶ 10, 51, 57, 63) Moreover, plaintiffs do not deny they can still sell tickets to concerts at Wrigley Field (including four this summer)—which customers purchase even though they never have a view of the event. (Dkt. 27, Ex. 1, Rice Decl. ¶ 29; *id.* Ex. 13, , Skybox on Sheffield, "Buy Tickets: Terms and Conditions"; *id.*, Ex. 14, Lakeview Baseball Club, Terms and Conditions) And while plaintiffs contend they are not a tavern, nightclub, or restaurant (Dkt. 47, Pl. Reply at 2), they still have liquor licenses and could operate in these capacities for the short period until litigation ends.

Without evidence showing plaintiffs have no alternative means to hold out until 2016 and thereafter, they cannot demonstrate irreparable harm. *Hall* is instructive. There, a college basketball player claimed he would be irreparably harmed if forced to go one year without his scholarship because he could not pay for school in the interim. 985 F. Supp. at 800-01. The court concluded there was no irreparable harm because plaintiffs "failed to demonstrate that all options for paying for Reggie's school have truly been exhausted":

> The Halls were able to obtain loans for Reggie's fall semester, and provided no evidence that those lenders are unwilling to fund loans for the spring semester as well. Moreover, Ms. Hall earns approximately $61,000 per year and has only one dependent, Reggie. Ms. Hall did not testify to any unique financial burdens or responsibilities. In short, funding or financing one year of college education hardly seems an insurmountable burden for the Halls.

*Id*. at 801; *see also Orth v. Wis. State Emps. Union Council 24*, 2007 WL 1029220, at *2-3 (E.D. Wis. Mar. 29, 2007) (no irreparable harm where payments would be "burdensome," but plaintiffs had "not established that payment . . . would be impossible" and had "not explored any alternatives"). In other words, plaintiffs cannot claim irreparable harm if other alternatives could mitigate their injury. *See Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192-93 (S.D.N.Y. 1990) ("Any party claiming an injury is under a duty to mitigate its damages. A movant for extraordinary relief cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm."); *Am. Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947, 950 (2d Cir. 1974) (denying preliminary injunction because "[i]t would appear to be basic that American is obligated to mitigate its damages" and there was no evidence it could not advertise in other magazines); *Air Transp. Int'l Ltd. Liab. Co. v. Aerolease Fin. Grp., Inc.*, 993 F. Supp. 118, 123 (D. Conn. 1998) ("Even if [plaintiff] could demonstrate that it would be irreparably harmed, it must also show that it could not prevent such harm.").

26

Plaintiffs have put forward no evidence they exhausted their ability to stay afloat pending resolution of this litigation or to reopen in subsequent seasons. The evidence, in fact, suggests otherwise. For example, the mortgage between 424 Associates and Right Field Properties suggests plaintiffs could use alternative financing options to get through this baseball season. McCarthy's 424 Associates loaned the rooftop property $6.225 million in February 2013; just two years later, the property only owes $3.05 million. (Ex. 22, 3/13/2015 Dudney Decl. ¶ 58; Dkt. 39, Bue Decl. ¶ 12) The outstanding mortgage thus dropped by half in only two years, with an extra $3.175 million apparently in 424 Associates' pockets. McCarthy's 424 Associates entity could now use that $3.175 million to pay off the JP Morgan loan (on which it is a co-borrower); or if it instead holds onto that money, this is a far cry from an entity that cannot forgive or defer mortgage payments from the McCarthy-owned rooftop properties. Again, this is not irreparable harm.

As another example, the mortgage for Right Field Properties provides it can "be renewed, extended, supplemented, increased or modified and in effect from time to time, and all other notes given in substitution therefore, or in modification, renewal, or extension thereof, in whole or in part." (Ex. 20 at 2) Similarly, the mortgage for Rooftop Acquisition states it can be "extended upon the request of [Rooftop Acquisition LLC] for up to six (6) months." (Ex. 21 at 2) These measures would alleviate the claimed burden on the rooftop properties. In addition, all three loans include a final balloon payment, like the $2.45 million end-of-term obligation in the JP Morgan mortgage. (Ex. 19 at 15; Ex. 20 at 2; Ex. 21 at 2) This will require the rooftop properties to either have large amounts of capital on hand, take restructuring steps when the mortgages mature in 2018, or turn to outside sources (such as McCarthy himself) for the payment. (Ex. 22, 3/13/2015 Dudney Decl. ¶ 62) It is nonsensical to think the rooftop properties

could not take similar steps now. Indeed, this distinguishes plaintiffs' case from the going-out-of-business cases they cite. *E.g.*, *Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1247 (N.D. Ill. 1996) (plaintiff attempted to stay afloat by developing relationships with other doctors).

Another option is for plaintiffs to turn to their owner or related McCarthy entities for temporary financial support. (Ex. 22, 3/13/2015 Dudney Decl. ¶ 56) Indeed, consistent with the principle that plaintiffs must try to mitigate impending irreparable harm, courts "have found the economic status of a plaintiff's parent corporation to be highly relevant when a plaintiff seeks to show irreparable economic harm." *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 169-70 (D.D.C. 2012) *vacated and remanded on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012) (refusing to ignore "the economic status of a retail store's parent company, much less the subsidiary company which directly owns and operates the store . . . [which] undermines to a significant degree the showing of irreparable economic harm to the plaintiffs, *as the parent company's substantial resources are likely to mitigate any financial losses* incurred by the two [plaintiff] pharmacies as a result of the temporary suspension of their DEA registrations.") (emphasis added); *accord Ajilon Prof'l Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 & n.6 (D.D.C. 2007) ("Given the size and prominence of Ajilon and its parent corporation, there is no reason to believe that Ajilon's alleged loss of revenue threatens the company's ability to stay in business" because "Ajilon is a part of the Adecco Group . . . [which] enjoyed gross revenues of $26 billion in 2006."). And there is no suggestion, nor could there be, that McCarthy's livelihood would be threatened without an injunction or that he cannot keep his businesses afloat until trial or reopen them thereafter. *See, e.g., Advanced Global*, 2008 WL 4387363, at *5 ("Mrs. Lowinger is also the sole shareholder, director and president of NAFT, a company that

28

had net sales of $23 million in 2006, and whose success is in no way compromised by the Agreement at issue in this case. . . . Finally, there has been no suggestion that Mrs. Lowinger will not be able to survive financially until the time that money damages may be awarded in arbitration."); *Holiday CVS*, 839 F. Supp. 2d at 170; *infra* at 35-37.  Given plaintiffs have no evidence they will be gone forever before the 2016 season, they have multiple avenues anyway to stay in business pending resolution of this case, *and* there is no evidence plaintiffs pursued, much less exhausted, any of them, plaintiffs have not demonstrated irreparable harm.  *Hall*, 985 F. Supp. at 800-01.

**B.      Traditional Legal Remedies Will Adequately And Fully Compensate Plaintiffs For Any Harm Through Trial.**

**1.      Several Damages Calculations Are Available On This Fixed-Length Contract If Plaintiffs Prevail At Trial.**

Plaintiffs concede they "are not claiming that a damages calculation on their breach of contract claim is mathematically impossible." (Dkt. 47, Pl. Reply at 9)  This is no doubt true.

***Lost Ticket Sales Calculation.***   At the TRO hearing, plaintiffs conceded they could calculate "the harm if [defendants] built the sign and these are the number of tickets we would have sold and this is the amount of money we would lose[.]"  (Ex. 1, 2/18/2015 TRO Tr. at 21-22)  They even submitted a declaration after the hearing providing exactly the information needed to calculate damages if plaintiffs later prevail at trial—*down to the penny*.  (Dkt. 47, Ex. 1, Anguiano Decl. at ¶¶ 6, 15, 16)  This is a simple math problem, and a far cry from an inadequate remedy at law.  *See Chicago United Ind. Ltd. v. City of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006) ("The normal remedy . . .  is an award of damages, not an order of specific performance.").[13]

---

[13] Plaintiffs can also look to other rooftops' profits during the 2015 season.  Plaintiffs repeatedly concede their businesses are "similar to the businesses operated at fifteen other buildings located on the 3600 block of North

***Fixed-Length Contract Damages.*** Plaintiffs want the Court to ignore their easily calculable damages—and the multitude of cases rejecting injunctive relief where damages can be computed—claiming they "will be totally destroyed before the case even gets to trial for that calculation to take place." (Dkt. 47, Pl. Reply at 9-10) Not only is this rhetoric contrary to the McCarthy reality of plaintiffs' businesses, but it also ignores the fixed-length contract that caps the life of their businesses. Come 2023, the contracts end, regardless of the current dispute. Damages can be calculated during the remaining nine years (or any interim period) if plaintiffs ultimately prevail at trial—which provides an adequate remedy at law. This Court put it well in its TRO Opinion:

> The Rooftops are in the business of selling tickets to watch Cubs games and other events taking place at Wrigley Field and they have no expectation that they will be able to maintain that business after this eight-year term. Because this end date [December 31, 2023] is so identifiable and because the Rooftops have at least ten years of data showing their revenues, a loss amount is simple to calculate.

(Dkt. 35, TRO Order at 10-11; *see also* Dkt. 27, Ex. 11, 2/17/2015 Dudney Decl. ¶¶ 28-29, 35-36)

This Court's decision in *Marketing Werks, Inc. v. Brian Fox & Foxsano Mktg., Inc.*, 2013 WL 5609339 (N.D. Ill. Oct. 11, 2013), is directly on point and confirms plaintiffs have a damages remedy. There, the plaintiff sought to enjoin its former employee from working with a client with which it had a multi-year contract. But the plaintiff's fixed-length contract provided sufficient data for a lost profits calculation:

> This dispute concerns a fixed-length contract. [Plaintiff] has at least three years of data that shows the value of the [customer's] account to [plaintiff]. Should [the customer] award its account to [defendant], the parties will know the value of the

---

Sheffield, and the 1000 block of West Waveland." (*E.g.*, Dkt. 21, Ex. C, Hamid Decl. ¶ 3; *id.*, Ex. D, McCarthy Decl. ¶ 4; *see id.* Ex. E, Schlenker Decl. ¶ 3) Under the contract, these other rooftops maintain financial information, including ticket sales and profits, for each season, sufficient to calculate the applicable royalty. Comparing plaintiffs' figures for the 2015 season to these other rooftops can help compute any sales plaintiffs lose. (*See* Dkt. 27, Ex. 11, 2/17/2015 Dudney Decl. ¶¶ 30, 36)

> 2014 [customer] account. To the extent that the value of the [customer] account to [defendant] differs to that of [plaintiff], [plaintiff's] confidential information at issue here will likely permit an expert to predict what the value of the 2014 [customer] account to [defendant] would have been.

*Id*. at *3. This Court thus found an adequate remedy at law. *Id*.

Plaintiffs now contend *Marketing Werks* and other fixed-length contract cases are inapplicable because in each case the plaintiff "was not claiming that it would be forced out of business[.]" (Dkt. 47, Pl. Reply at 7) This is the wrong measure. The issue is whether damages could be calculated as a make-whole remedy to a business with an identifiable contract shelf life. Plaintiffs have a long revenue history under the contract. That provides tailor-made data to calculate any claimed business loss for the contract years that remain. (*See* Dkt. 35, TRO Order at 10-11; *Marketing Werks*, 2013 WL 5609339, at *3; *K. Schlanger Co. v. Eastman Kodak Co.*, 1987 WL 9315, at *3 (N.D. Ill. Apr. 6, 1987) (denying injunction; "There are no provisions in the Agreements that require [defendant] to continue the dealership relationship beyond the three-year period. In light of this fact the court finds that an award of monetary damages would adequately compensate [plaintiff] for the termination of the three-year dealership Agreements."); *RWJ Cos., Inc. v. Equilon Enters., LLC*, 2005 WL 3544295, at *8 (S.D. Ind. Dec. 28, 2005) (denying injunction; fixed-length contract fact "distinguishes this case from the situation described in *Roland Machinery*, where the court commented that termination of a business that could reasonably be expected to last ***indefinitely*** can amount to irreparable harm") (emphasis added); *Lake in the Hills Aviation Grp., Inc. v. Village of Lake in the Hills*, 698 N.E.2d 164, 185 (Ill. Ct. App. 1998) (reversing preliminary injunction; damages could be calculated based on

"lost profits for the duration of the agreement"); *see also* Dkt. 27, Ex. 11, 2/17/2015 Dudney Decl. ¶¶ 28-29, 35-36)  That is the point plaintiffs still do not address—and cannot dispute.[14]

*Fair Market Value Calculation.*  According to the Complaint and reiterated in the preliminary injunction request, plaintiffs "offered to sell the Plaintiff Rooftop Businesses and Plaintiff Rooftop Properties to the Cubs Organization at *fair market value*."  (Cplt. ¶ 94 (emphasis added); Dkt. 21, Pl. Inj. Br. at 14)  That is, just months before plaintiffs filed suit, they had no problem valuing their businesses and did not claim they had some equitable right to operate their businesses forever.  (*See* Dkt. 47, Pl. Reply at 9)  It is nonsensical to now think a money damages figure no longer exists or ceased being an adequate remedy.  Fair market value was then, and remains now, a perfectly appropriate measure for plaintiffs' businesses.  Plaintiffs offer no answer to this damages method.[15]

---

[14] Indeed, this is "[t]he long-standing rule in Illinois[.]"  *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1236 (Ill. Ct. App. 1992); *see Excelsior Motor Mfg. & Supply Co. v. Sound Equip., Inc.*, 73 F.2d 725, 728-29 (7th Cir. 1934) ("[D]amages for the interruption of a going business with consequent loss of profits may be recovered where proof is introduced as to the amount of profit made in the past during a like period . . . ."); 11 Corbin on Contracts, § 56.20 ("If the business is one that already has been established, a reasonable prediction can often be made as to its future on the basis of its past history.").  Plaintiffs pass over *Milex* and *Excelsior* because they "merely involved how to calculate damages." (Dkt. 47, Pl. Reply at 8)  They ignore that these cases *in fact* awarded damages for business interruptions and lost profits.  *Milex*, 603 N.E.2d at 1236; *Excelsior Motor*, 73 F.2d at 728-29.  This availability of damages exemplifies an adequate legal remedy and precludes injunctive relief.  *E.g.*, *NTE LLC v. Kenny Constr. Co.*, 2015 WL 500623, at *4 (N.D. Ill. Feb. 4, 2015) ("All of these alleged losses are calculable and compensable through monetary damages at law. Plaintiff has an adequate remedy at law.").

[15] Nor do they dispute, much less address, the fact their buildings and businesses have been sold several times since 2004.  (Cplt. ¶¶ 39, 50; Dkt. 27, Ex. C, Hamid Decl. ¶¶ 5, 7)  One sale valued the 3627 N. Sheffield Avenue property and business at $7 million and expressly delineated the value of "rooftop seat rights" and intangible assets. (Dkt. 27, Ex. 22, Real Estate Sales Contract for 3627 N. Sheffield)  Plaintiffs in this case likewise assessed a fair market value when they purchased the 3633 N. Sheffield Avenue property and business in 2012 and bought out an owner—in the face of defendants' proposed expansion plan.  (*See* Cplt. ¶ 50)  They valued the property then and can do so now.  *See, e.g.*, *Five Mile Capital Westin N. Shore SPE, LLC v. Berkadia Commercial Mtg., LLC*, 2012 Ill. App. (1st) 122812, ¶ 18 (denying injunction: "plaintiff itself has provided an idea of what the potential damages would be" by arguing property was worth $14 million more); *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 378 F.3d 29, 35 (1st Cir. 2004) (denying preliminary injunction: "[A] damages remedy was adequate to redress wrongful termination [of a license].  After all, in the months leading up to the parties' falling out, a buy-out of the license was discussed.  Such a sale would put a price on the value of the license to Matrix."); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 2014 WL 1227311, at *7 (N.D. Ill. Mar. 25, 2014) ("When a defendant's breach of contract deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the 'market value' of the asset.").  At most, McCarthy made a bad investment.  But as the case law makes clear, market value provides a ready-made formula to calculate any claimed damages in this case.

***Comparable Sales Transaction Values.*** Another well-accepted damages approach is to consider transactions involving comparable businesses. *See, e.g., United Airlines, Inc. v. Pappas*, 809 N.E.2d 735, 743 (Ill. Ct. App. 2004) ("The sales comparison approach [ ] is the preferred method and should be used when market data is available."); *Willow Hill Grain, Inc. v. Prop. Tax Appeal Bd. of the State*, 549 N.E.2d 591, 596 (Ill. Ct. App. 1989) ("Where there is evidence of comparable sales, the market approach should be used."); *see also In re Marriage of Perlmutter*, 587 N.E.2d 609, 619 (Ill. Ct. App. 1992) (recognizing comparable sales as an accepted valuation method in determining value of hotel). Plaintiffs do not deny six different rooftop buildings and businesses traded hands in the last few months.[16] These transactions assigned a value to both the rooftop property and the rooftop business, and were characterized by individual owners as a "fair price" and the "fair market value."[17] Plaintiffs do not dispute these recent sales can adequately compensate plaintiffs for any damages if they later prevail at trial. *See, e.g., Kreg Therapeutics*, 2014 WL 1227311, at *7 ("[E]vidence such as expert opinions, evidence of sales of comparable assets, or testimony of the asset's owner may be used to establish fair market value."); *see also Bremer Bank, Nat'l Ass'n v. John Hancock Life Ins. Co.*, 2006 WL 1205604, at *3 (D. Minn. May 2, 2006) (denying TRO: "Courts routinely determine damages in cases similar to this through the use of experts and comparable sales."); Dkt. 27, Ex. 11, 2/17/2015 Dudney Decl. ¶¶ 41-42.

---

[16] *See, e.g.*, Dkt. 27, Cplt. ¶ 105; Dkt. 27, Ex. 26, Jared S. Hopkins, *Wrigley Rooftop Owners Go To Court To Block Signs' Installation*, Chicago Tribune (Feb. 13, 2015) ("Jerry Lasky and Murray Peretz, partners in a Chicago commercial real estate business, have purchased some of the distressed mortgage debt of two buildings on Sheffield Avenue."); *id.*, Dkt. 27, Ex. 23, Ameet Sachdev, *Cubs Owner Buys 3 Wrigley Rooftops*, Chicago Tribune (Jan. 16, 2015); *id.*, Dkt. 27, Ex. 24, Ameet Sachdev, *Cubs Owner Pays $3 Million For Two Rooftop Apartment Buildings*, Chicago Tribune (Jan. 21, 2015); *id.*, Dkt. 27, Ex. 25, Jared S. Hopkins, *Wrigley Rooftop Owner, Bank Reach Settlement*, Chicago Tribune (Jan. 9, 2015).

[17] Dkt. 27, Ex. 24, Ameet Sachdev, *Cubs Owner Pays $3 Million For Two Rooftop Apartment Buildings*, Chicago Tribune (Jan. 21, 2015).

***Agreed Contractual Dollar Figure.***  Finally, apart from these well-accepted damages measures, the parties themselves contractually agreed on several mathematical formulae to calculate compensation in the event of a partial or completely obstructed view from the rooftops, as plaintiffs even concede.  (Cplt. ¶ 42 ("the Cubs and the Rooftop Businesses agreed to certain compensation mechanisms and formulas . . ."); Dkt. 27, Ex. 3, 2004 Agreement § 6.2) Section 6.2 provides a remedy if a rooftop becomes "no longer viable" due to a bleacher expansion and elects to cease operations until 2023.  (Dkt. 27, Ex. 3, 2004 Agreement § 6.2) Section 6.4 likewise provides a formula if the rooftop loses more than 10 percent revenue but nonetheless elects to continue operating.  (*Id.* § 6.4)  The point at this stage is not whether these contractual remedies apply here, or whether they apply to a breach of contract or something else (Dkt. 47, Pl. Reply at 10-11).  What matters now is the contract figure confirms the availability of a monetary remedy in the event a rooftop business became "no longer viable" or lost business because an expansion "impair[ed] the view from any Rooftop into Wrigley Field."  (Dkt. 27, Ex. 3, 2004 Agreement §§ 6.2, 6.4)  The parties understood and agreed upon a value for obstructed views—whether called "damages" or something else.

### 2.  Plaintiffs' Cases Do Not Demonstrate Damages Are Inadequate.

Plaintiffs want the Court to ignore these well-accepted damages methods, claiming they will go out of business immediately.  Plaintiffs suggest *Roland*, a case *reversing* an injunction, created a *per se* rule authorizing injunctive relief any time a company might go out of business. (Dkt. 47, Pl. Reply at 7-8)  *Roland*, however, simply identified scenarios when money damages "***can be*** inadequate."  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (emphasis added).  The Seventh Circuit has remained willing to deny injunctive relief even where a plaintiff's entire source of revenue would "drop to zero."  *Original Great Am. Chocolate Chip Cookie*, 970 F.2d at 277 (reversing preliminary injunction despite recognizing

34

"they will have to cease operating the store as a Cookie Company franchise and we may assume with them that their income from the store will as a result drop to zero").  Other courts likewise have rejected injunctive relief despite cries of business destruction where damages could be calculated.  *E.g.*, *K. Schlanger*, 1987 WL 9315, at *3 (rejecting argument plaintiff had "intrinsic value as a family-run business which cannot be valued in monetary terms" where there was a fixed-term contract); *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (affirming denial of preliminary injunction:  "The district court correctly observed that, because any potential injury suffered by [plaintiff] (including its going out of business) could be calculated and recompensed in the form of damages, [plaintiff] did not prove a likelihood of irreparable injury.").

Plaintiffs rely heavily on *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970), a Second Circuit case affirming the grant of a preliminary injunction to a family-run car dealership.  That case does not justify granting an injunction here.  The plaintiff there operated a family business for 20 years, protected by a statute automatically extending the franchise relationship beyond the contract term, and intended to pass the business to his son.  *Id*. at 1205; N.Y. Business Law § 197.  The court noted money damages were inadequate, as "the Semmes want to sell automobiles, not to live on the income from a damages award."  *Semmes*, 429 F.2d at 1205.  Plaintiffs try to mirror that language, asserting they have a "right to conduct a business, not live off a damages award."  (Dkt. 47, Pl. Reply at 9-10)  But that logic is inapposite here.

For one thing, McCarthy bought the rooftops as a new investment just three years ago and is not "living off" its revenues or any damages incurred in this case.  This is not a family-run business with deep emotional roots.  While plaintiffs now claim they do not want to "live off a damages award," they were perfectly happy to do so just months before filing suit when

McCarthy offered to sell the rooftop businesses and properties to defendants for what he determined to be "fair market value." (Cplt. ¶ 94; Dkt. 21, Ex. D, McCarthy Decl. ¶ 7) And unlike in *Semmes*, McCarthy as lender, borrower, and owner can simply move money around or grant himself forgiveness on his own entities' loans.

Other courts have refused to apply *Semmes* in cases like this where the plaintiffs are sophisticated entities or investors, not individuals like Mr. Semmes whose personal finances and generational business faced ruin without injunctive relief. For example, in *Advanced Global Tech., LLC v. XM Satellite Radio Inc.*, the court denied a request for permanent injunctive relief where the plaintiff AGT claimed it "was formed for the sole purpose of doing business with XM," and would be "forced out of business" without an enforced contract. 2008 WL 4387363, at *1, *5 (S.D.N.Y. Sept. 24, 2008). The court disagreed. AGT, the court explained, had a single member and director, Mrs. Lowinger, who could survive without injunctive relief:

> [T]here is not the slightest hint of actual harm to any real person or any real business, but only to a wholly artificial entity that serves as a convenient opportunity for Mrs. Lowinger to give her grandson some experience. There is no suggestion, let alone any evidence presented to the Court, that the loss of AGT would threaten the livelihood of Edith Lowinger, who is AGT's sole member, director and president. Indeed, Mrs. Lowinger is also the sole shareholder, director and president of NAFT, a company that had net sales of $23 million in 2006, and whose success is in no way compromised by the Agreement at issue in this case. . . . Finally, there has been no suggestion that Mrs. Lowinger will not be able to survive financially until the time that money damages may be awarded in arbitration.

*Id*. at *5. The same is true here. There is no suggestion, nor could there be, that McCarthy's livelihood would be threatened without an injunction or that he cannot keep his businesses afloat until trial. Again, less money in McCarthy's own pocket today is not an inadequate remedy. *See, e.g., Flagship Fed. Savings Bank v. Wall*, 748 F. Supp. 742, 747 (S.D. Cal. 1990) (distinguishing *Semmes* as "limited to its facts" and finding no irreparable harm: "There is no such personal right at stake for [plaintiff's] sophisticated and diversified investors."); *Adiel v.*

36

*Coca-Cola Bottling Co. of New York, Inc.*, 1995 WL 329275, at *1 (S.D.N.Y. June 2, 1995) (distinguishing *Semmes*: "Here, most of the plaintiffs are corporations, and there is no contention that any of the individual plaintiffs are trying to protect long-established lifestyles for themselves or their families."); *Holiday CVS*, 839 F. Supp. 2d at 170 (denying injunction: "it is not as if [plaintiffs] are self-sustaining 'mom and pop' stores which live or die based solely on the revenue they independently generate").

Ultimately, despite their numerous filings, plaintiffs still have not cited a single case finding an inadequate remedy at law where money damages were easily calculable and the plaintiff's business would necessarily end in a few years due to a fixed-length contract—let alone where (i) there is no evidence the plaintiff cannot "reopen" after resolution of the merits, (ii) the wealthy owner, borrower, *and* lender could easily keep the businesses afloat through trial, and (iii) the plaintiff had not yet mitigated its claimed loss. Plaintiffs simply cannot show inadequate money damages here.

### C. Plaintiffs Cannot Establish A Likelihood Of Success Because The Contract Does Not Prohibit The Videoboard And Instead Permits It As A Government-Approved Expansion.

Plaintiffs' contract claim does not have a likelihood of succeeding on the merits. (Dkt. 30, Def. MTD Br. at 23-24; Dkt. 49, Def. MTD Reply at 24-35) There is no dispute the Court need look no further than the "four corners" of the parties' contract. (Dkt. 21, Pl. Inj. Br. at 24; Ex. 1, 2/18/2015 TRO Tr. at 4-5) That unambiguous, fully-integrated agreement expressly allows defendants to undertake any expansion of Wrigley Field so long as they obtain government approval—which they undisputedly did. (Dkt. 27, Ex. 3, 2004 Agreement § 6.6; *see* Dkt. 21, Pl. Inj. Br. at 10, 15, 18; Ex. 1, 2/18/2015 TRO Tr. at 26) The videoboard is an expansion of Wrigley Field under every dictionary definition plaintiffs offer—and ones they ignore. (Dkt. 27, Ex. 1, Rice Decl. ¶¶ 17-21)

37

Plaintiffs nonetheless argue defendants should be precluded from installing the videoboard because, they say, the preceding sentence in the same contract section prohibits "windscreens or other barriers" to "obstruct the views of the Rooftop[s.]" (*See* Cplt. ¶ 248; Dkt. 21, Pl. Inj. Br. at 22) But plaintiffs seek to extend this provision beyond what contract construction principles allow. The videoboard is not in the same class of objects as the "windscreens or other barriers" defendants publicly tested prior to the 2002 baseball season to obstruct plaintiffs' views, meaning it does not fall within this prohibition. And plaintiffs impermissibly seek to decouple the only two sentences in Section 6.6 and excise important contract language to reach their forced reading. Ultimately, plaintiffs cannot overcome defendants' clear contract rights and, therefore, cannot establish a likelihood of success on their claim. *See, e.g., Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 747-49 (7th Cir. 2006) (affirming denial of preliminary injunction where "there was no evidence to demonstrate a likelihood of success on the merits" based on contract's express terms); *McCoy v. Gamesa Tech. Corp., Inc.*, 2012 WL 983747, at *3-4 (N.D. Ill. Mar. 22, 2012) (denying preliminary injunction where plain-text interpretation of contract permitted defendants' action).[18]

### 1. The Contract Confirms Defendants Have The Right To Construct Government-Approved Outfield Signs At Wrigley Field.

Section 6.6 of the contract expressly permits defendants to undertake any government-approved expansion: "Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section." (Dkt. 27, Ex. 3, 2004 Agreement § 6.6) The challenged videoboard here is an expansion of Wrigley Field in two fundamental ways: *first*, it is an integral structural component of the bleacher, wall, and overall

---

[18] Plaintiffs likewise still have not established a likelihood of success on their antitrust claims for all the reasons outlined in defendants' motion to dismiss briefing. (Dkt. 30, Def. MTD Br. at 2-17; Dkt. 49, Def. MTD Reply at 1-19)

expansion of Wrigley Field approved by multiple government authorities; *second*, even if viewed in isolation, contrary to its design, the videoboard itself remains an approved expansion of Wrigley Field.

Defendants' expansion of Wrigley Field includes several interconnected features, including new outfield bleachers, a new fan deck, expanded property lines and walls, concessions, and the signs. (Dkt. 27, Ex. 1, Rice Decl. ¶ 19) Two examples illustrate how these features fit together. First, the same six steel columns provide the structural support for both the bleachers and the right field videoboard. (*Id.* ¶ 20) These columns extend 16 feet above ground and protrude 4 feet above the fan deck. Engineers specifically designed these columns to stabilize both the bleachers and signs in extreme weather, and would have selected other materials but-for the videoboard's significant weight. (*Id.* ¶¶ 19-21, 24) That is, without the anticipated signs, the bleacher expansion project would have been designed differently (and at a lower cost) and the steel currently ordered and being installed would have taken a much different shape. (*Id.*) As another example, the right field videoboard will be installed above the new bleacher patio, and the videoboard's structure will create a permanent overhang for the new, expanded concessions area. (*Id.* ¶ 17) It is simply not possible, or appropriate, as plaintiffs attempt (Dkt. 21, Pl. Inj. Br. at 25), to isolate the videoboard from the remaining expansion pieces.[19] (Dkt. 27, Ex. 1, Rice Decl. ¶ 19)

---

[19] Plaintiffs do not dispute government authorities agreed the signs are part of the Wrigley Field expansion. (*See* Dkt. 27, Def. Inj. Opp. at 7-8, 27) Specifically, the Commission on Chicago Landmarks, Chicago Plan Commission, and City Council repeatedly recognized how defendants' plan expanded each of the bleachers, the signage, the outfield walls, and the property lines. (*E.g.*, Dkt. 27, Ex. 6, 2013 Am. PD at ¶ 6 ("Applicant shall have the right to expand the Wrigley Field bleachers to install [various signs]"), *id.* ("all other signage contemplated by this Planned Development, is integral to the expansion and renovation of Wrigley Field"); Dkt. 27, Ex. 4, 7/18/2013 Chicago Plan Comm'n Hr'g at 13 ("On Waveland this will also allow us to build the signage further to the north, above the left-field bleachers, lessening the impact on the roof tops on Waveland and providing space inside the park for food and beverage and back-of-house mechanical rooms and field equipment."); Dkt. 27, Ex. 9, 11/7/2013 Landmarks Hr'g at 10-11, 30-31 ("[T]here is a 2-foot air right expansion just next to the rail of the bleacher deck. And this is to allow for any extension of possible structure that may be necessary for the right-field sign[.]")) Nor do they dispute

Nonetheless, the videoboard remains an expansion of Wrigley Field even if the Court instead considers it in isolation. Plaintiffs initially selected a dictionary definition in their preliminary injunction and TRO brief defining "expand" as "spreading out," "increasing in size or in volume," "enlargement," "anything spread out," and "an expanded, dilated or enlarged portion or form of a thing." (Dkt. 21, Pl. Inj. Br. at 25) Then, at this Court's February 18 hearing, plaintiffs offered a narrower definition: expansion means "to make a thing larger, not to change that thing by adding new things to it." (Dkt. 41, Pl. MTD Opp. at 61; *see* Ex. 1, 2/18/2015 TRO Tr. at 40, 126, 130)

All of these "expansion" definitions describe the videoboard here. Calling the videoboard an "addition" puts it squarely within the "expansion" definition from several dictionaries regularly cited by courts in this Circuit: "EXPAND may apply whether the increase comes from within or without and regardless of manner (as growth, unfolding, ***addition of parts***)"; "To increase the size, volume, quantity, or scope of; enlarge: expanded her store ***by adding a second room***." (Dkt. 49, Def. MTD Reply at 25-26 (citing Merriam-Webster's Collegiate Dictionary and American Heritage Dictionary); *id.*, Exs. 12-13) Apart from conceding the videoboard is an "addition," the videoboard and signs fall within plaintiffs' "spreading out," "increasing in size or in volume" or "enlarging" definitions of "expansion" as well.

*First*, the videoboard and signs expand and enlarge Wrigley Field both *out* and *up*. Plaintiffs concede defendants are expanding "the stadium" and "adding more bleacher seats."

---

government authorities approved the "*[e]xpansion of outfield signs*" at Wrigley Field, as the Landmarks Commission explained in its own recommendation report. (Dkt. 27, Ex. 10, 7/10/2014 Landmarks Commission Rec. at 3-4 (emphasis added); *see* Dkt. 27, Ex. 27, 7/10/2014 Comm'n on Chicago Landmarks Hr'g at 21 ("an expansion of the signs in right field"), *id.* at 24 ("the sign and bleacher expansion in the outfield"), *id.* at 33 ("the sign and light expansion in the outfield"), *id.* at 51 ("Expansion of outfield signs and light: The proposed five outfield signs and two new light standards are approved as proposed."))

(Dkt. 27, Pl. Inj. Br. at 25-26; Ex. 1, 2/18/2015 TRO Tr. at 26-27 ("They're putting more bleachers out further over the sidewalk. That's an expansion.")) Nothing in the contract limits "[a]ny expansion of Wrigley Field," only to expansions *out*. Here, the videoboard and signs expand and increase the height, size, and volume of Wrigley Field upward as well. The current height of the right field bleacher and fan deck structure is about 16 feet above ground. (Dkt. 27, Ex. 1, Rice Decl. ¶ 17) The top of the additional videoboard and sign extends approximately 40 feet above this structure, and will expand, enlarge, and increase Wrigley Field by approximately 250 percent higher in right field. (*Id.*) The right field videoboard also expands, increases, and enlarges the Wrigley Field right field structure by 2250 square feet in total, 75 feet wide and 30 feet high. (*Id.*) Indeed, plaintiffs even allege the signs "will sit atop Wrigley Field" (Dkt. 21, Pl. Inj. Br. at 25)—*i.e.,* enlarging and increasing its height, volume, and size. And at the February 18 hearing, plaintiffs acknowledged defendants could erect a 50- to 100-foot wall *upward* without violating the agreement. (*See* Ex. 1, 2/18/2015 TRO Tr. at 28-29) Certainly a 40-foot videoboard upward is no different; both are an expansion of Wrigley Field.[20]

*Second*, the right field videoboard increases and adds to both the number and volume of LED boards at Wrigley Field and spreads advertisements and information among these boards. (Dkt. 27, Ex. 1, Rice Decl. ¶ 16) There currently is one LED board defendants installed prior to the 2012 baseball season adjacent to the right field bleachers. (*Id.*) The new right field videoboard adds a second LED board to right field and both increases, enlarges, and expands the volume of the physical LED space at Wrigley Field by approximately 350 percent. (*Id.*)

---

[20] The same is true for the right field light structure defendants are installing, extending approximately 102 feet above ground, which expands, enlarges, and increases the size of Wrigley Field in right field in connection with the right field videoboard and sign. (Dkt. 27, Ex. 1, Rice Decl. ¶ 18) If the unopposed light structure expands Wrigley Field vertically, so does the right field videoboard.

*Third*, the videoboard and signs increase, spread out and expand the volume of information available at the ballpark. (*Id.* ¶ 15) Specifically, the videoboard and sign increase and add to the amount of available team, player, and game statistics; the amount of historical information and behind-the-scenes content provided to fans; the number of advertisements during games and events; the information, scores, and highlights from other Major League Baseball games; and the ability to show video replays. (*Id.*) The additional signs and videoboard, in short, "expand Wrigley Field" in every possible way.

### 2. The Videoboard Is Not A "Windscreen Or Other Barrier To Obstruct The Views Of The Rooftops."

Plaintiffs cite a single contract provision they claim prevents defendants from erecting government-approved signs and videoboards: the "windscreens or other barriers" sentence in Section 6.6. (Dkt. 21, Pl. Inj. Br. at 25; Cplt. ¶ 248) Plaintiffs now contend this "absolutely prohibited" construction of "permanent barriers to obstruct views from the Rooftop Businesses." (Dkt. 41, Pl. MTD Opp. at 58) This is not what the contract says, and it ignores basic contract principles. Under Illinois law, "where general words follow an enumeration of specific things of a particular class, the general words are to be construed as applying only to things of the same general class as those enumerated." *Save Our Little Vermillion Env't, Inc. v. Illinois Cement Co.*, 725 N.E.2d 386, 390 (Ill. Ct. App. 2000). The first sentence of Section 6.6 prohibits only "windscreens" (a specific thing) and "other barriers" (general words) "to obstruct the views of the rooftop." The "other barriers" phrase must be interpreted to mean obstruction barriers like windscreens—such as the balloons, tubes, and other temporary barriers defendants tested before entering the contract—not something entirely different.

Indeed, courts have limited the reach of similar "other" phrases in this way. For example, in *Save Our Little Vermillion Env't, Inc. v. Illinois Cement Co.*, the court held "coal and other

minerals" did not include limestone. 725 N.E.2d 386 (Ill. Ct. App. 2000). "Other minerals," the court said, must be interpreted in light of "coal," which had different properties from limestone. *Id*. at 390 ("Coal is a source of energy that can be mined without disturbing the surface. Limestone is not combustible and cannot be mined without destroying the surface."); *see also Farley v. Marion Power Shovel Co.*, 328 N.E.2d 318, 320 (Ill. 1975) ("any house, building, bridge, viaduct *or other structure*" did not include a "self-propelled power shovel"); *Paul B. Episcope Ltd. v. Law Offices of Cambell & Di Vincenzo*, 869 N.E.2d 784, 797 (Ill. Ct. App. 2007) ("[T]he word 'other' will generally be read as 'other such like,' so that the persons or things therein comprised may be read as *ejusdem generis* 'with,' and not of a quality superior to or different from, those specifically enumerated.").

The same analysis applies here. The "windscreens or other barriers" provision refers to the sort of obstructions defendants erected between 2002 and 2004 for the purpose of obstructing plaintiffs' and other rooftops' views into Wrigley Field. Defendants considered installing a number of barriers, including dark windscreens inside the outfield fences, large helium balloons, and inflatable tubes. (*See supra* at 6-11) There is a common element among these barriers: each was what plaintiffs call a "self-help" measure to obstruct the rooftops' views into Wrigley Field prior to the settlement agreement. In fact, plaintiffs allege the windscreens even "became popularly referred to as 'the spite fence.'" (Cplt. ¶¶ 34, 35) Windscreens, helium balloons, and inflatable tubes are different items from a videoboard structurally connected to the bleachers. A windscreen, for example, is "a curtain of dark green mesh, the sort that surrounds tennis courts." (Dkt. 41, Ex. 7 at 3) It is temporary, easily removed, and does not require a government permit for installation. Compare this to a videoboard, a solid, permanent surface physically bolted into

massive steel columns running through the bleachers which construction must be approved by government authorities. They are not remotely in the same class of items.

Indeed, plaintiffs cannot square their "other barrier" interpretation with what they argued at the February 18 hearing. Twice plaintiffs unequivocally conceded a giant wall completely blocking plaintiffs' views would not violate any contract provision—not the "windscreen or other barriers" sentence or anything else:

- "If they put up a wall that was 100 feet, I wouldn't be here telling you they can't do that." (Ex. 1, 2/18/2015 TRO Tr. at 28)

- "If the Cubs were able to convince the Landmark Commission tomorrow that they want to build a 50-, 60-, 70-, 80-foot wall, I'm not going to be standing before you saying that that's unauthorized under this agreement." (*Id.* at 29)

Nothing distinguishes the 40-foot videoboard from a 50-foot wall. Neither is a "windscreen." And if a 50-foot wall is not a prohibited "other barrier," neither is a 40-foot videoboard. Plaintiffs got it exactly right at the hearing (both times), and they cannot run away from that admission now.

Nor can plaintiffs square their interpretation now with what they conceded a few years back. Plaintiff Lakeview claimed during litigation a right field videoboard "materially obstructed" its views, but later expressly agreed it "did not violate the Agreement and [was] not installed to obstruct the views from [the rooftop]." (Ex. 18, 3/26/2009 Amendment Between Lakeview Baseball Club and Chicago National League Ball Club, LLC, §§ 2-3) If the agreement allowed a videoboard in 2009, it certainly allows one now.

Plaintiffs' windscreen argument is flawed for an additional reason: Section 6.6 only prohibits windscreens or other barriers designed ***"to"*** obstruct—not ***"that"*** obstruct—the rooftops. (Dkt. 30, Ex. 1, 2004 Agreement § 6.6) In other words, it does not prohibit items that have the collateral effect of obstructing views. This language again is consistent with the

balloons, tubes, and other obstructions publicly tested between 2002 and 2004, which even plaintiffs concede prompted the contract limitation in the first place: "Prior to filing that suit, the Cubs installed a windscreen to obstruct the view from the Rooftop Businesses." (Dkt. 41, Pl. MTD Opp. at 57; *id.* at 59; Cplt. ¶¶ 34, 35)  The videoboard here, by contrast, is being constructed to enhance fans' experience; increase and expand the number of videoboards present in right field; provide additional, expanded information available to fans; and create additional revenue for other aspects of the expansion project.  Indeed, even plaintiffs acknowledge the videoboard is designed to obtain "more revenue from the outfield.  They wanted revenue to hire new players.  They want to be a more competitive team.  They wanted more revenue." (Ex. 1, 2/18/2015 TRO Tr. at 14)  This is exactly what plaintiff Lakeview conceded in 2009:  the videoboard there "did not violate the Agreement and [was] *not installed to obstruct the views from [the rooftop]*." (Ex. 18, § 5 (emphasis added))  In short, because the videoboard here is not being built "to" block anyone, it is not prohibited by this provision.

> **3.** **The Agreement Confirms The Approved Expansion Does Not Violate "This Section"—The "Windscreen Or Other Barriers" Provision— On Which Plaintiffs Rely**

Not only do plaintiffs want the Court to ignore the limited scope of the "windscreens or other barriers" provision, but they also attempt to read it in isolation from the other contract provisions.  Illinois law requires more.  *See, e.g., Arvelo v. Plaza*, 2014 IL App. (1st) 142494-U, ¶ 12 (refusing "to read the second sentence of the paragraph in question without consideration to the first sentence . . .": "a sentence in a contract cannot be read in isolation"); Dkt. 41, Pl. MTD Opp. at 61-62 ("[S]entences are not isolated units of meaning, but take meaning from other sentences in the same document.").  The same provision—indeed, the very next sentence— expressly allows defendants to move forward with any approved expansion of Wrigley Field:

> The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. ***Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.***

(Dkt. 27, Ex. 3, 2004 Agreement § 6.6 (emphasis added))  The last clause of Section 6.6 is key. It makes clear defendants will not violate "this Agreement, ***including this section***"—that is, the "windscreen or other barriers" section—so long as their expansion is government approved.

Plaintiffs go to great lengths to ignore the "including this section" language.  They selectively quote around it in their motion (Dkt. 21, Pl. Inj. Br. at 25-28), and entirely exclude it from their Complaint.  That is because it removes any doubt defendants can proceed with any government-approved expansion of signs, videoboards, or other features that obstruct plaintiffs' view:  a structure can be *both* a "windscreen or other barrier" *and* an expansion of Wrigley Field. Indeed, the only contractual limitation plaintiffs point to is the language in Section 6.6, so if "any expansion of Wrigley Field" approved by government authorities does not violate "this section," then it does not violate the windscreen provision.  The Court cannot excise the "including this section" clause from the contract as plaintiffs suggest.  *See In re Innovatio IP Ventures LLC Patent Litig.*, 956 F. Supp. 2d 925, 937-38 (N.D. Ill. 2013) ("The exception in the second sentence would be superfluous unless it carves out of the definition territory included by the first sentence."); *Arvelo*, 2014 IL App. (1st) 142494-U, ¶ 12 (refusing to accept interpretation that would "render the first sentence of the paragraph superfluous"); *see also Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004) (cited by plaintiffs) (refusing to read "[e]xcept as herein provided" out of the contract:  "A phrase beginning 'except' implies that the following language limits the parties' options; otherwise it is a waste of ink and paper."); Ex. 1, 2/18/2015 TRO Tr. at 39-40 (Plaintiffs' Counsel:  "[A] term when construing a contract

46

shouldn't be rendered meaningless. A contract shouldn't be interpreted to render something meaningless.").

### 4. Plaintiffs' Other Contractual Interpretation Arguments Also Ignore The Contract's Plain Language.

Plaintiffs assert various other arguments they claim prevent defendants from erecting the videoboard. None has any merit. Plaintiffs state throughout their brief the contract provided "twenty years of guaranteed unobstructed views into Wrigley Field." (*E.g.*, Dkt. 21, Pl. Inj. Br. at 1, 28; Dkt. 41, Pl. MTD Opp. at 58) Not so. The contract provision they cite (Section 4.1) simply creates a 20-year fixed term and says nothing about any rights under the agreement. No other provision states, for example, "the Cubs shall not erect anything that obstructs the view of the Rooftops." Nor does any provision say, as the Court noted at the hearing, "any expansion that has been approved is not negated by this agreement unless it blocks the sight of the rooftops." (Ex. 1, 2/18/2015 TRO Tr. at 129) Plaintiffs cannot now create new rights in litigation they did not secure at the bargaining table. *See Gallagher v. Lenart*, 854 N.E.2d 800, 807 (Ill. Ct. App. 2006) ("[A] court cannot . . . add new terms or conditions to which the parties do not appear to have assented [or] write into the contract something which the parties have omitted . . . A presumption exists against provisions that easily could have been included in the contract but were not."); *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 154 (Ill. Ct. App. 2000) ("[W]here the terms of a contract are clear and unambiguous, they must be enforced as written, and no courts can rewrite a contract to provide a better bargain to suit one of the parties.").

Plaintiffs next assert their contract interpretation is necessary to "avoid absurd results" because "[n]one of the[ ] terms and provisions make sense if the Cubs Organization could effectively terminate the Rooftop License Agreement moments after signing it" by obstructing

their views.  (Dkt. 21, Pl. Inj. Br. at 26-27; Dkt. 41, Pl. MTD Opp. at 64)  It is telling they now seek to retreat from the actual contract language.  *See Employers Ins. of Wausau v. Stopher*, 155 F.3d 892, 900 (7th Cir. 1998) ("[A]s in any contract matter, 'the intent relevant . . . is not the parties' subjective intents but their outward manifestations of it.'  Accordingly, '[w]e cannot extend coverage beyond that provided in the contract and we may not rewrite the plain and unambiguous language of the insurance contract.'"); *In re Flexible Automation Sys., Inc.*, 100 B.R. 986, 989 (N.D. Ill. 1989) ("[I]f this Agreement was meant to provide some lesser degree of participation and protection by the parties, the Agreement itself should have so specified. . . . This Court should not, and will not use the rules of contract interpretation to save a party from a bad deal or even a silly bargain—especially because it only appears to be a bad deal in retrospect given the subsequent events[.]").  Regardless, defendants' interpretation certainly would not "lead to a completely one-sided agreement that no prudent business person would have ever signed given the context of this case."  (Dkt. 41, Pl. MTD Opp. at 60)  The agreement at the time, and still today, makes perfect sense.

The settlement contract gave plaintiffs considerable benefits, even if an expansion immediately blocked their views into Wrigley Field.  As plaintiffs acknowledge, the parties' contract "was formed for the specific purpose of settling litigation initiated by the Cubs in 2002 seeking to prohibit the Rooftop Businesses from commercially exploiting their views into Wrigley Field."  (Dkt. 41, Pl. MTD Opp. at 57)  As part of that settlement, defendants agreed to forgo their claim for past damages—a sizeable monetary award.  This afforded plaintiffs a direct, immediate financial benefit, and distinguishes the "one-sided deal" cases they cite.  *See Baldwin Piano*, 392 F.3d 881 (7th Cir. 2004) (refusing to interpret agreement "so that major clauses fall out" and defendant had no "valuable right"); *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d

856, 861 (7th Cir. 2002) (refusing to interpret agreement "to pay an agent for work that the agent did not do").

Moreover, defendants' reading does not lead to an absurd result simply because plaintiffs' views will be blocked 11 years into the contract. No contract provision guarantees plaintiffs the right to an unobstructed view into Wrigley Field and, in fact, the agreement details a scenario in which plaintiffs could be rendered "no longer viable" during the contract term. Specifically, Sections 6.1 and 6.2 provide remedies if "the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable." (Dkt. 27, Ex. 3, §§ 6.1, 6.2) Section 6.4 similarly provides a remedy if a rooftop's gross revenue instead decreased by more than 10 percent due to a bleacher expansion. (*Id*. § 6.4) Plaintiffs cannot now seriously argue it would be absurd if their views are obstructed. That is precisely what the parties agreed could happen.

Finally, plaintiffs plead defendants should not be "given carte blanche to obstruct [their views] into Wrigley Field merely by obtaining either a building permit or a finding from the Landmark Commission that a proposed sign package did not violate Wrigley Field's Landmark status." (Dkt. 21, Pl. Inj. Br. at 28) But that is what the parties negotiated and the contract expressly allows. (Dkt. 27, Ex. 3, 2004 Agreement § 6.6) The agreement only prevented defendants from putting up windscreens, balloons, tubes, or other similar barriers for which defendants needed no government approval at all. For the Wrigley Field expansion, in contrast, defendants needed to obtain not one, but several government approvals. Plaintiffs had the opportunity to oppose that government approval each step of the way (*id*. § 6.5)—*which they did and lost*. They now must live with the consequences of their bargain.

49

### 5. The Extrinsic Evidence, Which The Court Need Not Consider, Demonstrates Plaintiffs' Claims Are Meritless.

Plaintiffs assert the parties' contract is unambiguous and should be interpreted by this Court "as a matter of law without the use of parol evidence." (Dkt. 21, Pl. Inj. Br. at 24 (citing cases)) Defendants agree. The Court should not consider any extrinsic evidence in the face of an unambiguous, fully integrated agreement. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 879 (7th Cir. 2005) ("The introduction of parol evidence to establish ambiguity in a facially unambiguous, signed, dated and fully integrated contract is a practice which the Illinois Supreme Court has, to this date, neither condoned nor sanctioned, and accordingly we refuse to do so today."); Dkt. 27, Ex. 3, 2004 Agreement § 12. Yet plaintiffs go on to argue "extrinsic evidence" anyway. None of their arguments can save plaintiffs' strained interpretation, and the extrinsic evidence inarguably supports defendants' reading of the agreement in any event.

As an example, in settling the 2009 litigation, plaintiff Lakeview confirmed the "windscreens or other barriers" provision was never meant to prevent structures like the videoboard. (Ex. 18, § 5; *supra* at 6-11) A videoboard is a videoboard and if plaintiff agreed it did not violate the agreement in 2009, it does not violate the agreement today. Indeed, even plaintiffs' description of the parties' intent undermines their current litigation-driven theory. Plaintiffs themselves contend "nobody in their wildest dreams ever thought Wrigley Field would ever have jumbotrons or video boards." (Dkt. 41, Pl. MTD Opp. at 59; *accord id.* at 61 ("[T]he Agreement exists to settle litigation which had nothing to do with signs[.]"); Ex. 1, 2/18/2015 TRO Tr. at 128 ("There hadn't been talk or discussion of billboards or jumbotrons"); *id*. at 31 ("There was no talk in 2002, 3, 4, or 5 about putting up a video board to block rooftop views. . . . The notion of video boards and jumbotrons is something that occurred after 2009 when the new owners came in.")) Accepting plaintiffs' allegation as true, the limited prohibition on

"windscreens or other barriers" certainly could not mean something the parties never intended. And there is no other contractual limitation allegedly restricting defendants' right to expand and modify the property they own.

Plaintiffs' claimed extrinsic evidence does not help their arguments. Plaintiffs contend extrinsic evidence suggests "any expansion" does not mean what it says, but instead is actually just limited to a "bleacher expansion" or, worse yet, the 2005-06 bleacher expansion. (Dkt. 21, Pl. Inj. Br. at 27, 28) This argument is entirely without merit and fails for at least five different reasons. *First*, Section 6.6 discusses "[a]ny expansion," and there is absolutely no limit on this term—to a bleacher expansion, the 2005-06 bleacher expansion, or anything else. Courts routinely hold the adjective term "any" is unambiguous and means "all or every" and "without limit." *E.g., Owens*, 736 N.E.2d at 154 ("any securities" was unambiguous: "The word 'any' has broad and inclusive connotations. . . . We also note that at least one definition found in Black's Law Dictionary states that the term 'any' as synonymous with 'either, every or all.'").[21] Plaintiffs cite just a single case, *Bank of Am. Nat'l Trust v. Schulson*, 714 N.E.2d 20 (Ill. Ct. App. 1999), which is readily distinguishable. That court refused to interpret "any principal payments with respect to the liabilities" to mean a payment could be made *at any time* (not any kind of payment), where a second provision required immediate payment. *Id*. at 24-25. Here, "any expansion" does not contradict a provision allowing "bleacher expansions" or any other

---

[21] *See also Dows v. Nike, Inc.*, 846 So. 2d 595 (Fla. Dist. Ct. App. 2003) ("The definition of 'any' . . . means 'one or another without restriction or exception,' often synonymous with 'either,' 'every' or 'all.'"); *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 836-37 (Okla. 2005) ("any insured" is "unambiguous and expresses a definite and certain intent to deny coverage to all insureds—even to innocent parties."); *State Farm Auto. Ins. Co. v. Kiehne*, 641 P.2d 501, 502 (N.M. 1982) ("We find that the endorsement excluding 'any kind' of liability when [a third party] was the driver of one of the insured automobiles is clear and unambiguous. . . . 'Any,' in its usual and ordinary sense, means 'without limit'"); *Lopez v. Dairyland Ins. Co.*, 890 P.2d 192, 194-95 (Colo. App. 1994) ("The term 'any' in its ordinary sense means 'every,' 'all,' 'the whole of,' and 'without limit.'").

provision. Indeed, even *Schulson* refused to limit contract terms where "two [provisions] can be read as consistent." *Id.* at 27.

*Second*, the use of the specific phrase "bleacher expansion" elsewhere in the contract undermines any claim that "any expansion of Wrigley Field" really just refers to "a bleacher expansion." (Dkt. 27, Ex. 3, 2004 Agreement §§ 4.3, 6.1, 6.2, 6.4) As the Seventh Circuit has held, "when parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744-45 (7th Cir. 1996) (declining to find contract imposed same indemnity obligations for two different facilities, where language describing one set of obligations was broader than other); *accord Woods v. Elgin, Joliet & Eastern Ry. Co.,* 2000 WL 45434, at *5 (N.D. Ill. Jan. 11, 2000) ("When parties to a contract use different terms to address similar issues, it is reasonable to infer they intend these terms to have different meanings."); *Swplaza III, LLC v. TSA Stores, Inc.*, 2008 WL 703871, at *8 (C.D. Ill. 2008) (finding that "then-total reconstruction cost" and "actual construction cost" unambiguously meant different things in the same contract: "had the parties meant actual cost [in the disputed provision], they would have said so.").[22] Plaintiffs fail to address the rule in these cases (Dkt. 27, Def. Inj. Opp. at 33-34 & n.17), instead claiming only *Taracorp* and *Woods* involved "clearly distinct words." (Dkt.

---

[22] *Accord Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("Because the parties used the term 'improvements' in section 2A of the contract, and used the term 'replacement' in section 2B of the contract, we presume that the parties chose the word purposefully, and will give effect to that language."); *Penncro Assoc., Inc. v. Sprint Spectrum, LP*, 499 F.3d 1151, 1156-57 (10th Cir. 2007) ("When a contract uses different language in proximate and similar provisions, we . . . assume that the parties' use of different language was intended to convey different meanings."); *Great Am. Ins. Co. v. Norwin School Dist.*, 544 F.3d 229, 246 (3d Cir. 2008) ("The use of different language to address the same or similar issue—namely, retainage—strongly implies that a different meaning was intended . . . . The same language was *not* used, however; and we must assume that the choice of different words was deliberate."); *Int'l Fidelity Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ('[S]ophisticated lawyers ... must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so.'); *Fowler v. Gartner*, 89 So. 3d 1047, 1048-49 (Fla. App. 2012) (refusing to equate "day" with "business day" in contract: "As a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended.").

41, Pl. MTD Opp. at 60-61)  But they ignore *Taracorp* and subsequent cases have been applied repeatedly to language like that present here.  *See, e.g., Swplaza*, 2008 WL 703871, at *8 ("then-total reconstruction cost" versus "actual construction cost"); *Fowler*, 89 So. 3d at 1048-49 ("day" versus "business day").

*Third*, plaintiffs' current argument contradicts what they argued at the February 18 hearing.  There, plaintiffs conceded the contract allows the current 2015 bleacher expansion. (Ex. 1, 2/18/2015 TRO Tr. at 26-27 ("They're putting more bleachers out further over the sidewalk.  That's an expansion. . . . That expansion is still going to block some of our views.  But we're going to live with it because we have a contract that says they can expand Wrigley Field."))  Plaintiffs were right then and cannot now argue the "any expansion of Wrigley Field" language expired with the expansion from ten years ago, as they now suggest.

*Fourth*, plaintiffs' limited reading of "any expansion" does not even help, as the signs are part of the bleacher expansion, as discussed *supra* at 39.  Indeed, plaintiffs do not deny government authorities recognized the signs are "part of the bleacher expansion."  (Dkt. 27, Ex. 6, 2013 Am. PD at ¶ 6)

*Finally*, plaintiffs' claimed limitation is belied by other rooftop contracts post-dating the 2005-06 bleacher expansion.  Several other rooftops entered into contracts with defendants in 2008—*after* the 2005-06 bleacher expansion—and all of those contracts include the same "any expansion" language.  (Dkt. 27, Ex. 29, 2008 Annex Am.; *id.* Ex. 30, 3/30/2008 Wrigley Rooftops III Agreement; *id.* Ex. 31, 3/30/2008 Wrigley Rooftops IV Agreement)  There would have been no reason to include the "any expansion" language in these post-2006 agreements if the language only applied to previously constructed, pre-2006 bleachers.  Plaintiffs offer no response at all to this point.

In short, as the parties agree, this Court need not consider extrinsic evidence. (Dkt. 21, Pl. Inj. Br. at 27) But even accepting plaintiffs' invitation to do so only confirms what the contract already makes clear: plaintiffs have no breach of contract claim.

## II. PLAINTIFFS CANNOT SATISFY THE BALANCING PHASE REQUIRED FOR A PRELIMINARY INJUNCTION.

Because plaintiffs cannot establish any threshold element required for a preliminary injunction—irreparable harm, inadequate remedy at law, nor any likelihood of success on the merits—the Court need not proceed to the balancing phase. *See Charles River Labs. v. Beg*, 2014 WL 4100714, at *3 (N.D. Ill. Aug. 19, 2014) (where "the plaintiff has failed to satisfy th[e] threshold requirement[s]," "it is unnecessary to . . . weigh the balance of harms"); *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996) ("[I]f it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms.").

Nonetheless, the balancing phase only confirms there is no need for an "extraordinary and drastic" injunction in this case. At the balancing phase, the court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Charles River*, 2014 WL 4100714, at *2. "The court is also obligated to consider the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id*. Both factors weigh heavily against a preliminary injunction.

### A. The Balance Of Equities Favors Defendants.

Plaintiffs claim defendants will suffer no harm without the videoboard. (Dkt. 21, Pl. Inj. Br. at 47) This is simply wrong. First, plaintiffs sat on their legal rights for months before filing suit—inconsistent with a request for injunctive relief. Plaintiffs now contend they were not

"forced to sue" defendants until December 2, 2014, because, they claim, the videoboard "would have had a smaller impact on the Plaintiffs" before then. (Dkt. 47, Pl. Reply at 12) This is belied by plaintiffs' own allegations and prior public statements.

Plaintiffs understood time and again since at least May 2013 the right field videoboard would substantially obstruct their views. (Dkt. 21, Pl. Inj. Br. at 8-18; *id.*, Ex. B, Anguiano Decl. ¶ 17; *id.*, Ex. C, Hamid Decl. ¶ 16; Cplt. ¶¶ 71, 73, 89, 92, 94, 97, 100, 106) For example, plaintiffs claim they viewed a "mock up" on May 28, 2013, showing it was "clear" their "views would be ***substantially, if not completely blocked***." (Dkt. 21, Ex. C, Hamid Decl. ¶ 16 (emphasis added); Dkt. 21, Pl. Inj. Br. at 10; *id.*, Ex. B, Anguiano Decl. ¶¶ 16-17) Plaintiffs also claim it was "clear" by May 2014 defendants' plan "would effectively ***destroy*** the Rooftop Businesses altogether." (Dkt. 21, Pl. Inj. Br. at 14; *id.*, Ex. D, McCarthy Decl. ¶ 6 (emphasis added); Cplt. ¶ 89) In fact, this caused them to threaten legal action against defendants in both July 2013 and May 2014. (Cplt. ¶ 88; Dkt. 21, Ex. A-4-1) And in July 2014, plaintiffs warned the Landmark Commission that approval of the "sign in right field" would "block the views of my customers." (Dkt. 21, Ex. A-4-1; Dkt. 27, Ex. 8, 7/11/2013 Commission on Chicago Landmarks Tr. at 151)

Moreover, plaintiffs' current argument ignores they nonetheless still waited nearly two months to file their complaint after December 2, 2014, and yet another three weeks to seek an injunction. All the while, defendants expended considerable resources, including approximately $2 million designing, purchasing, and constructing the custom Daktronics video scoreboard at issue here and millions more for steel for its structural support system. (Dkt. 27, Ex. 1, Rice Decl. ¶¶ 21, 24, 26) This, of course, came on the heels of defendants' long, successful navigation through the extensive government approval process, receiving approval from Chicago

55

City Council, Chicago Plan Commission, and the Commission on Chicago Landmarks to construct the signs. (Dkt. 27, Def. Inj. Opp. at 7-8)

Plaintiffs' substantial delay puts this case on all fours with *J.C. Penney Corp. v. Milwaukee Golf Dev. Co.*, 2006 WL 1215376 (N.D. Ill. May 3, 2006). There, the plaintiff voiced its opposition to a lease in October 2005, but waited to seek injunctive relief until April 2006, after the defendant expended millions of dollars on renovations and obtained permits for a new store. *Id.* at *4. The court determined the balance of harms weighed in the defendant's favor:

> [Defendant] claims that it has spent over $1.7 million on renovations so far, in addition to the resources that it spent to obtain the necessary licensing and permits for its operations. These significant investments will lay idle and not generate any return to [defendant] if the operation of the [store] is enjoined for the duration of this action. . . . [Plaintiff] has not provided a sufficient explanation for why it did not file the instant action and motion until April 2006, which was more than five months after it first objected to the [lease]. Due to [plaintiff's] late filing of the instant motion, Defendants have expended significant amounts of money that it would not have spent had [plaintiff] been successful in obtaining a preliminary injunction at an earlier date.

*Id.* Other courts, including this Court, have reached similar results. *See, e.g., Marketing Werks*, 2013 WL 5609339, at *3 (denying TRO where plaintiff "delayed in seeking emergency relief" until October 2013 after learning of conduct in September 2013: "the events leading up to this motion and the effects they have had or will have do not warrant a TRO"); *Real-Time Reporters*, 2013 WL 5818460, at *1 (no irreparable harm where plaintiff was aware of conduct in April 2013 but did not sue until July 2013: plaintiff's "claims are not consistent with its unhurried approach in seeking injunctive relief in this case"). Plaintiffs do not even attempt to distinguish or otherwise address this case law.

Additionally, a preliminary injunction here would harm defendants' revenue immediately and impact its sponsorship relationships. Defendants already are under contract with Anheuser-

Busch to provide an advertisement on top of the right field videoboard, and Anheuser-Busch has paid defendants under this agreement. (Dkt. 27, Ex. 1, Rice Decl. ¶ 27) Anheuser-Busch is one of defendants' Legacy Partners, the highest tier of corporate partnership, and among defendants' most important business relationships. (*Id.*) A preliminary injunction now would substantially harm defendants and outweighs any harm plaintiffs claim.[23] *See, e.g., EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 845 (N.D. Ill. 2011) (balance of the equities favored defendant where preliminary injunction "would require [defendant] to change a significant amount of its marketing materials"); *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 359 (7th Cir. 1997) (vacating preliminary injunction where defendant would forgo "a sizeable sum in application and user fees" while case was litigated).[24]

### B.    The Public Will Suffer If Plaintiffs' Motion Is Granted.

Plaintiffs fail to appreciate the harm of an injunction to the public, claiming "the effect on third parties, and the public interest, may not be implicated in all cases." (Dkt. 21, Pl. Inj. Br. at 22, 48) This is certainly a case where it is. There is a strong public interest here in enforcing the government-approved expansion project promulgated in a project-specific zoning ordinance, including the outfield signs and videoboard, which followed lengthy public debate and hearing in which plaintiffs undisputedly participated. (Dkt. 27, Def. Inj. Opp. at 7-8) As plaintiffs conceded in their opening brief, "[c]ourts have found a strong public interest in the enforcement

---

[23] Plaintiffs claim "the need to show irreparable harm [is] less important" because they claim to have strong merits arguments. (Dkt. 21, Pl. Inj. Br. at 48) This ignores they have no chance of winning their antitrust or contract claims. (*Supra* at 37-54 & n.19)

[24] Plaintiffs' only response is to claim *MacDonald*, 132 F.3d at 359 does not support denying an injunction "if issuing it would cost a defendant a significant amount of money," yet they admit the balance of equities still weighed in defendant's favor in that case. (Dkt. 47, Pl. Reply at 13-14) And they attempt to distinguish *EnVerve*, 779 F. Supp. 2d at 845, by saying the defendant submitted evidence of the actual dollar value of its harm, $174,581 (and the court found only a modest likelihood of success) (Dkt. 47, Pl. Reply at 13), but the court's injunction denial there did not turn not on the fact of a specific dollar figure, but rather because the injunction "would require [defendant] to change a significant amount of its marketing materials."

of public laws and regulations." (Dkt. 21, Pl. Inj. Br. at 22 (citing cases)) Plaintiffs then cannot claim an absence of harm to the public here where a significant piece of the government-approved Wrigley Field renovation is at issue. (Dkt. 27, Def. Inj. Opp. at 14-15)

Of course, plaintiffs' isolation of the videoboard is not the renovation plan defendants designed or submitted—or what the government authorities approved. The Wrigley Field expansion includes several interrelated features, including the outfield signs and videoboard. (Dkt. 27, Ex. 1, Rice Decl. ¶¶ 11-13, 19-24) That outfield signage also provides a valuable revenue source to help fund the privately-financed renovation. (*Id.* ¶ 10) The expansion, in short, is a single cohesive project, and one the government authorities approved in its entirety. *See J.C. Penney Corp.*, 2006 WL 1215376, at *5 ("the public interest is in favor of allowing the OTB Parlor to open and operate, as reflected by the actions of the municipal and state authorities, who have issued the necessary permits and licenses for the OTB Parlor to open and operate at the Shopping Center"); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1223 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) (denying preliminary injunction that "would undermine the public process by nullifying the decision of the City's elected officials"); *see* Dkt. 27, Ex. 6, 2013 Am. PD at ¶ 6.

Moreover, as discussed above, Anheuser-Busch already contracted to provide an advertisement on top of the right field videoboard and would be harmed too if it loses its ability to advertise to customers at the ballpark. Plaintiffs' own cases confirm an injunction is inappropriate in light of this harm. *See, e.g., Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974) (reversing preliminary injunction where "the New York and Baltimore port areas suffer injury by the grant of the injunction") (Dkt. 21, Pl. Inj.

Br. at 22). Plaintiffs do not deny Anheuser-Busch would lose its advertising ability if the Court grants a preliminary injunction.

Finally, plaintiffs cannot dispute the strong public support for the preservation of Wrigley Field. Cubs fans have signed petitions and voiced support for the *entire* plan. Business and trade groups like the Illinois Chamber of Commerce, the United States Chamber of Commerce, and the Chicago & Cook County Building & Construction Trades Council concur.[25] (Dkt. 27, Ex. 32; *id*. Ex. 33) Plaintiffs cannot eliminate that support by trying to carve out the part of the expansion they do not like.

## CONCLUSION

For the foregoing reasons and those explained in their motion to dismiss briefing, the Court should deny plaintiffs' preliminary injunction request.

Date: March 13, 2015                    Respectfully submitted,


                                        /s/ *Andrew A. Kassof, P.C.*
                                        Andrew A. Kassof, P.C.
                                        Daniel E. Laytin, P.C.
                                        Diana M. Watral
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, Illinois  60654
                                        Telephone:     (312) 862-2000
                                        Facsimile:     (312) 862-2200

                                        *Counsel for Defendants*

---

[25] Hundreds of highly skilled union tradespeople are employed on the 1060 Project to restore Wrigley Field, including many dedicated to the steel and the bleachers. (Dkt. 27, Ex. 1, Rice Decl.¶ 25)

## CERTIFICATE OF SERVICE

I, Diana M. Watral, hereby certify that on this 13th day of March 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the electronic service list:

Thomas M. Lombardo
Abraham E. Brustein
Di Monte & Lizak
216 Higgins Road
Park Ridge, IL 60068
Telephone:     (847) 698-9600
Facsimile:     (847) 698-9623
tlombardo@dimontelaw.com
abrustein@dimontelaw.com

*Attorneys for Plaintiffs*

/s/ *Diana M. Watral*
Diana M. Watral