IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 15 C 551 |
| | ) | |
| CHICAGO BASEBALL HOLDINGS, LLC, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

A few things are inevitable when it comes to spring baseball at Wrigley Field: the ivy won't be green, the weather won't be warm, there will be many who say, "This is the year," and there will be a battle between the Chicago Cubs and the rooftop businesses that surround Wrigley Field. This spring is no different. The decades-old battle began back in the late 1990s[1] and came to a head in 2002 when the Cubs sued certain Rooftop owners for misappropriating the Cubs' property rights by selling tickets to patrons to watch Cubs games from the Rooftops.[2] Rather than having a judge resolve that matter on the law at that time, the parties opted to settle their differences. On January 27, 2004, the Cubs (who were then owned by the Chicago Tribune) entered into an agreement (the "License Agreement") that permitted the Rooftops to continue their business of wining and dining fans on the rooftops of various buildings surrounding Wrigley Field while viewing, albeit at a significant distance, the baseball game being played within the Friendly Confines. The License Agreement in its simplest terms required the Rooftops

---

[1] *See* Charles Shifley, <u>Who Owns The View? Chicago Cubs v. Rooftop Owners, Or Chicago National League Ball Club, Inc. v. Sky Box on Waveland, L.L.C.</u>, 1 Nw. J. Tech. & Intell. Prop. 6 (2003); Gary Weshburn, <u>Cubs Start to Play Hardball; Wrigley Draws the Curtain on Nearby Rooftops</u>, Chi. Trib., Dec. 6, 2001, at 3.

[2] The case was captioned *Chicago Nat'l League Ball Club, Inc. v. Sky Box on Waveland, LLC, et al.*, No. 2 C 9105, and claimed misappropriation of property, copyright infringement, deceptive advertising, and unjust enrichment.

to give the Cubs 17% of their profits and in return, the Cubs agreed not to erect any barricades that would block the long-distance viewing of the game from across the street. There was, however, one clause within the License Agreement that permitted the Cubs to have an "expansion" of Wrigley Field if that expansion was approved by a "governmental authority." Therein, lies the rub. The Cubs, under the new ownership of the Ricketts family, are working to make THIS year the year, and in doing so, have received a government-issued permit to update the Friendly Confines with electronic signs and video boards that will entirely block the views of the field from the Rooftop clients. The Rooftops have cried foul and want the signs down, or they assert they will be put out of business entirely. The Cubs instead claim that their move is fair and within the expected understanding of the parties when they entered into the License Agreement eleven years ago.

The Rooftops, however, have not simply relied on the License Agreement to battle the Cubs this season. This time, they allege, the Cubs have gone too far and have engaged in anti-competitive practices to put them out of business. The Rooftops claim that the Cubs tried to bully them to price-fix (essentially to increase the price of their tickets) and when they refused, the Cubs retaliated against them by taking steps to erect the massive video board directly in front of their businesses. This antitrust claim may be new to the battle between the Cubs and the Rooftops, but it is not novel to Major League Baseball which, according to the Cubs, enjoys the benefit of being exempt from any antitrust claims. Relying on Supreme Court case law starting back in 1922, the Cubs say that the antitrust claims must fall.

The ultimate dispute hinges on both contract and antitrust claims. Because the Court finds that the Cubs did not breach the 2004 License Agreement and are exempt from being accused of antitrust violations under clearly established Supreme Court precedent, and even if they were

not, the Cubs did not engage in anti-competitive behavior, the Court denies the Rooftops' Motion for Preliminary Injunction primarily because the Rooftops have no likelihood of success on the merits. All of the other factors also weigh in favor of the Cubs as set forth below.

## PROCEDURAL HISTORY

On January 20, 2015, Plaintiffs, Right Field Rooftops, LLC, Right Field Properties, LLC, 3633 Rooftop Management, LLC, and Rooftop Acquisition, LLC, brought a nine-count Complaint against Defendants, Chicago Cubs Baseball Club, LLC, Wrigley Field Holdings, LLC, Chicago Baseball Holdings, LLC, and Thomas Ricketts, alleging a host of claims stemming from the Cubs' intention to install a "jumbotron" video board and billboard signage over the right field bleachers at Wrigley Field. (Dkt. No. 1.) The Rooftops sit on Sheffield Street in Chicago, Illinois, directly across the street from Wrigley Field. They sell tickets to patrons wishing to watch Cubs baseball games and other events, like concerts, occurring in Wrigley Field. The Rooftops contend that the construction will deprive them of their business.

Around three weeks after the Rooftops filed their Complaint, they sought a temporary restraining order ("TRO") and preliminary injunction enjoining the Cubs from installing the video board and any other signage. The Court held a TRO hearing on February 18, 2015 and denied the Rooftops' motion for TRO the next day because the Rooftops had failed to establish: (1) a likelihood of success on their antitrust claim, (2) irreparable harm, and (3) an inadequate remedy at law. (*See* Dkt. No. 35.) The Court set a briefing schedule for the Rooftops' preliminary injunction motion and listened to over seven hours of oral argument from the parties on March 23, 2015. The preliminary injunction pertains to Counts I, II, and VIII of the Rooftops' Complaint. Counts I and II allege that the Cubs' conduct constitutes attempted monopolization in violation of the Sherman Act, 15 U.S.C. §§2, 26, while Count VIII alleges anticipatory breach of

contract based on the 2004 License Agreement guaranteeing the Rooftops views into Wrigley Field through the 2023 Major League Baseball season. With the benefit of the parties' thorough briefs and argument, the Court now denies the Rooftops' motion for a preliminary injunction for the following reasons.

**BACKGROUND**

Instead of an evidentiary hearing, the parties presented oral argument on their respective filings which comprise over 1,500 pages. For the purposes of the preliminary injunction, the facts are largely undisputed. Accordingly, the Court takes the following facts from the Complaint, briefs, and exhibits filed with the Court.

The Rooftops control two buildings and businesses that sell tickets to view Cubs baseball games and other events taking place within Wrigley Field. Right Field Rooftops does business as the "Skybox on Sheffield" and operates at 3627 N. Sheffield. (Dkt. 1, Compl. at ¶ 1.) 3633 Rooftops Management does business as "Lakeview Baseball Club" and, as its name suggests, operates at 3633 N. Sheffield. (*Id.* at ¶ 3.) Since Wrigley Field's construction in 1914, spectators on the roofs of the buildings across the street on Sheffield enjoyed a view into Wrigley Field. (*Id.* at ¶ 15.) Starting in the 1980s, owners of the buildings began to turn their roofs into grandstands for spectators and in 1998, the City of Chicago enacted an ordinance formally allowing the rooftop businesses to operate for profit. (*Id.* at ¶¶23-24.) By 2002, there were eleven rooftop businesses operating for profit by selling tickets to patrons who wanted to watch Cubs games and other events from the roofs. (*Id.*) The City designated Wrigley Field as a landmark on February 11, 2004, adopting the prepared Landmark Designation Report and limiting future alterations to Wrigley Field. (*Id.* at ¶¶ 31, 37.) Throughout the City's landmark process beginning in 2000, the

4

Cubs expressed an intention to expand the Wrigley Field bleachers which they did in 2005. (Compl. at ¶ 43.)

Before the beginning of the 2002 Major League Baseball season, the Cubs installed a large green windscreen above the outfield bleachers. (*Id.* at ¶ 34.) The windscreen negatively impacted views from the rooftop businesses across Sheffield. (*Id.*) The Cubs proceeded to file suit against a number of the rooftop businesses on December 16, 2002, claiming that the rooftop businesses were misappropriating the Cubs' property by charging admission fees to watch Cubs games from the roofs. (*Id.* at ¶ 35.) Before the start of the 2004 baseball season, the parties to the 2002 litigation reached a settlement leading to a contract (the "License Agreement") in which the rooftop businesses agreed to pay the Cubs a royalty of seventeen percent of their gross revenues in exchange for views into Wrigley Field until December 31, 2023. (*Id.* at ¶ 38; Dkt. 21-3, Ex. C-2-A, License Agmt. § 3.1.) The License Agreement contains a number of provisions establishing protocol for the expansion of Wrigley Field, its potential effect on any rooftop business, and consequences:

6. ***Wrigley Field bleacher expansion.***

> 6.1 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs  the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable unless it increases the height of its available seating, then such Rooftop may in its discretion    elect to undertake construction to raise the height of its seating to    allow views into Wrigley Field and the Cubs shall reimburse the  Rooftop for    17% of the actual cost of such construction.

> 6.2 If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs  the View from any Rooftop into Wrigley Field such that the Rooftop's business is no     longer viable even if it were to increase its available seating to the maximum height    permitted   by law, and if such bleacher expansion is completed within eight years from the Effective Date, then if such Rooftop elects to cease operations . . . the Cubs shall    reimburse that Rooftop for 50% of the royalties paid by that Rooftop to the Cubs . . .

. . .

6.4 If the Cubs expand the Wrigley Field bleacher seating and such expansion impairs the view from any Rooftop into Wrigley Field such that the Rooftop's Gross Revenue in the year of expansion is more than 10% below the average Gross Revenue for that Rooftop in the two years prior to expansion . . . then the affected Rooftop can seek a reduction in the Royalty rate for all subsequent years of the Term . . .

6.5 Nothing in this Agreement limits the Cubs' right to seek approval of the right to expand Wrigley Field or the Rooftops' right to oppose any request for expansion of Wrigley Field.

6.6 The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that temporary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

(License Agmt. § 6.) The Cubs added approximately 1,790 seats to the bleachers of Wrigley Field after the 2005 baseball season. (Compl. ¶ 43.)

The integral time period for the instant lawsuit is from 2009 onward. In the Fall of 2009, the Ricketts family and controlled entities purchased 95% of the Cubs and acquired Wrigley Field from the Tribune Company, subject to the preexisting Rooftop License Agreement. (*Id.* at ¶ 44.) Soon after, the Cubs began to acquire ownership interests in a number of the rooftop businesses.[3] (*Id.* at ¶ 46.) The Cubs unsuccessfully attempted to purchase all of the rooftop businesses before beginning any construction. (*Id.* at ¶¶ 46, 49; Dkt. 27 at 9.) In early 2010, the Cubs announced plans to install a "Toyota" billboard in left field, which Ricketts said "[would not] affect any rooftops." (Dkt. 21-1, Ex. A-6-2, ESPN Chi. Article.)

In late 2011 and early 2012, the Cubs began to lobby the City for approval of a number of Wrigley Field renovations, including bleacher seating expansion, an outfield sign package, and

---

[3] The Cubs first acquired "Down the Line," a rooftop business located at 3621 N. Sheffield. In total, six rooftop businesses changed hands: three to the Cubs and three to unrelated investors. (Dkt. 27 at 9.)

two video boards. (Compl. ¶ 51.) On April 15, 2013, the Cubs announced the renovation plan would include a 6,000 square foot video board in left field and a 1,000 square foot billboard in right field. (Dkt. 21-1, Ex. A-8-2, Apr. 15 Trib. Article.) The Cubs released an illustration of the intended construction on May 28, 2013 to all the rooftop business owners and the illustration showed that the rooftop businesses would be largely blocked by the construction.[4] (*Id.*). (Dkt. 21-2, Ex. A-3-3, May 28 Article.) After many meetings and public hearings over the course of two years, where a number of rooftop businesses appeared and objected to the proposed construction, the Chicago Plan Commission, City Council, and Commission on Chicago Landmarks approved the Cubs' plan, including the construction of the bleachers, video boards, and billboards. (Compl. ¶¶ 75, 91; Dkt. No. 27, Exs. 4-10, 27-28.) The City approved the Cubs final plan to construct a total of eight outfield signs above the bleachers, including a video board in both left and right field. (Dkt. 27, Ex. 1, Rice Decl. ¶ 14.)

Throughout the approval process, the Rooftops maintain that representatives of the Cubs made a number of statements acknowledging their obligations to the Rooftops and demonstrating their intent to drive the Rooftops out of business. Specifically, the Rooftops claim that Ricketts and other Cubs executives found the License Agreement to be a "bad deal" for the Cubs and that the business relationship led to a "price war" on Cubs tickets. (Dkt. 21-2, Ex. B, Anguiano Decl. ¶¶ 6-8.) The Rooftops allege that the Cubs demanded the Rooftops set minimum ticket prices and that failure to do so would lead to getting blocked. (*Id.* at ¶ 15.) The Rooftops refused to agree to set minimum ticket prices.[5] (*Id.*) The Rooftops further contend that they offered the space above their properties for the billboards and signs at no cost to the Cubs, but the Cubs

---

[4] A July 2014 rendering similarly showed that the signage approved for right field would substantially block the Rooftops. (Dkt. 21-1, Ex. A-10-1.)

[5] At oral argument, for example, the Cubs expressed concerns that the Rooftops were lowering the value of their tickets by selling Rooftops tickets on Groupon and other discount vendor sites.

refused. (Dkt. 21 at 17.) Once the City approved the Cubs' initial construction plan in July 2013, the Rooftops allege that the Cubs engaged a number of rooftop business owners in strong-arm negotiations to purchase their properties. (*Id.* at 18.) In May 2014, Ed McCarthy, one of the owners of the Rooftops, proposed a potential sale to the Cubs of both Rooftops. (Dkt. 21-4, Ex. D, McCarthy Decl. ¶ 6.) McCarthy claims that he offered to sell the Rooftops to the Cubs for below market value, but was met by a Cubs representative stating that McCarthy "better take" whatever the Cubs offer because the buildings would be worth nothing once they no longer had views into Wrigley Field. (*Id.* at ¶¶6-8.) The Cubs offered McCarthy a significantly lower number and McCarthy refused. (*Id.* at ¶¶ 10-12.) The Cubs also told McCarthy that they would block any rooftop business they did not purchase.[6] (*Id.* at ¶ 13.)

The Cubs began the construction and restoration process in September 2014. (Rice Decl. ¶ 12.) The Cubs have removed the outfield outer walls, purchased approximately fifteen feet of sidewalk and street on Waveland and Sheffield Avenues, purchased and installed steel beams, and poured a concrete foundation for the bleachers. (*Id.* at ¶ 12.) In total, the construction entails new seats in the outfield bleachers, a new "fan deck" in the bleachers, increased concessions, signs and video boards, and new light systems. (*Id.* at ¶ 13.) The steel beams used in the construction support both the bleachers and signs, and the Cubs contracted with Anheuser-Busch for sponsorship rights above the right field video board. (*Id.* at ¶ 27.) The right field video board additionally serves as an overhead cover for the enlarged concessions area. (*Id.* at ¶ 17.) The total estimated cost of construction materials is $32 million. (*Id.* at ¶ 21.) As it currently stands, the Cubs are placing the right field video board directly in front of the Rooftops, while the Cubs-owned rooftop businesses are left unobstructed.

---

[6] The Rooftops contend that as the Cubs have acquired certain rooftop businesses, they have altered their construction plans in an effort to block the remaining competing rooftop businesses. (Dkt. 21-1 at 25.)

## **LEGAL STANDARD**

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481 (7th Cir. 2015), and that he has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). "On the merits questions, 'the burdens at the preliminary injunction stage trace the burdens at trial.' " *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). A party seeking injunctive relief "has the burden of proving by a clear showing" that the injunction is warranted. *Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007). If the moving party meets these threshold requirements, the district court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Stuller*, 695 F.3d at 678. The Court must also consider the public interest in granting or denying the injunction. *See id.* In this balancing of harms conducted by the Court, the Court weighs these factors against one another "in a sliding scale analysis." *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir.2006). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.' " *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## **DISCUSSION**

As the Court stated in its opinion denying the Rooftops' motion for TRO, "it may be possible that with further briefing and analysis under the preliminary injunction hearing . . . one interpretation of that contract will prevail. (Dkt. No. 35 at 6.) Such is the case. Armed with the License Agreement, briefs, and arguments from the parties, the Court concludes that the Rooftops have not established a likelihood of success on the merits on their breach of contract claims. *See Adkins*, 779 F.3d at 481 (to establish the first requirement for a preliminary injunction, movant must demonstrate "that he is likely to succeed on the merits"). Nor have the Rooftops corrected the defects with their antitrust claims since the Court denied their motion for TRO. Because the Rooftops are unable to demonstrate a chance of succeeding on the merits on either of the claims pertinent to their preliminary injunction request, the Court denies the Rooftops' motion for a preliminary injunction. Moreover, even if the Rooftops had established any likelihood of success on their antitrust and contract claims, they still have not satisfied their burden of showing irreparable harm in the absence of injunctive relief, despite their financial statements showing they will be insolvent if the construction continues, nor an inadequate remedy at law. Having considered the economic realities of the situation, the Rooftops have not conclusively shown that (1) foreclosure is imminent or (2) that they will go out of business permanently. Without these showings, the Court does not find that the Rooftops will suffer irreparable harm or that money damages would not make them whole. *See Barland*, 751 F.3d at 830 (inadequate remedy at law prerequisite to preliminary injunction). Consequently, the Rooftops have not shown that a preliminary injunction is appropriate in this case. The factors of the preliminary injunction are discussed below.

## I.      Likelihood of Success on the Merits

### A.      Antitrust Claims

Counts I and II of the Rooftops' Complaint allege attempted monopolization. The Rooftops argue that the Cubs' conduct in attempting to set a minimum price for tickets, attempting to purchase all rooftop businesses, actually purchasing three rooftop businesses, threatening to block any rooftop business with signage if they do not sell to the Cubs, and commencing the construction at Wrigley Field that will block the Rooftops constitutes anticompetitive, monopolistic behavior in violation of the Sherman Act. The Sherman Act prohibits attempts to monopolize interstate commerce and authorizes the Court to issue injunctive relief to prevent monopolization. *See* 15 U.S.C. §§ 2, 26. Because the Rooftops' allegations fall within the Major League Baseball antitrust exemption, and, even if they did not, the Rooftops are unable to demonstrate a plausible relevant market emanating from Cubs games, the Court concludes that the Rooftops have not demonstrated any likelihood of success on their antitrust claims.

### 1.      Major League Baseball Antitrust Exemption

Long before the Rooftops began selling tickets to watch Cubs games, the Supreme Court in a series of decisions exempted Major League Baseball from the reach of antitrust laws. *See Fed. Baseball Club of Baltimore v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208 (1922) (the Sherman Act had no application to the "business [of] giving exhibitions of base ball"); *Toolson v. New York Yankees*, 346 U.S. 356, 357 (1953) (after recognizing that Congress had thirty years since *Federal Baseball* to bring baseball within the antitrust laws and had not done so, concluding that "the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws");

*Flood v. Kuhn*, 407 U.S. 258, 283-84 (1972) (because Congress had acquiesced in the baseball exemption by inaction, "the business of baseball [is] outside the scope of the [Sherman] Act"). With 93 years of jurisprudence to attack, the Rooftops argue that the baseball exemption does not apply to individual team franchises and that, if it does, the exemption does not apply here because the Rooftops' business is "not necessary to produce the game on the field" and therefore outside the scope of the exemption.

Most likely recognizing that there is established law that Congress has not altered legislatively in spite of numerous commentators arguing it should, *see* D. Logan Kutcher, Note, Overcoming an "Aberration": San Jose Challenges Major League Baseball's Longstanding Antitrust Exemption, 40 J. Corp. L. 233 (2014); Michael J. Mozes, et al., Adjusting the Stream? Analyzing Major League Baseball's Antitrust Exemption After American Needle, 2 Harv. J. Sports & Ent. L. 265 (2011), the Rooftops attempt to circumvent the exemption by distinguishing it. The Rooftops contend that the baseball exemption only applies to the league and to league rules, not to individual franchises. They further argue that the exemption has not been expanded past matters pertinent to putting on the game, and does not apply to issues collateral to it. Not only because both the Supreme Court and the Seventh Circuit have taken a broad reading of the baseball exemption, but also because the Cubs' business and conduct is central to "the business of providing public baseball games for profit," *Toolson*, 346 F.3d at 356-57, the Court finds that the Rooftops' have no likelihood of success on their antitrust claims.[7]

---

[7] The Supreme Court has made clear that the baseball exemption from anitrust law is limited solely to baseball. *See generally Radovich v. Nat'l Football League*, 352 U.S. 445 (1957) (football not exempt); *United States v. Shubert*, 348 U.S. 222 (1955) (theatre); *United States v. Int'l Boxing Club*, 348 U.S. 236 (1955) (boxing). To the extent the Rooftops rest their antitrust claims on other events taking place within Wrigley Field such as concerts, football games, and hockey games, the Rooftops have demonstrated no likelihood of success because they fail to allege a relevant market, as discussed below.

The Rooftops' first contention that the baseball exemption is inapplicable to individual team franchises is unsupported by the relevant case law. The *Toolson* defendants themselves included the New York Yankees, the Cincinnati Baseball Club, and both the owner and general manager of the Cincinnati club. *See Corbett v. Chandler*, 202 F.2d 428 (6th Cir. 1953), *aff'd sub nom.*, *Toolson v. N.Y. Yankees, Inc.*, 346 U.S. 356 (1953). More fundamentally, however, the Rooftops' reading of the baseball exemption is overly narrow. The exemption applies to the "business of baseball" in general, not solely those aspects related to baseball's unique characteristics and needs. *See Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978) (despite references to the player reserve system in Supreme Court precedent, "it appears clear from the entire opinions . . . that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws"); *see also City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 689-90 (9th Cir. 2015) (plaintiff's contention that baseball exemption only applies if activity is "sufficiently related to 'baseball's unique characteristics and needs' " discarded because nothing in Supreme Court precedent suggests that the exemption is "based on some fact-sensitive analysis of the role" the activity played within the baseball industry).

The Cubs' business of manufacturing Cubs baseball and presenting that product to the public is not an "incidental matter" to the business of baseball and falls within the baseball exemption. *See San Jose*, 776 F.3d at 690 (baseball exemption does not apply to activities "wholly collateral to the public display of baseball games"); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264 (9th Cir. 1975) (exemption did not apply to antitrust claim levied by baseball franchise against stadium concessionaires). Nor is the Rooftops' business of selling tickets to watch Cubs games outside the exemption's scope. The

antitrust claims here allege that "[t]he Cubs organization produces professional baseball games ("Cubs Games") to be commercially exploited in various product formats across various markets." (Compl. ¶¶ 111, 151.) The Rooftops contend that the Cubs' conduct will prevent them from offering views of baseball games to the public. Few, if any, issues can be as central to the "public display of baseball games" as producing those very same baseball games for public display.[8] The Rooftops' allegations are simply a different wording of "the business of providing public baseball games for profit." *Toolson*, 346 U.S. at 356-57. Accordingly, the baseball exemption applies here and therefore the Rooftops' antitrust claims must fail.

### 2. Relevant Market

Even if the baseball exemption did not apply, the Court would nevertheless conclude that the Rooftops have not demonstrated any likelihood of success on the merits of their antitrust claims because they have failed to establish a plausible relevant market. To prove attempted monopolization, the Rooftops must show the Cubs' "(1) specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). Here, the Cubs do not contest that the Rooftops could plausibly demonstrate that the Cubs acted with a specific intent to monopolize but argue that the Rooftops have failed to allege or establish a plausible relevant market.

In order to establish the "dangerous probability" prong, the Rooftops must demonstrate that the Cubs had sufficient market power to threaten actual monopolization within the relevant market. *See Indiana Grocery, Inc. v. Super Yalu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.

---

[8] Congress explicitly stated that the antitrust laws do not "create, permit, or imply a cause of action by which to challenge . . . the marketing or sales of the entertainment product of organized professional baseball." 15 U.S.C. § 26b(b)(3).

1989); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993) (to establish attempt to monopolize under § 2 of the Sherman Act, antitrust plaintiff must provide a "definition of the relevant market and examination of market power"). The Rooftops have not demonstrated any likelihood of success on their antitrust claims because they do not, and cannot, provide a plausible relevant market.

Although "market definition is a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001), failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim. *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *see also, e.g.*, *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (Kendall, J.) (court should not "blindly accept a market definition proposed in a complaint" and antitrust claims lack merit when a plaintiff "fails even to attempt a plausible explanation as to why a market should be limited in a particular way") (internal citations and quotation marks omitted)). To establish a relevant market, the Rooftops must define both a geographic market and a product market. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004). The Rooftops allege, alternatively, that two relevant markets exist: a "Live Cubs Game Product" market and a "Live Rooftop Games Product" market. (Compl. ¶¶ 116, 157.) Geographically, the Rooftops assert that the market for the products is either: (1) Wrigley Field and the sixteen total rooftop businesses lining Sheffield and Waveland Avenues or (2) only the sixteen rooftop businesses. (*Id.* at ¶¶ 121, 161.) At its most basic, however, both markets revolve around and rely upon the Cubs' production of Cubs professional baseball games. (*Id.* at ¶ 111.) For this reason, the Cubs challenge the Rooftops' proposed relevant markets.

15

The use or uses to which a product is put controls the boundaries of the relevant market. *United States v. E.I. DuPont deNemours & Co.*, 351 U.S. 377, 396 (1956). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2012). The Rooftops contend that live Cubs games form the market. The Rooftops specifically allege that the relevant product market influenced by the Cubs' conduct is "the market for watching Live Cubs Games, which consists of consumers who pay money to watch live-action Cubs Games, in person, as the games take place on the field at Wrigley Field." (Compl. ¶ 116.)[9] In essence, the Rooftops' antitrust claims rest on the Court concluding that a market exists for live-action Cubs games alone.

The Rooftops' proposed relevant market cannot stand because it is comprises a single brand product. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (district court correctly rejected that a specific brand constituted its own market); *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014) ("*House of Brides I*") ("law usually requires that a relevant product market for antitrust purposes comprise more than a single brand"); *Int'l Equip.*, 2013 WL 4599903, at *4 (antitrust claims are meritless "[w]hen a complaint limits the relevant market to a 'single brand, franchise, institution, or comparable entity that competes with potential substitutes' ") (quoting *Todd*, 275 F.3d at 200). Here, because the Cubs necessarily compete with other Major League Baseball teams, sporting events, and other live entertainment for revenue, the relevant market cannot be restricted solely to live Cubs games. *See Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86-87 (2d Cir. 2000) (Yale University was not its own product market because it

---

[9] The Rooftops alter this market definition in Count II to be "the market for the Live Rooftop Games Product, which consists of individuals and groups of consumers who pay money to watch live-action Cubs Games from Rooftop Businesses, in person, as the games take place on the field at Wrigley Field." (Compl. ¶ 157.)

competes with other schools), *abrogated on other grounds by Scierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Tanaka*, 252 F.3d at 1063-64 (UCLA women's soccer program did not constitute its own market because other college programs compete to recruit student-athletes); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (market could not be limited to products approved by Domino's pizza for Domino's stores).

Although, "[i]n rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes," *PSKS,* 615 F.3d at 418, those circumstances are not present here. For a single brand product market to exist, the brand product must either "lock in" consumers to a specific brand by nature of the product or be so unique that it is likely that there is no substitute. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461-79, 482 (1992) (relevant market existed where customers were effectively "locked in" to the market for Kodak brand services because service and parts for Kodak equipment were not interchangeable with other manufacturers' service); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1310 (N.D. Cal. 2008) (relevant market where consumers would be "locked into" using a certain wireless telephone provider by virtue of purchasing a specific cellular phone); *see also Int'l Equip.*, 2013 WL 4599903, at *4 (no single brand product relevant market unless allegations make it plausible that there is no substitute). Here, there are no allegations that consumers are effectively "locked in" to purchasing a subsequent product or service because of the Cubs' conduct.

While the Court accepts that there are some die-hard Cubs fans that would never attend a White Sox game, that does not mean that Cubs games constitute their own market. The Rooftops' contend that there are no reasonable substitutes for live Cubs games because watching the games on television "involves a limited number of cameras" and because fans who want to

see a live Cubs game are "unlikely to patronize another team's live games." (Compl. ¶¶119-20.) Such arguments of consumer preferences, however, "fall short of rendering it plausible that there exist no interchangeable substitutes for" live Cubs games. *House of Brides I*, 2014 WL 64657, at *6; *see also, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 6845862, at *4 (N.D. Ill. Dec. 4, 2014) ("*House of Brides II*") ("[n]o matter how distinctive the work of a wedding dress designer may be," contention that there were no adequate substitutes was implausible); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (no single brand market where "[o]nly customer preference for a product, not compulsion by the product itself as in *Kodak*, leads a customer" to purchase the product).

The Rooftops' arguments in favor of a live Cubs game market are belied not only by the fact that there are numerous live entertainment options available to consumers in Chicago that must be considered, *see Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997) (in antitrust suit claiming that United Center monopolized food sales within the United Center, proper relevant market was "at least Chicago"); *see also, e.g.*, *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, No. 89 C 4499, 1992 WL 111133, at *2 (N.D. Ill. May 12, 1992) ("court is not aware of any cases in which the relevant market is determined by the label placed on the product"), but also by Lakeview Baseball Club's market analysis filed by the Rooftops. *See* Dkt. No. 60 at 34-35 ("An improvement in quality or a reduction in the price of a competing event (e.g. concerts) can negatively affect demand for sports. Live radio, TV, and online broadcasting of sporting events are also direct substitutes for going to a venue to see a game.") The argument that the Rooftops could establish a live Cubs game product as a submarket of all live sporting

events in Chicago with the aid of discovery and experts, Dkt. No. 41 at 20, effectively concedes that they have failed to offer a plausible relevant market.[10]

The purpose of the antitrust laws is to protect competition, not competitors. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 906 (2007). Because the Rooftops cannot define a relevant product market in a single brand product, it is impossible to assess the anticompetitive effects of the challenged practices. Therefore, the Rooftops have not demonstrated any likelihood of success on the merits on their antitrust claims.[11]

### 3. Monopoly Power in Own Product

The Court additionally notes that the Rooftops antitrust claims are doomed because their claims turn on the Cubs controlling the exhibition of their own product. Both proposed markets revolve around the Cubs' product in producing "Cubs games to be commercially exploited." (Compl. ¶ 111.) Throughout the proceedings, the Rooftops have unfailingly maintained that their business relies on the Cubs manufacturing and producing Cubs games. The Rooftops "can't have a rooftop business without a view into Wrigley Field" with which to watch Cubs games. (Dkt. No. 37, TRO Tr. 20:24-25.) The problem with the Rooftops' position is that the Cubs are not limited by the antitrust laws with respect to what they do with and how they distribute their own product, in this case, live Cubs games. *See Elliott*, 126 F.3d at 1005 (the Seventh Circuit has "explicitly rejected the proposition that a firm can be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes" and found that the United Center could "monopolize" the parking lots around it, if it chose to). The Court has already concluded that live Cubs games have economic substitutes in the form of other baseball

---

[10] Although a recognized submarket doctrine exists, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), those markets must exist within broader economic markets and the requirements for pleading a submarket are identical.

[11] Additionally, the "essential facility" issue does not arise without establishing a proper relevant market. *Elliott v. United Center*, No. 95 C 5440, 1996 WL 400030, at *3 (N.D. Ill. July 15, 1996).

games, sporting events, or live entertainment and that the Rooftops' proposed relevant markets are overly narrow. Furthermore, the Rooftops' vertical integration arguments do not alter the Court's analysis. As the Court stated in its TRO opinion, "[t]he Cubs manufacture live baseball games and are taking over the distribution of their own product. This type of vertical integration is 'not unlawful or even [a] suspect category under the antitrust laws.' *Jack Walters & Sons, Corp. v. Morton Building, Inc.*, 737 F.2d 698, 710." The Court's analysis has not changed on this issue and the Rooftops have failed to demonstrate that they are likely to succeed on the merits of their antitrust claims.

### B.    Anticipatory Breach of Contract

Because the antitrust arguments are both exempted by law and fail on the merits, the Rooftops' remaining opportunity to win this round lies in their breach of contract claim. The Rooftops argue that the Cubs anticipatorily breached the License Agreement when they began construction on the video board. Because the parties entered into a twenty-year License Agreement and there are eight years left under that agreement, the Rooftops allege that the Cubs have breached the License Agreement because once the video board in right field goes up this Spring, the Cubs will have erected a barrier that they promised they would not for at least the duration of the License Agreement.

Under Illinois law, "[a]n anticipatory breach, also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 940 (Ill. App. Ct. 2007). The issue, therefore, is whether the Cubs have a contractual duty not to erect the video board that will block the Rooftops view into Wrigley Field.

20

Subsection 6.6 of the License Agreement provides that "any expansion of Wrigley field approved by governmental authorities shall not be a violation of this Agreement." (License Agmt. § 6.6.) The Rooftops concede that the proposed video board has been approved by a governmental authority, namely the Landmark Commission. (Dkt. No. 21 at 35.) Therefore, the Rooftops' position hinges on whether or not the video board constitutes "any expansion" for which governmental approval is a bulwark against breach.

The "cardinal rule" of contract construction is to give effect to the intent of the parties to the contract. *See Virginia Surety Co. v. Northern Ins. Co. of New York*, 866 N.E.2d 149, 154 (Ill. 2007). The Court "must initially look to the language of [the] contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). "[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* Only if the contractual language is ambiguous may the Court look outside the contract to determine the parties' intent. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). Language is ambiguous if it is susceptible to more than one meaning. *Gallagher*, 874 N.E.2d at 58 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991)).

Reading Section 6 as a whole, as the Court must, the Court concludes that "any" means "every or all." *See, e.g.*, *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 154 (Ill. App. Ct. 2000) (defining any). "Expansion," as confirmed by the word's plain meaning and its context within the License Agreement, means any change to Wrigley Field that adds volume or mass, including the addition of components unrelated to seating capacity. Section 6 confirms this definition. That Section 6 of the License Agreement is titled "Wrigley Field bleacher expansion" does not limit the phrase "any expansion" in Subsection 6.6 to projects that add seating capacity

21

to the bleachers. In fact, by modifying "expansion" with the word "any," it actually distinguishes it as a different form of expansion. The Court must not attempt to divine the intent of the parties "from detached portions of [the] contract or from any clause or provision standing by itself." *Gallagher*, 874 N.E.2d at 58. When read as a whole, Section 6 contemplates forms of "Wrigley Field bleacher expansion" that add neither square footage nor seating capacity to the stadium. Subsection 6.1, for example, provides for reimbursement "[i]f the Cubs expand the Wrigley Field bleacher *seating* . . ." (License Agmt. § 6.1.) Subsection 6.5 allows the Cubs to seek and the Rooftops to oppose "the right to expand Wrigley Field." (License Agmt. § 6.5.) Subsection 6.6 provides the circumstances under which the Cubs may "not erect windscreens or other barriers." (License Agmt. § 6.6.) If Section 6 were limited only to expansions that increased seating capacity, the variations in subject matter of each of the subsections would be unnecessary and illogical. Subsection 6.1 would not need to specify that it applied to seating expansions. The Section 6.6 provision related to windscreens would not belong in Section 6 at all because it plainly has nothing to do with seating capacity or area. Thus, while the four corners of the License Agreement limit the definition of expansion to expansion in the bleacher area of Wrigley Field, the term encompasses expansions that do not add seating capacity to the stadium.

The Court may also look to dictionary definitions to determine the plain and ordinary meaning of the term "expansion." *See Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 367 (Ill. 2006). The Oxford English Dictionary defines "expansion" as "the action or process of causing something to occupy or contain a larger space, or of acquiring greater volume or capacity[.]"*Oxford English Dictionary* (online ed.). This definition, as well as the dictionary definitions provided by both parties, is consistent with the Court's construction described above.

Expansions above the outfield wall, such as windscreens, barriers, and video boards, cause Wrigley Field to occupy a larger space and add to the volume of the stadium.

The final clause of Section 6.6 further confirms the Cubs' construction. Again, the relevant sentence as a whole reads: "Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, *including this section*." (Dkt. No. 27 Ex. 3) (emphasis added). The preceding sentences of Subsection 6.6 discuss "windscreens or other barriers." Windscreens and barriers, needless to say, are not bleachers and do not increase the seating capacity or bleacher area of Wrigley Field. If "any expansion" were limited to construction projects that increased Wrigley Field's seating capacity, or even structural expansions, it would be unnecessary to specify that windscreens and other barriers were subject to the governmental approval exception. The Rooftops' construction, therefore, renders the final clause of Subsection 6.6 mere surplusage. *See Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 678 (7th Cir. 2014) (rules of contract interpretation include "goal of giving meaning to all provisions of the contract and avoiding an interpretation that renders any provision or term surplusage").

At oral argument, the Rooftops for the first time asked the Court to read ambiguity into the word "any expansion." The Rooftops argue that the Court should consider extrinsic evidence of intent in order to define the term "expansion." The Court declines to read ambiguity into a clause where there is none. *See In re Airadigm Comms., Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) ("We will not bend the language of a contract to create an ambiguity where none exists[.]") (quoting *Chicago Bd. of Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)). When read together with the balance of the License Agreement's language, the meaning of "any expansion" in Subsection 6.6 is clear and unambiguous.

Extrinsic evidence, though, confirms that the Court's construction does not lead to an absurd result. *See BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 360 (7th Cir. 2009) (courts must "reject one party's strained, literal reading of contract language in favor of the other party's reasonable, commonsense reading") (collecting cases); *see also Foxfield Realty Co. v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997). The Rooftops argue that the Court's construction of "any expansion" would give the Cubs "carte blanche to obstruct the Rooftop Businesses' views into Wrigley Field merely by obtaining . . . a finding from the Landmark Commission that a proposed sign did not violate Wrigley Field's Landmark status." (Dkt. No. 21 at 35.) The Rooftops are correct that with Landmark Commission approval, the Court's construction provides great leeway to the Cubs to expand the bleacher area at Wrigley Field.

Before this dispute, the Rooftops, experienced business and real estate owners, were most likely comforted by the landmark status that had been imposed on Wrigley Field which limited future alterations without governmental approval. Even if they can somehow assert now that the governmental process was not as onerous as they had anticipated, such an understanding does not give reason to read ambiguity into the License Agreement. *See Badette v. Rodriguez*, 22 N.E.3d 1210, 1215 (Ill. App. Ct. 2014) ("self-induced or unilateral mistake is not a valid reason to set aside an unambiguous [contract]"). Nor have the Rooftops introduced any evidence that they were tricked or fooled into the License Agreement; nor could they, having spent years litigating the matter and finally entering into the Agreement after long negotiations monitored by a federal magistrate judge. Certainly, the Landmark Designation Report cited to "the varying height of the bleachers" and the "views of the surrounding townhouses" as important criteria that rendered Wrigley Field worthy of Landmark status back in 2004. (Dkt. No. 21, Ex. A-1.) Again, a savvy business owner would think that the video board proposed here clearly alters those

features, and therefore might assume that no expansion would be approved. Bottom line, they were wrong. The Landmarks Commission approved the Cubs' proposed construction. Indeed, Subsection 6.5 of the License Agreement reserves for both the Cubs and the Rooftops the ability to advocate to governmental authorities for or against the propriety of expansion. The parties contemplated the uphill battle that the Cubs faced in obtaining approval from the Landmark Commission and, with the "any expansion" language of Subsection 6.6, delegated substantial control of Wrigley Field to governmental authorities. Though the Rooftops may now wish that the License Agreement provided them greater power over the height of Wrigley Field's outfield walls, "no court can rewrite a contract to provide a better bargain to suit one of the parties." *Owens*, 736 N.E.2d at 349; *see also S. Fin. Group, LLC v. McFarland State Bank*, 763 F.3d 735, 743 (7th Cir. 2014) ("Except in the most extraordinary circumstances, [courts] hold sophisticated parties to the terms of their bargain."). The Court therefore concludes that the Rooftops have not demonstrated a likelihood of success on the merits on their contract claim to warrant injunctive relief.

## II.    Irreparable Harm and Inadequate Remedy at Law

Since the Court's ruling on the TRO motion, the Rooftops have failed to remedy the deficiencies in their irreparable harm analysis and have once again not shown they will suffer irreparable harm if the extraordinary remedy of injunctive relief is denied. *See, e.g., Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) ("standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions") (citing *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, 2001 WL 128164, at *1 (N.D. Ill. 2001)). To establish irreparable harm, the Rooftops must demonstrate "that irreparable injury is likely in the absence of an injunction." *See Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a

possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing." *Id.*

The Rooftops argue that their businesses will become "insolvent immediately" upon construction of the video board because without a view of the game, ticket sales will cease and the businesses will be unable to make mortgage payments and pay their real estate taxes. (Dkt. 47, Pl. Reply at 4); *see Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir. 1970) (recognizing that the destruction of a business may constitute irreparable harm). To support their argument, the Rooftops primarily rely on three declarations: Ed McCarthy, the manager of the real estate atop which the Rooftops sit, (Dkt. 59, McCarthy Decl. ¶ 1); Chris Bue, the financial record keeper of the Rooftops, (Dkt. 39, Bue Decl. ¶3); and Marc Anguiano, a business advisor to both the Rooftops and property managers of the underlying real estate, (Dkt. 47-1, Anguiano Decl. ¶ 1).

Bue claims that Skybox and Lakeview's "only significant source of revenue is derived from the sale of 'tickets'" and that if the proposed video board is installed, both Rooftops will "have no revenue, and will be unable to pay [their] fixed mortgage and real estate expenses immediately thereafter." (Dkt. 39, Bue Decl. ¶¶ 2-4.) Surprisingly, neither party presented evidence that the Rooftops may have a market as an operating bar with a rooftop ambience in Wrigleyville. Numerous restaurants and bars operate within the area of Wrigley Field without live views of the game; instead they sprinkle large-screen televisions throughout the inside of their establishments and do a lively business before, after, and even during Cubs games. Indeed, there are over forty bars within walking distance of Wrigley Field.

At argument, the Rooftops appear to assume that without a view of the game, there will be an automatic business shutdown. Yet, a business within the Wrigleyville community with a

license to serve alcohol would plausibly have some marketability, and one with outdoor dining would seem to have even more. One might argue, for example, that the patrons who go to the Rooftops do not really go to watch the game at all, and when they do, they see very little of it anyway. In short, being in close vicinity to the game with fresh air, alcohol, and good food might be sufficient to run a business—maybe not the business they are in now—but certainly a business. *See Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992) (finding of no irreparable harm despite fact that plaintiffs would likely no longer be able to operate their business as they were formerly). The parties failed to explore this angle, however, so the Court will not conjecture further and will turn instead to the issue of whether the Rooftops can pay their mortgages.

The mortgage and real estate expenses are characterized on the Profit and Loss statements for Lakeview and Skybox provided by Bue as "rent." (*Id*. at 10, 21.) McCarthy explained that the Rooftops pay rent to the underlying properties amounting to precisely the mortgage payment and real estate taxes owed on the underlying property. (Dkt. 59, McCarthy Decl. ¶¶ 3-4). Skybox pays its "rent" directly as the mortgage and real estate taxes of the underlying property instead of paying the property management company itself. (*Id*.) Lakeview, on the other hand, deposits "all revenues into an account held by Rooftop Acquisition (of which McCarthy is a manager), from which Rooftop Acquisition pays its mortgage payments and real estate taxes on the 3633 Property, and from which account Lakeview Club's other operating expenses are paid, such as inventory and wages." (*Id*.)

At oral argument, the Cubs presented evidence of the various entities and at least one of its owners, McCarthy, showing McCarthy's role as both mortgagor and mortgagee, borrower and lender, landlord and tenant, manager and member, essentially with monies going from one

pocket to the other. Leaving the Court with the proverbial "who's on first" confusion and weakening significantly any argument that tomorrow the businesses will be shut down. The Court finds this property relationship and payment scheme at best curious. First, it is unclear what legitimate business incentive would inspire a property owner to charge its business tenant merely the amount of its mortgage payment and real estate taxes as rent, thus denying itself any profit from the relationship. The Rooftops do not claim to be in a family business or a small business relationship with closely-knit friends, as might justify such an arrangement, and if shown also justify some impending harm to one or more of its members. Rather, the Rooftops appear from the financial records before the Court to be businesspersons of substantial acumen. Regardless, the Court need not inquire into the motivation of the Rooftops in structuring their business as they see fit, because the more curious part of this arrangement is the conspicuously absent evidence of the joint bank account between the property owners and at least one of the rooftop businesses or any other compelling evidence of the financial situation of the four plaintiffs. Given this unique structure—where bank statements, mortgage agreements, and loan repayment information are presumably readily available—the Rooftops should have provided more than mere informal record keeping of the two rooftop businesses to carry their burden of demonstrating that loss of all four businesses is imminent. *See, e.g., Winter*, 555 U.S. at 375-76 (moving party must "demonstrate that irreparable harm is likely in the absence of an injunction" and mere "possibility" of irreparable harm will not suffice). Although cries of mortgage foreclosure might have had an impact on the analysis, when the Court cannot even determine who would foreclose whom, and those records are uniquely within the control of the Rooftops to share with the Court, the Rooftops' plaintive plea for relief falls on deaf ears.

Compounding the lack of evidence provided by the Rooftops is the evidence brought forth by the Cubs minimizing the likelihood that the Rooftops will not be able to sustain their businesses until the resolution of this litigation before the 2016 Major League Baseball season. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (relevant time period in evaluating preliminary injunction is in the interim period prior to final resolution of claims) (citing *Ty, Inc.,* 237 F.3d at 895 (7th Cir. 2001)). As of February 27, 2015, Lakeview—which shares the common bank account with its "landlord"—had $49,307.78 cash on-hand and Skybox had $141,030.57 cash on-hand. (Dkt. 39, Bue Decl. ¶¶ 3-4.) At the preliminary injunction hearing, the Cubs presented checks they received from Lakeview and Skybox on March 13, 2015 in the amounts of $215,836.00 and $341,736.00. (Prel. Inj. Tr. 269.) Further, the Cubs brought forth public records tending to show that McCarthy, who identified himself in his declaration only as the manager of the underlying properties, in fact appears on both sides of two out of the three mortgages held by the underlying rooftop properties. (Dkt. 53, Defendants' Response at 17.) While the details of each of the three mortgages are slightly disparate, McCarthy appears to be both an owner or member of the rooftop properties (i.e. the borrowers) and a manager of the lenders on two of the three mortgages; that McCarthy has substantial assets; and that the Rooftops have an opportunity to mitigate potential harm from missed mortgage payments because their lender is also a part of their ownership. (*See* Dkt. 53 Defs. Resp. at 24, Fig. 1; Prel. Inj. Tr. 265-73.) McCarthy, moreover, appears to have substantial control over both the rooftop properties and the rooftop businesses because, by his own admission, he was negotiating a potential sale of all four entities with the Cubs just over a year ago. (Dkt. 21-4, Ex. D, McCarthy Decl. ¶¶ 6-8; 10-13.)

Whether to consider these circumstances gives rise to a clash of two principles. On the one hand, corporations exist to protect individual investors and their individual wealth is unrelated to the liabilities of the corporation. But, on the other hand, the Rooftops have the burden of making a clear showing of irreparable harm, which in this case would consist of permanent destruction of their businesses. On the specific circumstances in this case—where the Rooftops recently paid substantially larger sums of money than they claimed to have on-hand; have a rental agreement under which the property owners appear not to profit financially; and have generally provided the Court an incomplete picture of their finances—the Court does not ignore that the Rooftops have a history of coming up with money and that the same individual is on both sides of two out of their three mortgages. Under these unique circumstances, the Court gives less weight to that corporate structure as it appears it could be used here to shield from the Court information about potential assets to help the Rooftops weather the storm. *See, e.g., Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 170 (D.D.C. 2012) (no irreparable injury where parent corporation had substantial resources to potentially mitigate any financial losses), *vacated on other grounds*, *Holiday CVS, L.L.C. v. Holder,* 493 F. App'x 108 (D.C. Cir. 2012). Without the Rooftops showing otherwise, the fact that the same individual is on all sides of at least some of the subject loans, while not determinative of the potential harm that may be avoided in this matter, supports the idea that there will be some opportunity for Plaintiffs to mitigate the harm to their businesses until the time of a final ruling on the merits, which the Cubs have assured could take place before the start of the 2016 baseball season. Additionally, the Rooftops have failed to present any evidence that they have unsuccessfully sought relief from their lenders; that they will be unable to operate as rooftop bars absent a view of the game; or that they possess bank account statements showing that, although they may have had cash to

make their recent payments to the Cubs, the remaining financial picture is actually as bleak as they make it out to be. *See, e.g., Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 800-01 (N.D. Ill. 1997) (no irreparable harm where plaintiff failed to demonstrate all options for payment truly exhausted).

The Cubs have maintained throughout these proceedings that they will be ready, willing, and able to try this case to verdict prior to the 2016 season. (Prel. Inj. Tr. 257.) The Rooftops' argument that they will suffer "immediate foreclosure" and will be unable to weather the financial storm for a year is still too conclusory to establish irreparable harm in this case. (Dkt. 47, Pl. Reply at 4) (contending they would be unable to "close down for a year, and then come back in 2016 or 2017 if they win the trial"). Foreclosures are not "instantaneous" and mere inconvenience does not show that harm would be irreparable. *See, e.g., Original Great Am. Chocolate Chip Cookie,* 970 F.2d 273 at 277 (finding no irreparable harm despite fact that plaintiffs would have to cease operating property because foreclosures are not instantaneous so even if it took a while to assign property, unlikely party would lose collateral for loan in interim); *Hall*, 985 F. Supp. at 800 (basketball player missing a year of play, though inconvenient, was not irreparable).

Nor, as this Court held at the TRO, are the Rooftops faced with an inadequate remedy at law. On the contrary, any harm the Rooftops may suffer between now and a final verdict on the merits is entirely financial in nature, ascertainable, and calculable. This conclusion is bolstered not only by the fact that the dispute concerns a fixed-length contract, *see Marketing Werks, Inc. v. Fox*, No. 13 C 7256, 2013 WL 5609339, at *3 (N.D. Ill. Oct. 11, 2013) (dispute concerning fixed-length contract presented an adequate remedy at law), but also because the Cubs have committed to resolving this matter prior to the start of the 2016 baseball season. At this moment

in time, there is a very calculable amount of income that would be lost until a ruling on the merits. The argument by the Rooftops, without any factual support, they will not get to a trial on the merits because they will be unable to pay their lawyers absent an injunction is baseless. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy. But in an age of contingent-fee contracts this will rarely be a decisive consideration.").

Additionally, although the Rooftops have not demonstrated a likelihood of succeeding on their contract claim, the License Agreement only guarantees a view into Wrigley Field until December 31, 2023, pursuant to limitations. The Rooftops are in the business of selling tickets to watch Cubs games and other events taking place at Wrigley Field and they can assert no expectation that they will be able to maintain a business of selling views into Wrigley Field after this eight-year term. Because this end date is so identifiable and because the Rooftops have at least ten years of data showing their revenues, a loss amount is simple to calculate. That the parties will not be in the same position they would have been in 2023 had the License Agreement merely expired and they were able to retry their antitrust claims at that point does nothing to save their claim for injunctive relief now. Without evidence that the Rooftops are entitled to be in the business of selling tickets to view Cubs games beyond the 2023 season or that the Rooftops will be immediately foreclosed upon and closed permanently in the absence of a preliminary injunction between now and a ruling on the merits, any alleged irreparable injury is too speculative to warrant the imposition of injunctive relief. *Cf. Semmes Motors*, 429 F.2d at 1205 (irreparable harm where plaintiffs had expectation of continued business pursuant to state statute had they not suffered the subject harm); *see also Chicago United*, 445 F.3d at 945 ("persuasive

showing of irreparable harm" required for preliminary injunction to issue). The Rooftops have not conclusively demonstrated that they will suffer an irreparable harm or have no adequate remedy at law in the absence of injunctive relief. Their request for a preliminary injunction is therefore also denied on these grounds.

## III.    Other Considerations

The Rooftops have failed to establish any of the threshold requirements for a preliminary injunction and the Court need not reach the balance of the harms. Even if they had, however, other considerations would not warrant the imposition of injunctive relief. *See Merritte v. Kessel*, 561 F. A'ppx 546, 548 (7th Cir. 2014) ("If those three [threshold] factors are shown, the court must then balance the harm to each party and to the public interest from granting or denying the injunction."). In balancing the harms, the Court applies a sliding scale approach in that the greater the likelihood of success on the merits, the less the balance of harms need favor the plaintiff. *See Christian Legal Soc'y*, 453 F.3d at 859; *Ty, Inc.*, 237 F.3d at 895. The sliding scale approach permits courts to "weigh the competing considerations and mold appropriate relief." *Stuller*, 695 F.3d at 678 (internal citation and quotation marks omitted).

Here, the Rooftops contend that the balance of hardships is distinctly in their favor because without an injunction, "[the Rooftops are] out of business. [They are] dead." (Prel. Inj. Tr. 304.) But as previously stated, the Rooftops have failed to carry their burden of demonstrating irreparable harm "by a clear showing." *Goodman v. Ill. Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). At the same time, the Court does not doubt that the Rooftops will be harmed by installation of the right field video board. But that harm is entirely remediable by money damages that would entail a simple calculation for lost profits for the 2015 Major League Baseball season. The Rooftops have years of past revenue records and a

33

number of rooftop businesses will remain open this season, offering a particularly convenient starting point for a damages calculation. Because the Rooftops have failed to conclusively demonstrate that they will go out of business permanently, they are not faced with the hardship they claim. Additionally, the Plaintiffs' have urged the Court to consider the economic realities of the situation, yet concurrently ask the Court to ignore the potential harm to the Cubs were construction halted. The Cubs claim that they have invested approximately $2 million in designing the overall construction, the steel has been purchased, and they waded through the governmental approval process involving the Chicago City Council, Chicago Plan Commission, and the Landmarks Commission. The Cubs also state that they already sold sponsorship rights for the right field video board to Anheuser-Busch, one of their most important commercial partners, and Anheuser-Busch has already paid the Cubs under their agreement. (Rice Decl. ¶ 27.) Injunctive relief halting construction on the video board and accompanying signage would therefore not only negatively impact the corporate relationship between the Cubs and Anheuser-Busch, but also would negatively impact Anheuser-Busch financially, a party not involved in this lawsuit. *See Roland*, 749 F.2d at 388 ("[s]ometimes an order granting or denying a preliminary injunction will have consequences beyond the immediate parties . . . those interests—the "public interest" if you will—must be reckoned into the weighing process"). The balance of the hardships therefore does not weigh in favor of granting injunctive relief.

Additionally, the Court will not ignore the Rooftops' delay in filing suit and seeking injunctive relief against the Cubs. The Rooftops' counsel's argument that any delay was his fault in filing the Complaint and that the "world changed" on December 4, 2014, when the Cubs revised their plans to move the video board in right field (Prel. Inj. Tr. 315), does not sufficiently explain why the Rooftops did not seek legal relief earlier in the proceedings. The Rooftops

concede that on May 28, 2013, it was "clear from the mock-up event that the [Rooftops'] views would be substantially blocked." (Dkt. 21 at 17.) Yet the Rooftops waited to attempt to stop the construction. The Rooftops further conceded that by May 2014, it "became clear that . . . [the signs] in the outfield would effectively destroy the Rooftops' business altogether." (Dkt. 21 at 21.) Still, they waited to file suit. The Rooftops' current argument that they did not think they would be blocked until December 4, 2014 is therefore belied by their own filings. The Rooftops' delay in seeking legal relief weighs against an injunction. *See Marketing Werks,* 2013 WL 5609339, at *3. On balance, the events leading up to this motion for injunctive relief do not warrant the imposition of injunctive relief.

## CONCLUSION

Because the Rooftops have failed to show a likelihood of success on the merits of their claims that the Chicago Cubs breached the License Agreement and engaged in anticompetitive practices, and that the Cubs are somehow excluded from the antitrust exemption that applies to Major League Baseball, the Rooftops' motion for preliminary injunction is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: April 2, 2015