IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RIGHT FIELD ROOFTOPS, LLC et al, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 C 551 |
| CHICAGO CUBS BASEBALL CLUB, LLC et al, | ) ) ) | Judge Virginia M. Kendall |
| Defendant. | ) ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

      Due to the extensive history that has already occurred in this case--a hearing on a motion for temporary restraining order and voluminous briefing with corresponding evidentiary exhibits leading up to a hearing on a motion for preliminary injunction--it may seem odd that the Court returns to the original complaint to determine whether it states a claim. Yet, that is the posture this matter takes at this point in the litigation in spite of the Court's rulings in February and April of this year. Those rulings took into account the likelihood of success on the merits, but now we must return to the initial stage to determine whether the complaint states a claim in order to determine whether the case should proceed to full discovery and a decision on the merits. Plaintiffs, Right Field Rooftops, LLC; Skybox on Sheffield; Right Field Properties, LLC; Lakeview Baseball Club; and Rooftop Acquisition, LLC (the "Rooftops") initiated this action against Defendants, Chicago Baseball Holdings, LLC; Chicago Cubs Baseball Club, LLC; Wrigley Field Holdings, LLC; and Thomas Ricketts (the "Cubs") alleging that the Cubs engaged in anti-competitive behavior and breached a contract wherein the parties agreed the Rooftops would provide the Cubs 17% of their profits in exchange for the Cubs promise to not block the

1

view of Wrigley Field from the Rooftops (the "License Agreement"). The Rooftops' nine-count complaint can be grouped as claims seeking relief for: (1) attempted monopolization (Counts I and II); (2) false and misleading commercial representations, defamation, false light, and breach of the non-disparagement clause (Counts III-VII); and (3) breach of contract (Count VIII and IX). The Cubs filed a motion to dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court grants the Cubs' Motion to Dismiss all counts with prejudice.

## BACKGROUND

A full description of the facts giving rise to the complaint is set forth in the Court's preliminary injunction opinion. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 1497821, at *2-5 (N.D. Ill. Apr. 2, 2015). The Court assumes familiarity with those facts. Briefly, this dispute began years ago from the embattled relationship between the Rooftops and the Cubs, who continually clash over the Rooftops' patrons viewing live Cubs games. It specifically pertains to the Cubs' construction of a video board that blocks the view of Wrigley Field from the Rooftops, Cubs' acquisition of rooftop properties, and attempts by the Cubs to set minimum ticket prices for the rooftops. The Rooftops' defamation claims derive from a statement made by Ricketts at the Cubs convention about the nature of the relationship between the Rooftops and the Cubs.

The Rooftops filed their complaint on January 20, 2015, and three weeks later sought a temporary restraining order ("TRO") and preliminary injunction enjoining the Cubs from constructing a video board. On February 18, 2015, the Court held a TRO hearing and denied the Rooftops' motion for TRO the following day. Then on April 2, 2015, the Court denied the Rooftops motions for a preliminary injunction because: (1) the exemption of Major League

Baseball teams forecloses antitrust claims; (2) live Cubs games are not a relevant market; (3) plans to construct the video board did not constitute anticipatory repudiation; (4) the Rooftops failed to establish that they would suffer irreparable harm and had no adequate remedy at law besides injunctive relief; and (5) a balance of hardships weighed in favor of denying injunctive relief. The Court now grants the Cubs' motion to dismiss all counts with prejudice.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Doe v. Village of Arlington Heights,* 782 F.3d 911, 914 (7th Cir. 2015). To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). All well-pled facts are taken as true and viewed in the light most favorable to the plaintiff, *Hatmaker v. Mem'l Med. Ctr.,* 619 F.3d 741, 743 (7th Cir. 2010), but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## DISCUSSION

### I. Cubs' Motion to Dismiss Counts I and II

The Cubs move to dismiss Counts I and II that allege attempted monopolization by the Cubs in violation of the Sherman Act. They argue first that the Major League Baseball exemption from antitrust laws applies to the Cubs, and in the alternative, that the Rooftops failed to state an antitrust claim because there is no plausible relevant market and the Cubs cannot monopolize distribution of their own product.

3

As this Court has previously held, the Supreme Court in a series of decisions exempted Major League Baseball from the reach of antitrust laws. *See Fed. Baseball Club of Baltimore v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208 (1922) (the Sherman Act had no application to the "business [of] giving exhibitions of base ball"); *Toolson v. New York Yankees*, 346 U.S. 356, 357 (1953) (after recognizing that Congress had thirty years since *Federal Baseball* to bring baseball within the antitrust laws and had not done so, concluding that "the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws"); *Flood v. Kuhn*, 407 U.S. 258, 283-84 (1972) (because Congress had acquiesced in the baseball exemption by inaction, "the business of baseball [is] outside the scope of the [Sherman] Act"). In spite of numerous commentators arguing it should be otherwise, *see* D. Logan Kutcher, Note, Overcoming an "Aberration": San Jose Challenges Major League Baseball's Longstanding Antitrust Exemption, 40 J. Corp. L. 233 (2014); Michael J. Mozes, et al., Adjusting the Stream? Analyzing Major League Baseball's Antitrust Exemption After American Needle, 2 Harv. J. Sports & Ent. L. 265 (2011), both the Supreme Court and the Seventh Circuit have taken a broad reading of the baseball exemption. Because the Cubs' business and conduct is central to "the business of providing public baseball games for profit," *Toolson*, 346 F.3d at 356-57, the Court finds that the antitrust exemption applies to the Rooftops' claims.

As the Court has already held, the exemption applies to the "business of baseball" in general, not solely those aspects related to baseball's unique characteristics and needs. *See Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978) (despite references to the player reserve system in Supreme Court precedent, "it appears clear from the entire opinions . . . that the Supreme Court intended to exempt the business of baseball, not any particular facet

of that business, from the federal antitrust laws"); *see also City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 689-90 (9th Cir. 2015) (plaintiff's contention that baseball exemption only applies if activity is "sufficiently related to 'baseball's unique characteristics and needs' " discarded because nothing in Supreme Court precedent suggests that the exemption is "based on some fact-sensitive analysis of the role" the activity played within the baseball industry). Therefore, the Court finds that the Cubs are exempt from antitrust laws as a business that produces and presents live baseball to the public. This exemption protects the general "business of baseball" from antitrust laws, and the public display of baseball games is integral to that business. *See Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978); *see also Toolson*, 346 U.S. at 356-57; *City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 689-90 (9th Cir. 2015). By attempting to set a minimum ticket price, purchasing rooftops, threatening to block rooftops with signage that did not sell to the Cubs, and beginning construction at Wrigley Field, the Cubs directly engaged in the business of publicly displaying baseball games. As such, the Court finds that the Cubs' conduct falls into the Major League Baseball exemption from antitrust laws and therefore Counts I and II must be dismissed

Even if the baseball exemption did not apply, the Court would still dismiss Counts I and II because there is no plausible relevant market. The Rooftops must show the existence of a plausible relevant market to prove attempted monopolization. *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). The Rooftops argue that two possible relevant markets exist: a "Live Cubs Game Product" market and a "Live Rooftop Games Product" market. (Compl. ¶¶ 116, 157.) Neither is a plausible relevant market however because each depends upon the Cubs' presentation of live professional baseball, and a single brand product

5

like producing live-action Cubs games cannot be a relevant market. *Compare, PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (a women's accessories brand not a single brand product); *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657 at *6 (N.D.Ill. Jan. 8, 2014) ("highly differentiated and unique" wedding products not a single brand product). Moreover, this situation does not align with the limited circumstances where a single brand product or service can constitute a relevant market. First, consumers were not "locked in" to purchasing a future product or service because of the Cubs' conduct, and second, viewing a live Cubs game is not so unique that there is no substitute. *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 461-79 (1992) (relevant market existed where consumers were effectively "locked in" to the Kodak brand because service and parts for Kodak equipment were not compatible with other manufacturers' service); *Right Field Rooftops, LLC*, 2015 WL 1497821 at *8-9 ("arguments of consumer preferences…fall short of rending it plausible that there exist no interchangeable substitutes for live Cubs games."). Therefore, the Court dismisses Counts I and II with prejudice also on the alternative ground that there is no plausible relevant market for the presentation of live Cubs games.

Finally, the Court dismisses Counts I and II for the additional reason that antitrust laws cannot limit how the Cubs distribute their own product, specifically live baseball games. A defendant cannot monopolize its own product unless there is proof that the product has no economic substitutes. *See, e.g., Elliott v. United Center*, No. 95 C 5440, 1996 WL 400030, at *3 (N.D. Ill. July 15, 1996) (no antitrust violation because operation of food at the United Center is defendant's own product that cannot constitute a relevant market). The product at issue is the Cubs presentation of live baseball games, which is the product of the Cubs alone that thus cannot

6

be monopolized by the Cubs. And as explained in the Court's preliminary injunction opinion, there are economic substitutes for live Cubs games such as "other baseball games, sporting events, or live entertainment". *Right Field Rooftops, LLC*, 2015 WL 1497821 at *9. The Court therefore holds that the antitrust claims in Counts I and II are dismissed with prejudice.

**II.     Cubs' Motion to Dismiss Counts III-VII and IX**

Counts III-VII and IX all pertain the statement made by Ricketts that the Rooftops allege harmed them. Each requires Ricketts's statement be an actionable false statement of fact. Counts III and IV are allegations of violations of the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act (the "UDTPA") respectively and can be analyzed using the same framework. *See, e.g., MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998). At the Cubs Convention, in response to a question regarding the construction at Wrigley Field, Ricketts stated:

> It's funny—I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching "Homeland." You pay for that channel, and then you notice your neighbor looking through your window watching your television. (Dkt. No. 1. at ¶80.)

The Rooftops contend that this statement is defamatory because it is a false statement of fact and also that it constitutes defamation per se because it alleges criminality on the part of the Rooftops. AS to the Lanham Act and UDTPA allegations, to establish liability in Counts III and IV, the Rooftops must prove:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

7

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). Two types of false statements can violate the Lanham Act and the UDTPA: "(1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* at 820. Similarly, Count IX for breach of the License Agreement's non-disparagement clause requires that a statement be "untrue or misleading." *Pekins Ins. Co. v. Phelan*, 343 Ill. App. 3d 1216, 1220 (Ill. Ct. App. 2003). The Consumer Fraud and Deceptive Business Act claim brought in Count V contains identical elements as a Lanham Act and UDTPA violation except there is no requirement that any person was misled, deceived, or damaged by the unfair method of competition. *See* 815 ILCS 505/2. Count VI for defamation per se and Count VII for false light also require a false statement of fact about the plaintiff. *See Green v. Rogers*, 234 Ill.2d 478, 491 (2009) ("To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff[.]"); *Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 764 (Ill. Ct. App. 2002) ("As in defamation actions, statements that are expressions of opinion devoid of any factual content are not actionable as false light claims."). In sum, Counts III-VII and IX each hinge on the need for a statement of fact.

In order to survive a motion to dismiss these counts, the Rooftops must allege facts that show that under the circumstances alleged, an observer could plausibly believe Ricketts's statement to be factual. *See, e.g., Rosenthal Consulting Group, LLC v. Trading Techs. Intern., Inc.*, No. 05 C 4088, 2005 WL 3557947, *9 (N.D. Ill. Dec. 26, 2005). The statement must not be a subjective statement or mere puffery; the statement must be objectively verifiable by specific or absolute characteristics. *See Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (finding statement that plaintiff was too small to handle a

certain amount of business was vague and subjective, and thus not actionable under the Lanham Act); *Rosenthal*, 2005 WL 3557947, at *9 (in order to be actionable under Lanham Act, statement must be specific or absolute in that the claim can be objectively tested).

In determining whether a statement constitutes an opinion or factual assertion, the Court considers: "(1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content." *Madison v. Frazier*, 539, F3d 646, 654 (7th Cir. 2008) (citing *J. Maki. Constr. Co. v. Chicago Reg'l Council of Carpenters*, 379 Ill. App. 3d 189, 200 (2008)). Furthermore, "statements that do not contain verifiable facts, such as opinions or rhetorical hyperbole, are not actionable as defamation" or the other counts at issue requiring a false statement of fact. *Frain Group, Inc. v. Steve's Frozen Chillers*, No. 14 C 7097, 2015 WL 1186131, at *3 (N.D. Ill. Mar. 10, 2015).

Here, it cannot be said that any reasonable person hearing the statement would believe that is was a fact and not a personal opinion about the relationship between the Cubs and the Rooftops in the form of a readily understandable metaphor. Ricketts's statement, made to fans during a convention, was his own personal interpretation of how he viewed his relationship with the Rooftops. He used a metaphor to describe his feelings. In fact, he stated as much. Ricketts prefaced his statement with, "I always tell this story" as if to describe how he feels about the situation by using a non-factual, personal description to describe the conflict. There is no objective way to verify his statement because there is no way to fact check whether the Rooftops are similar to those who charge admission to watch their neighbor's television. *See e.g., Id.* at *4 (statements that plaintiff "ripped off" defendant and plaintiff's product was "butchered piece of junk" are non-actionable statements of opinion while statements about the age of the plaintiff's

9

machine and its deficient construction are actionable factual statements); *Pease v. Int'l Union of Operating Eng'rs Local 150, et al.*, 208 Ill. App. 3d 863, 870 (1991) ("Words that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense" are nonactionable).

The Rooftops further allege that Mr. Ricketts's "story" alleges criminal conduct by "telling the consumer public and media outlets that the Rooftop Businesses were thieves that were preventing the Cubs from winning the World Series." (Dkt. No. 1 at ¶¶82-83.) In short, they allege defamation *per se* due to the statement allegedly stating they committed a crime. In order for that to be the case, his story must specifically allege criminal conduct on the part of the Rooftops; his statement also must be false and cannot be an opinion. *See Green v. Rogers*, 234 Ill.2d 478, 491 (2009) (elements of a defamation claim are "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages."). Yet, even taking the allegations in the light most favorable to the Rooftops, Ricketts's statement fails to fulfill the elements of defamation *per se*.

First, there is no statement of fact, but rather, a colorful story that is used to show the convention attendees how he feels about the dispute regarding the attempted renovation. The story can only be interpreted as expressing Ricketts's own personal frustration at the situation. Comparing the Rooftops to nosey neighbors viewing his television program is hardly an accusation of criminality. Instead, it is a personal description to personalize how he feels about the Rooftops viewing the Cubs baseball games. Second, to suggest that this interpretation falsely represents the actual dispute between the parties fails to take into account the decades-old battle that the parties have engaged in wherein the Cubs have continually taken a position that the Rooftops are not entitled to view their game for free. Even the settlement agreement is premised

on the understanding that the Cubs believed that the Rooftops owed them money for viewing the games and the agreement that they entered into provided them with some of that money. So to suggest that the story somehow makes false accusations belies the very litigation history between the parties and the basis for the agreement in the first place. Third, to the extent that the Rooftops allege defamation *per se*, the statement must be more than merely a suggestion of criminality, it must clearly refer to a specific offense that is indictable. *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 47 (1st Dist. Ill. Ct. App. 1997). No reasonable person could hear the "story" of Ricketts's personal frustration and make the leap that he was accusing the Rooftops of an indictable offense. In fact, it is easily capable of an innocent construction – Ricketts's frustration that his neighbors continue to seek to view the Cubs baseball games in spite of a contract that says he is allowed to erect a sign now that he has received governmental approval. There is nothing criminal alleged; there is nothing false alleged; and no reasonable person could interpret his statement as anything other than the frustrations of an individual who has litigated the same issue in different fora and in various forms for years.

The Court grants the Cubs motion to dismiss Counts III-VII and IX with prejudice because Ricketts expressed an opinion and made not allegation of criminal activity on the part of the Rooftops, and did not make a statement that was false.

### III.   Cubs' Motion to Dismiss Count VIII[1]

The Rooftops allege that the Cubs violated the License Agreement by constructing the video board that blocks the view of Wrigley Field from the Rooftops. At issue is Subsection 6.6 of the License Agreement, which states that "any expansion of Wrigley field approved by governmental authorities shall not be a violation of this Agreement, including this section."

---

[1] In their complaint, the Rooftops seek relief for an anticipatory breach of contract on this count. But since the relevant video board has now been constructed, the Court will analyze this claim as a breach of contract.

11

(License Agmt. § 6.6.) The Court rejected the Rooftops' argument during the preliminary injunction hearing that "any expansion" refers only to expansion in the form of increased seating capacity because of the term's plain meaning and context. Where a contract is unambiguous, the Court need not look past its plain meaning and discovery is unnecessary. *See, e.g., McWane Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) (finding district court properly dismissed a claim based on its reading of the plain language of the contract); *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1998) (where court determines that contract language is unambiguous, court may determine its meaning as a matter of law); *Charles Hester Enter., Inc. v. Illinois Founders Ins. Co.*, 114 Ill.2d 278, 287 (1986) (unambiguous contract controls over contrary allegations in the plaintiff's complaint).

Under Illinois law, when interpreting a contract the Court must look first at the language of the contract "given its plain and ordinary meaning" in order to decipher the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). Moreover, "[a] contract must be construed as a whole, viewing each provision in light of the other provisions." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). Within the plain meaning and context of the License Agreement, the installation of the video board qualifies as an expansion under Subsection 6.6. It is undisputed that the government approved its construction.

In light of the entirety of Section 6, the Court holds that "any expansion" of Wrigley Field means every addition of volume or mass, including additions that are not incidental to expanded seating. Individually, "any" means "every or all" and "expansion" means "any change to Wrigley Field that adds volume or mass." *Right Field Rooftops*, 2015 WL 1497821, at *10 (citing to *Owens v. McDermott, Will, & Emery*, 316 Ill. App. 3d 340, 349 (2000)). The Rooftops argue that "any expansion" should be limited to expansion in the form of added seating. But

because Section 6 as a whole contemplates expansion not related to increased seating, the Court declines to so narrowly interpret this term. For instance, Subsection 6.1 guarantees the Rooftops reimbursement if the Cubs "expand the Wrigley Field bleacher seating" and Subsection 6.6 outlines when the Cubs may "not erect windscreens or other barriers." (License Agmt. §§ 6.1, 6.6.) If these provisions of the License Agreement spell out when "expansion" refers only to added seating or to other variations such as windscreens, then the unqualified term "any expansion" must encompass expansions other than those incidental to increased seating. *See Right Field Rooftops*, 2015 WL 1497821, at *10-11 ("[W]hile the four corners of the License Agreement limit the definition of expansion to expansion in the bleacher area of Wrigley Field, the term encompasses expansions that do not add seating capacity to the stadium.").

Furthermore, the Rooftops' proposed interpretation of Subsection 6.6 is antithetical to the provision's final phrase which establishes that "[a]ny expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, *including this section*." (Dkt. No. 27 Ex. 3) (emphasis added). The prior portions of this subsection address "windscreens or other barriers" that do not increase the seating. And as this Court noted previously, "[i]f 'any expansion' were limited to construction projects that increased Wrigley Field's seating capacity, or even structural expansions, it would be unnecessary to specify that windscreens and other barriers were subject to the governmental approval exception." *Right Field Rooftops*, 2015 WL 1497821, at *11. The Court thus concludes that the video board constitutes an "expansion" under Subsection 6.6, and because the Cubs received governmental approval for its installation they did not plausibly breach the License Agreement. As a result, the Court grants the Cubs' motion to dismiss Count VIII with prejudice.

## **CONCLUSION**

For the reasons stated herein, the Court grants the Cubs' motion to dismiss all counts with prejudice.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 9/30/2015